IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

WILLIAM R. JACKSON,

Plaintiff,

v.

Civil Action No.
9:08-CV-1373 (TJM/DEP)

ANTHONY Q. BOUCAUD, et al.,

Defendants.

---

APPEARANCES: OF COUNSEL:

FOR PLAINTIFF:

WILLIAM R. JACKSON, *Pro Se*
04-A-4904
Queensboro Correctional Facility
47-04 Van Dam Street
Long Island City, NY 11101

FOR DEFENDANTS:

HON. ANDREW M. CUOMO
Attorney General of the State
of New York
The Capitol
Albany, New York 12224

JUSTIN C. LEVIN, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT, RECOMMENDATION AND ORDER

Plaintiff William R. Jackson, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. § 1983 against the Commissioner of the New York State Department of Correctional Services ("DOCS") and two other DOCS employees, alleging violations of his civil rights. In his complaint, plaintiff alleges that the senior librarian of the correctional facility in which he was housed at the relevant times denied him access to a book entitled "The Bible Code", which he requested through the DOCS interlibrary loan program, thus violating his right to exercise his chosen religion. As relief, plaintiff's complaint seeks recovery of money damages in the sum of $2 million.

In response to plaintiff's complaint, defendants have moved for its dismissal as facially lacking in merit, additionally asserting their entitlement to qualified immunity. For the reasons set forth below, I recommend that defendants' motion be granted, but that plaintiff be given leave to amend his complaint.

## I. BACKGROUND[1]

[1] In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true

Plaintiff is a New York State prison inmate entrusted to the care and custody of the DOCS. *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims in this action, plaintiff was designated to the Altona Correctional Facility ("Altona"), located in Altona, New York. *Id.*

On June 23, 2008, while confined at Altona, Jackson submitted a library request for "The Bible Code," a book that he had begun reading while confined at the Barehill Correctional Facility before his transfer out of that prison. Complaint (Dkt. No. 1) § 6 ¶ 1 and Attachment p. 7. By memorandum dated July 24, 2008 from C. Paulson, identified as the Senior Librarian at Altona, plaintiff was advised that his application, which was apparently treated as an interlibrary loan request, had been forwarded to the Facility Media Review Committee ("FMRC"), and that upon review of the publication in accordance with DOCS Directive No. 4572, entitled "Media Review", the FRMC found it to be unacceptable for

---

for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 1734 (1964). Portions of the background description which follows have been derived from the exhibits attached to plaintiff's complaint, which may also properly be considered in connection with a dismissal motion. *See Cortec Indus., Inc. v. Sum Holding L..P.,* 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561 (1992); *see also Samuels v. Air Trans. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).

loan. [2,3] *Id.,* Attachment p. 7. Plaintiff was further advised that the book was therefore returned by officials at Altona to the originating facility from which it was borrowed.

---

2 Under that Directive, it is the policy of DOCS to

> encourage inmates to read publications from varied sources if such material does not encourage them to engage in behavior that might be disruptive to orderly facility operations. Accordingly, inmates shall be allowed to subscribe to and possess a wide range of printed matter such as books, magazines and newspapers, subject to the provisions of this directive, because these items may prompt constructive individual development.
>
> In the event that the Superintendent, or his designee, believes that printed material addressed to an inmate represents a possible threat to orderly facility operations, that material will be referred to the Facility Media Review Committee (FMRC) for its assessment and disposition.

7 N.Y.C.R.R. § 712.1(a). The DOCS standard with respect to evaluation of literature provides, in pertinent part, that "[t]he publication should not . . [c]ontain information which appears to be written in code. . ." *Id.* § 712.2(h)(1).

3 Plaintiff's request was the subject of e-mail communications aimed at determining the appropriate avenue to be followed in addressing the matter. In apparent response to plaintiff's request Gregg Stanley, the FMRC Chairman at Altona, elicited guidance from the DOCS central office, specifically inquiring whether an interlibrary loan request was subject to review under the DOCS Directive No. 4572. Complaint (Dkt. No. 1) Attachment p. 6. In response, it was noted that

> [i]t's a gray area. If the publication is not specifically adressed [sic] to a particular inmate, the media review guidelines can be applied but not the process. If you were to look at it and determine that it shouldn't come into the facility then you could just return it to the sending library. If the publication is coming in for a specific inmate, then the Media Review process would apply. If you denied it the inmate could appeal it but there would be no redaction because the book is the property of the sending library.

Complaint (Dkt. No. 1) Attachment at p. 6.

Despite having been told that his interlibrary loan request was forwarded to and reviewed by the FMRC at Altona, Jackson was later informed by memorandum dated July 31, 2008 from FMRC Chairman Stanley, that this was not the case, and instead "the decision to deny the literature was solely at the discretion of the librarian and his supervisor." Complaint (Dkt. No. 1) Attachment p. 4.  In that memorandum plaintiff was also advised that while the provisions of the DOCS Directive No. 4572 did no provide for appeal of the decision of the FMRC, "the Inmate Grievance Procedure [could] be utilized to challenge the denial." *Id.*

Plaintiff filed two grievances addressing the denial of his request for the publication.  The first, dated July 28, 2008 but filed on July 30, 2008 – and thus predating the July 31, 2008 memorandum – included plaintiff's assertion that his First Amendment rights had been violated based upon the denial of his book request.  Complaint (Dkt. No. 1) § 6 ¶ 2 and Attachment pp. 8-9.  Following his receipt of the July 31, 2008 memorandum, Jackson filed a second grievance, dated August 3, 2008. *Id.* § 6 ¶ 4 and Attachment p. 3-4.  In that grievance, plaintiff complained of the fact that his book request was not reviewed by the facility FMRC but instead was denied by the librarian and his supervisor.  *See id.*

Plaintiff's first grievance was denied by the facility superintendent on August 11, 2008 in a written determination which stated, in pertinent part,

> [p]ursuant to direction from . . . Central Office, any books that are sent to the Altona C.F. library via the Inter-Library Loan Service, are not subject to the Media Review procedure outlined in Directive 4572, since the books are the property of the sending library and no redaction of objectionable material can be done. Thus, the books in question were not allowed for security reasons and returned to the sending library.

Complaint (Dkt. No. 1) ¶ 5 and Attachment p. 2. That determination was upheld on appeal by the plaintiff to the DOCS Central Office Review Committee ("CORC"). *Id.* § 6, ¶¶ 6, 7 and Attachment p. 1. In rejecting plaintiff's appeal, the CORC noted that "there is no provision in Directive # 4470 or # 4572 to refer books received from Inter Library Loan (ILL) to the Facility Media Review Committee (FMRC). However, the Librarian may access FMRC resources when determining the acceptability of such books."[4] *Id.,* Attachment p. 1.

II. <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on December 29, 2008. Dkt. No. 1. Named as defendants in plaintiff's complaint are Anthony Q. Boucaud, the Superintendent at Altona; Brian Fischer, the Commissioner of the

---

[4] There is no indication in either plaintiff's complaint or its attachments reflecting the ultimate disposition, if any, of plaintiff's second grievance.

DOCS; and, C. Paulson, the Senior Librarian at the facility. *Id.* Plaintiff's complaint alleges a single cause of action principally alleging a free religious exercise violation under the First Amendment, although also referencing in passing an alleged denial of due process. *Id.* § 7.

On April 2, 2009, in lieu of answering, the defendants moved for dismissal of plaintiff's claims against them, asserting 1) failure to state a cause of action upon which relief may be granted, 2) lack of personal involvement with respect to defendant Fischer, and 3) qualified immunity as grounds for their motion.[5] Dkt. No. 12. Despite an extension of the deadline to respond, at his request, *see* Dkt. No. 14, Jackson has failed to submit any opposition to defendants' motion.[6]

---

5 Defendants have also moved pursuant to Rule 26(c)(1) Federal Rules of Civil Procedure for a protective order staying discovery pending the resolution of their dismissal motion.

6 Plaintiff's failure to respond to the pending dismissal motion does not preclude me from recommending its disposition without the benefit of his submission. *See*, *e.g.*, *Cicio v. Graham*, No. 9:08-CV-534, 2009 WL 537534, at *9 n.5 ( Mar. 3, 2009) (Mordue, C. J. and Peebles, M.J.). Such a motion tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki*, 232 F.3d 321, 322-23 (2d Cir. 2000).

It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance. Under this court's local rules, a party's failure to respond to a properly filed motion can constitute consent to the granting of that motion, so long as the court determines that the moving party has met its burden demonstrating entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also*

Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and North District of New York Local Rule 72.3 (c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65 (2007)).  The relevant pleading requirements are set forth in Rule 8(a)(2) of the Federal Rules of Civil Procedure, which requires that a complaint contain "a short and plain

---

*McCall*, 232 F.3d at 322-23 (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal of plaintiff's complaint stated a claim for relief); *White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 n. 2 (E.D.N.Y. Jan. 18, 2001) (citing *McCall*).

statement of the claim showing that the pleader is entitled to relief."  Fed.

R. Civ. P. 8(a)(2).  *Id.*  While modest in its mandates, that rule commands

that a complaint contain more than mere legal conclusions; "[w]hile legal

conclusions can provide the framework of a complaint, they must be

supported by factual allegations."  *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient

facts which, when accepted as true, state a claim which is plausible on its

face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing

*Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974).  As the Second Circuit has

observed, "[w]hile *Twombly* does not require heightened fact pleading of

specifics, it does require enough facts to 'nudge [plaintiffs'] claims across

the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502

F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at

1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept

the material facts alleged in the complaint as true, and draw all inferences

in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84

S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d

292, 300 (2d Cir.), *cert. denied*, 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke*

*v. Gregory*, 356 F. Supp.2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (other quotations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94, 127 S.Ct. at 2200 (2007) ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord*, 320 F.3d 346, 350 (2d Cir. 2003) (citation omitted); *Donhauser v. Goord*, 314 F. Supp.2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should

not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires").

  B.  Personal Involvement

 In their motion, defendants challenge the sufficiency of plaintiff's allegations regarding defendant Fischer's role in the constitutional deprivations alleged.  Personal involvement of a defendant in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

 Plaintiff's claim against defendant Fischer is apparently premised exclusively upon his role as a Commissioner of the DOCS; nowhere in

plaintiff's complaint is there an allegation that defendant Fischer was an active participant in the conduct giving rise to Jackson's claims, or that he was even aware of the relevant events. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim . . . [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.") (citations omitted).

That is not to say that a supervisory official may never be held liable for a civil rights violation. Culpability on the part of a supervisory official can be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3)

created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *overruled on other grounds sub nom., Ashcroft v. Iqbal*, 129 S.Ct. 1937; *see also Richardson*, 347 F.3d at 435; *Wright*, 21 F.3d at 501; *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).

A thorough review of plaintiff's complaint and the attached documents fails to disclose any personal involvement of defendant Fischer in the conduct giving rise to Jackson's claims. The only reference in plaintiff's complaint to defendant Fischer is in that portion wherein the defendants are named; there, defendant Fischer's position is listed as "Commissioner". *See* Complaint (Dkt. No. 1) § 3(b). Plaintiff's complaint is devoid of any allegations that defendant Fischer, as the DOCS Commissioner, was involved in the alleged constitutional violations, that he allowed an unconstitutional policy to occur, that he was negligent in the management of a subordinate, or that he failed to act on information indicating that unconstitutional acts were occurring. *See generally id.*

In sum, plaintiff's complaint does not disclose any basis on which to conclude that defendant Fischer was personally involved in any of the constitutional deprivations alleged to a sufficient degree to support a finding of liability on his part. Accordingly, I recommend dismissal of plaintiff's claims as against defendant Fischer, with leave to replead. *See Anderson v. Duke*, No. 9:04-CV-0030, 2006 WL 2792735, at *5 (N.D.N.Y. Sept. 27, 2006) (Mordue, C.J. and Peebles, M.J.) (dismissing plaintiff's claim against a prison Superintendent defendant with leave to replead where plaintiff alleged the defendant merely overheard a conversation relating to the claims in his complaint)[7]; *see also Orraca v. McCreery*, No. 9:04-CV-1183, 2006 WL 1133254, at *6 (N.D.N.Y. Apr. 25, 2006) (Hurd, D.J. and Peebles, M.J.) (dismissing plaintiff's claim against a defendant with leave to replead where defendant was named in caption but not described in body of complaint); *Hucks v. Artuz,* No. 99 Civ. 10420, 2001 WL 210238, at *5-*6 (S.D.N.Y. Feb. 27, 2001) (granting a defendant who was named in the caption but not described in the body of an amended complaint motion to dismiss).

---

7 Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

C. First Amendment[8]

In their motion defendants argue that the plaintiff does not specifically allege that he sincerely believes that "The Bible Code" is necessary for him to practice religion, nor does he elaborate as to how the book fits into his scheme of sincerely-held religious beliefs; as a result, defendants assert, Jackson has failed to state how his religious beliefs were burdened by the defendants' actions.

The First Amendment guarantees the right to free exercise of religion.[9] *Cutter v. Wilkinson*, 544 U.S. 709, 719, 125 S.Ct. 2113 (2005).

---

8

Although his complaint does not allege such a cause of action, plaintiff's factual allegations could also implicate the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). The Act provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person – 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Similar principles inform the analysis of plaintiff's free exercise claim as well as any the potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salhuddin v. Goord,* 467 F.3d 263, 264 (2d Cir. 2006).

9

That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

The free exercise clause, as is true with regard to the First Amendment generally, applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGuinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)).  The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but is instead subject to valid penological concerns, including those relating to institutional security.  *O'Lone v. Estate of Shabazz,* 483 U.S. 342, 328, 107 S.Ct. 2400, 2404 (1987); *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993).

        Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life.  *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir. 2004); *Ford,* 352 F.3d at 597.  Courts in this circuit and elsewhere have addressed whether denial of religious materials can support a cognizable free exercise claim.  *See, e.g., Amaker v. Hakes*, No. 00-0152, 2001 WL 258063, *1 (2d Cir. March 14, 2001) (cited in accordance with Fed. R. App. Proc. 32.1(a)) (discussing whether

confiscation of certain prohibited religious materials within the prison can serve as the basis of a free exercise claim); *Kay v. Bemis*, 500 F.3d 1214 (10th Cir. 2007) (discussing whether deprivation of tarot cards could support a plaintiff's free exercise claim). Whether the religious subject is literature, or more commonly meals (*see Ford*, 352 F.3d at 597; *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992); *Johnson v. Guiffere*, No. 9:04-CV-57, 2007 WL 3046703 (N.D.N.Y., Oct. 17, 2007) (Hurd, D.J. and Peebles, M.J.), a free exercise claim often brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand. *See Benjamin v. Coughlin*, 905 F.2d, 571, 574 (2d Cir.), *cert. denied*, 498 U.S. 951, 111 S.Ct. 372 (1990).

Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir. 1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes upon his or her sincerely-held religious beliefs.[10] *Salahuddin v. Goord*, 467 F.3d at 274-

10 Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to

75; *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y.

Mar. 30, 2007).   Importantly, in evaluating this factor the court must be

wary of "question[ing] the centrality of particular beliefs or practices to a

faith, or the validity of particular litigants' interpretations of those creeds[,]"

*McEachin v. McGuinnis*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r of

Internal Revenue*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49 (1989)),

and instead may only consider whether the particular plaintiff holds a

belief which is religious in nature.  *Ford*, 352 F.3d at 590; *King,* 2007 WL

1017102, at *4.  Once a plaintiff has made this showing, the burden then

shifts to the defendant to identify a legitimate penological purpose

justifying the decision under scrutiny.[11]  *Salahuddin v. Goord*, 467 F.3d at

474-75; *Evans v. Albany County Corr. Facility*, No. 9:05-CV-1400, 2009

---

establish a free exercise claim, the Second Circuit declined to resolve the issue,
instead assuming continued applicability of the substantial burden test. 352 F.3d 582,
592-93 (2d Cir. 2003). Recent cases from this and other courts suggest that the
Second Circuit resolved this split in its decision in *Salahuddin* by subscribing to the
substantial burden test. *See, e.g., Livingston v. Griffin,* No. 9:04-CV- 00607, 2007 WL
1500382, at *15 (N.D.N.Y. May 21, 2007) (Singleton, J.); *King*, 2007 WL1017102, at
*4. While harboring some doubt that the Second Circuit has in fact laid the matter to
rest, I find it unnecessary to now take a stance regarding the issue.

[11]

    While this framework is particularly well-suited for analysis of a systematic or
facility policy or practice affecting inmates generally, it applies with equal force to
individual decisions such as that involved in this case, which may impact only a single
inmate.  *Salahuddin,* 467 F. 3d at 274 n.4.

WL 1401645, at *6 (N.D.N.Y., May 14, 2009) (Suddaby, J.). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254 (1987). *See Giano v. Senkowski*, 54 F.3d 1050, 1054 (2d Cir. 1995); *Evans*, 2009 WL 1401645, at *6.

Under *Turner,* the court must determine “whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective.” *Thornburgh v. Abbott*, 490 U.S. 401, 414, 109 S.Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine “the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison.” *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* have clarified that when applying this test, a court should examine “the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests.” *Evans,* 2009 WL 1401645, at *6 (citing *Salahuddin,* 467 F. 3d at 274).

In this instance, as defendants point out in their motion, the plaintiff

has not set forth facts demonstrating that the disputed conduct infringed upon his sincerely-held religious beliefs.  Plaintiff's complaint alleges in conclusory fashion that defendants denied him religious freedom when refusing to permit access to the material at issue, described by him as an interpretation of sections of the Bible, without any further clarification of what his religion is, or what sincerely-held beliefs are attached to its practice.[12]  Plaintiff refers to the book, "The Bible Code," as a "religious interpretation of the Bible," but does not expand upon that claim to explain why denial of this interpretative book constituted a deprivation that imposed anything more than a *de minimis* burden upon his religious practice.  Complaint (Dkt. No. 1), Facts ¶1; *see Evans*, 2009 WL 1401645, at *8.

Even when liberally construed, plaintiff's complaint simply cannot be read as satisfying his initial burden to sufficiently allege that the disputed

---

[12]
      In his complaint, plaintiff does not specify his religion or the religious beliefs that he claims were interfered with through defendants' conduct.  In the damages portion of his complaint, plaintiff merely states that the damages now sought are "to compensate [him] for the blatant violation of the United States Constitutionally protected First Amendment guarantee to practice [*his*] religion."  Complaint (Dkt. No. 1) § 9 (emphasis added).  If plaintiff exercises his option to amend his complaint, he must include facts identifying his religion and the religious practices with which he alleges the defendants have interfered.

conduct infringes on his sincerely-held religious beliefs.[13] *See Salahuddin v. Goord,* 467 F.3d at 274-75. Plaintiff has thus failed to meet his initial burden to allege sufficient facts showing that defendants' conduct violated his right to freely exercise his chosen religion. Accordingly, I recommend a finding that plaintiff has failed to state a plausible claim for violation of the his First Amendment rights.

In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not ordinarily order its dismissal without granting leave to amend at least once provided there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"). I therefore recommend that the plaintiff be afforded leave to amend his complaint in order to develop his First Amendment free exercise claim to identify his religion and to allege with specificity what religious beliefs defendants have infringed upon.

I note that if plaintiff's complaint were deemed sufficient to meet his initial burden under the controlling test, the focus would then turn to

---

13 Plaintiff's First Cause of Action reads "I was denied the right to access religous [sic] meterial [sic] . . . in violation of the First Amendment. . ." Complaint (Dkt. No. 1) § 7. Plaintiff does not allege that the religious material involved was necessary to his sincerely-held religious beliefs.

assessment of whether the defendants have articulated a palpably legitimate penological concern to justify the denial of the requested book, in apparent reliance, at least in part, on the DOCS Directive No. 4572. *See Salahuddin v. Goord*, 467 F.3d at 474-75; *see also Guiffere*, 2007 WL 3046703 at *6. Defendants appear to be arguing that internal safety and security concerns, leading to the prohibition of inmate access to publications written in code, served as the basis for denying plaintiff access to "The Bible Code". With the articulation of this justification, the focus of the analysis would again shift, and the burden would then return to the plaintiff, under the governing test, to establish that the policy is not reasonably related to legitimate penological interests. *See Ford*, 352 F.3d at 595-96. Such an inquiry is particularly fact-ladden and often ill-suited for resolution on motion for summary judgment, let alone a motion to dismiss.[14] *See generally, Marria v. Broaddus*, 200 F. Supp.2d 280, 297

---

[14]      Broadly construing his complaint as asserting a more general First Amendment right to reading material of his choice, notwithstanding the fact that the book in question is allegedly religious in nature, would lead to the same result. Prison officials enjoy wide discretion in regulating the relations between prisoners and the outside world, including the written word. *Thornburgh*, 490 U.S. at 407, 109 S.Ct. at 1878; *Procunier v. Martinez*, 416 U.S. 396, 404-405, 94 S.Ct. 1800, 1807 (1974). Similar to regulations that might abridge an inmate's religious practices, regulations that restrict access reading material, such as those in the DOCS Directive No. 4372, must be analyzed under the standards mentioned above and as set forth by the Supreme Court in *Turner*. *See generally Turner*, 428 U.S. 78, 107 S.Ct. 2254. Additionally, the Supreme Court has noted that in "[a]cknowledging the expertise of these officials . . . [the

(S.D.N.Y. 2002) (holding that fact issues existed as to whether the DOCS'

ban on literature and assembly of religious group was reasonably related

to legitimate penological interests); *see also McEachin v. McGuinnis*, 357

F.3d at 201 ("Dismissing [the plaintiff's First Amendment claim] without

requiring an answer from defendants, or permitting further discovery to

determine, for example, whether denying the plaintiff access to ["The Bible

Code"] significantly impeded his religious observance, makes it impossible

to evaluate the validity of his claim.")

In sum, I recommend that plaintiff's First Amendment free exercise

claim be dismissed as lacking in merit, though with leave to replead.[15]

---

Supreme] Court has afforded considerable deference to the determinations of prison administrators." *Thornburgh*, 490 U.S. at 407-08, 109 S.Ct. at 1878-79 (citing *Procunier*, 416 U.S. at 404-405, 94 S.Ct.at 1807). Overall, the validity of prison regulations relating to incoming materials turns on whether they are "reasonably related to legitimate penological interests." *Id.* (quoting *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261). Accordingly, the test of whether the regulations set forth in the DOCS Directive No. 4372 are related to legitimate penological interests in the context of a more general First Amendment claim is very similar to the test that would be used to assess the regulation's validity in the free exercise context. *See Thornburgh*, 490 U.S. 406-20, 109 S.Ct. at 1878-85; *see also Turner*, 482 U.S. at 89, 107 S.Ct. at 2261. As a result, that analysis would likewise normally be ill-suited for determination on a motion to dismiss.

[15]      The plaintiff has alleged that "The Bible Code" is "a religious interpretation," and attempts to distinguish the word "code" as utilized in the title of the book from the type of code prohibited by Directive No. 4572. Complaint (Dkt. No. 1), §6 and Attachment pp. 12-13, 17-18. Contrary to defendants' assertion, plaintiff has not acknowledged that the book contains material which "appears to be written in code." *See* Defendants' Memorandum (Dkt. No. 12-2) at p. 11. Whether the book is written in a code, justifying its prohibition at Altona, may ultimately present a material question of fact, providing an additional reason why dismissal of the plaintiff's complaint without leave to amend

D. Due Process

Potentially embedded within the plaintiff's complaint, when liberally read, is an alleged due process deprivation. It is not entirely clear, however, whether plaintiff is in fact advancing such a claim, and if so whether it is a substantive or procedural due process cause of action. The Due Process Clause of the Fourteenth Amendment contains both a substantive and a procedural component. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975 (1990). The substantive component "bars certain arbitrary and wrongful government action regardless of the fairness of the procedures used to implement them." *Id.* at 125, 110 S.Ct. at 983 (internal quotations and citation omitted). While it appears that the gravamen of plaintiff's due process claim is procedural in nature, even if the court were to construe his complaint as attempting to allege a violation of his right to substantive due process, I would conclude that plaintiff has failed to adequately allege such a right.

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or

---

would be inappropriate at this early procedural juncture.

ill-advised." *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotations and citations omitted) (citing cases). "The first step in a substantive due process analysis is to identify the constitutional right at stake." *Excell v. Woods*, No. 9:07-CV-0305, 2009 WL 3124424, at *23 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J. and Lowe, M. J.) (citing *Lowrance*, 20 F.3d at 537). There are few circumstances arising in the context of prison life that ascend to the level of shocking and suffice to state a substantive due process violation. *Shuler v. Brown*, No. 07-CV-0937, 2009 WL 790973, at *9 (N.D.N.Y. Mar. 23, 2009) (McAvoy, S. J. and Lowe, M. J.).[16]

At the outset, I find the denial of access to reading material, while potentially within the protection of the First Amendment, is not the kind of condition of prison life that implicates substantive due process and also that DOCS Directive No. 4572 did not create a substantive right to FMRC review of inmate reading material. *See Barnes v. Craft*, No. 9:04-CV-

[16] There is yet another reason why a substantive due process claim would fail. The Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision . . . it must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272, n.7, 117 S.Ct. 1219 n.7 (1997) (citing *Graham v. Conner*, 490 U.S. 386, 394, 109 S.Ct. 1870, 1871 (1989)); *see also*, *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). As previously discussed, plaintiff's claim relating to the denial of access to reading material is more appropriately analyzed under the First Amendment.

1269, 2008 WL 3884369, at *5 (N.D.N.Y. Aug. 18, 2008) (Mordue, C.J. and Lowe, M. J.) (finding that the DOCS beard exemption policy did not create a substantive due process right).  Moreover, even if I were to find that the DOCS Directive No. 4572 did create a substantive due process right, any attempt to allege a substantive due process violation still must fail.  At best, defendants' failure to follow DOCS Directive No. 4572 amounts to incorrect or ill-advised conduct and falls far short of the type of conscience-shocking behavior that would support a substantive due process claim.  *See Lowrance*, 20 F.3d at 537.

Plaintiff's due process claim appears to hinge on defendants' alleged failure to comply with the procedures outlined in DOCS Directive No. 4572.  *See* Complaint (Dkt. No. 1), § 6 ¶¶ 3, 5, 7.  Plaintiff complains that he was originally informed by defendant Boucaud that the FMRC at Altona had decided to deny him access to the book "The Bible Code," but was later told by Gregg Stanley that the FMRC in fact was not consulted, although the standards set forth in DOCS Directive No. 4572 were utilized by the librarian and his supervisor in making the decision, within their sole discretion.  *See* Complaint (Dkt. No. 1), Attachment at pp. 5, 6.  Plaintiff appears to take issue with the fact that despite being told otherwise, the

FMRC did not review his request. Additionally, he claims that the book does not violate any of the standards enunciated in the DOCS Directive No. 4572, and alleges that the interference with access to this publication constitutes a violation of his right to practice his religion as well as harassment.

When construed as procedural in nature, plaintiff's due process claim is similarly destined to fail. As an initial matter, it is well established that the failure of prison officials to follow internal prison regulations does not give rise to a federal constitutional claim. *Rivera v. Wohlrab*, 232 F. Supp.2d 117, 123 (S.D.N.Y. 2002) (citing *Hyman v. Holder*, No. 96 Civ. 7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001)). Accordingly, to the extent that plaintiff relies solely upon defendants' alleged failure to follow the DOCS Directive No. 4572 to support a constitutional claim for violation of the right to procedural due process, his claim is legally insufficient.

To successfully state a claim under section 1983 for denial of due process, a plaintiff must show that he or she 1) possessed an actual liberty or property interest, and 2) was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106,

118 (2d Cir. 2004); *see also Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillance*, 143 F.3d 653, 658 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996). The first inquiry in the analysis of an alleged procedural due process violation is whether there exists a protected liberty or property interest at stake in the case.  *Shakur*, 391 F.3d at 118; *see also Barna v. Travis*, No. CIV97CV1146 (FJS/RWS), 1999 WL 305515, at *1 (N.D.N.Y. Apr. 22, 1999) (Smith, M.J.) (citing *Kentucky Dep't of Corr. v. Thompson*, 490 U.S.454, 460, 109 S.Ct. 1904, 1908 (1989)).  Here, plaintiff has alleged neither.

Plaintiff did not own the publication in question.  By his own admission, Jackson began reading the book in question while housed at Bare Hill and upon transfer to Altona requested that the publication be made available to him via the DOCS inter-library loan service.  It thus appears that "The Bible Code" is owned by the DOCS, not the plaintiff.  As a result, plaintiff has not stated a property interest of which he was deprived without due process of law.

Turning to the issue of whether plaintiff has sufficiently alleged a liberty interest, "in 1995, the United States Supreme Court shifted a court's

focus, when conducting a procedural due process analysis, from language of the particular authority allegedly giving rise to the protected liberty interest alleged (*e.g.* a state law or regulation) to the nature of the of the deprivation alleged." *Barnes*, 2008 WL 3884369, at *5 (citing *Sandin v. Conner*, 515 U.S. 472, 483-84, 115 S.Ct. 2293 (1995)). In *Sandin,* the Supreme Court held that, although "States may under certain circumstances create liberty interests which are protected by the Due Process Clause, these interests will be generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."   515 U.S. at 483-484, 115 S.Ct. 2300.  Applying this well established principle of law here dictates the conclusion that Directive No. 4572 simply does not create a cognizable liberty interest.

It is worth noting that the directive at issue does not include mandatory language, but clearly affords prison officials broad discretion in deciding what materials are suitable within a DOCS facility.  From this it is clear that the State has not conferred a liberty interest upon prison inmates guarantying their unfettered access to written materials of their choice, and plaintiff thus cannot base his Due Process claim on the

deprivation of such an intent.  *See Shakur*, 391 F.3d at 118-119

  More importantly, as a matter of law, failing to allow plaintiff access to reading material of his choice in violation of that directive did not rise to a constitutionally cognizable level and result in an atypical and significant hardship upon the plaintiff in relation to the ordinary incidents of prison life. *See id.* (finding that the plaintiff's allegation that defendants deviated from Media Review Committee procedures in denying him access to a publication did not support a procedural due process claim); *see also Barnes*, 2008 WL 3884369,at *5 (finding that a DOCS-issued beard exemption did not create a liberty interest for purposes of procedural due process); *cf. Cusamano v. Sobek*, 604 F. Supp.2d 416, 482 (N.D.N.Y. 2009) (finding that a DOCS regulation requiring every DOCS employee present at an incident of misbehavior to either submit an incident report or endorse a report prepared by another employee did not created a protected liberty interest).

  Even if plaintiff had sufficiently alleged the existence of a constitutionally significant liberty or property interest and the deprivation of that interest, to prevail he would additionally be required to show that he was denied minimal due process with respect to such deprivation.  *See*

*Tellier,* 280 F.3d 69, 79-80. On the face of the complaint, however, the facts alleged demonstrate that the plaintiff was afforded sufficient procedural safeguards to challenge the deprivation. The procedure outlined in Directive No. 4572 states that if the FMRC disapproves a publication request, "such decision shall be in the form provided in Exhibit B, and include a brief statement of reasons explaining why the publication is deemed to violate one or more of the media review guidelines and identifying by page number, article title, and location on the page, the contents objected to." 7 N.Y.C.R.R. § 712.3 (c)(4). While initially plaintiff was not offered a "brief statement" as to why "The Bible Code" was unacceptable for loan under Directive No. 4572 by defendant Paulson, he was ultimately given the opportunity to grieve the denial through resort to the DOCS inmate grievance process ("IGP").[17] *See* Complaint (Dkt. No.

---

[17] The requisite procedural protections that must be provided to an individual vary according to "time, place and circumstances." *Ruggia v. Kozak*, 9:05-CV-0217, 2008 WL 541290, at *16 (N.D.N.Y. Feb. 25, 2008) (Kahn, D.J. and Lowe, M.J.) (citations omitted). In the context of prison life, "[t]he primary mechanism made available to New York state prison inmates for presenting grievances concerning prison conditions is the [IGP] established by the DOCS . . . ." *Orraca v. McCreery*, 9:04-CV-1183, 2008 WL 4279509, at *6 (Sept. 15, 2008) (Hurd, D.J. and Peebles, M.J.) (citations omitted). The IGP has consistently been held by courts to meet the constitutional minimum and provide adequate procedures for challenging a liberty or property interest deprivation. *See, e.g.*, *Zimmerman v. Burge*, No. 06-cv-0176, 2008 WL 850677, at *13 (N.D.N.Y. Mr. 28, 2008) (Sharpe, D.J. and Lowe, M.J.) (finding that plaintiff was provided with adequate due process even thought his "several grievances challenging the . . . restriction of his visiting privileges ha[d] all been denied (and those denials [were] repeatedly been affirmed on appeal) . . . .").

1), Attachment p. 7.

After the Altona FMRC Chairman clarified that the book requested by Jackson had not been reviewed by the FMRC, he informed the plaintiff that he could resort to the inmate grievance process to challenge the denial an avenue of which plaintiff availed himself. Plaintiff's grievance was reviewed by the facility superintendent, and his denial of plaintiff's grievance was in turn reviewed by the CORC.

In view if these facts, even if the plaintiff was deprived of a property or liberty interest when denied access to "The Bible Code," that deprivation did not occur without constitutionally adequate, minimal due process. *See Shakur*, 391 F.3d at 118-19. Accordingly, I find that the plaintiff has failed to allege a plausible due process claim.

D. Protective Order

Defendants also move order pursuant to Federal Rules of Civil Procedure Rule 26(c)(1) for a protective order staying discovery pending the resolution of defendants' motion to dismiss. Rule 26(c)(1) of the Federal Rules of Civil Procedure provides, in relevant part, that

> [a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending . . . The Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment,

> oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery.

Fed. R. Civ. P. 26(c)(1). In light of my recommendation that the court dismiss plaintiff's complaint, with leave to amend, I find the existence of good cause to issue an order protecting the defendants from the burden of engaging in discovery until after the plaintiff files an amended complaint, if any, and issue is properly joined by the defendants' filing of an answer.

## III. SUMMARY AND RECOMMENDATION

Having carefully considered defendants' motion in view of the formative stage of the proceedings at which it is made and the relatively lax standard against which such motions are gauged, I nonetheless find that defendants are entitled to dismissal of plaintiff's claims. Plaintiff's complaint in this action asserts claims of unconstitutional deprivation of the right to religious exercise and the denial of procedural due process. Because plaintiff has failed to sufficiently allege how the denial of his book request interfered with the free exercise of his sincerely-held religious beliefs, his First Amendment claim is subject to dismissal, though with leave to amend to cure this fatal deficiency. As to his suggestion that his right to due process was also violated, however, it is clear from the face of

the complaint that the plaintiff cannot state a colorable claim for deprivation of substantive or procedural due process and that claim is subject to dismissal as a matter of law, without leave to amend.  In addition, plaintiff's claims against defendant Fischer are likewise subject to dismissal based upon the lack of any showing of his personal involvement, although with leave to amend.[18]  Accordingly, it is hereby respectfully

RECOMMENDED, that defendants' motion to dismiss (Dkt. No. 12) be GRANTED; that plaintiff's First Amendment claims, and all claims against defendant Fischer, be DISMISSED, with leave to amend; and that plaintiff's claim for deprivation of due process be DISMISSED as a matter of law, without leave to replead; and it is further

ORDERED that discovery be and is hereby STAYED pending a final determination of defendants' motion to dismiss; and it is further

ORDERED that the clerk serve a copy of this report and recommendation upon the parties in accordance with the local rules.

---

[18]    In light of my findings, I recommend that consideration of defendants' argument that they are entitled to qualified immunity be deferred pending plaintiff's submission of an amended complaint, if he opts to pursue that avenue.  *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001); *Harhay v. Town of Ellington Bd. of Ed.*, 323 F.3d 206, 211 (2d Cir. 2003); *Warren v. Keane*, 196 F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996)).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).


David E. Peebles
U.S. Magistrate Judge

Dated:      December 31, 2009
            Syracuse, NY

C Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Terry CICIO, Plaintiff,
v.
GRAHAM, Peter M. Sigona, Richard D. Ruston, III, Phil J. Manna, A. Vega, and Ryerson, Defendants.
**No. 9:08-CV-534.**

March 3, 2009.

West KeySummary
**Civil Rights 78 1358**

78 Civil Rights
78III Federal Remedies in General
78k1353 Liability of Public Officials
78k1358 k. Criminal Law Enforcement; Prisons.
Most Cited Cases
Dismissal of a prisoner's § 1983 complaint against a prison superintendent alleging deliberate indifference to his serious medical needs was not warranted. Prisoner's theory of liability against the superintendent appeared to have been centered upon the claim that his refusal to conduct an investigation of prisoner's grievance resulted in a denial of procedural due process. Prisoner, proceeding *pro se*, could have argued that the superintendent was potentially subject to personal liability based upon his awareness of the alleged, ongoing failure of prison officials to provide him with medical treatment for his injuries, coupled with the failure to remedy the wrong after learning of it through the grievance appeal. Such circumstances could have given rise to a finding of liability on the part of the superintendent. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General, State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

***ORDER***

NORMAN A. MORDUE, Chief Judge.

***1** The above matter comes to me following a Report-Recommendation by Magistrate Judge David E. Peebles, duly filed on the 10th day of February 2009. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motions to dismiss plaintiff's complaint for

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

failure to state a cause of action upon which relief may be granted (Dkt. Nos. 9, 15, 22 and 28) are denied in their entireties.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983, claiming deprivation of his civil rights. In his complaint, plaintiff asserts that he was assaulted by two of the defendants, while another stood by, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

Currently pending before the court are motions brought on behalf of five of the six named defendants, challenging the sufficiency of plaintiff's allegations against them. Having carefully reviewed the contents of plaintiff's complaint, considered in the light of defendants' arguments, for the reasons which follow I recommend that defendants' motions be denied.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734, 12 L.Ed.2d 1030 (1964).

The facts giving rise to plaintiff's claims, as set forth in his complaint, are not particularly complex. Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was designated to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1).

On March 7, 2006, while plaintiff and other inmates at Auburn were confined in a group cell awaiting transfer out of the facility hospital depot, a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1. Defendants Sigona, Manna and Ruston responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. *Id.* ¶ 2. Plaintiff was pushed by defendant Sigona into defendant Manna, who then grabbed and assaulted Cicio, while defendants Sigona and Ruston stood by without intervening. *Id.* ¶¶ 4-5.

Following the incident plaintiff was seen by defendant A. Vega, a registered nurse at the facility, complaining of wrist and head pains. Complaint (Dkt. No. 1) Statement of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Facts ¶ 6. Despite those complaints no medical attention was provided, nor were arrangements made for Cicio to see a doctor. *Id.* ¶¶ 7, 8. Subsequent efforts by the plaintiff to obtain medical attention for his injuries, through the submission of sick call slips, went unanswered. *Id.* ¶¶ 9-13, 15.

***2** Grievances were filed by Cicio on March 4, 2006, and again on March 21, 2006, complaining of the failure of prison officials to render him medical attention. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14-16. Both grievances were denied, and those determinations were upheld on April 19, 2006, on appeal to defendant Graham, the superintendent at Auburn. *Id.* ¶ 17. Plaintiff appealed that determination, presumably to the Central Office Review Committee ("CORC"), on June 12, 2006; there is no indication in plaintiff's complaint, however, regarding the disposition of that appeal. *Id.* ¶ 18.

II. *PROCEDURAL HISTORY*

Plaintiff initiated this action on April 28, 2008.[FN2] Dkt. No. 1. In his complaint, plaintiff names Superintendent Graham, Corrections Sergeant Peter M. Sigona, Corrections Officers Richard D. Ruston and Phil J. Manna, Registered Nurse A. Vega, and Nurse Administrator Ryerson as defendants and asserts varying claims against them based upon the alleged use of excessive force and failure to intercede on his behalf, and indifference to his medical needs arising from the incident. *See generally* Complaint (Dkt. No. 1)

FN2. This action was commenced in the Western District of New York, but was subsequently transferred here as a result of the issuance of an order on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

On August 12, 2008, in lieu of answering, defendants Sigona and Graham moved seeking dismissal of plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 9. Similar motions have since been interposed on behalf of defendant Ruston, on August 27, 2008 (Dkt. No. 15); defendant Ryerson, on September 25, 2008 (Dkt. No. 22); and defendant Vega, on December 29, 2008, (Dkt. No. 28).[FN3] Plaintiff responded to the motions filed by defendants Sigona, Graham, and Ruston, but has failed to submit papers in opposition to the motions of defendants Ryerson and Vega. *See* Dkt. Nos. 14, 16, 21.

FN3. On September 25, 2008 defendant Manna, who has not moved seeking dismissal of plaintiff's claims at this juncture, filed an answer generally denying the material allegations contained within plaintiff's complaint and setting forth various affirmative defenses. Dkt. No. 23.

Defendants' motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

***3** In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111-12 (2d Cir.2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly* ). "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (3d Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1974).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Slip Copy, 2009 WL 537534 (N.D.N.Y.)
(Cite as: 2009 WL 537534 (N.D.N.Y.))

B. *Controlling Legal Principles*

Before addressing the specifics of each of the four pending motions, I will outline the legal principles which generally govern the various issues raised by plaintiff's complaint and in defendants' motions.

1. *Excessive Force*

***4** The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 103, 104, 97 S.Ct. at 290, 291 (quotations and citations omitted); *see also* *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia,* *Estelle,* 429 U.S. at 103, 97 S.Ct. at 290). Claims that excessive force has been used toward an inmate by a corrections worker implicate the Eighth Amendment's protection against cruel and unusual punishment. *See* *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.,* *John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive, as the defendants seemingly suggest. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe' ", a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail a plaintiff must establish that the defendant under consideration acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d at 1033. When considering the subjective element of the governing Eighth Amendment test, a court must consider that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

> ***5** [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( McAvoy, C.J.) (quoting *Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a *de minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." [FN4] *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

> FN4. It should be noted, however, that in practice a truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action"); *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

2. *Failure to Intervene*

A corrections worker who, while not participating in an assault upon an inmate, is present while it occurs may nonetheless bear responsibility for any resulting constitutional deprivation. It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at *4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual, and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See id.; see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955 F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. *Deliberate Medical Indifference*

Claims of medical deliberate indifference to a prison inmate's serious medical needs also call into play the protections of the Eighth Amendment. As in the case of any other Eighth Amendment claim, a plaintiff who contends that prison officials have been deliberately indifferent to his or her medical needs must satisfy both an objective and subjective requirement; the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See* *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (citations omitted).

a) *Serious Medical Need*

***6** In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom*., *Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia,* *Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

b) *Deliberate Indifference*

Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994); *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979); *Waldo,* 1998 WL 713809, at *2 (same).

There is a distinction to be drawn between ignoring an inmate's serious medical condition altogether and failing to provide the form of treatment sought or preferred by a prisoner. The Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment" and accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(citation omitted).

C. *Defendants' Motions*

1. *Defendant Graham*

The only factual allegation contained within plaintiff's complaint involving Auburn Superintendent Graham centers upon his denial on April 19, 2006 of Cicio's appeals taken from adverse determinations rendered in connection with grievances regarding the failure of prison officials to provide him with adequate medical attention. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 17. Defendants assert that this meager allegation fails to disclose the requisite personal involvement on the part of defendant Graham in the matters complained of, and that no cognizable due process claim may be asserted against him arising from the failure to conduct a proper investigation of the denial of plaintiff's grievance.

***7** It is well-established that personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983 against that individual. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 claim against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) ("[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim.") (citations omitted); *Wright,* 21 F.3d at 50; *see also, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same). Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 2009 WL 189901, at *5 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Plaintiff's theory of liability against defendant Graham appears to be centered upon the claim that his refusal to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

conduct an investigation of Cicio's grievance resulted in a denial of procedural due process as guaranteed under the Fourteenth Amendment to the United States Constitution. Complaint (Dkt. No. 1) Statement of Facts ¶ 23. As defendants correctly argue, however, plaintiff has no constitutional right of access to an internal grievance process. *Ward v. Goord,* No. 9:06-CV1429, 2009 WL 102928, at *7 (N.D.N.Y. Jan.13, 2009) (Hurd, D.J. and Homer, M.J.). Accordingly, defendant Graham's failure to investigate, or act favorably upon, plaintiff's grievance does not give rise to his liability for due process deprivation.

***8** This, however, does not end the inquiry. The court's function in assessing plaintiff's *pro se* complaint is to detect the strongest claim which, based upon the circumstances alleged, could be asserted by the plaintiff. *Diaz v. United States,* 517 F.3d 608, 613 (2d Cir.2008) (recognizing that courts are to construe *pro se* submissions liberally "to raise the strongest arguments that they suggest") (quotations and citation omitted). In this instance plaintiff could argue that defendant Graham is potentially subject to personal liability based upon his awareness of the alleged, ongoing failure of prison officials to provide him with medical treatment for his injuries, coupled with the failure to remedy the wrong after learning of it through the grievance appeal. Such circumstances could give rise to a finding of liability on the part of Superintendent Graham. *See Tomarkin v. Ward,* 534 F.Supp. 1224, 1232 (S.D.N.Y.1984). Accordingly, under these circumstances it cannot be said at this early procedural juncture that plaintiff has not plausibly alleged defendant Graham's personal involvement in the claimed deliberate indifference to his serious medical needs. *See id.*

2. *Defendant Sigona*

In the factual body of his complaint plaintiff alleges that defendant Sigona, a corrections sergeant, was one of three DOCS employees who entered the group cell on March 7, 2006 to investigate the disturbance among inmates. Complaint (Dkt. No. 1) Statement of Facts ¶ 2. Plaintiff asserts that Sergeant Sigona pushed him into defendant Manna, who then assaulted him while Sergeant Sigona stood by and failed to intervene. *Id.* ¶¶ 4, 5. Although plaintiff's allegations of defendant Sigona's initial push likely do not support an excessive force claim against him, *see Johnson,* 481 F.2d at 1033, Cicio's assertions regarding that defendant's awareness of the subsequent, alleged beating by defendant Manna suffice to establish a plausible claim, at a minimum, for defendant Sigona's failure to intervene and to end the use of excessive force.

In support of his motion defendant Sigona cites cases which, though informative with regard to the controlling legal principles, are inapposite since each involves analysis on a motion for summary judgment of whether a particular defendant's conduct in allegedly failing to intervene violated plaintiff's civil rights. *See, e. g., Mowry,* 2004 WL 2202645, at *4 (finding, based upon the record, no reasonable opportunity to intercede, and thus no basis for finding liability); *Husbands v. City of New York,* No. 05-Civ. 9252, 2007 WL 2454106, at *11 (S.D.N.Y. Aug. 16, 2007) (same); *see also Espada,* 522 F.Supp.2d at 556 n. 13 (same). At this procedural juncture, the court is tasked only with determining whether plaintiff has pleaded a plausible claim against defendant Sigona based upon his failure to intercede. *See Twombly,* 127 S.Ct. at 1974. While with the benefit of a more fully developed record the court may ultimately conclude, as a matter law, that Sigona did not have a reasonable opportunity to intervene, or that excessive force was not used by another corrections officer toward the plaintiff, thus exonerating defendant Sigona from liability for violating plaintiff's civil rights, it cannot now do so given the procedural posture of the case.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Slip Copy, 2009 WL 537534 (N.D.N.Y.)
(Cite as: 2009 WL 537534 (N.D.N.Y.))

3. *Defendant Ruston*

***9** The allegations made by plaintiff in his complaint against defendant Ruston are similar to those against defendant Sigona. Plaintiff asserts that Corrections Officer Ruston was present in the group cell when he was assaulted by defendant Manna, and that he "stood and watched the incident" without intervening. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. For the reasons previously stated with respect to defendant Sigona, I am unable to conclude at this juncture that this allegation does not suffice to support a plausible failure to intervene cause of action. *See supra* at Part III.C.2.

4. *Defendant Ryerson*[FN5]

FN5. Plaintiff's failure to respond to the motions submitted by defendants Ryerson and Vega does not preclude me from making a recommendation as to the pending motions without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan.18, 2001). Such a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court can now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir.2000). It should be noted, however, that plaintiff's failure to respond in opposition to the pending motion is not without significance; under this court's local rules, a party's failure to respond to a properly filed motion can constitute consent to the granting of that motion, so long as the court determines that the moving party has met its burden demonstrating entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also McCall,* 232 F.3d at 322-23 (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall* ).

The situation with respect to defendant Ryerson is distinctly different from that of his or her co-defendants. No mention is made of defendant Ryerson in the factual body of plaintiff's complaint; defendant Ryerson is referenced only in the causes of action, in which plaintiff alleges defendant Ryerson's failure to process his sick call slips, thereby effectively precluding plaintiff from receiving medical treatment for his injuries. *See* Complaint (Dkt. No 1) Statement of Facts ¶ 22. While modest at best in describing defendant Ryerson's alleged involvement, given the deference owed to his *pro se* status I conclude that this allegation satisfies the minimal pleading requirement of Rule 8 of the Federal Rules of Civil Procedure and sufficiently alleges, at this early procedural juncture, defendant Ryerson's deliberate indifference to plaintiff's serious medical needs.[FN6] *See Rodriguez v. Suffolk County Corr. Facility,* No. 08-CV-2041, 2009 WL 205052, at *6-7 (E.D.N.Y. Jan. 27, 2009) (denying motion to dismiss medical indifference claim where claim was supported by complaint and appended materials, but acknowledging that it could emerge at summary judgment or some later stage of the proceeding that the claim was not sufficiently supported). I therefore recommend that defendant Ryerson's motion be denied.

FN6. It is noted that in defendant Ryerson's motion, an additional argument is made to the effect that plaintiff's description of his injuries resulting from the alleged March 7, 2006 assault

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

do not suffice to establish the existence of a serious medical need. Defendant Ryerson's Memorandum (Dkt. No. 22-2) at p. 2. That argument is reiterated in the motion subsequently filed by defendant Vega. Defendant Vega's Memorandum (Dkt. No. 28-2) at p. 2. While it may well be true that in the end, based upon a more robust record, the court will agree and determine, as a matter of law, that plaintiff's injuries do not meet this threshold showing necessary to support an Eighth Amendment claim, plaintiff's complaint nonetheless states a plausible deliberate indifference to a serious medical need claim. *See* *Rodriguez v. Suffolk County Corr. Facility,* No. 08-CV-2041, 2009 WL 205052, at *7 (E.D.N.Y. Jan. 27, 2009).

5. *Defendant Vega*

Plaintiff's complaint alleges that defendant Vega, apparently a registered nurse at the Auburn Correctional Facility, examined Cicio's injuries following the alleged assault by defendant Manna, but failed to provide any medical assistance, including to arrange for plaintiff to be seen by a doctor. *See* Complaint (Dkt. No. 1) Statement of Facts ¶¶ 6, 8, 21. Plaintiff also alleges that the injuries which he received presented serious medical needs. *Id.* ¶¶ 21-22. These allegations, taken together, suffice to establish a plausible claim of deliberate medical indifference on the part of defendant Vega. *See* *Rodriguez,* 2009 WL 205052, at *6 (finding that plaintiff's allegations that prison personnel acted recklessly when they deprived him of treatment for insect bite and failed to provide him with necessary medical care during hospital stay set forth a plausible claim of medical indifference).

IV. *SUMMARY AND RECOMMENDATION*

In four separate motions, five of the six defendants named in plaintiff's complaint seek a finding that plaintiff's complaint fails to demonstrate the existence of plausible claims of excessive force, failure to intervene, and/or deliberate indifference to serious medical needs against them, asserting arguments which will undoubtedly resurface, either at trial or through the filing of motions for summary judgment, when the issues raised in those motions can be examined with the benefit of a more fully developed record. At this juncture, I am unable to conclude that plaintiff has not plausibly alleged those defendants' participation in constitutional deprivations under the Eighth and Fourteenth Amendments alleged by Cicio. Accordingly, it is hereby respectfully

***10** RECOMMENDED that defendants' motions to dismiss plaintiff's complaint for failure to state a cause of action upon which relief may be granted (Dkt. Nos. 9, 15, 22 and 28) be DENIED in their entireties.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2009.
Cicio v. Graham
Slip Copy, 2009 WL 537534 (N.D.N.Y.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

Slip Copy, 2009 WL 537534 (N.D.N.Y.)
(Cite as: 2009 WL 537534 (N.D.N.Y.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Lessie ANDERSON, Plaintiff,
v.
Loyce DUKE, Dept. Superintendent of Programs; Herbert McLaughlin, Superintendent, Hudson Correctional Facility; Oscar McLaughlin; Rev., Coordinating Chaplain; D. Thomas Testo, Grievance Supervisor; and Watch Commander, Defendants.
**Civil Action No. 9:04-CV-0030 (NAM/DEP).**

Sept. 27, 2006.

Lessie Anderson, pro se.

Hon. Eliot Spitzer, Office of the Attorney General, Janice A. Dean, Esq., Assistant Attorney General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief District Judge.

***1** Plaintiff, formerly an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brought this action under 42 U.S.C. § 1983, alleging that while he was incarcerated, defendants deprived him of his First Amendment right to free exercise of his religious beliefs. He also claims that, after he filed that an inmate grievance regarding the matter, prison officials improperly disclosed information regarding his grievance and conducted a hearing regarding the grievance in his absence.

Presently before the Court is a motion (Dkt. No. 31) by defendant Herbert McLaughlin to dismiss the amended complaint against him based on the lack of his personal involvement in the constitutional violations alleged. The motion was referred to United States Magistrate Judge David E. Peebles for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c).

In his Report and Recommendation (Dkt. No. 42), Magistrate Judge Peebles finds that, "even when generously construed in his favor," plaintiff's amended complaint (Dkt. No. 20) "fails to allege the moving defendant's personal involvement in a cognizable, constitutional violation[.]" Accordingly, Magistrate Judge Peebles recommends that the motion be granted with leave to replead.

Plaintiff has interposed an objection (Dkt. No. 43). Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of those parts of a magistrate judge's Report and Recommendation to which a party specifically objects. Essentially, plaintiff's objection addresses the merits of his claim against McLaughlin. These allegations may be asserted in a second amended complaint filed in accordance herewith.

It is therefore

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

ORDERED that the Report and Recommendation of United States Magistrate Judge David E. Peebles (Dkt. No. 42) is accepted and adopted; and it is further

ORDERED that the motion (Dkt. No. 31) by defendant Herbert McLaughlin to dismiss the amended complaint is granted with leave to replead; and it is further

ORDERED that if plaintiff chooses to replead his claims against defendant Herbert McLaughlin, he is directed to serve and file a second amended complaint on or before October 30, 2006.

IT IS SO ORDERED.
DAVID E. PEEBLES, Magistrate Judge.

*REPORT AND RECOMMENDATION*

Plaintiff Lessie Anderson, a former New York State prison inmate who is apparently also known as Jeffrey Benjamin, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 alleging that while incarcerated he experienced a deprivation of his constitutional rights. In his complaint, plaintiff asserts that his First Amendment right to freely exercise his religious beliefs was infringed by prison officials, and that after filing an inmate grievance regarding the matter prison officials improperly disclosed information regarding his grievance, in violation of governing regulations, and additionally conducted a hearing regarding the grievance in his absence.

***2** Currently pending before the court is a motion by Herbert McLaughlin, one of the defendants named in plaintiff's complaint, seeking dismissal of plaintiff's claims against him based upon the lack of his personal involvement in the constitutional violations alleged. Because plaintiff's complaint, even when generously construed in his favor, fails to allege the moving defendant's personal involvement in a cognizable, constitutional violation, I recommend that his motion be granted, with leave to replead.

I. *BACKGROUND* [FN1]

FN1. In light of the procedural posture of the case, the following recitation is drawn from plaintiff's complaint, the contents of which are deemed to be true for purposes of the pending motion. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

Plaintiff is a former New York State prison inmate who, at the relevant times, was entrusted to the custody of the New York State Department of Correctional Services ("DOCS"), and incarcerated within the Hudson Correctional Facility ("Hudson"), located in Hudson, New York. Amended Complaint (Dkt. No. 20) at 2. From his complaint, it appears that during the time of his incarceration at Hudson plaintiff was a practicing Muslim. *Id.* at 3-4.

Plaintiff's allegations center around an Islamic prayer service known as Eid al-Fitr, conducted in November of 2003 in conjunction with the month of Ramadan. Amended Complaint (Dkt. No. 20) at 3-B. According to Anderson, while the Eid al-Fitr prayer service was to have taken place on November 25, 2003, it was deferred by prison officials, and not held until November 26, 2003. *Id.* Plaintiff's complaint attributes the delay in permitting participation in the Islamic prayer event to defendant Loyce Duke, the Deputy Superintendent of Programs at Hudson. *Id.* at 3, 3-B.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In or about late November, 2003, plaintiff filed an inmate grievance regarding the delay in scheduling the Eid al-Fitr prayer service. Amended Complaint (Dkt. No. 20) at 3-C. Plaintiff asserts that information regarding his grievance was improperly disclosed to others by defendant Oscar L. McLaughlin, a chaplain stationed at Hudson, in violation of governing regulations. *Id.* Plaintiff further alleges that defendant D. Thomas Testo, the Grievance Supervisor at the facility, scheduled and presided over a hearing before the Inmate Grievance Review Committee ("IGRC") to address his grievance, but that he was not permitted to attend that hearing. *Id.* at 3-C-3-D.

On December 19, 2003 plaintiff confronted Testo in the prison library, questioning the basis for the refusal to allow him to be present during the IGRC hearing. Amended Complaint (Dkt. No. 20) at 3-C-3-D. According to Anderson, Hudson Superintendent Herbert McLaughlin, who was also in the library at the time, overheard the conversation but took no action to address the issue. *Id. at* 3-D-3-E.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 9, 2004 and, at the court's direction, filed an amended complaint on June 20, 2005. Dkt. Nos. 1, 6, 15, 20. Named as defendants in plaintiff's complaint, as amended, are Loyce Duke, Deputy Superintendent of Programs at the facility; Herbert McLaughlin, the Superintendent at Hudson; D. Thomas Testo, the Grievance Supervisor; Oscar L. McLaughlin, a prison chaplain; and a watch commander who is not identified by name in plaintiff's complaint. As relief, plaintiff's complaint seeks recovery of $100 million against each of the defendants.

***3** Three of the four defendants sued by Anderson, including Loyce Duke, Oscar L. McLaughlin, and Thomas Testo, have jointly interposed an answer to plaintiff's complaint, dated January 26, 2006, generally denying its allegations and asserting various defenses. Dkt. No. 30. The fourth named defendant, Herbert McLaughlin, has chosen instead to move seeking dismissal of plaintiff's claims against him, based upon the lack of any allegation showing his personal involvement in the constitutional violations alleged. Dkt. No. 31. The court has received no papers from or on behalf of the plaintiff in opposition to Superintendent McLaughlin's motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Legal Significance of Plaintiff's Failure To Oppose Defendants' Motion*

Confronted with a motion by defendant H. McLaughlin seeking dismissal of plaintiff's complaint as against him, Anderson has failed to provide the court with the benefit of any argument as to why that motion should not be granted. Before turning to the merits of the pending motion, I must first consider the legal consequences, if any, associated with that failure.

Although the plaintiff has filed no opposition to defendants' motion to dismiss, I am not precluded from recommending disposition of the motion without the benefit of his submission. *See, e.g., White v. Mitchell,* No. 99-CV-8519, 2001 WL 64756, at *1 (E.D.N.Y. Jan. 18, 2001). Motions to dismiss test only the legal sufficiency of the complaint; accordingly, while a party should be given

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

reasonable opportunity to respond to such a motion the court can determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the relevant case law. *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir.2000).

While under this court's local rules a party's failure to respond to a properly filed motion can be considered as signaling the lack of any opposition, before granting the motion the court must first make a threshold finding that the moving party has met its burden demonstrating entitlement to the relief requested. N.D.N.Y.L.R. 7.1(b)(3); *see also* *McCall,* 232 F.3d at 322-23 (holding that plaintiff's failure to respond to motion to dismiss in and of itself could not constitute basis for dismissal if plaintiff's complaint stated a claim for relief); *White,* 2001 WL 64756, at n. 2 (citing *McCall).* Accordingly, the court must review the pending motion for facial sufficiency before the relief sought can be awarded, notwithstanding plaintiff's failure to properly oppose the motion.

B. *Rule 12(b)(6) Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, applying a standard which is neither controversial nor rigorous in its requirements. Under that provision, a court may not dismiss a complaint unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him [or her] to relief.' " *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 300 (2d Cir.) (citation omitted), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The court's determination as to the sufficiency of a complaint must take into consideration the fact that the governing rules require only that the defendant be afforded "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103; *see* *Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005).

***4** When assessing the sufficiency of a complaint against this backdrop, particular deference must be afforded to a *pro se* litigant; a court must generously construe a *pro se* plaintiff's complaint when determining whether it states a cognizable cause of action. *Davis,* 320 F.3d at 350 (citations omitted). A complaint drafted by an uncounselled plaintiff should not be dismissed unless "it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations." *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (citation omitted). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim could potentially be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

C. *Lack of Personal Involvement*

The sole basis for Superintendent McLaughlin's dismissal motion is the contention that plaintiff's complaint fails to disclose any basis for finding personal involvement on his part in any constitutional deprivation. Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

section 1983 against that party. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

The fact that defendant H. McLaughin is the superintendent of a prison facility at which constitutional violations are alleged to have occurred does not in and of itself expose him to liability for damages. A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

***5** The solitary allegation in plaintiff's complaint regarding Superintendent McLaughlin's participation in the events giving rise to plaintiff's claim surrounds a conversation between Anderson and defendant Testo, the inmate grievance supervisor at Hudson, concerning the fact that a grievance hearing had been conducted in plaintiff's absence. Amended Complaint (Dkt. No. 20) at 3-C-3-E. Plaintiff alleges that Superintendent McLaughlin witnessed that conversation and, surmising that he was able to overhear its contents, accuses him of failing to intervene on his behalf, noting that the Superintendent "never said a word[.]" *Id.* at 3-E.

In their motion defendants liken this situation to those circumstances under which courts have absolved facility superintendents or other similarly positioned supervisory employees of liability where allegations regarding their involvement are limited to the receipt of unanswered letters complaining of constitutional deprivations. *See, e.g., Pettus v. Horn,* No. 04 Civ. 459, 2005 WL 2296561, at *4 (S.D.N.Y. Sept. 21, 2005); *Greenwaldt v. Coughlin,* No. 93 Civ. 6551, 1995 WL 232736, at *4 (S.D.N.Y.Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations .") (citing, *inter alia, Garrido v. Coughlin,* 716 F.Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against superintendent of prison where only allegation was that he ignored inmate's request for an investigation)). Those and other similar cases absolving supervisory DOCS employees of personal liability, however, are premised upon the inability to say with certainty that an ignored letter complaining of a constitutional deprivation provides a basis to conclude that the recipient knew or reasonably should have been aware of the violation, but failed to act on information reflecting its existence. In this instance, however, it cannot be said based upon the allegations of plaintiff's complaint, construed in a light most favorable to him, that at trial he could not prove a set of circumstances which would lead a reasonable factfinder to conclude Superintendent McLaughlin was aware of, but failed to act with regard to, the contents of plaintiff's communication with defendant Testo. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

This finding, however, does not end the inquiry. Under the relevant test for establishing supervisory liability, a plaintiff seeking to hold a defendant accountable under circumstances such as those now presented must establish that the defendant knew of and acquiesced in a constitutional deprivation. *See Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."). In this instance, plaintiff's allegations regarding Superintendent McLaughlin's involvement focus solely upon the claim that a grievance hearing was improperly conducted in his absence. Plaintiff has not cited, nor am I aware of, any authority establishing that a failure to permit an inmate to be present at an IGRC hearing addressing a grievance filed by the prisoner represents a deprivation of constitutional proportions. *Cf., Dawes v. Leonard,* 885 F.Supp. 375, 377-78 (N.D.N.Y.) (exclusion of inmate from attendance at disciplinary hearing does not represent a constitutional deprivation) (Baer, J.), *aff'd,* 71 F.3d 406 (2d Cir.1995); *see also Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at *9-* 10 (S.D.N.Y. Dec. 10, 2004) (while the filing of inmate grievances is constitutionally protected, the manner in which such grievances are addressed is not subject to due process scrutiny). As such, plaintiff's allegations do not suffice to establish that through overhearing plaintiff's conversation with defendant Testo, Superintendent McLaughlin became aware of, but refused to act in connection with, a constitutional deprivation. *See Colon,* 58 F.3d at 873. Accordingly, plaintiff has not sufficiently alleged Superintendent McLaughlin's personal involvement in connection with an actionable constitutional deprivation to establish a potential basis for finding liability on his part.

IV. *SUMMARY AND RECOMMENDATION*

***6** The only allegations set forth in plaintiff's complaint against defendant Herbert McLaughlin, the Superintendent of the Hudson Correctional Facility, grow out of his allegedly having witnessed a conversation in which plaintiff complained to the inmate grievance coordinator of the fact that a grievance hearing was conducted in his absence. Since the holding by the IGRC of an inmate grievance hearing in the absence of the grieving inmate does not implicate a constitutional violation, plaintiff's allegations do not suffice to adequately plead Superintendent McLaughlin's personal involvement in a constitutional deprivation. It is therefore hereby

RECOMMENDED, that defendant Herbert McLaughlin's motion seeking dismissal of plaintiff's complaint as against him (Dkt. No. 31) be GRANTED, and that plaintiff's claims against that defendant be DISMISSED in all respects, with leave to replead.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

N.D.N.Y.,2006.
Anderson v. Duke
Not Reported in F.Supp.2d, 2006 WL 2792735 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jose ORRACA, Plaintiff,
v.
T, McCREERY; M. Bertone; Mr. Andrews; T. Nasaveria; Mr. Wright; Mr. Maly; and Mr. Mayberry, Defendants.
**No. 9:04-CV-1183.**

April 25, 2006.

Jose Orraca, Pine City, NY, Plaintiff, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Stephen M. Kerwin, Esq., Asst. Attorney General, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Jose Orraca, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated February 14, 2006, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendants' motion be granted, in part, and plaintiff's claims against them in their official capacities for damages be dismissed, based upon the Eleventh Amendment; that plaintiff's claims against defendant Maly be dismissed, with leave to replead, based upon the lack of his personal involvement in the deprivations alleged; and that plaintiff's claim for compensatory damages for mental anguish and emotional distress be dismissed; but that defendants; motion be denied in all other respects. (Docket No. 33). The defendants have filed timely objections to the recommendations of the Magistrate Judge. (Docket No. 34). The plaintiff filed a response. (Docket No. "35").

Based upon a de novo determination of the portions of the Report-Recommendation to which the parties have objected, the Report-Recommendation is accepted and adopted in whole. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion to dismiss is GRANTED in part and DENIED in part;

2. Plaintiff's claims for damages against defendants in their official capacities is DISMISSED, based upon the Eleventh Amendment;

3. Plaintiff's claims against defendant Mr. Maly are DISMISSED;

4. Plaintiff's claim for compensatory damages for mental anguish and emotional distress is DISMISSED;

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Arthur HUCKS, Plaintiff,
v.
Christopher ARTUZ, et al., Defendants.
**No. 99 Civ. 10420RMB RLE.**

Feb. 27, 2001.

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

I. INTRODUCTION

***1** This matter was referred to the undersigned for resolution of dispositive motions. Plaintiff filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging: (1) deliberate indifference to his medical needs in violation of the Eighth Amendment to the Constitution; (2) violation of the Fourteenth Amendment to the Constitution; and (3) state law claims of assault, medical malpractice, and negligence. Plaintiff also alleges violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182.[FN1] Defendants moved to dismiss the claims pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. For the following reasons, this Court recommends the motion be GRANTED.

FN1. The Court assumes for the purposes of this Report and Recommendation that plaintiff meant to have alleged violation of Title II of the ADA, codified at 42 U.S.C. 12131 *et seq.* That section, prohibiting a "public entity" from discriminating against a "qualified individual with a disability" because of that individual's disability, has been held to apply to inmates in state prisons. *See Pennsylvania Dep't of Corrections v. Yeskey, 524 U.S. 206 (1998)*.

II. BACKGROUND

Plaintiff Arthur Hucks was a paraplegic inmate confined to a wheelchair at Green Haven Correctional Facility. Proceeding *pro se,* he filed his first complaint in this action on October 12, 1999. He alleged he was harassed, threatened, and denied treatment by medical staff. *See* Hucks Aff. ¶ 1.[FN2] Plaintiff further alleged that on August 4, 1999, Sgt. Schwartzman struck him, then dumped him out of his wheelchair onto the floor, and that officers Sneddon, Osterhoudt, and Lennox stood by. *Id.,* ¶ 1-2. Plaintiff stated that nurses Dorothy [FN3] and Fila laughed at him and discussed with the officers "their strategy to cover up what they did to me." *Id.* ¶ 3. He further stated that once taken to the clinic, he was left alone on a stretcher without being examined, although Dr. Sohng was standing nearby. *Id.,* ¶ 4. Plaintiff also alleged that Superintendent Artuz allowed staff misconduct, that Dr. Silver and Ece, a physical therapist, were indifferent to his medical needs, and that Koenigisman "supports the lies and mistreatment of disabled inmates by medical and security staff." *See* Compl. 3-4 [FN4] Plaintiff attached a letter to his complaint stating that his cell lights did not work and "now I have to live in a state of fear for my life." Att. Let. at 2. [FN5] By way of relief, plaintiff sought punitive damages in the amount of $1,000,000 per defendant and compensatory damages

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the amount of $25,000 per defendant. *See* Compl. at 5.

FN2. "Hucks Aff." refers to plaintiff's affidavit, dated August 16, 1999, submitted with his first complaint.

FN3. Nurse Dorothy is named as defendant Donagarra in defendants' memorandum of law in support of their motion to dismiss, dated April 7, 2000.

FN4. "Compl." refers to plaintiff's first complaint, dated August 22, 1999.

FN5. "Att. Let." refers to a letter, dated August 12, 1999, attached to plaintiff's first complaint.

By letter dated February 2, 2000, defendants requested a conference before District Judge Berman and indicated the bases upon which they intended to file a motion to dismiss. The letter stated that plaintiff had failed to exhaust available administrative remedies, as is required under the Prisoner Litigation Reform Act of 1996, 42 U.S.C. § 1997e(a), and that plaintiff had failed to allege personal involvement by defendants Artuz and Silver. *See* Def. Let. 2/2/2000.[FN6] Before assigning the case to the undersigned, Judge Berman ordered the plaintiff to respond to defendant's arguments. Accordingly, plaintiff submitted a letter, dated February 10, 2000, arguing that the case should not be dismissed because, to the best of his knowledge, he had exhausted available remedies. *See* Pl. Let. 2/10/2000.[FN7]

FN6. "Def. Let. 2/2/2000" refers to letter submitted by defendants, dated February 2, 2000.

FN7. "Pl. Let. 2/10/2000" refers to letter submitted by plaintiff, dated February 10, 2000.

***2** Meanwhile, plaintiff filed an amended complaint on January 14, 2000, but it was not actually served on defendants until March and April, 2000. On March 22, 2000, defendants requested and were granted an extension of time for filing their motion to dismiss the complaint. In his amended complaint, plaintiff alleged the same legal violations, but relied on different facts and added three more defendants. *See* Am. Compl.[FN8] Plaintiff alleged staff would refuse to assist him, and that "on many occasions, I was left in my bed in my human waste." *Id.* at 3. Plaintiff alleged that on September 5, 1999, he fell attempting to transfer from the toilet to his wheelchair, and was threatened with a misbehavior report because he rang the emergency call bell. *Id.* at 4. Plaintiff also alleged that on October 18, 1999, the axle on his wheelchair broke, resulting in injury to his elbow, head and back. *Id.* Plaintiff contended that prison staff did not follow proper procedures and did not have photos taken of the broken chair or of his injuries. Stmt. of Facts. at 2. [FN9] Plaintiff also contended Dr. Silver and other staff ignored his complaints. *Id.* Further, plaintiff contended that after "Dr. Ms. Paulpauly" examined him and issued him a permit to be pushed short and long distances and increased his pain medication, defendants directed inmates to taunt and harass him. *See id.;* Am. Compl. at 5. Plaintiff also indicated he wrote a letter to Superintendent Artuz stating that an inmate threatened to set his cell on fire. Stmt. of Facts at 2. Finally, plaintiff alleged Dr. Silver stopped his AIDS medication "for quite some time ." *Id.* By way of remedy, plaintiff seeks spinal surgery and $1,025,000 per defendant. Am. Compl. at 5.

FN8. "Am. Compl." refers to plaintiff's Amended Complaint, dated January 9, 2000.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2001 WL 210238 (S.D.N.Y.)
(Cite as: 2001 WL 210238 (S.D.N.Y.))

FN9. "Stmt. of Facts" refers to two handwritten pages, marked "Statement of Facts," attached to plaintiff's Amended Complaint.

On April 7, 2000, defendants moved for dismissal of the amended complaint pursuant to Rules 12(b)(1) and (6). Defendants argue that plaintiff failed to exhaust his administrative remedies and failed to allege personal involvement of twelve defendants; that defendants are not subject to suit under the ADA; and that plaintiff failed to plead a Fourteenth Amendment claim. *See* Def. Mem.[FN10] Plaintiff did not respond to defendant's motion.[FN11]

FN10. "Def. Mem." refers to defendant's memorandum of law in support of motion to dismiss, dated April 7, 2000.

FN11. Court records indicate plaintiff is no longer in prison and wrote to inform the Court of a change of address on October 29, 2000. This correspondence occurred over six months after defendants moved for dismissal, but made no mention of the motion or plaintiff's failure to respond to it.

III. DISCUSSION

A. Standard for dismissal under 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint when the federal court "lacks jurisdiction over the subject matter." *See* Fed.R.Civ.P. 12(b)(1). In most cases, the court will consider a 12(b)(1) motion before ruling on any other motions to dismiss, since dismissal of an action for lack of subject matter jurisdiction will render all other accompanying defenses and motions moot. *See United States ex rel Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1155-56 (2d Cir.1993), *cert. denied sub nom. Kreindler & Kreindler v. United Technologies Corp.,* 508 U.S. 973 (1993); *see also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990). Thus, a court confronted with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) should decide the jurisdictional question first because "a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Magee v. Nassau County Medical Center,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998); *see also Rhulen,* 896 F.2d at 678.

***3** In considering a 12(b)(1) motion to dismiss for want of subject matter jurisdiction, a court must assume as true factual allegations in the complaint. *Shipping Financial Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998) (*citing Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)); *Serrano v. 900 5th Ave. Corp.,* 4 F.Supp.2d 315, 316 (S.D.N.Y.1998). Where jurisdictional issues are in dispute, the court may look to "evidence outside the pleadings, such as affidavits." *Filetech S.A. v. France Telecom, S.A.,* 157 F.3d 922, 932 (2d Cir.1998) (*quoting Antares Aircraft v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215 (1992)).

B. Standard for dismissal under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) should be granted only if it appears beyond doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J., Inc. v.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See id.; Hernandez v.. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994), *cert. denied,* 513 U.S. 836 (1994). However, a court does not have to accept as true "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079 (1995) (*quoting* 2 Moore's Federal Practice ¶ 12.08, at 2266-69 (2d ed.1984)). The review is limited, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)(*quoting Scheuer v. Rhodes,* 416 U.S. at 236).

Pleading requirements for *pro se* plaintiffs are relaxed. *See Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir.1974). While generally courts do not look outside the pleadings when reviewing a motion to dismiss pursuant to Rule 12(b)(6), they may consider the allegations contained in a *pro se* plaintiff's memorandum of law, where those allegations are consistent with the allegations in the complaint. *See Donahue v. United States Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990). Accordingly, the Court will take into consideration both of plaintiff's complaints and his letter submission of February 10, 2000, in construing the factual background.

*Pro se* plaintiffs, however, are not relieved of pleading requirements. In order to avoid dismissal, plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (*quoting* 2 James Wm. Moore, Moore's Federal Practice ¶ 12.34[1][b] (3d ed.1997)). *See also, Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) (stating that civil rights complaints "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983").

C. Failure to Exhaust Administrative Remedies

***4** Defendants argue that the case should be dismissed for lack of subject matter jurisdiction because plaintiff has failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). *See* Def. Mem. at 6-9. Plaintiff stated that he filed numerous grievances. *See* Am. Compl. at 2, 4; Compl. at 2. He also stated that, to the best of his knowledge, he did exhaust all administrative remedies before he filed the instant action. *See* Pl. Let. 2/10/2000.

The statute reads, in pertinent part, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (Supp.2000). Here, the plaintiff did not submit any documentation demonstrating that he exhausted his administrative remedies by obtaining a final administrative determination from the Central Office Review Committee ("CORC"). Such exhaustion is a mandatory requirement. *See, e.g., Laureano v. Pataki,* 2000 WL 1458807, at *1 (S.D.N.Y. Sept. 29, 2000); *Edney v. Karrigan,* 69 F.Supp.2d 540, 543 (S.D.N.Y.1999). Where an inmate fails to satisfy this requirement, the complaint must be dismissed. *See, e.g., Laureano v. Pataki,* 2000 WL 1458807, at *3. I therefore recommend that the complaint be dismissed for failure to exhaust.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

D. Section 1983 Claims

Plaintiff brought his constitutional claims under 42 U.S.C. § 1983. In order to state a cause of action under § 1983, a plaintiff must show the conduct in question was committed by a person acting under color of state law, and that the conduct deprived the plaintiff of his "rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). To survive a motion to dismiss, a plaintiff must make specific allegations of fact indicating a deprivation of his or her constitutional rights. *See Rivera v. Goord,* 119 F.Supp.2d 327 (S.D.N.Y.2000).

1. Eighth Amendment Claim

To establish a claim under the Eighth Amendment because of inadequate medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (*quoting Estelle v. Gamble,* 429 U.S. 97, 104 (1976)); *Graham v. Perez,* 121 F.Supp.2d 317, 325 (S.D.N.Y.2000). The deprivation of care must be "sufficiently serious." *Chance,* 143 F.3d at 702 (*quoting Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). A medical condition is considered serious if it is "a condition of urgency" that may result in "degeneration" or "extreme pain." *Hernandez v. Keane,* 2000 WL 16951, *2 (S.D.N.Y. Jan. 7, 2000) (*quoting Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("Hathaway III")); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990). *See, e.g., Chance,* 143 F.3d at 702 (extreme dental pain and deterioration constitutes a serious medical condition).

***5** Additionally, the defendant must act with a sufficiently culpable state of mind. *Id.* An official acts with deliberate indifference when "he knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (*quoting Farmer v. Brennan,* 511 U.S. 825, 837 (1994)); *Hernandez,* 2000 WL 16951, at *2.

Plaintiff's allegations do not rise to the level of an Eighth Amendment violation, as he does not describe any instance in which his serious medical needs were disregarded. Only two of plaintiff's allegations describe incidents involving his medical care: (1) Dr. Sohng's indifference to plaintiff as he lay on a stretcher suffering the effects of mistreatment by Sgt. Schwartzman, *see* Hucks Aff. ¶ 4; and (2) Dr. Silver's decision to stop plaintiff's AIDS medication. *See* Stmt. of Facts at 2. Plaintiff fails to allege, however, that either Dr. Sohng's inaction or Dr. Silver's action created an excessive risk to plaintiff's health or that either doctor acted with a culpable state of mind.

The PRLA allows a court to dismiss a claim without first requiring the exhaustion of administrative remedies if the plaintiff fails to state a claim for which relief can be granted. 42 U.S.C. § 1997e(c)(2). Nevertheless, if the plaintiff were to establish administrative exhaustion, the Court recommends that he be allowed to replead on this issue.

2. Personal Involvement

Under § 1983, a plaintiff must allege the personal involvement of defendants in the alleged deprivation. *See Dove v. Fordham University,* 56 F.Supp.2d 330, 336

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(S.D.N.Y. June 14, 1999) (*citing* *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986)); *Zamakshiri v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995). If a complaint names a defendant in the caption but fails to indicate how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint with regard to that defendant should be granted. *See* *Dove,* 56 F.Supp.2d at 335. A plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Liability may not be predicated on a theory of *respondeat superior* or vicarious liability. *See* *Dove,* 56 F.Supp.2d at 335. Rather, a supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *See* *Williams v. Smith,* 781 F.2d at 323-24.

In his original complaint, plaintiff alleged Sgt. Schwartzman and officers Sneddon, Osterhoudt, and Lennox assaulted him. *See* Hucks Aff. at ¶ 1-2. He did not state how nurses Donagarra and Fila violated his rights, *see Id.* at ¶ 3, or how Dr. Sohng violated his rights. *Id.* at ¶ 4. Although plaintiff mentioned defendants Artuz, Ece, Silver and Koenigisman in the complaint, he did not allege facts explaining how they violated his rights. *See* Compl. at 3-4. He did not mention defendant Westley. Consequently, the original complaint alleges violations only by Schwartzman, Sneddon, Osterhoudt, and Lennox.

***6** In his amended complaint, plaintiff alleged that Dr. Silver had stopped his AIDS medication "for quite some time." Stmt. of Facts at 2. He also alleged that he wrote to Artuz to inform him that an inmate threatened to set fire to his cell. *Id.* However, plaintiff does not allege involvement by Artuz sufficient to establish liability under § 1983. Even assuming the letter could be construed as one alleging a constitutional violation, it would not be sufficient to establish liability. The fact that an inmate informs a supervisor of an alleged constitutional deprivation by letter is insufficient to support a finding that the supervisor was on notice of the deprivation. *See* *Zamakshiri v. Dvoskin,* 899 F.Supp. 1097, 1110 (S.D.N.Y.1995). Thus, in his amended complaint, plaintiff stated claims only against Dr. Silver.

Taken together and construed liberally, plaintiff's two complaints state claims against defendants Schwartzman, Sneddon, Osterhoudt, Lennox, and Silver. Claims against any other defendants must be dismissed.

3. Fourteenth Amendment Claim

Defendants also argue that plaintiff fails to state a Fourteenth Amendment claim. *See* Def. Mem. at 14. The Court agrees. Plaintiff does not specify which Fourteenth Amendment rights were violated, or by which acts, in any of his submissions. The claim therefore constitutes a conclusory allegation unsupported by factual allegations. Accordingly, I recommend that it should be dismissed.

E. Americans With Disabilities Act Claim

Defendants also argue that plaintiff's claim under the ADA must be dismissed because ADA claims may not be brought against individuals. *See* Def. Mem. at 13. Although the Second Circuit has yet to decide the issue of whether Title II of the ADA lies against individuals, district courts in this circuit have held that individual defendants may not be held liable under the statute. *See, e.g.,* *Shariff v. Artuz,* 2000 WL 1219381 at *5 (S.D.N.Y.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Aug. 28, 2000); *Hallett v. New York State Department of Correctional Services, et al.,* 109 F.Supp.2d 190, 199 (S.D.N.Y. Aug. 14, 2000). In so holding, the courts have analogized to Title VII of the Civil Rights Act, which does not impose liability on individuals. *See* *Shariff,* 2000 WL 1219381, at *4; *Hallett,* 109 F.Supp.2d at 199; *Candelaria v. Cunningham,* 2000 WL 798636, at *3 (S.D.N.Y. June 20, 2000). *See also* *Smith v. University of State of New York,* 1997 WL 800882, at *8 (W.D.N.Y. Dec. 31, 1997).

While this Court accepts the proposition that individual liability does not attach under the ADA, it acknowledges that analogizing to Title VII has led some courts to conclude that plaintiffs could nevertheless sue individual defendants in their *official* capacities. *See* *Candelaria,* 2000 WL 798636, at *2 (*citing* *Jones v. Inter-County Imaging Centers,* 889 F.Supp. 741 (S.D.N.Y.1995); *Romand v. Zimmerman,* 881 F.Supp. 806 (N.D.N.Y.1995)). However, the distinction between official and individual capacity liability under the ADA has since been rejected on the theory that official capacity suits are not necessary where plaintiffs may sue a government entity directly. *See* *Shariff,* 2000 WL 1219381 at *5; *Hallett,* 109 F.Supp.2d at 199; *Candelaria,* 2000 WL 798636, at *3 (relying on District Judge Martin's reasoning with respect to Title VII in *Bakal v. Ambassador Constr.,* 1995 WL 447784 (S.D.N.Y. July 28, 1995)). Here, plaintiff could have sued the Department of Corrections directly, obviating the need to sue defendants in their official capacities. The Court sees no justification for permitting a claim against individuals, and accordingly recommends that plaintiff's ADA claims be dismissed.

F. State Law Claims

***7** Finally, defendants argue that plaintiff's state law claims should be dismissed for lack of subject matter jurisdiction. Defendants correctly point out that state law tort claims against prison officials may only be brought in state court. Def. Mem. at 14, *citing* *Parker v. Miller,* 1999 WL 1024108, at *2 (2d Cir.1999) (*citing* *Baker v. Coughlin,* 77 F.3d 12, 15-16 (2d Cir.1996)). I therefore recommend these claims be dismissed.

IV. CONCLUSION

For the foregoing reasons, this Court respectfully recommends that defendants' motion to dismiss be GRANTED. If plaintiff establishes that he has exhausted his administrative remedies, the dismissal should be without prejudice and plaintiff should be afforded an opportunity to file an amended complaint alleging sufficient facts to make out a claim under the Eighth Amendment. The amended complaint should be dismissed in all other respects.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard M. Berman, 40 Centre Street, Room 201, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See* *Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2001.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2001 WL 210238 (S.D.N.Y.)
(Cite as: 2001 WL 210238 (S.D.N.Y.))


Hucks v. Christopher Artuz
Not Reported in F.Supp.2d, 2001 WL 210238 (S.D.N.Y.)


END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

5. Defendants' motion is DENIED in all other respects; and

6. The defendants shall file and serve an answer to the remaining allegations in the complaint on or before May 10, 2006.

IT IS SO ORDERED.
DAVID E. PEEBLES, Magistrate Judge.

*REPORT AND RECOMMENDATION*

Plaintiff Jose Orraca, a New York state prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against seven individuals employed by the New York State Department of Correctional Services ("DOCS") at the prison facility in which he was incarcerated at the relevant times. In his complaint, plaintiff alleges that the defendants took various actions against him in retaliation for having complained of the loss or destruction of legal documents and personal property. Plaintiff's complaint names the seven defendants in both their individual and official capacities, and seeks recovery of compensatory and punitive damages.

In response to plaintiff's complaint, defendants have moved seeking dismissal of all or portions of plaintiff's claims on various bases including, *inter alia,* plaintiff's failure to exhaust available administrative remedies before commencing suit. Based upon my review of plaintiff's complaint and defendants' moving papers, I recommend dismissal of plaintiff's damage claims against the defendants in their official capacities, and of his claim for compensatory damages for mental anguish and emotional distress based upon his failure to plead the existence of physical injury, but denial of the portions of defendants' motion seeking additional relief.

I. *BACKGROUND* [FN1]

FN1. In light of the procedural posture of this case, the following facts are taken from plaintiff's complaint, which has been interpreted in a light most favorable to him, and with all inferences drawn and ambiguities resolved in his favor. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

***2** Plaintiff is a New York State prison inmate entrusted to the custody of the DOCS and, at the times relevant to his complaint, was confined within the Shawangunk Correctional Facility ("Shawangunk"). While at Shawangunk, plaintiff has complained to prison officials regarding the loss or destruction of legal transcripts and other court papers, as well as personal property, apparently including civilian clothes which were sent to him for use when appearing in United States District Court for the Western District of New York in connection with a civil action brought by him in that forum.[FN2]

FN2. An attachment to plaintiff's complaint reflects that he brought an action in the United States District Court for the Western District of New York, entitled *Orraca v. Cetti, et al.,* Civil Action No. 96-CV-6385 (W.D.N.Y., filed 1996). According to publicly available records regarding that suit, that action concerned matters which occurred during the course of plaintiff's imprisonment in the Attica Correctional Facility.

After lodging complaints regarding the loss and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

destruction of property while at Shawangunk and pursuing grievances associated with those issues, plaintiff began experiencing recrimination. In retaliation for voicing those complaints, plaintiff has been issued five drug-related misbehavior reports by defendants T. McCreary and M. Bertone, beginning in October of 2003, resulting in Tier III disciplinary proceedings against him.[FN3] According to the plaintiff, defendants' actions have resulted in periods of disciplinary keeplock and special housing unit ("SHU") confinement for him, the requirement that he undergo drug counseling, denial of his participation in a family reunion program, and the further destruction of legal materials and corresponding denial of court access.

FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

II. *PROCEDURAL HISTORY*

Plaintiff, who appears to be an experienced *pro se* litigant, commenced this action on February 14, 2004.[FN4] Dkt. No. 1. Named as defendants in plaintiff's complaint are seven DOCS workers employed at Shawangunk, including T. McCreary, a corrections officer; M. Bertone, a corrections sergeant; (first name unknown) Andrews, a hearing officer; T. Nasaveria, a property officer; (first name unknown) Wright, a corrections lieutenant; (first name unknown) Maly, Deputy Superintendent of Security at the facility; and C. Mayberry, a recreational officer. Although somewhat ambiguous on this score, plaintiff's complaint appears to assert only a claim of unlawful retaliation against the various defendants.

FN4. A search of this court's records reflects the filing by plaintiff of six other lawsuits in this district, in addition to the instant action, arising from the terms of his confinement. *See Orraca v. Pilatich,* Civil Action No. 9:05-CV-1305 (DNH/GHL) (N.D.N .Y., filed Oct. 14, 2005); *Orraca v. Lee,* 9:04-CV-1249 (DNH/DRH) (N.D.N.Y., filed Oct. 27, 2004); *Orraca v. Clark,* Civil Action No. 9:00-CV-766 (TJM/GJD) (N.D.N.Y., closed May 11, 2004); *Orraca v. Estabrook,* Civil Action No. 9:99-CV-1216 (NAM/GLS) (N.D.N.Y., closed Mar. 28, 2002); *Orraca v. Maloy,* Civil Action No. 9:96-CV-2000 (NAM/DEP) (N.D.N.Y., closed Mar. 22, 2001); *Orraca v. Walker,* Civil Action No. 6:98-CV-448 (LEK) (N.D.N.Y., closed March 29, 2000). In addition, it appears that plaintiff has filed at least two suits in the Western District of New York, including *Orraca v. Cetti,* Civil Action No. 96-CV-6385 (DGL/JWF) (W.D.N.Y., filed 1996); and *Orraca v. Kelly,* Civil Action No. 1:95-CV-729 (WMS) (W.D.N.Y., filed 1995). Plaintiff's responsive motion papers also disclose the existence of at least one action commenced by the plaintiff in the Southern District of New York, *Orraca v. Walker,* Civil Action No. 00-CV-5503 (LMM) (S.D.N.Y., filed 2000). *See* Orraca Decl. (Dkt. No. 32) at 3. All of the foregoing matters appear to have involved claims associated with his DOCS confinement. Notwithstanding the commencement of these actions, when asked in the form complaint which he filed with the court in this action whether he had commenced other

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

> lawsuits in state or federal court relating to his imprisonment, plaintiff responded that he had not. *See* Complaint (Dkt. No. 1) § I(a).

In lieu of answering plaintiff's complaint, defendants have instead moved seeking its dismissal on a variety of grounds, arguing that 1) plaintiff's claims against them in their official capacities are barred by the Eleventh Amendment; 2) plaintiff's complaint is subject to dismissal in its entirety based upon his failure to exhaust available administrative remedies; 3) plaintiff's complaint fails to allege the requisite personal involvement with regard to all or some of the defendants named; and 4) plaintiff's compensatory damages cause of action is subject to dismissal under 42 U.S.C. § 1997e(e), in light of his failure to allege that he suffered physical injury as a result of defendants' actions. Dkt. No. 21. Plaintiff has since submitted both a declaration and exhibits (Dkt. No. 32) in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

***3** A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, applying a standard which is neither controversial nor rigorous in its requirements. Under that provision, a court may not dismiss a complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him [or her] to relief." *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citing, *inter alia, Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957)). In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper,* 378 U.S. at 546, 84 S.Ct. at 1734; *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The court's determination as to the sufficiency of a complaint must take into consideration the fact that the governing rules require only that the defendant be afforded "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103; *see Phillips v. Girdich,* 408 F.3d 124, 127-29 (2d Cir.2005).

When assessing the sufficiency of a complaint against this backdrop, particular deference must be afforded to a *pro se* litigant; a court must generously construe a *pro se* plaintiff's complaint when determining whether it states a cognizable cause of action. *Davis,* 320 F.3d at 350 (citation omitted). A complaint drafted by an uncounselled plaintiff should not be dismissed unless "it is clear that the plaintiff would not be entitled to relief under any set of facts that could be proved consistent with the allegations." *Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997) (citation omitted). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim could potentially be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Eleventh Amendment*

In his description of the parties to this action, plaintiff

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

identifies the seven DOCS employees named as defendants and states that "[e]ach defendant is being sued in their [sic] individual and official capacity." Complaint (Dkt. No. 1) at 3 (unnumbered). Plaintiff's prayer for relief reiterates his intention to recover damages against the defendants both individually and in their official capacities, stating that he requests the entry of judgment

[i]n favor of plaintiff for actual compensatory and consequential damages in the amount of $350,000.00 *(three hundred and fifty thousand dollars),* three hundred and fifty thousand dollars in punitive damages against defendants *T. McCreery, M. Bertone, and T. Nagaveria* [sic] in their individual and official acting capacity [sic].

***4** *Id.* at 7 (emphasis in original). Defendants assert that plaintiff's damage claims against them in their official capacities are barred by the Eleventh Amendment.

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities, when the essence of the claim involved is one against a state as the real party in interest. *Richards v. State of New York Appellate Division, Second Department,* 597 F.Supp. 689, 691 (E.D.N.Y.1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S.Ct. 2325, 2328-29 (1982)). "To the extent that a state official is sued for damages in his official capacity ... the official is entitled to invoke the Eleventh Amendment immunity belonging to the state." [FN5] *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 361 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166-67, 105 S.Ct. 3099, 3105 (1985).

FN5. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

Plaintiff's complaint in this action seeks only money damages, without additionally requesting equitable relief.[FN6] Since plaintiff's damage claims against the defendants in their official capacities are plainly barred by the Eleventh Amendment, I recommend their dismissal.

FN6. The Eleventh Amendment does not preclude maintenance of an action against a governmental employee in his or her official capacity seeking only equitable relief. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 2312 n. 10 (1989).

C. *Exhaustion of Remedies*

Responding to questions set forth in his form complaint, the plaintiff answered both "yes" and "no" to inquiries regarding both the existence of a grievance procedure at Shawangunk and the filing of grievances related to the matters set forth in his complaint. Complaint (Dkt. No. 1) at 4. When asked to describe the steps taken to present grievances relating to the matters in suit, plaintiff answered that "[g]rievance does not provide relief that I am seeking." *Id.* Responding to an inquiry regarding the result of his grievance filings, plaintiff stated that

[a]llegations of employee harassment/discrimination are of particular concern to the administrators of department facilities. Prison Directive 4040(VII) after exercising initial obligations (reported the incidents to supervisors

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

first) after being again threaten [sic] plaintiff was discouraged to process with this complaint any further with the facility out of fear for his safety.

*Id.* Citing the equivocal nature of this response, defendants argue that plaintiff's complaint fails to reflect compliance with the requirement that he exhaust available administrative remedies before commencing suit.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), altered the inmate litigation landscape considerably, imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. One such restriction introduced by the PLRA requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002).

***5** New York prison inmates are subject to an Inmate Grievance Program established by the DOCS, and recognized as an "available" remedy for purposes of the PLRA. *See* *Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The New York Inmate Grievance Program consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within fourteen days of the incident.[FN7] 7 N.Y.C.R.R. § 701.7(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. § 701.7(a). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.7(b). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.7(c). Only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N . Y.2002) (citing, *inter alia,* *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

FN7. The Inmate Grievance Program supervisor may waive the timeliness of the grievance submission due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.7(a)(1).

In their motion, defendants interpret plaintiff's responses to the form complaint's grievance inquiries as a concession that he did not avail himself of the Inmate Grievance Program with regard to the claims now raised. See Defendants' Memorandum (Dkt. No. 21) at 8. Interpreted in a light most favorable to him, however, plaintiff's complaint could be construed as avowing both that he did file grievances, where appropriate, and that in certain instances he was discouraged by prison officials from pursuing matters through the grievance process. Since the exertion of threats and intimidation by prison officials in an effort to dissuade a prisoner from pursuing claims through the grievance process can, under appropriate circumstances, provide a basis for excusing the PLRA's exhaustion requirement, *Hemphill v. State of New York,* 380 F.3d 680, 683-84, 688 (2d Cir.2004), I am unable to conclude as a matter of law, based upon plaintiff's complaint, that his claims are subject to dismissal for failure to exhaust.[FN8]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. Among the materials submitted by the plaintiff in opposition to defendants' motion are documents reflecting the filing by him of several grievances, many of which addressed the matters at issue in this suit, and some of which were pursued by him to the CORC. *See, e.g.,* Orraca Decl. (Dkt. No. 32) at 9, 29, 43, 45, 47-49. While as a technical matter the court may not directly consider these documents in connection with defendants' dismissal motion without converting it to a summary judgment application, in light of plaintiff's *pro se* status I will read plaintiff's opposition papers in conjunction with his complaint in order to assess the sufficiency of evidence as to plaintiff's efforts to exhaust his administrative remedies. *Massey v. Fisher,* No. 02CIV10281, 2004 WL 1908220, at *3 (S.D.N.Y. Aug. 26, 2004); *Negron v. Macomber,* No. 95 Civ. 4151, 1999 WL 608777, at *5 (S.D.N.Y. Aug. 11, 1999); *see also Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987); *Tsai v. The Rockefeller Univ.,* 137 F.Supp.2d 276, 280 (S.D.N.Y.2001); *Donahue v. United States Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990)

Because plaintiff's complaint, construed in a light most favorable to him and with all ambiguities resolved in his favor, does not firmly establish that plaintiff failed to satisfy his administrative exhaustion requirement under the PLRA before commencing this action, I recommend denial of defendants' motion to dismiss plaintiff's complaint for failure to exhaust available administrative remedies.

D. *Personal Involvement*

In their motion, defendants also attack the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged.

***6** Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor-there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

Defendants' motion apparently concedes the sufficiency of plaintiff's allegations regarding the conduct of defendants McCreery and Bertone, particularly in filing false

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

misbehavior reports allegedly in retaliation for Orraca having engaged in protected activity. Defendants' Memorandum (Dkt. No. 21) at 1. Defendants do, however, challenge the sufficiency of plaintiff's allegations of personal involvement on the part of the remaining defendants.

In his complaint, Orraca alleges that defendants Andrews, Nasaveria, Wright and Mayberry "are either part of the writing of misbehavior reports or conducted the hearings of the violations [sic] or were aware of the harassment and discrimination against the plaintiff and did nothing to stop the violations." Complaint (Dkt. No. 1) at 3. While these allegations are both conclusory and skeletal, they reveal a potential basis for finding their personal involvement in the violations alleged in plaintiff's complaint. *See* *Richardson,* 347 F.3d at 435.

The allegations against the remaining defendant, Deputy Superintendent Maly, stand on different footing. A thorough search of plaintiff's complaint and the attached documents fails to disclose any basis on which to conclude that defendant Maly was personally involved in any of the retaliatory conduct alleged to a sufficient degree to support a finding of liability on his part. Accordingly, I recommend dismissal of plaintiff's claims as against defendant Maly, with leave to replead. *See* *Hucks v. Artuz,* No. 99 Civ. 10420, 2001 WL 210238, at *5 (S.D.N.Y. Feb. 27, 2001) (no personal involvement when defendant named in caption but not described in body of complaint); *Dove v. Fordham Univ.,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999) (same); *Brown v. Costello,* 905 F.Supp. 65, 77 (N.D.N.Y.1995) (same)

E. *42 U.S.C. § 1997e(e)*

*7 In their next and final point, defendants argue that plaintiff's failure to allege he suffered physical injury as a result of the acts complained of is fatal to his claims altogether, and should result in his dismissal of his complaint. Plaintiff opposes the granting of that relief.

Section 1997e(e), a provision added by the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), provides in relevant part that

[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. § 1997e(e). Section 1997e(e) includes within its purview alleged constitutional violations. *Thompson v. Carter,* 284 F.3d 411, 417-18 (2d Cir.2002); *Petty v. Goord,* No. 00 Civ.803, 2002 WL 31458240, at *8-*9 (S.D.N.Y. Nov. 4, 2002). Claims brought by inmates pursuant to section 1983 for emotional damages unrelated to any physical injury should be dismissed. *Shariff v. Coombe,* No. 96 Civ. 3001, 2002 WL 1392164, at *4 (S.D.N.Y. June 26, 2002). The absence of physical injury does not totally bar claims by inmates under section 1983, however, since section 1997e(e) does not preclude claims for nominal damages, punitive damages, or declaratory or injunctive relief. *Id.,* at *5 (citation omitted).

A thorough search of plaintiff's complaint fails to reveal any indication that he has suffered physical injury as a result of the retaliatory acts of which he complains. The lack of such an allegation is fatal to Orraca's quest for recovery for compensatory damages for mental anguish and emotional distress, in light of the preclusive effect of 42 U.S.C. § 1997e(e). As plaintiff correctly argues, however, that section does not require dismissal of his

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

complaint, as now sought by the defendants; instead, plaintiff should be afforded the opportunity to pursue his claims and seek recovery of other forms of appropriate relief, including nominal damages, which are potentially recoverable despite operation of section 1997e(e).[FN9] *See Thompson v. Carter,* 284 F.3d 411, 418 (2d Cir.2002). I therefore recommend that this portion of defendants' motion be granted only to the extend of dismissing plaintiff's claim for compensatory damages for mental anguish and emotional distress.

FN9. I note that plaintiff may well be found entitled to recover compensatory damages for the loss of any property allegedly taken or destroyed in retaliation for his having engaged in protected activity. Such a recovery would not be precluded by 42 U.S.C. § 1997e(e) based upon plaintiff's failure to plead and prove the existence of physical injury. *See, e.g., Lipton v. County of Orange, New York,* 315 F.Supp.2d 434, 457-58 (S.D.N.Y.2004).

IV. *SUMMARY AND RECOMMENDATION*

Having reviewed the four corners of plaintiff's complaint and interpreted its allegations liberally, and in a manner most favorable to him, I find that it adequately pleads a basis for finding personal involvement on the part of all of the defendants, with the exception of Deputy Superintendent for Security Maly, in the constitutional violations alleged. As to defendant Maly, since his involvement in the violations alleged is not readily apparent, Orraca's claims against him should be dismissed, with leave to replead.

At this early juncture, and based upon the scant record now before the court, I am unable to conclude that plaintiff either did not pursue available administrative remedies with regard to the matters complained of or cannot establish a basis for being excused from that requirement. I therefore recommend denial of the portion of defendants' motion seeking dismissal of his complaint for failure to exhaust administrative remedies.

***8** Turning to the legal sufficiency of plaintiff's damage claims, I find that to the extent he has named the defendants in their official capacities, such claims are barred by the Eleventh Amendment. Additionally, I find that plaintiff's claims for recovery of compensatory damages for mental anguish and emotional distress are subject to dismissal under 42 U.S.C. § 1997e(e), in light of his failure to plead the existence of physical injury resulting from the constitutional violations alleged.

Based upon the foregoing it is hereby

RECOMMENDED that defendants' motion be GRANTED, in part, and plaintiff's claims against them in their official capacities for damages be DISMISSED, based upon the Eleventh Amendment; that plaintiff's claims against defendant Maly be DISMISSED, with leave to replead, based upon the lack of his personal involvement in the deprivations alleged; and that plaintiff's claim for compensatory damages for mental anguish and emotional distress be DISMISSED; but that defendants' motion be DENIED in all other respects.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)
(Cite as: 2006 WL 1133254 (N.D.N.Y.))

85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties by regular mail.

N.D.N.Y.,2006.
Orraca v. McCreery
Not Reported in F.Supp.2d, 2006 WL 1133254 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Arthur HUCKS, Plaintiff,
v.
Christopher ARTUZ, et al., Defendants.
**No. 99 Civ. 10420RMB RLE.**

Feb. 27, 2001.

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

I. INTRODUCTION

***1** This matter was referred to the undersigned for resolution of dispositive motions. Plaintiff filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging: (1) deliberate indifference to his medical needs in violation of the Eighth Amendment to the Constitution; (2) violation of the Fourteenth Amendment to the Constitution; and (3) state law claims of assault, medical malpractice, and negligence. Plaintiff also alleges violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182.[FN1] Defendants moved to dismiss the claims pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. For the following reasons, this Court recommends the motion be GRANTED.

FN1. The Court assumes for the purposes of this Report and Recommendation that plaintiff meant to have alleged violation of Title II of the ADA, codified at 42 U.S.C. 12131 *et seq.* That section, prohibiting a "public entity" from discriminating against a "qualified individual with a disability" because of that individual's disability, has been held to apply to inmates in state prisons. *See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206 (1998).

II. BACKGROUND

Plaintiff Arthur Hucks was a paraplegic inmate confined to a wheelchair at Green Haven Correctional Facility. Proceeding *pro se,* he filed his first complaint in this action on October 12, 1999. He alleged he was harassed, threatened, and denied treatment by medical staff. *See* Hucks Aff. ¶ 1.[FN2] Plaintiff further alleged that on August 4, 1999, Sgt. Schwartzman struck him, then dumped him out of his wheelchair onto the floor, and that officers Sneddon, Osterhoudt, and Lennox stood by. *Id.,* ¶ 1-2. Plaintiff stated that nurses Dorothy [FN3] and Fila laughed at him and discussed with the officers "their strategy to cover up what they did to me." *Id.* ¶ 3. He further stated that once taken to the clinic, he was left alone on a stretcher without being examined, although Dr. Sohng was standing nearby. *Id.,* ¶ 4. Plaintiff also alleged that Superintendent Artuz allowed staff misconduct, that Dr. Silver and Ece, a physical therapist, were indifferent to his medical needs, and that Koenigisman "supports the lies and mistreatment of disabled inmates by medical and security staff." *See* Compl. 3-4 [FN4] Plaintiff attached a letter to his complaint stating that his cell lights did not work and "now I have to live in a state of fear for my life." Att. Let. at 2. [FN5] By way of relief, plaintiff sought punitive damages in the amount of $1,000,000 per defendant and compensatory damages

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

in the amount of $25,000 per defendant. *See* Compl. at 5.

FN2. "Hucks Aff." refers to plaintiff's affidavit, dated August 16, 1999, submitted with his first complaint.

FN3. Nurse Dorothy is named as defendant Donagarra in defendants' memorandum of law in support of their motion to dismiss, dated April 7, 2000.

FN4. "Compl." refers to plaintiff's first complaint, dated August 22, 1999.

FN5. "Att. Let." refers to a letter, dated August 12, 1999, attached to plaintiff's first complaint.

By letter dated February 2, 2000, defendants requested a conference before District Judge Berman and indicated the bases upon which they intended to file a motion to dismiss. The letter stated that plaintiff had failed to exhaust available administrative remedies, as is required under the Prisoner Litigation Reform Act of 1996, 42 U.S.C. § 1997e(a), and that plaintiff had failed to allege personal involvement by defendants Artuz and Silver. *See* Def. Let. 2/2/2000.[FN6] Before assigning the case to the undersigned, Judge Berman ordered the plaintiff to respond to defendant's arguments. Accordingly, plaintiff submitted a letter, dated February 10, 2000, arguing that the case should not be dismissed because, to the best of his knowledge, he had exhausted available remedies. *See* Pl. Let. 2/10/2000.[FN7]

FN6. "Def. Let. 2/2/2000" refers to letter submitted by defendants, dated February 2, 2000.

FN7. "Pl. Let. 2/10/2000" refers to letter submitted by plaintiff, dated February 10, 2000.

***2** Meanwhile, plaintiff filed an amended complaint on January 14, 2000, but it was not actually served on defendants until March and April, 2000. On March 22, 2000, defendants requested and were granted an extension of time for filing their motion to dismiss the complaint. In his amended complaint, plaintiff alleged the same legal violations, but relied on different facts and added three more defendants. *See* Am. Compl.[FN8] Plaintiff alleged staff would refuse to assist him, and that "on many occasions, I was left in my bed in my human waste." *Id.* at 3. Plaintiff alleged that on September 5, 1999, he fell attempting to transfer from the toilet to his wheelchair, and was threatened with a misbehavior report because he rang the emergency call bell. *Id.* at 4. Plaintiff also alleged that on October 18, 1999, the axle on his wheelchair broke, resulting in injury to his elbow, head and back. *Id.* Plaintiff contended that prison staff did not follow proper procedures and did not have photos taken of the broken chair or of his injuries. Stmt. of Facts. at 2. [FN9] Plaintiff also contended Dr. Silver and other staff ignored his complaints. *Id.* Further, plaintiff contended that after "Dr. Ms. Paulpauly" examined him and issued him a permit to be pushed short and long distances and increased his pain medication, defendants directed inmates to taunt and harass him. *See id.;* Am. Compl. at 5. Plaintiff also indicated he wrote a letter to Superintendent Artuz stating that an inmate threatened to set his cell on fire. Stmt. of Facts at 2. Finally, plaintiff alleged Dr. Silver stopped his AIDS medication "for quite some time ." *Id.* By way of remedy, plaintiff seeks spinal surgery and $1,025,000 per defendant. Am. Compl. at 5.

FN8. "Am. Compl." refers to plaintiff's Amended Complaint, dated January 9, 2000.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN9. "Stmt. of Facts" refers to two handwritten pages, marked "Statement of Facts," attached to plaintiff's Amended Complaint.

On April 7, 2000, defendants moved for dismissal of the amended complaint pursuant to Rules 12(b)(1) and (6). Defendants argue that plaintiff failed to exhaust his administrative remedies and failed to allege personal involvement of twelve defendants; that defendants are not subject to suit under the ADA; and that plaintiff failed to plead a Fourteenth Amendment claim. *See* Def. Mem.[FN10] Plaintiff did not respond to defendant's motion.[FN11]

FN10. "Def. Mem." refers to defendant's memorandum of law in support of motion to dismiss, dated April 7, 2000.

FN11. Court records indicate plaintiff is no longer in prison and wrote to inform the Court of a change of address on October 29, 2000. This correspondence occurred over six months after defendants moved for dismissal, but made no mention of the motion or plaintiff's failure to respond to it.

III. DISCUSSION

A. Standard for dismissal under 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint when the federal court "lacks jurisdiction over the subject matter." *See* Fed.R.Civ.P. 12(b)(1). In most cases, the court will consider a 12(b)(1) motion before ruling on any other motions to dismiss, since dismissal of an action for lack of subject matter jurisdiction will render all other accompanying defenses and motions moot. *See United States ex rel Kreindler & Kreindler v. United Technologies Corp.,* 985 F.2d 1148, 1155-56 (2d Cir.1993), *cert. denied sub nom. Kreindler & Kreindler v. United Technologies Corp.,* 508 U.S. 973 (1993); *see also Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n,* 896 F.2d 674, 678 (2d Cir.1990). Thus, a court confronted with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) should decide the jurisdictional question first because "a disposition of a Rule 12(b)(6) motion is a decision on the merits, and therefore, an exercise of jurisdiction." *Magee v. Nassau County Medical Center,* 27 F.Supp.2d 154, 158 (E.D.N.Y.1998); *see also Rhulen,* 896 F.2d at 678.

***3** In considering a 12(b)(1) motion to dismiss for want of subject matter jurisdiction, a court must assume as true factual allegations in the complaint. *Shipping Financial Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998) (*citing Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)); *Serrano v. 900 5th Ave. Corp.,* 4 F.Supp.2d 315, 316 (S.D.N.Y.1998). Where jurisdictional issues are in dispute, the court may look to "evidence outside the pleadings, such as affidavits." *Filetech S.A. v. France Telecom, S.A.,* 157 F.3d 922, 932 (2d Cir.1998) (*quoting Antares Aircraft v. Federal Republic of Nigeria,* 948 F.2d 90, 96 (2d Cir.1991), *vacated on other grounds,* 505 U.S. 1215 (1992)).

B. Standard for dismissal under Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) should be granted only if it appears beyond doubt that "no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J., Inc. v.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Northwestern Bell Tel. Co.,* 492 U.S. 229, 249-50 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996). In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See id.; Hernandez v.. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994), *cert. denied,* 513 U.S. 836 (1994). However, a court does not have to accept as true "conclusions of law or unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079 (1995) (*quoting* 2 Moore's Federal Practice ¶ 12.08, at 2266-69 (2d ed.1984)). The review is limited, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995)(*quoting Scheuer v. Rhodes,* 416 U.S. at 236).

Pleading requirements for *pro se* plaintiffs are relaxed. *See Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir.1974). While generally courts do not look outside the pleadings when reviewing a motion to dismiss pursuant to Rule 12(b)(6), they may consider the allegations contained in a *pro se* plaintiff's memorandum of law, where those allegations are consistent with the allegations in the complaint. *See Donahue v. United States Dep't of Justice,* 751 F.Supp. 45, 49 (S.D.N.Y.1990). Accordingly, the Court will take into consideration both of plaintiff's complaints and his letter submission of February 10, 2000, in construing the factual background.

*Pro se* plaintiffs, however, are not relieved of pleading requirements. In order to avoid dismissal, plaintiff must do more than plead mere "[c]onclusory allegations or legal conclusions masquerading as factual conclusions." *Gebhardt v. Allspect, Inc.,* 96 F.Supp.2d 331, 333 (S.D.N.Y.2000) (*quoting* 2 James Wm. Moore, Moore's Federal Practice ¶ 12.34[1][b] (3d ed.1997)). *See also, Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) (stating that civil rights complaints "must contain specific allegations of fact which indicate a deprivation of constitutional rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983").

C. Failure to Exhaust Administrative Remedies

***4** Defendants argue that the case should be dismissed for lack of subject matter jurisdiction because plaintiff has failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a). *See* Def. Mem. at 6-9. Plaintiff stated that he filed numerous grievances. *See* Am. Compl. at 2, 4; Compl. at 2. He also stated that, to the best of his knowledge, he did exhaust all administrative remedies before he filed the instant action. *See* Pl. Let. 2/10/2000.

The statute reads, in pertinent part, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (Supp.2000). Here, the plaintiff did not submit any documentation demonstrating that he exhausted his administrative remedies by obtaining a final administrative determination from the Central Office Review Committee ("CORC"). Such exhaustion is a mandatory requirement. *See, e.g., Laureano v. Pataki,* 2000 WL 1458807, at *1 (S.D.N.Y. Sept. 29, 2000); *Edney v. Karrigan,* 69 F.Supp.2d 540, 543 (S.D.N.Y.1999). Where an inmate fails to satisfy this requirement, the complaint must be dismissed. *See, e.g., Laureano v. Pataki,* 2000 WL 1458807, at *3. I therefore recommend that the complaint be dismissed for failure to exhaust.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

D. Section 1983 Claims

Plaintiff brought his constitutional claims under 42 U.S.C. § 1983. In order to state a cause of action under § 1983, a plaintiff must show the conduct in question was committed by a person acting under color of state law, and that the conduct deprived the plaintiff of his "rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994). To survive a motion to dismiss, a plaintiff must make specific allegations of fact indicating a deprivation of his or her constitutional rights. *See* *Rivera v. Goord,* 119 F.Supp.2d 327 (S.D.N.Y.2000).

1. Eighth Amendment Claim

To establish a claim under the Eighth Amendment because of inadequate medical care, "a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (*quoting* *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)); *Graham v. Perez,* 121 F.Supp.2d 317, 325 (S.D.N.Y.2000). The deprivation of care must be "sufficiently serious." *Chance,* 143 F.3d at 702 (*quoting* *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). A medical condition is considered serious if it is "a condition of urgency" that may result in "degeneration" or "extreme pain." *Hernandez v. Keane,* 2000 WL 16951, *2 (S.D.N.Y. Jan. 7, 2000) (*quoting* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("Hathaway III")); *Liscio v. Warren,* 901 F.2d 274, 277 (2d Cir.1990). *See, e.g.,* *Chance,* 143 F.3d at 702 (extreme dental pain and deterioration constitutes a serious medical condition).

***5** Additionally, the defendant must act with a sufficiently culpable state of mind. *Id.* An official acts with deliberate indifference when "he knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (*quoting* *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)); *Hernandez,* 2000 WL 16951, at *2.

Plaintiff's allegations do not rise to the level of an Eighth Amendment violation, as he does not describe any instance in which his serious medical needs were disregarded. Only two of plaintiff's allegations describe incidents involving his medical care: (1) Dr. Sohng's indifference to plaintiff as he lay on a stretcher suffering the effects of mistreatment by Sgt. Schwartzman, *see* Hucks Aff. ¶ 4; and (2) Dr. Silver's decision to stop plaintiff's AIDS medication. *See* Stmt. of Facts at 2. Plaintiff fails to allege, however, that either Dr. Sohng's inaction or Dr. Silver's action created an excessive risk to plaintiff's health or that either doctor acted with a culpable state of mind.

The PRLA allows a court to dismiss a claim without first requiring the exhaustion of administrative remedies if the plaintiff fails to state a claim for which relief can be granted. 42 U.S.C. § 1997e(c)(2). Nevertheless, if the plaintiff were to establish administrative exhaustion, the Court recommends that he be allowed to replead on this issue.

2. Personal Involvement

Under § 1983, a plaintiff must allege the personal involvement of defendants in the alleged deprivation. *See* *Dove v. Fordham University,* 56 F.Supp.2d 330, 336

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(S.D.N.Y. June 14, 1999) (*citing* *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986)); *Zamakshiri v. Dvoskin,* 899 F.Supp. 1097, 1109 (S.D.N.Y.1995). If a complaint names a defendant in the caption but fails to indicate how the defendant violated the law or injured the plaintiff, a motion to dismiss the complaint with regard to that defendant should be granted. *See* *Dove,* 56 F.Supp.2d at 335. A plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). Liability may not be predicated on a theory of *respondeat superior* or vicarious liability. *See* *Dove,* 56 F.Supp.2d at 335. Rather, a supervisory official is liable for constitutional violations if he or she (1) directly participated in the violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; or (4) was grossly negligent in supervising subordinates who caused the violation. *See* *Williams v. Smith,* 781 F.2d at 323-24.

In his original complaint, plaintiff alleged Sgt. Schwartzman and officers Sneddon, Osterhoudt, and Lennox assaulted him. *See* Hucks Aff. at ¶ 1-2. He did not state how nurses Donagarra and Fila violated his rights, *see Id.* at ¶ 3, or how Dr. Sohng violated his rights. *Id.* at ¶ 4. Although plaintiff mentioned defendants Artuz, Ece, Silver and Koenigisman in the complaint, he did not allege facts explaining how they violated his rights. *See* Compl. at 3-4. He did not mention defendant Westley. Consequently, the original complaint alleges violations only by Schwartzman, Sneddon, Osterhoudt, and Lennox.

***6** In his amended complaint, plaintiff alleged that Dr. Silver had stopped his AIDS medication "for quite some time." Stmt. of Facts at 2. He also alleged that he wrote to Artuz to inform him that an inmate threatened to set fire to his cell. *Id.* However, plaintiff does not allege involvement by Artuz sufficient to establish liability under § 1983. Even assuming the letter could be construed as one alleging a constitutional violation, it would not be sufficient to establish liability. The fact that an inmate informs a supervisor of an alleged constitutional deprivation by letter is insufficient to support a finding that the supervisor was on notice of the deprivation. *See* *Zamakshiri v. Dvoskin,* 899 F.Supp. 1097, 1110 (S.D.N.Y.1995). Thus, in his amended complaint, plaintiff stated claims only against Dr. Silver.

Taken together and construed liberally, plaintiff's two complaints state claims against defendants Schwartzman, Sneddon, Osterhoudt, Lennox, and Silver. Claims against any other defendants must be dismissed.

3. Fourteenth Amendment Claim

Defendants also argue that plaintiff fails to state a Fourteenth Amendment claim. *See* Def. Mem. at 14. The Court agrees. Plaintiff does not specify which Fourteenth Amendment rights were violated, or by which acts, in any of his submissions. The claim therefore constitutes a conclusory allegation unsupported by factual allegations. Accordingly, I recommend that it should be dismissed.

E. Americans With Disabilities Act Claim

Defendants also argue that plaintiff's claim under the ADA must be dismissed because ADA claims may not be brought against individuals. *See* Def. Mem. at 13. Although the Second Circuit has yet to decide the issue of whether Title II of the ADA lies against individuals, district courts in this circuit have held that individual defendants may not be held liable under the statute. *See, e.g.,* *Shariff v. Artuz,* 2000 WL 1219381 at *5 (S.D.N.Y.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2001 WL 210238 (S.D.N.Y.)
(Cite as: 2001 WL 210238 (S.D.N.Y.))

Aug. 28, 2000); *Hallett v. New York State Department of Correctional Services, et al.,* 109 F.Supp.2d 190, 199 (S.D.N.Y. Aug. 14, 2000). In so holding, the courts have analogized to Title VII of the Civil Rights Act, which does not impose liability on individuals. *See* *Shariff,* 2000 WL 1219381, at *4; *Hallett,* 109 F.Supp.2d at 199; *Candelaria v. Cunningham,* 2000 WL 798636, at *3 (S.D.N.Y. June 20, 2000). *See also* *Smith v. University of State of New York,* 1997 WL 800882, at *8 (W.D.N.Y. Dec. 31, 1997).

While this Court accepts the proposition that individual liability does not attach under the ADA, it acknowledges that analogizing to Title VII has led some courts to conclude that plaintiffs could nevertheless sue individual defendants in their *official* capacities. *See* *Candelaria,* 2000 WL 798636, at *2 (*citing* *Jones v. Inter-County Imaging Centers,* 889 F.Supp. 741 (S.D.N.Y.1995); *Romand v. Zimmerman,* 881 F.Supp. 806 (N.D.N.Y.1995)). However, the distinction between official and individual capacity liability under the ADA has since been rejected on the theory that official capacity suits are not necessary where plaintiffs may sue a government entity directly. *See* *Shariff,* 2000 WL 1219381 at *5; *Hallett,* 109 F.Supp.2d at 199; *Candaleria,* 2000 WL 798636, at *3 (relying on District Judge Martin's reasoning with respect to Title VII in *Bakal v. Ambassador Constr.,* 1995 WL 447784 (S.D.N.Y. July 28, 1995)). Here, plaintiff could have sued the Department of Corrections directly, obviating the need to sue defendants in their official capacities. The Court sees no justification for permitting a claim against individuals, and accordingly recommends that plaintiff's ADA claims be dismissed.

F. State Law Claims

***7** Finally, defendants argue that plaintiff's state law claims should be dismissed for lack of subject matter jurisdiction. Defendants correctly point out that state law tort claims against prison officials may only be brought in state court. Def. Mem. at 14, *citing* *Parker v. Miller,* 1999 WL 1024108, at *2 (2d Cir.1999) (*citing* *Baker v. Coughlin,* 77 F.3d 12, 15-16 (2d Cir.1996)). I therefore recommend these claims be dismissed.

IV. CONCLUSION

For the foregoing reasons, this Court respectfully recommends that defendants' motion to dismiss be GRANTED. If plaintiff establishes that he has exhausted his administrative remedies, the dismissal should be without prejudice and plaintiff should be afforded an opportunity to file an amended complaint alleging sufficient facts to make out a claim under the Eighth Amendment. The amended complaint should be dismissed in all other respects.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard M. Berman, 40 Centre Street, Room 201, and to the chambers of the undersigned, 500 Pearl Street, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See* *Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

S.D.N.Y.,2001.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2001 WL 210238 (S.D.N.Y.)
(Cite as: 2001 WL 210238 (S.D.N.Y.))

Hucks v. Christopher Artuz
Not Reported in F.Supp.2d, 2001 WL 210238 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



5 Fed.Appx. 77, 2001 WL 258063 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 5 Fed.Appx. 77, 2001 WL 258063 (C.A.2 (N.Y.)))

This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,
Second Circuit.
Anthony D. AMAKER, Plaintiff-Appellant,
v.
Suzanne HAKES, Walter R. Kelly, Superintendent, Cunningham, Sergeant, M. Schiefer & Cheney, C.O., Defendants-Appellees.
**No. 00-0152.**

March 14, 2001.

Appeal from the United States District Court for the Western District of New York, Skretny, J.
Anthony D. Amaker, Dannemora, NY, pro se.

Elliot Spitzer, Attorney General of the State of New York; Frank Brady, Assistant Solicitor General, Nancy A. Spiegel, Assistant Solicitor General, Peter H. Schiff, Senior Counsel, Albany, NY.

JOHN M. WALKER Jr., Chief Judge, OAKES and CALABRESI, Circuit Judges.

SUMMARY ORDER

****1** UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of said district court be and it hereby is AFFIRMED.

Plaintiff-appellant Anthony D. Amaker, a *pro se* and *in forma pauperis* prisoner, appeals from a March 30, 2000, judgment of the district court dismissing pursuant to Fed.R.Civ.P. 56(c), his suit that asserts violations of 42 U.S.C. §§ 1981, 1983 and 1985. Amaker's complaint alleged, *inter alia,* that the defendants, various employees of the Attica Correctional facility, subjected him to sexual abuse during a pat down search in violation of the Fourth Amendment guarantee against unwarranted searches and the Eighth Amendment guarantee against cruel and unusual punishment. It also alleged that the defendants violated the Fourth Amendment guarantee against unreasonable searches during a search of his prison cell, and violated the First Amendment guarantee of free exercise of religion in confiscating certain religious materials during that search.

The district court granted summary judgment on each claim. With respect to the pat down search, the district court concluded that there was no indication that the alleged conduct was objectively serious enough so as to violate contemporary standards of decency, or that it was otherwise unreasonable or unrelated to prison interests. With respect to the cell search, the district court stated that the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell. And finally, with respect to the free exercise claim, the district court found that the confiscated materials were prohibited materials within the prison and therefore their confiscation could not serve as the basis of a free exercise violation. We agree and, therefore, conclude that the district court's grant of summary judgment was proper.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

5 Fed.Appx. 77, 2001 WL 258063 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 5 Fed.Appx. 77, 2001 WL 258063 (C.A.2 (N.Y.)))

Moreover, having reviewed and considered Amaker's remaining claims raised on appeal, we find them lacking merit. Accordingly, the district court's order granting summary judgment is hereby AFFIRMED.

C.A.2 (N.Y.),2001.
Amaker v. Hakes
5 Fed.Appx. 77, 2001 WL 258063 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
John Earl JOHNSON, Plaintiff,
v.
Joseph GUIFFERE [FN1] and John Pecora, Administrator, Defendants.

FN1. Defendant Joseph A. Guiffere, who is alleged to have been a corrections sergeant at the Montgomery County Jail during the times relevant to plaintiff's claims, was mistakenly named by the plaintiff in his complaint as Sergeant Guiffery. In my earlier report and recommendation, dated May 17, 2005, I directed the clerk to revise his records to reflect that defendant's name as Sergeant Guiffrie. *See* Dkt. No. 48. Because it now appears that the proper spelling of this defendant's name is Guiffere, I will once again ask the clerk's office to adjust its records accordingly.

**No. 9:04-CV-57.**

Oct. 17, 2007.

John Earl Johnson, Albany, NY, pro se.

Donohue Sabo, Fred Hutchison, Esq., Kenneth G. Varlely, Esq., of Counsel, Albany, NY, for Defendant Guiffere.

***ORDER***

DAVID N. HURD, United States District Judge.

***1** Plaintiff, John Earl Johnson, brought this civil rights action pursuant to 42 U.S.C. § 1983. In a Report Recommendation dated August 10, 2007, the Honorable David E. Peebles, United States Magistrate Judge, recommended that the defendant Sergeant Guiffere's motion for summary judgment be granted and the plaintiff's complaint be dismissed in all respects, with prejudice regarding defendant Guiffere, but without prejudice as to defendant Pecora. Objections to the Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. The defendant Sergeant Guiffere's motion for summary judgment is GRANTED;

2. The complaint is DISMISSED in all respects, with prejudice with regard to defendant Guiffere;

3. The complaint is DISMISSED in all respects, without

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

prejudice as to defendant Pecora; and

4. The Clerk shall file judgment accordingly.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff John Earl Johnson, who is now a federal prison inmate, has commenced this action pursuant to 42 U.S.C. § 1983 alleging violation of his constitutional rights during a one and one-half month period while confined as a federal detainee within the Montgomery County Jail ("MCJ"). Johnson, a practicing Muslim, claims that jail officials at the MCJ violated his constitutional rights by depriving him of a diet consistent with his religious beliefs.

Currently pending before the court is a motion by Sergeant Guiffere, the lone remaining defendant appearing in the action, seeking the entry of summary judgment dismissing plaintiff's claims against him. Defendant's motion is predicated upon his assertion that the policy in place at the MCJ, requiring only that Islamic inmates be provided a "no pork" diet but that requests for vegetarian or other religious alternative meals be denied, is constitutional under existing law. Defendant Guiffere further contends that if a constitutional violation occurred, he is nonetheless entitled to qualified immunity from suit based upon the legal uncertainties surrounding plaintiff's claims. For the reasons set forth below, I recommend that Guiffere's summary judgment motion be granted and that plaintiff's claims against him be dismissed on the basis of qualified immunity.

I. *BACKGROUND*

At the times relevant to his complaint the plaintiff, who subscribes to strict Islamic religious tenets, was a federal detainee held in the custody of the United States Marshals Service, and incarcerated within the MCJ pursuant to an apparent arrangement between that agency and officials operating the facility for the housing of federal prisoners awaiting trial and/or sentencing. Complaint (Dkt. No. 1) ¶ 3, Facts ¶¶ 1, 20; *see also* Defendant's Motion for Summary Judgment (Dkt. No. 62) Exh. B, at 37. On June 13, 2003, following his transfer into the MCJ, plaintiff informed jail officials that his religion required he be fed meals consistent with his Islamic beliefs, though without providing elaboration regarding the diet being requested.[FN2] Complaint (Dkt. No. 1), Facts ¶¶ 1, 2; Johnson Aff. (Dkt. No. 30) ¶ 1. After an ensuing series of discussions with various prison officials at the MCJ regarding the issue, plaintiff formalized his dietary request on June 16, 2003 through the submission of a special diet request form asking that he not be served any meats "such as beef, chicken, turkey etc." because of his religious affiliation. Johnson Aff. (Dkt. No. 30) ¶¶ 1-2; Complaint (Dkt. No. 1), Facts ¶¶ 2-9; *see also* Guiffere Aff. (Dkt. No. 33-4) Exh. B. That request was denied on June 18, 2003 by defendant Guiffere, who responded that the MCJ is a "no pork facility" which does "not honor vegetarian diets." Guiffere Aff. (Dkt. No. 33-4) Exh. B; Complaint (Dkt. No. 1), Facts ¶ 12.

FN2. Plaintiff apparently adheres to a strict Islamic diet, which has been described by one court as follows:

[p]racticing Muslims eat food that is Halal,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

which means allowed or lawful. The opposite of Halal is Haram, which means prohibited or unlawful. A Halal diet includes fruits, vegetables and all things from the sea. The flesh of herbivorous animals, such as cows, lambs, chickens and turkeys, is Halal if it is slaughtered with the appropriate prayer and in the appropriate manner.... Haram items include pork and all pork by-products, carrion and the flesh of carnivorous animals, such as cat, dog, rat, lion, tiger, and eagle.... Halal does not require separate preparation and serving facilities after Halal meat is slaughtered according to ritual.

*Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at *1 (S.D.N.Y. Feb. 27, 1997); *see also* *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL 837111, at *1 n. 3 (W.D.N.Y. Mar. 14, 2007). During his deposition, plaintiff explained the four mandatory characteristics of properly prepared Halal food at length by quoting a translation of the relevant sections of the Koran (Quran). *See* Defendant's Motion for Summary Judgment (Dkt. No. 62) Exh. B, at 18-22.

***2** Plaintiff filed a formal grievance regarding the denial of his special dietary request on June 18, 2003. Complaint (Dkt. No. 1), Facts ¶ 13; Johnson Aff. (Dkt. No. 30) ¶ 3. That grievance was denied by the facility's grievance coordinator, Candus M. Kwiatkowski, on June 25, 2003, based upon her finding that the facility's policy of reasonably accommodating prisoners' religious dietary beliefs had been followed. Complaint (Dkt. No. 1), Facts ¶ 14; Johnson Aff. (Dkt. No. 30) ¶ 5. That grievance denial was later upheld on appeal to John F. Pecora, the facility's chief administrative officer, on June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 7.

Plaintiff appealed the matter further to the Citizens' Policy and Complaint Review Council (the "CPCR Council") on or about June 27, 2003. Complaint (Dkt. No. 1), Facts ¶ 19; Johnson Aff. (Dkt. No. 30) ¶ 8. While plaintiff, who was transferred out of the MCJ on July 29, 2003, *see* Complaint (Dkt. No. 1), Facts ¶ 20, maintains that he never received a response with respect to that appeal, defendants assert that the CPCR Council voted on November 19, 2003 to deny the grievance, and notified both the Montgomery County Sheriff and the plaintiff of that determination by letter dated November 25, 2003 from Daniel B. Reardon, Commissioner and Chair of the New York Commission of Correction. Guiffere Aff. (Dkt. No. 33) ¶ 10.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on January 16, 2004. Complaint (Dkt. No. 1). In his complaint, plaintiff named as defendants the CPCR Council as an entity, as well as John F. Pecora, the Administrator of the MCJ, and Sergeant Guiffere, a corrections employee at the facility.[FN3] *Id.* Plaintiff's complaint asserts various constitutional claims stemming from the denial of his dietary request, including interference with the free exercise of his religious beliefs, procedural and substantive due process violations, and the denial of equal protection, and seeks recovery of compensatory and punitive damages. *Id.*

FN3. Defendant Pecora has neither been served, nor has he appeared in the action. *See* Dkt. Nos. 13, 16, 22. In light of plaintiff's failure to serve him within the allotted 120 days under Rule 4(m) of the Federal Rules of Civil Procedure, and in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the absence of anything which would constitute good cause to extend that period, plaintiff's claims against defendant Pecora are subject to dismissal, without prejudice. Fed.R.Civ.P. 4(m); *see* *Shuster v.. Nassau County,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan. 11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publ'g Corp. v. Murphree,* 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

On July 15, 2004, in lieu of answering, the CPCR Council moved seeking dismissal of plaintiff's claims against it for failure to state a cause of action upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. Nos. 10, 11. In a report dated May 17, 2005, I recommended that all claims against the CPCR Council as an entity be dismissed as barred by absolute immunity under the Eleventh Amendment, with leave for plaintiff to replead to assert claims against individual members of the council, and further urged the court to deny plaintiff's cross-motion for summary judgment on the merits of his claims.[FN4] Dkt. No. 48. Those recommendations were adopted by order issued by U.S. District Judge David N. Hurd on December 7, 2005. Dkt. No. 51.

FN4. Plaintiff has not availed himself of this limited opportunity to replead.

On October 31, 2006 defendant Guiffere, the only other defendant served in the action, filed a summary judgment motion with the court, arguing both that the denial of plaintiff's dietary request did not violate a constitutional right because it was reasonably related to a legitimate penological interest, and that in any event he is protected from suit under the doctrine of qualified immunity. Dkt. No. 62. Plaintiff responded in opposition to Guiffere's motion by submission filed on January 22, 2007, Dkt. No. 67, and defendant Guiffere has since countered with the filing on February 1, 2007 of a reply memorandum in response to plaintiff's opposition. Dkt. No. 69. Defendant Guiffere's summary judgment motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1) (B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

***3** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (citations omitted); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *First Amendment Free Exercise Claim*[FN5]

FN5. Although his complaint does not contain such a cause of action, plaintiff's factual allegations could support a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), which provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution .... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of a burden on that person-1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Because the principles which inform analysis of plaintiff's free exercise claim are similar to those applicable to his potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks, *see Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), and my finding of defendant's entitlement to qualified immunity applies equally to this potential claim, it is unnecessary to separately determine whether plaintiff's *pro se* complaint should be liberally construed as asserting such a cause of action.

***4** In his summary judgment motion, Guiffere initially argues that plaintiff's First Amendment rights were not abridged while being held in the MCJ, since New York State guidelines for religious dietary needs and the facility's local practices, providing that a "pork-free" meal satisfies the constitutional dietary requirements for Muslim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

inmates, are reasonably related to legitimate penological interests. Defendant's Motion for Summary Judgment (Dkt. No. 62-6) at 2. Plaintiff counters that the budgetary concerns implicitly advanced by the defendant in defense of the relevant dietary practices at the MCJ do not support their position, since all that he asked was that his meals consist only of fish and vegetables, not that prison officials incur the expense of preparing Halal meals.

The First Amendment to the United States Constitution guarantees the right to the free exercise of religion.[FN6] *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 2020 (2005). That clause, as is true with regard to the First Amendment generally, applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) ( "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

FN6. That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404 (1987); *Salahuddin,* 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, hinges upon the balancing of an inmate's First Amendment free exercise right, against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals. *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir.2004); *Ford,* 352 F.3d at 597. Ordinarily the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials retain considerable discretion in determining dietary constituents. *Word v. Croce,* 169 F.Supp.2d 219, 226 (S.D.N.Y.2001). This requirement, however, is augmented by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples." *Ford,* 352 F.3d at 597; *see also Bass v. Coughlin,* 976 F.2d 98, 99 (2d Cir.1992). "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin,* 357 F.3d at 203. A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests on the other hand. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

***5** Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework. *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs.[FN7] *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). Importantly, in evaluating this factor the court must be wary of " 'question[ing] the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds [,]' " *McEachin,* 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148-49 (1989)), and instead may only consider whether the particular plaintiff holds a belief which is religious in nature. *Ford,* 352 F.3d at 590; *King,* 2007 WL 1017102, at *4. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny.[FN8] *Salahuddin,* 467 F.3d at 274-75; *Livingston v. Griffen,* No. 04-CV-00607, 2007 WL 1500382, at *15 (W.D.N.Y. May 21, 2007). In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U .S. 78, 107 S.Ct. 2254 (1987). *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995); *Livingston,* 2007 WL 1500382, at *15.

FN7. Noting in its decision in *Ford v. McGinnis* a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, the Second Circuit declined to resolve the issue, instead assuming continued applicability of the substantial burden test. 352 F.3d 582, 592-93 (2d Cir.2003). Recent cases from this and other courts suggest that the Second Circuit resolved this split in its decision in *Salahuddin v. Goord,* 467 F.3d 263 (2d Cir.2006) by subscribing to the substantial burden test. *See, e.g., Livingston v. Griffin,* No. 04-CV-00607, 2007 WL 1500382, at *15 (N .D.N.Y. May 21, 2007) (Singleton, J.); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar. 30, 2007). While harboring some doubt that the Second Circuit has in fact laid the matter to rest, I find it unnecessary to take a stance regarding this issue.

FN8. While this framework is particularly well-suited for analysis of an agency wide or facility policy or practice affecting inmates generally, it applies with equal force to individual decisions such as that involved in this case, which impacts only a single inmate. *Salahuddin,* 467 F.3d at 274, n. 4.

Under *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective." *Thornburgh v. Abbott,* 490 U.S. 401, 414, 109 S.Ct. 1874, 1882 (1989). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question. *Id.* at 417, 109 S.Ct. at 1884. Lastly, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418, 109 S.Ct. 1884. Decisions rendered since *Turner* have clarified that when applying this test, a court should examine "the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests." *Smith v. Nuttal,* No. 04-CV-0200, 2007 WL837111, at *5 (W.D.N.Y. Mar. 14, 2007) (citing *Salahuddin,* 467 F.3d at 274).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)
(Cite as: 2007 WL 3046703 (N.D.N.Y.))

In his motion, defendant does not question the sincerity of plaintiff's Islamic religious beliefs. Plaintiff maintains that by providing him with meals containing meat other than pork, defendants have interfered with free exercise of his religion, the beliefs associated with which require him to observe a vegetarian diet-with the exception of fish, which he is permitted to eat. While plaintiff offers nothing, aside from his naked assertions in this regard, as evidence that his sincerely held religious beliefs require such a dietary accommodation, the Second Circuit has encouraged "courts [to] resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith." [FN9] *McEachin,* 357 F.3d at 201. Accordingly, the plaintiff has satisfied his burden at step one of the inquiry.

FN9. The Second Circuit had occasion to address this element-the bonafides of a plaintiff's sincerely held religious beliefs-in the context of a religious dietary restriction request made by an inmate in *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003). While noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.' " *Id.* at 588 (citations omitted).

***6** It would ordinarily be incumbent at this juncture for the defendant to articulate palpably legitimate penological concerns to justify his refusal to provide the plaintiff with a vegetarian-plus-fish diet. Typically, defendants in similar cases offer up the financial burden associated with affording inmates particular diets, including those involving preparation and serving of Halal meals. *See, e.g., Williams v. Morton,* 343 F.3d 212, 217-18 (3d Cir.2003); *Abdul-Malik v. Goord,* No. 96 CIV. 1021, 1997 WL 83402, at *4 (S.D.N.Y. Feb. 27, 1997). With the articulation of such a justification, the focus would then return to the plaintiff, under the governing test, to establish that the policy is not reasonably related to legitimate penological interests. *Ford,* 352 F.3d at 595-96. Such an inquiry is particularly fact-laden, and generally ill-suited for resolution on motion for summary judgment. *See generally Marria v. Broaddus,* 200 F.Supp.2d 280, 297 (S.D.N.Y.2002) (holding that fact issues existed as to whether DOCS' ban on literature and assembly of religious group was reasonably related to legitimate penological interests); *Show v. Patterson,* 955 F.Supp. 182, 190-91 (S.D.N.Y.1997) (finding fact issues precluding summary judgment regarding whether strip search of Muslim inmates was reasonably related to legitimate penological interests).

In this instance the defendant has not offered any justification for his refusal to provide the plaintiff with the requested, vegetarian-plus-fish diet, the reasonableness of which could then be examined under *Turner,* instead arguing only his belief that plaintiff's non-pork diet should satisfy the requirements of mainstream Islamic religious tenets. Since this represents little more than an invitation for the court to examine the bonafides of plaintiff's religious beliefs-an invitation which, the Second Circuit has counseled, should be firmly resisted-I find defendant's failure to offer justification for his denial of plaintiff's dieting request to be fatal to his motion, and that accordingly he is not entitled to summary judgment in connection with the merits of plaintiff's First Amendment free exercise claim.

C. *Equal Protection*

In addition to raising concerns under the free exercise clause of the First Amendment, plaintiff's complaint

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

asserts a cause of action under the equal protection clause of the Fourteenth Amendment. The essence of that claim, however, is not well-defined in plaintiff's complaint, and his response in opposition to defendant's summary judgment motion fails to illuminate the claim.

The equal protection clause directs state actors to treat similarly situated people alike. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the equal protection clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano,* 54 F.3d at 1057 (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475, 1477 (2001)) (internal quotation marks omitted).

***7** It may be that plaintiff asserts an equal protection violation stemming from the failure of prison officials to provide him with a diet consistent with his religious beliefs, while members of other religions are accommodated. In such a case plaintiff's equal protection claim is properly analyzed under the framework articulated by the Supreme Court in *Turner. Smith,* 2007 WL 837111, at *5.

As is the case with regard to plaintiff's First Amendment claim, defendant has offered little of value to assist in determining whether it can be said, as a matter of law, that plaintiff's dietary request could not be accommodated consistent with legitimate penological concerns, and that the disparate treatment afforded to plaintiff, based upon his religious beliefs, thus did not abridge his rights to equal protection under the Fourteenth Amendment. Accordingly, defendant Guiffere is not entitled to summary judgment at this juncture with regard to the merits of plaintiff's equal protection claim.

D. *Procedural Due Process*[FN10]

FN10. Plaintiff's complaint also alleges deprivation of substantive due process. Because plaintiff's complaint adequately alleges a violation of the First Amendment free exercise clause and the denial of equal protection as guaranteed by the Fourteenth Amendment, there is no need to resort to the more generic substantive due process provision for an analysis of those claims. *See Velez v. Levy,* 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). In any event, it cannot be said that plaintiff's allegations arise to a level sufficient to offend notions of substantive due process. *See id.* (noting alternatively that plaintiff's substantive due process claim must fail because alleged actions of defendants were not sufficiently shocking to create substantive due process violation).

In his complaint plaintiff also asserts a claim for deprivation of his procedural due process rights. Plaintiff's procedural due process claim contains two elements.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The first component of that claim derives from plaintiff's contention that in denying his request for a vegetarian-plus-fish diet, prison officials at the MCJ failed to follow their own internal regulations. This element of plaintiff's due process claim is easily discounted. It is well-established that no due process claims arise from the failure of prison officials to follow internal prison regulations. *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citing *Hyman v. Holder,* No. 96 Civ. 7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001)).

The second portion of plaintiff's due process claim stems from the failure of prison officials to provide a hearing before denying his request for a religious meal. To successfully state a claim under 42 U.S.C. § 1983 for denial of due process, a plaintiff must show that he or she both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillance,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

In his papers plaintiff has cited no provision under which New York has created a liberty interest guarantying prisoners meals including only vegetables and fish, as requested by him. Consequently, in order to prevail on his due process claim plaintiff must establish that the denial of his request in that regard imposed upon him "atypical and significant hardship" in relation to the ordinary incidents of prison life. *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 2300 (1995); *see also McEachin,* 357 F.3d at 202-03; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. Because plaintiff's complaint, even when most generously construed, fails to contain any such allegation, his procedural due process claim is subject to dismissal as a matter of law.

E. *Qualified Immunity*

***8** In addition to seeking dismissal of plaintiff's claims on the merits, defendant now presses qualified immunity as an alternative basis for dismissal of plaintiff's claims against him.

Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citing *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)); *see also Zellner v. Summerlin,* 494 F.3d 344, 2007 WL 2067932, at *20-21 (2d Cir. July 20, 2007); *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007). The law of qualified immunity seeks to strike a balance between overexposure by government officials to suits for violations based upon abstract rights and an unduly narrow view which would insulate them from liability in connection with virtually all discretionary decisions. *Locurto v. Safir,* 264 F.3d 154, 162-63 (2d Cir.2001); *Warren,* 196 F.3d at 332. As the Second Circuit has observed,

> [q]ualified immunity serves important interests in our political system, chief among them to ensure that damages suits do not unduly inhibit officials in the discharge of their duties by saddling individual officers with personal monetary liability and harassing litigation.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Provost v. City of Newburgh,* 262 F.3d 146, 160 (2d Cir.2001) (internal quotations omitted) (citing, *inter alia, Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 456 F.2d 1339, 1348 (2d Cir.1972)).

Analysis of a claim of qualified immunity entails a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.,* 323 F.3d 206, 211 (2d Cir.2003). As a threshold matter, it must first be determined whether, based upon the facts alleged, plaintiff has facially established a constitutional violation. *Id.* If the answer to this inquiry is in the affirmative, the court must then turn its focus to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 2156 (2001)); *see also Poe v. Leonard,* 282 F.3d 123, 132-33 (2d Cir.2002). Finally, if the plaintiff had a clearly established, constitutionally protected right that was violated, he or she must demonstrate that it was not objectively reasonable for the defendant to believe that his action did not violate such law. *Harhay,* 323 F.3d at 211; *Poe,* 282 F.3d at 133 (quoting *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting, in turn, *Salim,* 93 F.3d at 89)).

***9** The first two elements, as they apply to the facts of this case, are not controversial. Addressing the merits of the plaintiff's free exercise and equal protection claims, I have found at least the existence of genuinely disputed material facts precluding a finding, as a matter of law, that no substantive violation occurred. Moreover, the right at stake, including of a prison inmate to receive meals consonant with their religious beliefs, subject only to the constraints of legitimate penological concerns, was clearly established at the times in dispute. *See, e.g., Ford,* 352 F.3d at 507; *Bass,* 976 F.2d at 99; *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975).

It is the third element, addressing on Sergeant Guiffere's state of mind, that is the focus of his application for immunity from suit. In this instance, Sergeant Guiffere asserts-and plaintiff does not contest-that it was his belief at the relevant times that the prescribed pork-free diet was in conformance with Johnson's Islamic dietary restrictions. *See, e.g.,* Guiffere Aff. (Dkt. No. 33-3) ¶ 6. Guiffere's belief in this regard was apparently influenced in large part by an advisory chart maintained at the MCJ reflecting that the dietary beliefs of the Islamic (Muslim) religion require consumption of Kosher meals, to include "meat, but no pork or pork by-products." Hutchinson Aff. (Dkt. No. 33) ¶ 5 and Exh. A. It also should be noted that at the time in question the provision of pork-free diets to Islamic inmates had been approved by the New York courts as "satisf[ying] the constitutional requirement." *See Malik v. Coughlin,* 158 A.D.2d 833, 834, 551 N.Y.S.2d 418, 418 (3d Dep't 1990) (citing *O'Lone,* 482 U.S. at 352, 107 S.Ct. at 2406); *see also Majid v. Leonardo,* 172 A.D.2d 914, 914, 568 N.Y.S.2d 200, 201 (3d Dep't 1991). Under these circumstances I find that it was objectively reasonable for the defendant to believe that his actions in denying plaintiff's request for a vegetarian-plus-fish diet did not violate Johnson's clearly established constitutional rights.[FN11] *See generally Kind v. Frank,* 329 F.3d 979 (8th Cir.2003).

FN11. Undeniably, the Second Circuit has been less than generous in finding qualified immunity in settings such as that now presented. *See Ford,* 352 F.3d at 596-98. In *Ford,* for example, the Second Circuit rejected a finding of qualified immunity based upon the failure of prison officials to provide an Islamic inmate with the Eid ul Fitr meal to celebrate the close of Ramadan, in reliance upon advice from religious authorities that postponement of the feast meal was not religiously significant. *Id.* at 597-98. The instant case, however, presents a far more compelling argument for invocation of qualified immunity, based upon facts which are strikingly

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

similar to those involved in *Kind,* in which the Eighth Circuit endorsed a finding of qualified immunity under analogous circumstances to those now presented. 329 F.3d at 980-81.

IV. *SUMMARY AND RECOMMENDATION*

Analysis of plaintiff's substantive free exercise and equal protection claims turn upon resolution by the factfinder of critical issues of fact, including whether his sincerely held religious beliefs require the diet which he requested, and whether legitimate penological concerns preclude providing him with the meals sought by him. I find, however, that a reasonable person in the defendant's circumstances, denying plaintiff's meal request based upon an established facility policy and a practice which has passed state court scrutiny, would not have appreciated that he or she was violating plaintiff's clearly established constitutional rights. Accordingly, I recommend a finding that defendant Guiffere is entitled to dismissal of plaintiff's claims against him on the ground of qualified immunity.

***10** Based upon the foregoing, it is therefor hereby

RECOMMENDED that defendant's motion for summary judgment (Dkt. No. 62) be GRANTED, and the plaintiff's complaint be DISMISSED in all respects, with prejudice with respect to defendant Guiffere, but without prejudice as to defendant Pecora.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the plaintiff by regular mail and the defendant electronically.

N.D.N.Y.,2007.
Johnson v. Guiffere
Not Reported in F.Supp.2d, 2007 WL 3046703 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Bobby KING and James Ford, Plaintiffs,
v.
Floyd BENNETT, John Hayes, John Laconte and Glenn Goord, Defendants.
**No. 02-CV-349Sr.**

March 30, 2007.

Bobby King, Wallkill, NY, pro se.

James Ford, Gainesport, NY, pro se.

Michael J. Russo, New York State Attorney General's Office, Buffalo, NY, for Defendants.

***DECISION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

***1** In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this case, including entry of final judgment. Dkt. # 23.

Currently before the Court is defendants' motion for summary judgment dismissing plaintiffs' complaint of denial of the right to free exercise of religion by virtue of DOCS' policy of holding joint Friday prayer services for both Shi'a and Sunni Muslims. Dkt. # 33. For the following reasons, defendants' motion is granted.

***BACKGROUND***

In *Cancel v. Goord,* a Shi'a Muslim incarcerated at the Fishkill Correctional Facility filed a grievance "requesting that Shi'a Muslims be allowed to have religious study meetings, classes or study group specific to their religious beliefs and that they be allowed access to outside Shi'a clergy persons." 181 Misc.2d 363, 364 (Sup.Ct. Dutchess County 1999), *aff'd as modified,* 278 A.D.2d 321 (2d Dep't 2000), *leave to appeal denied,* 96 N.Y.2d 707 (2001). The Department of Correctional Services ("DOCS"), denied the grievance, prompting the inmate to commence an article 78 proceeding challenging DOCS' determination as arbitrary and capricious. *Id.* The trial court concluded that DOCS' determination that the spiritual needs of the inmates of the Shi'a Muslim faith could be met in religious services led by chaplains of the Sunni Muslim faith was arbitrary and capricious. *Id.* at 365. Accordingly, the trial court granted the petition and annulled DOCS' resolution of the grievance. *Id.* at 365-66. The trial court also ordered that DOCS permit Shi'a inmates "to have contact with a volunteer Shi'a scholar" or, if no such volunteer was available, to permit Shi'a inmates "to participate in a religious education class or study group up to once per week with an approved inmate acting as facilitator and with security staff present...." *Id.* at 366.

The Appellate Division affirmed the trial court's order insofar as it granted the petition and annulled DOCS'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

resolution of the grievance, but vacated that portion of the trial court's decision "which directed the manner in which [DOCS] was to permit the petitioner and his fellow adherents of the Shi'a sect of Islam to practice their faith, and remit[ted] the matter to ... DOCS to conduct administrative proceedings, with Shi'a participation, to determine the manner in which to best afford Shi'a inmates speararate religious services, under appropriate Shi'a religious leadership, in a time and place that comport with legitimate penological concerns." 278 A.D.2d at 323.

In accordance with that decision, DOCS implemented an official policy entitled "Protocol for Shi'ite Muslim Programs and Practices" ("Protocol"). Dkt. # 36, ¶ 5. The Protocol requires DOCS to: (1) refrain from disparaging the doctrines of any religious faith; (2) endeavor to consult with ecclesiastical authorities on Shi'ite Islam in the community at large to obtain advice and guidance regarding accommodation of the religious needs of Shi'ite inmates; (3) afford Shi'ite inmates the right to attend Shi'ite religious education and study classes; (4) afford Shi'ite inmates full and equal opportunity to participate in, without discrimination, the weekly Friday Jumah [FN1] services and ensure that the Muslim Council has at least one Shi'ite member; and (5) revise it's religious observance calendar to include observances unique to Shi'ite Muslims. Dkt. # 36, ¶ 5.

> FN1. Jumah is a weekly congregational service commanded by the Quran which must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 344 (1987).

***2** Following implementation of the Protocol, *Cancel* moved for civil contempt, arguing that DOCS "disobeyed the express mandate of the Court to afford Shi'a inmates separate religious services under appropriate Shi'a leadership." Dkt. # 36, Exh. D, p. 4. Despite the language used by the Appellate Division, the Hon. Mark C. Dillon, J.S.C., determined that

> The Order of the Appellate Division remitting this matter to ... DOCS does not mandate separate religious services for the Shi'a inmates. If it had, there would have been no need of a remittal. The Order only mandates that ... DOCS determine the manner in which the Shi'a inmates can practice their faith, apart [from] Sunni prisoners.

Dkt. # 36, Exh. D, p. 5.

On January 24, 2002, plaintiffs filed grievances at the Elmira Correctional Facility ("Elmira"), claiming that the Protocol did not conform to *Cancel v. Goord* and violated their right to attend separate Shi'a prayer services. Dkt. # 5, Exh. 2. DOCS denied the grievances, stating:

> Jumah services are held on Friday afternoon with Shi'ite and Sunni Muslims in the mosque. Worship classes for Sunni and Shi'ite are held separately each week. Therefore, the facility is in accordance with the state directive and the *Cancel v. Goord* decision.

Dkt. # 5, Exh. 2.

Plaintiffs commenced this action by filing a complaint in the Northern District of New York on April 12, 2002, which was transferred to this district for proper venue. Dkt. # 5. Although plaintiffs' complaint acknowledges that the Islamic Chaplin at Elmira had authorized a Shi'a study group one night per week to enable Shi'ite Muslim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)
(Cite as: 2007 WL 1017102 (W.D.N.Y.))

inmates to learn and study the Shi'ite Muslim Sect of Islam, plaintiffs allege that Shi'ite inmates have not been afforded a meaningful or reasonable opportunity to freely participate and practice the Shi'a faith in a separate religious service as set forth in *Cancel v. Goord* and as required by the First Amendment to the United States Constitution. Dkt. # 5, ¶ 4. Plaintiffs demand Jumah services separate and apart from Sunni Muslims and seek monetary damages to compensate for their mental anguish and to punish DOCS' refusal to comply with *Cancel v. Goord* . Dkt. # 5, ¶ 11 & p. 6.

In support of their motion for summary judgment, defendants submit the affidavit of Richard Cerio, Deputy Superintendent for Programs at Elmira. Dkt. # 36. Deputy Superintendent Cerio declares that Elmira

> is in accordance with the Protocol, as Elmira has one general Muslim service on Fridays, Shi'a Muslims participate in these services, and at least one Shi'a is on the Muslim Majlis. When Elmira occasionally has inmate facilitators assist in the prayer service, the responsibility is shared by both Sunni and Shi'a Muslims. Shi'a inmates also have the right to attend Shi'a Muslim religious education and study classes apart from Sunni Muslims (as Elmira has a weekly study class that is held on Thursdays from approximately 6:30 to 9:00 pm). Shi'a Muslim inmates can also participate in Arabic language classes and Islamic studies classes, which are conducted by an Imam. Finally, Elmira's Religious Observance Calendar for 2003 is being revised to include the Day of Ghadi (March 3), which is a day of prayer and reflection for Shi'a Muslims, and to include Ashura (March 24), a further day of prayer and reflection for Shi'a Muslims.

***3** Dkt. # 36, ¶ 8.

Defendants also rely upon the October 3, 2001 affidavit of John LoConte, Director of Ministerial and Family Services for DOCS, which was submitted to the district court with respect to a motion for preliminary injunction by a Shi'a inmate at the Fishkill Correctional Facility seeking religious services separate from Shi'ite inmates. *Pugh v. Goord,* 184 F.Supp.2d 326 (S.D.N.Y.2002), *vacated,* 345 F.3d 121 (2d Cir.2003). Director LoConte affirms that although "plaintiffs may be viewed as simply asking that DOCS accommodate their request for a separate prayer area and religious services for a single religious sub-group-Shi'ite Muslims-in reality, establishing a separate organization and program for such inmates would increase pressure on DOCS to make such distinctions for other groups, or subgroups, now and in the future." Dkt. # 37, ¶ 27. For example, Director LoConte notes that there are over 200 protestant denominations encompassed within the Protestant program and three major denominations within the Jewish program. Dkt. # 37, ¶ 42. Director LoConte also avers that "[s]eparate programs would raise security concerns and are fiscally prohibitive because each such program would have to be overseen by prison staff." Dkt. # 37, ¶ 28. In addition, DOCS lacks sufficient space for separate worship areas. Dkt. # 37, ¶ 32. Furthermore, Director LoConte affirms that

> dividing DOCS' Islamic program into separate programs for each sect represented in the prison system would encourage rivalries among the different sects by promoting power struggles and competition for new members or converts. By way of example, in the late 1970's and into the 1980's there had been two major Islamic programs in the state's prison system: a generic Islamic Program and the American Muslim Mission. The inmates in each of the two programs competed for new members and converts from the other. On many occasions this competition turned violent. Recognizing the divisiveness of having the two programs, the religious leadership agreed to a unification and a singular Islamic program, since which the various

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Muslim sects have coexisted peacefully within DOCS' Islamic program.

Dkt. # 37, ¶ 29. As a result, DOCS has structured the current Muslim program "to accommodate beliefs and practices common to all Muslims." Dkt. # 37, ¶ 17.

In opposition to the motion for summary judgment, plaintiff King [FN2] argues that the Protocol does not provide for separate religious services under appropriate Shi'a leadership as required by *Cancel v. Goord* and the free exercise clause of the First Amendment. Dkt. # 40. To support the sincerity of his belief in the necessity of separate Jumah, plaintiff King avers that "the Practical Laws of Islam" by Imam Khomenini, requires that "one who conducts congregational prayer must," *inter alia,* be a believer in "the twelve Imam Shia." Dkt. # 60, p. 2. Plaintiff King also avers that

FN2. Plaintiff Ford has not participated in this action since his release to parole on June 10, 2002.

***4** Sunni Muslim adherents perform certain religious functions that invalidate prayer for Shi'a adherents, i.e., the folding of the hands in prayer on the chest, stomach, turning of the head in prayer and the recitation of the words AMIN after the recitation of the Fatiah chapter of the Quran, all of which invalidate prayers for any Shi'a adherents ... which ultimately means that it's an invalidation of the central tenant [sic] of worship....

Dkt. # 60, pp. 2-3.

***DISCUSSION AND ANALYSIS***

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), *citing Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials chaged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone,* 482 U.S. at 349 *and Turner v. Safley,* 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs. *Salahuddin,* 467 F.3d at 274-75. In assessing the sincerity of an inmate's religious belief, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford,* 352 F.3d at 593. Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford,* 352 F.3d at 590. A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Assuming, without deciding, the sincerity of plaintiff King's belief that engaging in Jumah with Sunni Muslims invalidates his prayers and substantially burdens the exercise of his religious faith, DOCS' refusal to afford Shi‘a separate Jumah will still be permissible if it is reasonably related to some legitimate penological interests. “Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.” *Salahuddin,* 467 F.3d at 274, *citing Turner,* 482 U.S. at 90-91; *Ford,* 352 F.3d at 595. Once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these penological concerns are irrational. *Ford,* 352 F.3d at 595.

***5** In the instant case, DOCS has articulated a rational basis for their refusal to afford Shi‘a inmates an opportunity to attend Jumah separate from Sunni inmates. Director LoConte expresses concern that permitting separate Jumah for Sunni and Shi‘a inmates would pressure DOCS to afford separate services for numerous subgroups within the Protestant and Jewish faiths which would increase fiscal and administrative burdens and encourage rivalries among different groups by promoting power struggles and competition for new members and converts. Dkt. # 37, ¶ ¶ 29, 42. As justification for his security concerns, Director LoConte recounts that DOCS previously recognized two major Islamic programs but unified them because of violent competition between the groups. Dkt. # 37, ¶ 17. Director LoConte also affirms that DOCS lacks sufficient resources, staff and space to accommodate separate Jumah services, a consideration under both the first and third factors. Dkt. # 37, ¶ ¶ 28, 32.

With respect to the second and fourth considerations, Director LoConte affirms that DOCS has structured the general Muslim program “to accommodate beliefs and practices common to all Muslims” and has endeavored to equalize participation by Sunni and Shi‘a with respect to Jumah by sharing responsibility between Shi‘a and Sunni inmate facilitators when such facilitators are utilized and by including at least one Shi‘ite member on the Muslim Council. Dkt. # 36, ¶ ¶ 8 & 17. In addition, DOCS has afforded Shi‘a inmates, including plaintiff King, the opportunity to attend weekly Shi‘a religious education and study classes and has added holy days unique to Shi‘a Muslims to Elmira's Religious Observance Calendar. Dkt. # 36, ¶ 8.

As a result, it is the decision of this Court that DOCS' Protocol, as currently implemented at Elmira, strikes a reasonable balance between the accommodation of plaintiff King's religious beliefs and DOCS' legitimate penological interests and does not, therefore, violate plaintiff King's constitutional right to free exercise of religion. *See, e.g., Orafan v. Goord,* 411 F.Supp.2d 153 (N.D.N.Y.2006 (DOCS did not deny Shi‘a inmates statutory rights under Religious Land Use and Institutionalized Person Act or First Amendment free exercise rights by refusing to provide Jumah service separate from Sunni inmates); *Muhammad v. City of N.Y. Dep't of Corrs,* 904 F.Supp. 161, 197 (S.D.N.Y.1995) (First Amendment did not require accommodation of Nation of Islam inmate's request for separate services), *appeal dismissed,* 126 F .3d 119 (1997); *Matiyan v. Commissioner Dep't of Corrs.,* 726 F.Supp. 42, 44 (W.D.N.Y.1989) (DOCS' refusal to honor Sunni inmate's request for Jumah separate from Shi‘a inmates did not offend the Free Exercise Clause of the First Amendment).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

***CONCLUSION***

Based on the foregoing, defendants' motion (Dkt.# 33), for summary judgment dismissing plaintiff's complaint is **GRANTED.**

The Clerk of the Court is directed to enter judgment in favor of the defendants.

***6** The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

W.D.N.Y.,2007.
King v. Bennett
Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Orrel EVANS, Plaintiff,
v.
ALBANY COUNTY CORRECTIONAL FACILITY; Mary Kay Weis, Kitchen Supervisor; James Campbell, Sheriff; T. Rockwell, ISU; Gloria Cooper, Medical Supervisor; and Thomas Wigger, Jail Administrator, Defendants.
**No. 9:05-CV-1400.**

May 14, 2009.

Orrel Evans, Coxsackie, NY, pro se.

Thuillez, Ford, Gold, Butler & Young LLP, Kelly M. Monroe, Esq., of Counsel, Albany, NY, for Defendant Gloria Cooper.

Roche, Corrigan McCoy & Bush, Robert P. Roche, Esq., of Counsel, Albany, NY, for Remaining Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

***1** Currently before the Court in this *pro se* prisoner civil rights action are (1) Defendant Cooper's motion for summary judgment (Dkt. No. 53), (2) the remaining Defendants' motion to dismiss for failure to state a claim and/or for summary judgment (Dkt. No. 54), (3) United States Magistrate Judge David E. Peebles's Report-Recommendation recommending that Defendant Cooper's motion be granted, and that the remaining Defendants' motion be granted in part and denied in part (Dkt. No. 66), and (4) Defendants' timely Objections to the Report-Recommendation (Dkt. No. 67). For the reasons set forth below, the Report-Recommendation is adopted in part, Defendants' motions for summary judgment are granted in their entirety, and Plaintiff's Second Amended Complaint is dismissed in its entirety.

**I. BACKGROUND**

**A. Relevant Procedural History**

On November 9, 2005, Plaintiff filed this action against Albany County Correctional Facility ("ACCF") and five individuals employed by Albany County. On July 13, 2007, Plaintiff amended his Complaint for the second time. (Dkt. No. 27.) Generally, in his Second Amended Complaint, Plaintiff claims that Defendants violated his rights under the First, Eighth and Fourteenth Amendments by failing to provide him on a regular basis with a vegetarian diet which, he maintains, was necessitated by both an allergy to certain foods and his genuinely held religious beliefs. (*Id.*) More specifically, Plaintiff alleges that this failure (1) infringed upon his right to freely exercise his chosen religion, as guaranteed by the First Amendment to the United States Constitution, (2) exposed him to cruel and unusual punishment and/or deliberate indifference to a serious medical need, in violation of the Eighth Amendment, and (3) denied him equal protection under the law, as guaranteed under the Fourteenth Amendment. (*Id.*)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

On October 2, 2007, Defendants filed their Answer to Plaintiff's Second Amended Complaint. (Dkt. No. 31.) On May 15, 2008, Defendant Gloria Cooper filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 53.) The next day, the remaining Defendants filed a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) and, in the alternative, a motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 54.)

On January 30, 2009, Magistrate Judge Peebles issued a Report-Recommendation recommending that Defendants' motions be granted in part and denied in part. (Dkt. No. 66.) Specifically, Magistrate Judge Peebles recommended that (1) all claims against Defendant Cooper be dismissed, (2) all claims against Defendant ACCF be dismissed, (3) Plaintiff's Fourteenth Amendment claim be dismissed, and (4) a trial be held on Plaintiff's remaining First and Eighth Amendment claims because of the existence of genuine issues of material fact. Familiarity with the grounds of the Report-Recommendation is assumed in this Decision and Order.

On February 12, 2009, Defendants (other than Defendant Cooper) filed their Objections to the Report-Recommendation. (Dkt. No. 67.)

**B. Undisputed Material Facts**

***2** Plaintiff was incarcerated at the ACCF on June 30, 2005. Upon intake, the staff at ACCF performed a medical screening of Plaintiff. During his screening, Plaintiff filled out a medical history and screening form.[FN1] On the form (which he signed), Plaintiff indicated that he had no allergies, medical or otherwise, and further indicated that he did not require any special diet. On July 3, 2005, Plaintiff submitted a Health Services Request Form to the medical department.[FN2] This form did not reference any special/vegetarian diet.

FN1. (Dkt. No. 54, Part 8, at 5.)

FN2. (*Id.* at 12-13.)

On July 5, 2005, Plaintiff sent a letter to the Inmate Services Unit ("ISU"), in which he indicated-for the first time-that he was a vegetarian.[FN3] Generally, there are at least four separate types of vegetarian diets offered at ACCF.[FN4] In addition, there are at least three separate "vegetarian style" diets, which either include the use of fish, cheese or eggs.[FN5]

FN3. (Dkt. No. 54, Part 7, at 26.)

FN4. (Dkt. No 54, Part 2, at 3-4.)

FN5. (*Id.*)

On July 7, 2005, Plaintiff submitted a second Health Services Request Form, which again made no reference to any special/vegetarian diet.[FN6] However, on July 8, 2005, Plaintiff submitted a third Health Services Request Form that did indicate that he was a vegetarian, in addition to being allergic to meat and eggs.[FN7] On that same day, the medical department wrote an order for Plaintiff to receive a vegetarian diet.[FN8]

FN6. (Dkt. No. 54, Part 8, at 14.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN7. (*Id.* at 15.)

FN8. (*Id.* [noting that a slip was sent].)

On July 20, 2005, Plaintiff submitted a letter to Defendant Rockwell at ISU, in which he complained that it took "years" for him to get his food.[FN9] On July 29, 2005, Plaintiff submitted a letter to ISU, indicating that he was not receiving the proper meals, even though the medical department had indicated that he was a vegetarian.[FN10] On that same day, ISU provided the letter to the kitchen supervisor and to the medical department. ISU also sent a letter to Plaintiff, informing him that his letter had been sent to the "kitchen and medical supervisor," and that his card on his "tier is marked for a rasafarian [sic] vegitarian [sic] diet." [FN11]

FN9. (Dkt. No. 54, Part 7, at 28.)

FN10. (*Id.* at 30.)

FN11. (*Id.* at 31.) The Court notes that Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, the particular dietary requirements of his Rastafarian religion.

On July 30, 2005, the medical department prepared a Special Diet Request Form for Plaintiff, which indicated that Plaintiff should receive a vegetarian diet, and should not receive any animal products.[FN12] However, according to Plaintiff, on August 5, 2005, he "again did not receive a meal because [,] according to an unknown correctional officer, there was nothing in the kitchen stating Plaintiff was to receive vegetarian meals." [FN13] Plaintiff unsuccessfully "tried explaining his situation regarding him not receiving his and having his name removed from the vegetarian diet list to an unknown supervising officer making rounds." [FN14]

FN12. (Dkt. No. 54, Part 8, at 10.)

FN13. (Dkt. No. 27, ¶ 24 [Plf.'s Second Am. Compl.].)

FN14. (*Id.* at ¶ 25.)

As a result, Plaintiff submitted a Health Services Request Form to the medical department on August 20, 2005.[FN15] In this Health Services Request Form, Plaintiff indicated that the "wrong meal" was being sent to him. The form was reviewed by the medical department on August 22, 2005. Defendant Cooper noted on the form that, according to the department's records, Plaintiff had already been placed on a vegetarian diet since August 5, 2005.[FN16] However, according to Plaintiff, even after submitting a grievance on August 20, 2005, regarding the receipt of the wrong meals, he "continued to have problems receiving, and quality of his meals." [FN17]

FN15. (Dkt. No. 54, Part 8, at 16.)

FN16. (*Id.*)

FN17. (Dkt. No. 27, ¶ 27 [Plf.'s Second Am. Compl.].) The Court notes that, in Plaintiff's last letter to Defendant Rockwell dated September

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

19, 2005, Plaintiff explained that he had to wait "over 30 minutes or more" for a "court sandwich that was so old bread hard and falling apart." (Dkt. No. 54, Part 7, at 33.) In the same letter, Plaintiff explained that on another occasion, he "had to wait over 40 minutes [to receive his meal] then they sent over a dirty tray. I don't no [sic] who the hell they think they are dealing with that way." (*Id.*)

***3** In early September 2005, Plaintiff submitted a Health Services Request Form complaining of skin irritation on his face and arm.[FN18] The form did not mention any allergy, or problems with his vegetarian/special diet. After receiving the form, the medical department saw Plaintiff and gave him ointment for an acne breakout.

FN18. (Dkt. No. 54, Part 8, at 17.)

On October 13, 2005, Plaintiff submitted another Health Services Request Form regarding a problem with urinating.[FN19] The form made no mention of any allergy, or problems with his vegetarian/special diet. On October 14, 2005, Plaintiff was seen for this complaint.

FN19. (*Id.* at 18.)

According to Plaintiff, "[o]n October 20, 2005, [he] received a 'supposed' vegetarian meal" that was actually "badly burnt eggs and pears." [FN20]

FN20. (Dkt. No. 27, ¶ 28 [Plf.'s Second Am. Compl.].)

In addition, attached as an exhibit to his unsworn opposition memorandum of law, Plaintiff has provided the Court with a calendar, in which he has circled 72 days between June 29, 2005, and October 20, 2005, on which he asserts he either (1) "miss[ed]" a meal, or (2) received his meal late.[FN21] The Court notes that, apart from not being attached to an affidavit, the calendar fails to specify which days Plaintiff missed a meal, and which days he simply received his meal late. In addition, the calendar fails to specify whether he missed the meal because (1) he was not given a meal at all, or (2) he was not given the (presumably vegetarian) meal he requested. Finally, the calendar indicates that Plaintiff did not receive a timely meal at ACCF on June 29, 2005 (though incarcerated there at the time), which appears inaccurate because he was not incarcerated at ACCF until June 30, 2005.

FN21. (Dkt. No. 57, Part 2, at 7, 30.)

In any event, in their memorandum of law in support of their motion for summary judgment, Defendants concede that Plaintiff did not receive a vegetarian meal on a few occasions.[FN22] Furthermore, in their reply papers, Defendants attempt to quantify the extent of this deprivation by indicating that Plaintiff did not receive the proper meal "a half dozen or so times." [FN23]

FN22. (Dkt. No. 54, Part 4, at 3.)

FN23. (Dkt. No. 59, at 2.) The Court notes that, in their Objections, Defendants offer (for the first time) evidence in support of this estimate, although the Court declines to consider this late-blossoming record evidence, pursuant to the legal standard described below in note 26 of this Decision and Order. (*See, e.g.,* Dkt. No. 67, Part 1, ¶ 8 [Roche Affid.]; Dkt. No. 67, Part 5, ¶¶ 8-9

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[Clark Affid.]; Dkt. No. 67, Part 8 [Ex. C to Clark Affid.]; Dkt. No. 67, Part 9, ¶ 7, 10, 11, 12 [Weis Affid.].)

As a result of the foregoing treatment, Plaintiff alleges that he lost thirty (30) pounds between June 28, 2005, and October 2005.[FN24] Plaintiff also alleges that he suffered from migraine headaches, and dizziness because of his hunger.[FN25]

FN24. (Dkt. No. 27, ¶ 33 [Plf.'s Second Am. Compl.].) Plaintiff alleges that the departmental medical staff at Downstate Correctional Facility (where Plaintiff was transferred on October 25, 2005) has a record of his weight, which supports his weight loss claim. (*Id.*)

FN25. (*Id.* at ¶ 14.)

**II. APPLICABLE LEGAL STANDARDS**

**A. Standard of Review on Objection from Report-Recommendation**

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a "de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN26] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See* *Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).[FN27] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See* *Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN26. On *de novo* review, "[t]he judge may ... receive further evidence ...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN27. *See also* *Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec.12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (1996).

**B. Standard Governing Motion to Dismiss for Failure to State a Claim**

***4** After the pleadings are closed, a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is properly brought as a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *Maggette v. Dalsheim,* 709 F.2d 800, 801 (2d Cir.1983) [citations omitted]; *see also* Fed.R.Civ.P. 12(b), 12(c). However, the motion for judgment on the pleadings is then decided according to the same standard as is a motion to dismiss for failure to state a claim. *Id.*

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211 nn. 15-16 (N.D.N.Y.2008) (McAvoy, J., adopting Report-Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212 n. 17 [citations omitted]. The main purpose of this rule is to "facilitate a proper decision on the merits." *Id.* at 212 n. 18 [citations omitted].[FN28]

FN28. *See also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ( "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ( "[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. *Id.* at 212 n. 20 [citations omitted]. However, even this liberal notice pleading standard "has its limits." *Id.* at 212 n. 21 [citations omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. *Id.* at 213 n. 22 [citations omitted].

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968-69. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965 [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [citations omitted].[FN29]

FN29. *See also* *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ("[The Supreme Court] is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ).

***5** As have other Circuits, the Second Circuit has recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN30] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted; emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965 n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level.[FN31]

FN30. *See, e.g.,* *Jacobs v. Mostow,* 271 F. App'x 85, 87 (2d Cir. March 27, 2008) (in *pro se* action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

FN31. For example, in *Erickson,* the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care. *Erickson,* 127 S.Ct. at 2199-2200. Expressed differently, the Court held that such a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication (a requirement that had been imposed by the district court). This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief. Prior to the Supreme Court's decision, numerous decisions, from district courts within the Second Circuit alone, had found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000). The important thing is that, in *Erickson,* even the *pro se* plaintiff was required to allege some sort of fact.

Finally, in reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. This standard is applied with even greater force where the plaintiff alleges civil rights violations and/or where the complaint is submitted *pro se.* However, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN32] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN33] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN34] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214 n. 28 [citations omitted].

FN32. *Sealed Plaintif v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

FN33. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN34. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

with relevant rules of procedural and substantive law") [citation omitted], *accord, Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

**C. Standard Governing Motion for Summary Judgment**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with "specific facts showing a genuine issue [of material fact] for trial." Fed.R.Civ.P. 56(e)(2).

***6** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) [citation omitted]; *see also* Fed.R.Civ.P. 56(e)(2). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." [citations omitted]. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute-even if that nonmoving party is proceeding *pro se.*[FN35] (This is because the Court extends special solicitude to the *pro se* litigant, in part by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment. [FN36] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules. [FN37] For this reason, this Court has often enforced Local Rule 7.1(a) (3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has failed to properly respond to that statement [FN38]-even where the nonmoving party was proceeding *pro se* in a civil rights case.[FN39]

FN35. *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN36. *Krug v. County of Rennselaer,* 04-CV-0640, 2006 WL 2669122, at *3 (N.D.N.Y. Sept.18, 2006) (McAvoy, J.) ("When dealing with a *pro se* party, certain procedural rules apply so as to insure that the *pro se* litigant is not disadvantaged by the lack of legal training. In this regard, the Local Rules require that [a *pro se* party be informed of the consequences of failing to respond to a motion for summary judgment, before those consequences may be imposed]."); *see also* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("This Court has also held that summary judgment should not be entered by default against a *pro se* plaintiff who has not been given any notice that failure to respond will be deemed a default.") [citations omitted].

FN37. *See* *McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *McKaskle v. Wiggins,* 465 U.S. 168, 184, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) ("Nor does the Constitution require judges to take over chores for a *pro se* [litigant] that would normally be attended to by trained counsel as a matter of course."); *Mohasco Corp. v. Silver,* 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980) ("[I]in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law [even when that strict adherence inures to the detriment of a *pro se* litigant]."); *Faretta v. California,* 422 U.S. 806, 834 n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*"[P]ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") [citation omitted]; *LoSacco v. City of Middletown,* 71 F.3d 88, 92 (2d Cir.1995) ("Although *pro se* litigants should be afforded latitude, ... they generally are required to inform themselves regarding procedural rules and to comply with them .... This is especially true in civil litigation.") [internal quotation marks and citations omitted]; *Edwards v. I.N.S.,* 69 F.3d 5, 8 (2d Cir.1995) ("[W]hile a *pro se* litigant's pleadings must be construed liberally, ... *pro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them .") [citations omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ( "[T]he right [to benefit from reasonable allowances as a *pro se* litigant] does not exempt [the *pro se* ] party from compliance with relevant rules of procedural and substantive law.") [internal quotation marks and citations omitted].

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN38. Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L.R. 7.1(a)(3).

FN39. *See, e.g., Hassig v. N.Y.S. Dep't of Envtl. Conservation,* 01-CV-0284, Decision and Order, at 7 (N.D.N.Y. filed March 4, 2004) (McAvoy, J.), *aff'd,* No. 04-1773, 2005 WL 290210 (2d Cir. Feb.2, 2005); *Lee,* 2004 U.S. Dist. LEXIS 20746, at *12-13, 15, *aff'd,* No. 04-1921, 2004 U.S.App. LEXIS 21432; *Harvey v. Morabito,* 99-CV-1913, 2003 WL 21402561, at *1, 3-4 (N.D.N.Y. June 17, 2003) (Sharpe, M.J.), *adopted by* 99-CV-1913, Order, at 2-3 (N.D.N.Y. filed Jan. 15, 2004) (Munson, J.), *aff'd,* No. 04-1008, 115 F. App'x 521 (2d Cir. Dec.23, 2004); *Krug,* 2006 WL 2669122, at *2-3; *Fox,* 2006 U.S. Dist. LEXIS 9147, at *2-3, 2006 WL 395269; *Singleton v. Caron,* 03-CV-0455, 2005 WL 2179402, at *3-4 (N.D.N.Y. Sept.5, 2005) (Peebles, M.J.), *adopted by* 03-CV-0455, 2006 WL 2023000, at *3 (N.D.N.Y. July 18, 2006) (Sharpe, J.); *Govan,* 289 F.Supp.2d at 295; *Butler v. Weissman,* 00-CV-1240, 2002 WL 31309347, at *3 (N.D.N.Y. June 20, 2002) (Sharpe, M.J.), *adopted by* 00-CV-1240, Decision and Order, at 1-2 (N.D.N.Y. filed July 22, 2002) (Kahn, J.); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 & n. 1 (N.D.N.Y.1999) (McAvoy, C.J.); *Costello v. Norton,* 96-CV-1634, 1998 WL 743710, at *1 n. 2 (N.D.N.Y. Oct.21, 1998) (McAvoy, C.J.); *Squair v. O'Brien & Gere Eng'rs, Inc.,* 96-CV1812, 1998 WL 566773, at *1 n. 2 (N.D.N.Y. Aug.21, 1998) (Scullin, J.); *see also Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing, in *pro se* civil rights case, district courts' discretion to adopt local rules like 7.1[a] [3] "to carry out the conduct of its business").

## III. ANALYSIS

### A. Plaintiff's First Amendment Claim

Plaintiff claims that Defendants violated his rights under the Free Exercise Clause of the First Amendment by denying him food consistent with his Rastafarian faith. The First Amendment guarantees the right to free exercise of religion. U.S. Const. amend. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citation omitted). This protection extends "into ... aspects of prison life including, pertinently, that of an inmate's diet ...." *Ward v. Goord,* 06-CV-1429, 2009 WL 102928, at *9 (N.D.N.Y. Jan.13, 2009) (Hurd, J.) (citation omitted). "The Second Circuit has held that it is clearly established that a prisoner has a right to a diet consistent with his or her religious scruples." *Ward,* 2009 WL 102928, at *9 (citation omitted). Therefore, "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *Johnson v. Guiffere,* 04-CV-0057, 2007 WL 3046703, at *4 (N.D.N.Y. Oct.17, 2007) (Hurd, J.) (internal quotation marks and citation omitted). "A free exercise claim arising from such a denial brings into focus the tension between the right of prison inmates to freely enjoy and exercise their religious beliefs on the one hand, and the necessity of prison officials to further legitimate penological interests

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

on the other hand." *Guiffere,* 2007 WL 3046703, at *4 (citation omitted).

***7** "Examination of plaintiff's free exercise claim entails application of a three-part, burden shifting framework." *Id.* at 5 (citation omitted). "A party asserting a free exercise claim bears the initial burden of establishing that the disputed conduct infringes on his or her sincerely held religious beliefs." *Id.* (citations omitted). "Importantly, in evaluating this factor the court must be wary of questioning the centrality of particular beliefs or practices to a faith, or a validity of particular litigants' interpretations of those creeds, and instead may only consider whether the particular plaintiff holds a belief which is religious in nature." *Id.* (internal quotation marks and citations omitted). Stated another way, "[t]he freedom to exercise religious beliefs cannot be made contingent on the objective truth of such beliefs." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984). Rather, a subjective test must be employed to determine whether the disputed conduct infringes on the plaintiff's sincerely held religious beliefs. *See* *Ford v. McGinnis,* 352 F.3d 582, 589-90 (2d Cir.2003).

"Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny." *Guiffere,* 2007 WL 3046703, at *5 (citations omitted). "In the event such a penological interest is articulated, its reasonableness is then subject to analysis under the test set out by the Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)." *Id.* (citations omitted).

"Under *Turner,* the court must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and whether the regulations are rationally related to that objective." *Id.* (internal quotation marks and citation omitted). The court then asks whether the inmate is afforded adequate alternative means for exercising the right in question." *Id.* (citation omitted). "Lastly, the court must examine the impact that accommodation of the asserted constitutional right will have on others guards and inmates in the prison." *Id.* (internal quotation marks and citation omitted). "Decisions rendered since *Turner* have clarified that[,] when applying this test, a court should examine 'the existence of alternative means of facilitating exercise of the right that have only a *de minimis* adverse effect on valid penological interests.' " *Id.* (citations omitted).

With all of this in mind, it is important to note that "[t]here may be inconveniences [regarding denials of religiously required food] so trivial that they are most properly ignored." *Tafari v. Annets,* 06-CV-11360, 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008) (quoting *McEachm v. McGuinnis,* 357 F.3d 197, 203 n. 6 [2d Cir.2004] ). "In this respect, this area of the law is no different from many others in which the time-honored maxim *de minimis non curat lex* applies." *McEachm,* 357 F.3d at 203 n. 6.

***8** Here, as an initial matter, Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, that the disputed conduct infringed on his sincerely held religious beliefs. In particular, Plaintiff has not alleged or established how the meals that he received were actually "wrong." For example, Plaintiff has not alleged or established that the meals were "wrong" because they were not in conformity with his Rastafarian faith, or because they contained a product to which he is allergic. Nor has Plaintiff alleged or established how receiving non-vegetarian meals infringed on his sincerely held religious beliefs. *See* *Benjamin v. Coughlin,* 905 F.2d 571, 580 (2d Cir.1990) (dismissing Rastafarians' "dietary claim" asserting they had constitutional right to observe "Ital," because plaintiffs "failed to clearly define the claim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

or to make the evidentiary showing required to establish any constitutional dietary claim").

In any event, Plaintiff has not alleged facts plausibly suggesting, or adduced admissible record evidence establishing, that the "wrong meals" he (allegedly) received constituted a burden that was anything more than *de minimis* in nature. As explained above in Part I.B. of this Decision and Order, Plaintiff has not established (or even alleged) the number of "wrong meals" that he (allegedly) received.[FN40] As also explained above in Part I.B., in their motion for summary judgment, Defendants concede that Plaintiff was denied vegetarian food during "a few of his meals." Furthermore, in an effort to quantify the extent of this deprivation, Defendants estimate that Plaintiff received the "wrong meal" about "a half dozen or so times."

> FN40. As explained above in Part I.B. of this Decision and Order, the closest Plaintiff comes to doing so is when he provides the Court with a calendar, in which he has circled 72 days between June 29, 2005, and October 20, 2005, on which he asserts he either (1) "miss[ed]" a meal, or (2) received his meal late.

For the sake of argument, the Court will assume that the number of "wrong meals" was *three times* the number of "wrong meals" conceded by Defendants, which would be the equivalent of one "wrong meal" per week for each of the 18 weeks that Plaintiff was incarcerated at ACCF. What is as significant as the number of "wrong meals" is the time period over which they occurred. Here, such "wrong meals" were not delivered to Plaintiff consecutively. Rather, Plaintiff asserts they were delivered over the course of Plaintiff's incarceration at ACCF, from June 30, 2005, until October 25, 2005-a time period of approximately 118 days. Given that Plaintiff was supposed to receive three meals per day, Plaintiff was supposed to receive approximately 354 meals while at ACCF. Assuming that Plaintiff received the "wrong meal" approximately 18 out of 354 times, the Court finds that a rational juror could not conclude that the resulting burden on Plaintiff's religious beliefs was anything more than *de minimis.*

In the analogous case of *Odom v. Dixion,* the Western District of New York held that the New York State Department of Correctional Services' failure to provide a prisoner with Kosher meals on seven out of 33 occasions (i.e., over an eleven-day time period) did not "support a § 1983 violation under either the First Amendment or RLUIPA." *Odom v. Dixion,* 04-CV-0889, 2008 WL 466255, at *11 (W.D.N.Y. Feb.15, 2008) (noting that deprivation was due to "an administrative error based on [the prisoner's] failure to timely advise [the facility's] food service personnel of his brief confinement on keeplock status"). Other courts have issued similar rulings. *See, e.g., Norwood v. Strada,* 249 F. App'x. 269, 272 & n. 1 (3d Cir.2007) (denial of religiously certified "halal" meals on seven out of seven occasions, during prison's two-and-onehalf-day emergency lock-down, was "a mere *de minimis* intrusion" that failed to substantially burden the inmate's religious beliefs); *Rapier v. Harris,* 172 F.3d 999, 1006 n. 4 (7th Cir.1999) (affirming summary judgment for defendants because denial of pork-free meal on three occasions out of 810 meals constituted *de minimis* burden, where the denials were caused by "institutional shortage," and plaintiff "has not alleged a routine or blanket practice of denying him pork-free meals."); *Thomas v. Picio,* 04-CV-3174, 2008 WL 820740, at *6 & n. 8 (S.D.N.Y. Mar.26, 2008) (assuming that inmate plaintiff was denied three or four Kosher meals for one or two consecutive days, "such a denial is not a substantial burden" on her free exercise of religion); *Omar v. Casterline,* 414 F.Supp.2d 582, 593 (W.D.La.2006) ("[T]he refusal to hold three meals [until sunset] because of Ramadan states only a *de minimis* imposition on ... free exercise rights.") .[FN41]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN41. *Cf. Tafari,* 2008 WL 2413995, at *16 (denial of Kosher meals on a few separate occasions "did not substantially burden [Plaintiff's] religious beliefs and constituted, at most, a *de minimis* violation."); *Ward,* 2009 WL 102928, at *9 ("The failure to provide a single meal is insufficient to allege a constitutional violation."); *Peterson v. Price,* 06-CV-0106, 2007 WL 2893009, at *6 (N.D.W.Va. Sept.28, 2007) ("[T]he failure to provide inmates with one or two kosher meals does not rise to the level of a constitutional claim.").

***9** For each of these alternative reasons, Plaintiff's First Amendment claim is dismissed.

**B. Plaintiff's Eighth Amendment Claim**

Plaintiff claims that Defendants violated his Eighth Amendment rights in two separate ways. First, he claims that, by denying him food consistent with his vegetarian diet, which was approved by the medical department at ACCF, he was denied the right to adequate prison conditions. Second, he claims that, by knowingly being allowed to lose significant weight, he was denied the right to adequate medical care. The relevant legal standard governing both claims is the same.

"The Eighth Amendment prohibits 'cruel and unusual punishments' in the course of incarceration." *Labounty v. Gomez,* 94-CV-3360, 1998 WL 214774, at *2 (S.D.N.Y. May 1, 1998). "To bring a cause of action pursuant to Section 1983 of Title 42, United States Code, for a violation of the Eighth Amendment's prohibition, a plaintiff must establish that the deprivation of which he is complaining is 'sufficiently serious' to constitute cruel and unusual punishment and that a defendant's actions in allowing the deprivation must have amounted to deliberate indifference." *Labounty,* 1998 WL 214774, at *2 (citing *Farmer v. Brennan,* 511 U.S. 825, 114 [1994, 114 S.Ct. 1970, ---- ----, 128 L.Ed.2d 811, ---- ----] ). "Thus, there is an objective and subjective component to the test." *Id.* (citing *Rivera v. Senkowski,* 62 F.3d 80, 84 [2d Cir.1995] ).

"The denial of a medically proscribed diet may constitute an Eighth Amendment violation under certain circumstances." *Abdush-Shahid v. Coughlin,* 933 F.Supp. 168, 180 (N.D.N.Y.1996) (citing *Robles v. Coughlin,* 725 F.2d 12, 15-16 [2d Cir.1983] ) (other citations omitted). Likewise, "under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles,* 725 F.2d at 15-16 [citations omitted]; *see also Chapdelaine v. Keller,* 95-CV-1126, 1998 WL 357350, at *12 (N.D.N.Y. Apr.16, 1998) (Sharpe, M.J.) ("[T]he Eighth Amendment requires that prisoners receive nutritionally adequate food prepared and served in conditions that do not present an immediate danger to the health of the inmates who consume it"). However, "[m]ere negligence or inadvertent failure to provide a medically necessary diet is not a constitutional violation." *Abdush-Shahid,* 933 F.Supp. at 180.

To establish a valid claim that the denial of food (or the denial of a medically proscribed diet) constitutes an Eighth Amendment violation, one must establish that there was a "sufficiently serious condition" that resulted from the food not being received. *See, e.g., Labounty,* 1998 WL 214774, at *2. A condition is serious for constitutional purposes if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (internal quotation marks and citations omitted).[FN42]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN42. *See also Bost v. Bockelmann,* 04-CV-0246, 2007 WL 527320, at *8 (N.D.N.Y. Feb.20, 2007) (Sharpe, J.) (concluding that, although Plaintiff allegedly lost fifteen pounds in two days, "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's food intake and weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation"); *cf. Beckford v. Portuondo,* 151 F.Supp.2d 204, 213 (N.D.N.Y.2001) (Kahn, J.) (material issue of fact existed with regard to inmate's Eighth Amendment claim because evidence showed that inmate was deprived of two out of three meals per day for eight days); *Moss v. Ward,* 450 F.Supp. 591, 594, 597 (W.D.N.Y.1978) (material issue of fact existed with regard to inmate's Eighth Amendment claim because evidence showed that inmate was completely deprived of food for four consecutive days, and was given only one meal a day for next three days).

If Plaintiff is able to establish a "sufficiently serious condition," he must also establish "that corrections personnel intentionally denied, delayed access to, or interfered with the [receipt of food]." *Abdush-Shahid,* 933 F.Supp. at 180; *see also Portuondo,* 151 F.Supp.2d at 213. Stated another way, deliberate indifference requires more than "negligent oversight." *Bockelmann,* 2007 WL 527320, at *10. In addition, a showing of deliberate indifference requires more than just "vague and conclusory allegations." *Labounty,* 1998 WL 214774, at *2. Finally, it is worth noting that a plaintiff has "a duty to inform [facility] staff that he was not receiving his medically prescribed diet," and if he "fail[s] to do so[,] ... [d]eliberate indifference does not exist." *Labounty,* 1998 WL 214774, at *2.

**1. Whether Plaintiff's Weight Loss Constitutes a Serious Medical Need**

***10** As an initial matter, Plaintiff's claim that he is allergic to meat and eggs is problematic because the admissible record evidence before the Court fails to establish a diagnosis by any medical professional that Plaintiff suffers from allergies to meat or eggs. *See Bockelmann,* 2007 WL 527320, at *8 (noting, as an initial problem to Plaintiff's claim that his medical condition constitutes a serious medical need, that "the record before the court fails to disclose a diagnosis by any medical professional that [Plaintiff] suffers from a medical condition requiring the high calorie diet which he so persistently sought"). The only proof that Plaintiff has offered that supports his claim that he is allergic to meat and eggs is his statement to medical staff, as well as the letters he wrote to Defendant Rockwell, indicating that he is allergic to meat and eggs. (Dkt. No. 54, Part 7, at 26, 28, 30, 32.) Apart from the conclusory and self-serving nature of this "evidence," it should be noted that (1) Plaintiff failed to inform Defendants of this alleged allergy for roughly a week, despite having multiple opportunities to do so, and (2) he affirmatively indicated during his screening on June 30, 2005, that he did not suffer from any allergies.

However, even assuming that Plaintiff is indeed allergic to meat and eggs, and was entitled to a vegetarian diet for that reason, the only harm that he has alleged as a result of being deprived vegetarian meals on an unspecified number of occasions is that he lost thirty (30) pounds over a four-month period, and that this weight loss contributed to him suffering migraine headaches and dizziness. There are three problems with this alleged harm.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

First, although Plaintiff claims that Downstate Correctional Facility has a record of his weight, which supports his weight loss claim, Plaintiff has failed to adduce admissible record evidence establishing this loss of thirty pounds. Second, the record reflects that, at no point in any of the complaints that Plaintiff filed between July and October 2005, or during any of his visits with medical staff, did Plaintiff indicate that he had lost any weight or was experiencing headaches or dizziness. Finally, Plaintiff does not adduce admissible record evidence establishing (or even allege facts plausibly suggesting) that he has been unable to gain weight since leaving ACCF, or that the headaches and dizziness have persisted since October 2005.

As a result, even assuming that Plaintiff lost thirty pounds and experienced dizziness and headaches over a four-month period (from June 30, 2005 to October 25, 2005), as the District Judge Gary L. Sharpe of this Court concluded *Bost v. Bockelmann,* the undersigned concludes that "there is no evidence in the record from which a reasonable factfinder could conclude that plaintiff's ... weight loss concerns represented a condition of urgency or resulted in degeneration or extreme pain sufficient to implicate an Eighth Amendment violation." *Bockelmann,* 2007 WL 527320, at *8.

**2. Whether Defendants Were Deliberately Indifferent to any of Plaintiff's Serious Medical Needs**

***11** Even if the Court were to find a question of fact as to whether Plaintiff's weight loss constituted a sufficiently serious condition, the Court could not find any admissible record evidence establishing that Defendants were deliberately indifferent to this condition. When viewing the record in the light most favorable to Plaintiff, the Court finds that, during his incarceration at ACCF, Plaintiff (1) wrote four letters to Defendant Rockwell at ISU, (2) complained twice to unidentified corrections officers about his food, and (3) notified the medical staff that he was receiving the "wrong meals" one time in a Health Services Request Form. *See* Part I.B. of this Decision and Order.

Based on these undisputed facts, the Court finds that there is at least a question of fact as to whether there were certain days on which Plaintiff did not receive vegetarian meals. However, the Court also finds that "[t]here is no evidence in the record ... to suggest that this deprivation was deliberate and calculated to deprive the plaintiff of the nourishment constitutionally required and necessary to avoid ... weight loss, as distinct from the result of negligent oversight[,] which does not rise to a level of deliberate indifference." *Bockelmann,* 2007 WL 527320, at *10. "Simply stated, the evidence is lacking that any of the constituent groups sued in this action, including the county defendants, prison medical personnel, and the food service providers at [ACCF], were both cognizant of a serious medical need on the part of the plaintiff and aware that their failure to be faithful in providing the prescribed ... diet would result in a substantial risk of serious harm." *Bockelmann,* 2007 WL 527320, at *10.

In support of this finding, the Court makes four points. First, of the four letters that Plaintiff wrote to ISU, two focused almost exclusively on the quality of the food he received,[FN43] and another was the first letter that he sent to ISU, notifying them that he was a vegetarian. (Dkt. No. 54, Part 7, at 26, 28, 33.) The remaining letter, written on July 29, 2005, explained that Plaintiff was a vegetarian and implied that Plaintiff had problems receiving vegetarian meals. (Dkt. No. 54, Part 7, at 30.) However, neither this letter, nor any of the other letters, in any way stated that Plaintiff was losing weight, or suffering from other side-effects as a result of receiving the "wrong meal." (Dkt. No. 54, Part 7, at 26, 28, 30, 32, 33, 35, 38, 40, 42.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN43. "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *Bockelmann,* 2007 WL 527320, at *10 (citing *LeMaire v. Maass,* 12 F.3d 1444, 1456 [9th Cir.1993] [other citation omitted] ).

Second, the Court notes that Plaintiff indicated on August 20, 2005, in a Health Services Request Form, that "everyday they send up the wrong meal." The record reflects that, after filling out this form, Plaintiff filled out Health Services Request Forms on two separate occasions (once in early September 2005 and once on October 13, 2005). On neither occasion did Plaintiff mention that he was still receiving the "wrong meal." The Court finds this fact material because, if Plaintiff was having a problem with his meals, based on the fact that he had previously notified the medical department in a Health Services Request Form of his problem, it would be reasonable to expect that he would have again voiced this problem to the medical department.

***12** Third, the record reflects that, in all of the visits that Plaintiff had from the medical department throughout his four-month stay at ACCF, never once did he speak of weight loss, or mention other side-effects that he was suffering as a result of receiving the "wrong meal."

Finally, the record reflects that Defendant Rockwell took action to make the kitchen staff and medical staff aware of Plaintiff's issues; the medical staff also took action to so notify the kitchen staff; and the kitchen staff did not intentionally deprive Plaintiff of his vegetarian diet.[FN44] Simply stated, whatever harm Plaintiff suffered cannot be attributed to anything more than negligence, which, again, is not actionable under the Eighth Amendment.

FN44. In his memorandum of law in opposition to Defendants' motion for summary judgment, Plaintiff argues that "a screw up or simple negligence or inadvertent failure to provide food or care as requested automatically [gives rise] to a deprivation of constitutional privilege." However, the law is clear that simple negligence does not rise to the level of deliberate indifference. *See* *Bockelmann,* 2007 WL 527320, at *10. Rather, deliberate indifference is a state of mind akin to criminal recklessness. *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003); *Hathaway v. Coughlin* ("Hathaway II"), 99 F.3d 550, 553 (2d Cir.1996).

For all of these reasons, Plaintiff's Eighth Amendment claims are dismissed.

**C. Plaintiff's Fourteenth Amendment Claim**

Magistrate Judge Peebles recommended that the Court dismiss Plaintiff's Fourteenth Amendment claim that Defendants' refusal to adhere to the Court Order that he receive a special vegetarian diet associated with his religious practices violated Plaintiff's right to equal protection under the law. Neither party has objected to this recommendation. As a result, the Court reviews the recommendation for clear error, and finds no such error. Accordingly, for the reasons set forth in Magistrate Judge Peebles's Report-Recommendation, Plaintiff's Fourteenth Amendment claim is dismissed.

**ACCORDINGLY,** it is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

Slip Copy, 2009 WL 1401645 (N.D.N.Y.)
(Cite as: 2009 WL 1401645 (N.D.N.Y.))

**ORDERED** that Magistrate Judge Peebles's Report-Recommendation (Dkt. No. 66) is ***ADOPTED* in part,** as described above; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt.Nos.53, 54) is ***GRANTED*** in its entirety; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 27) is ***DISMISSED*** in its entirety. The clerk is directed to enter judgment and close this case.

N.D.N.Y.,2009.
Evans v. Albany County Correctional Facility
Slip Copy, 2009 WL 1401645 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Detroy LIVINGSTON, Plaintiff,
v.
P. GRIFFIN, Correction Captain, State of New York Correctional Services (DOCS); Donald Selsky, Director of Special Housing for DOCS; R. Lee, Correction Officer (C.O.); S. Hurteau, C.O.; S. Gawlicky C.O.; LeFrance, Sergeant of DOCS; M. Foster, C.O.; D. Abair, C.O.; S. Salls, Sergeant of DOCS; J. Bouyea, C.O., Defendants.
**No. 9:04-cv-00607-JKS.**

May 21, 2007.

Detroy Livingston, Elmira, NY, pro se.

Bridget Erin Holohan, New York State Attorney General, the Capitol Albany, NY, for Defendants.

MEMORANDUM DECISION and ORDER

JAMES K. SINGLETON, JR., United States District Judge.

I. MOTION PRESENTED

***1** At Docket No. 56 defendants P. Griffin, Donald Selsky, R. Lee, Scott Hurteau, S. Gawlicky, G. LeFrance,[FN1] M. Foster, D. Abair, S. Salls and J. Bouyea have moved for summary judgment in their favor under FED.R.CIV.P. 56. At Docket No. 62 Plaintiff Detroy Livingston has opposed the motion to which Defendants replied at Docket No. 66. After reviewing the moving and opposing papers the Court has determined that the issues are fully briefed and oral argument would not assist the Court in ruling on the motion. The matter is decided on the moving and opposing papers.

FN1. In various documents filed with the Court, "LeFrance" is spelled "LaFrance." For purposes of consistency the Court will use the LeFrance spelling in this memorandum decision and order.

II. BACKGROUND/JURISDICTION

Plaintiff Detroy Livingston ("Livingston") is an inmate in the custody of the New York Department of Correctional Services ("DOCS") incarcerated at the Coxsackie Correctional Facility, Coxsackie, New York. Defendants P. Griffin ("Griffin"), Donald Selsky ("Selsky"), R. Lee ("Lee"), Scott Hurteau ("Hurteau"), S. Gawlicky ("Gawlicky"), G. LeFrance ("LeFrance"), M. Foster ("Foster"), D. Abair ("Abair"), S. Salls ("Salls") and J. Bouyea ("Bouyea") are all employees of DOCS in various capacities. Livingston, appearing *pro se,* has sued all the defendants in their individual capacities under 42 U.S.C. § 1983 alleging various violations of his civil rights under the Constitution and laws of the United States in 17 causes of action. These causes of action are divided into seven separate claims at three separate correctional facilities.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In his first count, Livingston sets forth his first four causes of action alleging that Griffin denied him due process of law under the Sixth and Fourteenth Amendments arising out of a disciplinary hearing. Livingston's fifth cause of action, contained in his second count, alleges that Selsky in reviewing and modifying the disposition of the disciplinary action also violated his due process rights under the Sixth and Fourteenth Amendments. The third count contains the sixth and seventh causes of action alleging that Lee inflicted cruel and unusual punishment on him in violation of the Eighth and Fourteenth Amendments as well as violated New York law by feeding him foods mixed with unknown drugs. Livingston's fourth count contains Livingston's eighth and ninth causes of action alleging that Hurteau inflicted cruel and unusual punishment on him in violation of the Eighth and Fourteenth Amendments as well as violated New York law by feeding him foods mixed with unknown drugs. In his fifth count Livingston sets forth his tenth, eleventh, and twelfth causes of action alleging that Gawlicky fabricated a misbehavior report subjecting him to cruel and unusual punishment in violation of Fifth, Eighth and Fourteenth Amendments and provided false testimony that resulted in a violation of the Sixth and Fourteenth Amendments. In the sixth count, Livingston's thirteenth cause of action alleges that LeFrance tried to force him to be chained to a transsexual/homosexual contrary to Livingston's religious beliefs in violation of First and Fourteenth Amendments and the fourteenth cause of action alleges that Foster fabricated a misbehavior report arising out of his refusal to be transported while chained to a transsexual/homosexual in violation of his First and Fourteenth Amendments. Livingston's seventh count contain Livingston's fifteenth, sixteenth, and seventeenth causes of action alleging that Abair, Salls, and Bouyea, respectively, denied him religious meals in violation of the First, Eighth, and Fourteenth amendments.

***2** This Court has jurisdiction over the federal constitutional claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

III. ISSUES PRESENTED

Defendants' Motion raises essentially two issues: (1) that there is insufficient evidence to support any of the claims made and (2) defendants Griffin, Selsky, Foster, LeFrance, Salls, Abair, and Bouyea are entitled to qualified immunity.

The claims under Count One and the Second Count raise the issue of the due process requirements in prisoner disciplinary actions to (1) compulsory production of witness; (2) the extent to which documentary evidence used by the hearing officer in making his decision must be provided to the prisoner; and (3) whether a recording of the proceedings is constitutionally mandated.

The claims under the Third and Fourth Counts raise the issues of (1) whether expert testimony is required to establish a claim that food fed to an inmate was drugged and (2) whether a private cause of action exists for a violation of the New York penal Code.

The Fifth Count deals with the issue of whether temporal proximity between the filing of a complaint against a correctional officer and an adverse action (issuance of a misbehavior report), standing alone, is sufficient evidence to survive a summary judgment motion on a retaliation claim.

The Sixth Count presents the issue of whether a sincerely held religious belief that homosexuality is an abomination justifies a refusal to be shackled to or be compelled to sit

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

next to a transsexual/homosexual individual.

The Seventh Count presents an issue of whether a prisoner's dietary restrictions must be central to his religious beliefs.

IV. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law. FED.R.CIV.P. 56(c); *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.2000). Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, answers to interrogatories, setting forth such facts as may be admissible in evidence. FED.R.CIV.P. 56(e). "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist, provided that it meets the other requirements for an affidavit under Rule 56(e)." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995); *see also* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. AND PROC. CIV. (3rd) § 1339 (noting that a verified pleading may serve as an affidavit only if it contains facts known to be true in the affiant's own knowledge and if it has a certain level of factual specificity).

In response to a properly supported motion for summary judgment, the opposing party must come forth with evidence that would be sufficient to support a jury verdict in his favor at trial. *Colon v. Coughlin, supra; Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995).[FN2] The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial. In order to show that a genuine issue of material fact exists a nonmoving plaintiff must introduce probative evidence that establishes the elements of the complaint. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-49 (1986). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Id.,* at 255. All reasonable inferences are drawn in favor of the non-moving party and the moving party bears the burden of both production and persuasion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Additionally, *pro se* litigants should generally be afforded "special solicitude" regarding motions for summary judgment. *Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir .1988).[FN3]

FN2. The Court notes that in their motion Defendants offer DOCS records that although authenticated by counsel are not properly authenticated by the custodian of records. However, Plaintiff has not objected to their use and their admissibility at trial is not subject to dispute. Consequently, the Court will consider the records. *See H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454-55 (2d Cir.1991).

FN3. The Court need not, however, accept conclusory statements or allegations. *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2004).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
(Cite as: 2007 WL 1500382 (N.D.N.Y.))

V. DISCUSSION

A. **Denial of Due Process Claims (Count One-Griffin; Second Count-Selsky).**

***3** The basic facts underlying these claims is not disputed. On November 27, 2001, Livingston was issued a misbehavior report charging him with violating prison rules 100.11 (assault on staff) and 106.10 (direct order). Griffin conducted a disciplinary hearing on November 30, December 5, and December 8, 2001. Livingston's defense was that the C.O. assaulted him by pushing him down the stairs.[FN4] Eight witnesses testified at the hearing, one inmate witness refused to testify, and Griffin denied Livingston's request to call the facility doctor as a witness. Livingston was provided a copy of the denial of witness form. Livingston was furnished and submitted a redacted copy of the unusual incident report and the officers' "To/From" forms, which comprise the report. Following the hearing, Livingston was found guilty and sentenced to 36 months in the special housing unit ("SHU"). Livingston appealed the guilty disposition and sentence to Selsky, Director of Special Housing/Inmate Disciplinary Program. Selsky affirmed the guilty disposition, but modified the sentence imposed to 12 months in the SHU.

FN4. The C.O. who filed the complaint against Livingston, T. Notobartolo, is not a party to this lawsuit.

Livingston alleges that Griffin violated his Sixth and Fourteenth due process rights by: (1) failing to call witnesses; (2) taking testimony off the record; (3) denying Livingston documentary evidence; (4) failing to personally ascertain whether an inmate witness in fact refused to testify and failing to provide him with the refusal to testify form; and (5) knowingly used a defective tape recorder. With respect to Selsky, Livingston alleges that, notwithstanding the reduction in the sentence to the SHU, in affirming the finding of guilt notwithstanding the due process violations, Selsky also violated Livingston's Sixth and Fourteenth Amendment due process rights.

In his complaint Livingston alleges:

20. On November 30, 2001 Plaintiff informed defendant P. Griffin that he wanted to call all the c.o.'s as witnesses that responded to the incident because he did not know their names.

21. Defendant P. Griffin failed to call but four of the c.o.'s that responded to the incident.

22. There was over ten c.o's that responded to the November 26, 2001 incident.

23. C.O. Keller witnessed part of the incident and he gave defendant P. Griffin the name of another C.O. that responded to the incident during a off-the-record testimony which Plaintiff over heard.

24. When Plaintiff requested the C.O. whose name c.o. Keller gave to defendant P. Griffin to be call as a witness he refused to call him or disclose the name.

25. Defendant P. Griffin's off-the-record testimony violated Title 7 NYCRR § 254.6(b).

26. Defendant P. Griffin denied Plaintiff the injury report of C .O. T. Notobartolo concerning the November 26, 2001 incident.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

27. Defendant P. Griffin denied Plaintiff the institution doctor as a witness at the hearing.

28. Defendant P. Griffin did not personally ascertain whether inmate Shabazz in fact refused to testify at the hearing, and place his findings on the record.

***4** 29. Defendant P. Griffin did not furnish Plaintiff with any of the forms to explain the refusal of witnesses, refusal to testify, nor denial of documentary evidence.

30. Defendant P. Griffin refused Plaintiff the Unusual incident report, and accident reports even though he promised that he will.

31. Defendant P. Griffin knowningly [*sic* ] used a defective tape recorder which did not clearly record Plaintiff's objections and conclusions.

The minimum due process requirements for prison disciplinary proceedings were laid down by the United States Supreme Court more than 30 years ago in *Wolff v. McDonnell,* 418 U.S. 539, 563-71 (1974). Summarized, these include: (1) written notice of the charges; (2) sufficient time to marshal the facts and prepare a defense; (3) a limited or restricted right to call witnesses and present documentary evidence; and (4) a written statement by the fact finder as to the evidence relied upon and the reasons for the disciplinary action. Prison officials have the discretion to keep to keep a disciplinary hearing within limits and refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as limit the access to other inmates to collect statements or compile documentary evidence. Although not prescribed, it is useful for the reason for refusal to call a witness to be stated. Confrontation and cross-examination are not constitutionally required. Nor does the inmate have a right to counsel; however, where an illiterate inmate is involved or the complexity of the issues render it unlikely the that the inmate will be able to collect and present the evidence necessary for an adequate comprehension of the case, he should be free to seek the aid of a fellow inmate, or if that is forbidden, to have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff.

Once a court has decided that the procedural due process requirements have been met, its function is to determine whether there is some evidence that supports the decision to impose discipline on the inmate. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. *Superintendent, Mass. Correctional Inst. v. Hill,* 472 U.S. 445, 454-55 (1985).

The ordinary disciplinary procedures of the New York prison system comport with the appropriate due process standards outlined in *Wolff. See Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). In a § 1983 civil rights action, the only relevant inquiry is whether the constitutional minimal requirement for imposing disciplinary punishment was met, not whether state procedures were followed. *Shakur v. Selsky,* 391 F.3d 106, 118-19 (2d Cir.2004). The record in this case clearly establishes that Plaintiff's constitutional due process rights were satisfied. Of the rights recognized in *Wolff* only the right of right to call witnesses and present documentary evidence is implicated in this case.

***5** The Court notes initially that, with respect to the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

disciplinary charge, only Plaintiff and C.O. T. Notobartolo were present during the altercation on the stairs. At the disciplinary hearing the two gave diametrically opposed versions of what occurred. According to the testimony of Notobartolo while he was escorting Livingston down the stairs Livingston turned and punched him in the side of the face. Notobartolo then grabbed Livingston in a bear hug in an upper body hold and the two tumbled down the stairs. After scrapping for a while, Notobartolo gained control of Livingston, rolled him over face forward, put his knee on Livingston's buttocks and held him while two other officers applied mechanical restraints. Livingston testified that Notobartolo pushed him down the stairs and that, while holding him down, Notobartolo mouthed to an unidentified officers to hit him (Notobartolo) in the face, which the unidentified officer did.

The two inmate witnesses testified as to what they observed prior to the time Notobartolo and Livingston entered the stairwell but did not observe what occurred in the stairwell. None of the other four correctional officers who testified, all of whom arrived on the scene after Notobartolo had regained control of Livingston in the stairwell, corroborated Livingston's testimony concerning the officer who allegedly was requested to and did hit Notobartolo.

Turning first to the unidentified C.O. who was not called (¶¶ 23 and 24). A review of the transcript and Livingston's statement of facts simply do not support the speculative and conclusory allegation that Griffin Keller identified the C.O. Livingston believes was present. Livingston was permitted to call every C.O. identified either by testimony or in a report submitted. Keller testified that he, Sgt. Shanley, C.O. Kukla, and an unidentified C.O. responded to the scene. C.O. Kukla testified that he, C.O. Keller, and C.O. Notobartolo were present and that C.O. Hemeon came later. Sgt. Shanley testified that he came on the scene after Livingston was under control. Griffin explained that he was unable to learn the identity of the C.O., which is clearly a valid reason for not calling the witness. Livingston's position in this case would go further and require Griffin to prove that he was unable to learn the identity. This, the Court may not do. *See* *Freeman v. Rideout,* 808 F.2d 949, 954 (2d Cir.1986) citing *Ponte v. Real,* 471 U.S. 491, 497 (1985). Moreover, while due process requires that an inmate be permitted to call witnesses in his defense, there is no authority for the proposition that due process requires the hearing officer to identify and locate witnesses for the inmate.

With respect to the recording allegations (¶¶ 25 and 31) due process does not require that the proceedings be recorded. Accordingly, while it may be contrary to New York law, the failure to record a part of the proceeding or use a defective recorder that does not accurately record the entire proceeding does not violate constitutional due process.

***6** As the hearing officer (Griffin) explained in denying access to C .O. Notobartolo's injury report (¶ 26), those records are confidential. Their relevance to the disputed issues is, at best, tangential. The extent of the injuries Notobartolo may have suffered was not at issue. Livingston does not cite and the Court's independent research does not reveal any authority for the proposition that, in the context of the disputed issues involved in this case, Livingston was entitled to see that report. Griffin also adequately and properly explained his denial of Livingston's request to call the institution doctor (¶ 27), *i.e.,* that testimony of the doctor, who was not at the scene and did not witness the incident, was irrelevant. All the institutional doctor could have testified to was the extent of Livingston's injuries, not how he incurred them. The Court notes that the injuries Livingston suffered were, by his own admission, as a result of falling down the stairs. Whether he was pushed, as Livingston alleges, or was grabbed and fell in the grasp of Notobartolo as

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Notobartolo alleges, is not a matter to which the doctor could competently testify. Since the refusal to call the doctor was based upon irrelevance, that refusal was justified and did not violate constitutional due process. *Kingsley v. Bureau of Prisons,* 962 F.2d 145, 146-47 (2d Cir.1992).

With respect to the testimony of Shabazz (¶ 28), the hearing transcript shows that Griffin received the refusal form signed by Shabazz that he would not testify and heard the testimony of the C.O. who obtained and witnessed the signed refusal to testify form. Due process does not require, as Livingston suggests, that the hearing officer personally ascertain that a witness refuses to testify.

Finally, turning to Griffin's refusal to furnish the forms and denial of documentary evidence,[FN5] the unusual incident, and accident reports (¶¶ 29 and 30).[FN6] Livingston complains he was not furnished the refusal to testify form signed by Shabazz and an unredacted copy of the unusual incident report. The material redacted from the unusual incident report was a portion of a sentence that described the injuries received by Notobartolo. That was properly withheld from Livingston for the same reason as was the injury report. As for the refusal to testify form is concerned, as noted above, the hearing officer received the form and heard testimony concerning how it was obtained and signed. Even assuming that not giving it to Livingston (the transcript does not indicate that he requested a copy or to examine it) constituted a denial of due process, it was harmless. Livingston merely complains that he was not provided a copy of the refusal form but does not contend that Shabazz did not refuse or even make any offer as to what the testimony of Shabazz might be or what disputed issue of fact to which it might related.

FN5. Livingston does not identify what other documentary evidence he was denied.

FN6. The accident report is the injury report referred to in ¶ 26 and disposed of above.

Livingston's constitutional due process rights were not violated by either the Tier III hearing by Griffin or its review by Selsky. Moreover, with respect to Selsky, Livingston has failed to provide facts that even hint at, let alone establish, Selsky had a personal involvement in the alleged denial of his constitutional due process rights. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). Although he alleges that the complaint by the C.O. was "fabricated," the record contains ample evidence to support the finding that Livingston was guilty of the infractions of which he was charged. Griffin is entitled to judgment in his favor on Count One (First, Second, Third, and Fourth Causes of Action) and Selsky is entitled to judgment in his favor on the Second Count (Fifth Cause of Action).

**B. Cruel and Unusual Punishment-Food Drugging (Third Count-Lee; Fourth Count-Hurteau).**

***7** Livingston contends that on various dates in July 2002 Lee and Hurteau knowingly, intentionally, and deliberately served him food trays laced with unknown drugs. As a result each time Livingston ate the food he became dizzy, light headed, disoriented, sleepy and rendered unconscious. Livingston also contends that he had to file a felony complaint before the poisoning of his food ceased. In his Affidavit, Livingston states:

14. Defendant R. Lee knowingly gave Plaintiff food trays with some kind of drugs mixed into the food. Plaintiff was poisoned by defendant Lee on July 15, 16, 17, 21

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and 29, 2002. Each time Plaintiff ate the food defendant Lee gave him the drug made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious. That is how Plaintiff realized that defendant Lee was poisoning him through the food tray.

15. The poisoning of Plaintiffs food started after he wrote some complaints and grievances on defendant Lee. The first grievance Plaintiff wrote on defendant Lee was that he refused to pick up his mail, and the next was in regard to him not giving Plaintiff his law library request. Plaintiff did not have any problem with defendant Lee before these instances. Nor was Plaintiffs food poisoned until after he wrote the grievances and complaints against defendant Lee. The poisoning of Plaintiffs was done in retaliation for writing grievances and complaints against defendant Lee.

16. When defendant Lee gave Plaintiff his food tray he would make sarcastic remarks about the food like, "don't forget to eat your vegetables, it's good for you", and "I put something good for you in there." Plaintiff did not really know what defendant Lee meant by these remarks until after he ate the food, and felt the effects of the poison.

17. Plaintiff complaint numerous times about defendant Lee poisoning his food. Plaintiff went as far as filing a felony complaint against defendant Lee in an attempt to stop him from poisoning his food.

18. Plaintiff also tried to get medical tests performed to figure out what was causing the dizziness, disorientation and unconsciousness after he ate the food. Nurse Gomez did not have any medical tests done when Plaintiff requested them, and complained about the effects of the poisoned food to him.

19. Defendant S. Hurteau also knowingly and deliberately gave Plaintiff poisoned food. On July 23, and September 4, 2002 defendant Hurteau deliberately gave Plaintiff food trays in which unknown drugs were mixed into the food. Each time Plaintiff ate the food defendant Hurteau gave him the drugs made him dizzy, lightheaded, disorientated, sleepy and rendered unconscious.

20. Plaintiff was being poisoned by defendant Hurteau, because of the grievances he wrote on him. Plaintiff had written a couple of grievances on defendant Hurteau for breaking the cell headphones and then writing him a misbehavior report for breaking the headphones.

21. At no time did Plaintiff consent to have drugs planted in his food by defendant Hurteau, or anyone else. Nor did a medical doctor authorize drugs to be put in Plaintiff's food by defendant Hurteau, or anyone else. Plaintiff was taking medication for a chronic illness at the time that his food was being poisoned by defendant Hurteau, but the medication did not cause any vertigo, unconsciousness, or dizziness. It was the unknown drugs that were in the food that cause these effects in Plaintiff.

***8** 22. Plaintiff had to resort to filing a felony complaint on defendant Hurteau for poisoning his food for the violation to stop.

23. Plaintiff told the other prisoners in his area that sometimes when he ate the food he felt the effects of being drugged. Some of these prisoners also told Plaintiff that they also felt drugged up after eating the food.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

24. Plaintiff loss 50 pounds because defendants Lee and Hurteau were poisoning his food and he was in fear of eating the food.

In his deposition with respect to Lee, Livingston testified:

Q How do you know Defendant Lee put drugs in your food?

A Because sometime he will say something to the effect of eat-don't forget to eat your vegetables, and it's good for you, and I put something good for you in there and stuff like that.

Q Did he tell you he put drugs in your food?

A Not, not like that. He didn't come outright and say there's drugs in your food poisoning you. He would say some sarcastic things like I put something good in there, and don't forget to eat your vegetables and stuff like that.

Q What made you think that those comments reflected that Defendant Lee put drugs in your food?

A At first I didn't-when he said it, I didn't 24 think-you know, he was just talking. But after eating it, then I feel the effect of the drugs, then I knew what he's doing-what he meant by what he said.

Q And what effects are you referring to?

A I would get lethargic, sleepy, dizzy, and I 4 would sometimes fall out-go to sleep.

Q Why would Defendant Lee put drugs in your food?

A Retaliation.

Q For what?

A For writing him up.

Q When did you write him up?

A While I was there. I don't remember the dates, but I wrote him up about not. giving me my law library and stuff like that.

Q Are you referring to formal grievances that you wrote?

A Formal grievances and complaints that the Superintendent was provided.

With respect to Hurteau, Livingston testified:

Q And how do you know Defendant Hurteau put drugs in your food?

A Because he was the one that was giving me that food, that specific tray right there, and he had an ax to grind

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

or something to retaliate against me for writing him up and ...

Q And how do you know those two trays had drugs in it?

A After eating it, I felt the effects of the poison.

Lee and Hurteau do not contradict the facts asserted by Livingston. Instead they rely on the perceived weaknesses in his case. Contrary to the arguments of Lee and Hurteau, Livingston's medical records for July 24, 2002, reflect: “When I been eating food in the last month I've been feeling dizzy, light headiness, sleep, I want to take [illegible writing] see why this is happening” and the notation under “Plan” “ : Thinks it the food-Discuss [medical symbol for with] PA.” Although Livingston's medical records show several visits with medical personnel in the month following his initial complaint, the record does indicate any further investigation of Livingston's complaints was undertaken. Lee and Hurteau also argue that because Livingston has no expert medical testimony to establish a causal connection between his alleged health ailments and the alleged drugs in his food and the cause of the injury is not within common knowledge of a layperson, his claim must fail, citing *Wills v. Amerada Hess Corp.,* 379 F.3d 32, 46 (2d Cir.2004) and *Barnes v. Anderson,* 202 F.3d 150, 159 (2d Cir.1999).

***9** Neither *Wills* nor *Barnes* is apposite to this case. In *Wills* the issue presented was the causal connection between squamous cell carcinoma and exposure to benzene or PAHs. *Barnes* presented the issue of the causal connection between a miscarriage and an incident that was alleged to have caused substantial emotional stress. This case, on the other hand, involves a situation in which it is uncontested that Livingston ingested food provided him by Lee and Hurteau and after ingesting the food became dizzy, lightheaded, disorientated, sleepy and rendered unconscious. No medical or laboratory tests were run on Livingston. Under these circumstances it is impossible to determine from direct objective evidence what, if any, foreign substance adulterated the food he ingested. Without this critical information it would not be possible for a medical expert to testify with any reasonable degree of medical certainty the cause of the symptoms exhibited by Livingston. At best, a medical expert could only provide the trier of fact with a list of those substances that, when added to food, (1) would not necessarily be readily detectable while it was being eaten and (2) would cause similar symptoms to occur. The facts in this case are more akin to an ordinary food poisoning case. It is within common knowledge that when one eats contaminated food and suffers food poisoning one becomes ill. The severity of the illness may be dependent upon the exact nature of the contaminant but irrespective of the contaminant the person who ingests contaminated food suffers to some degree from food poisoning. In this case, if the jury accepts Livingston's claim that Lee and Hurteau drugged or poisoned the food he was served, the causality nexus between that and the ensuing symptoms may be logically inferred from temporal proximity.

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See, e.g., Hudson v. McMillian,* 503 U.S. 1, 7-8 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). The subjective component of the claim requires a showing that the defendant “had the necessary level of culpability, shown by actions characterized by ‘wantonness' “ in light of the particular circumstances surrounding the challenged conduct. *Blyden v. Mancusi,* 186 F.3d at 262 (quoting *Wilson v. Seiter,* 501 U.S. 294, 299 (1991)); *see, e.g., Davidson v. Flynn,* 32 F.3d 27, 30 & n. 2 (2d Cir.1994).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Administering a harmful foreign substance through food causes bodily injury just as does the use of excessive force. In an excessive-force case, whether conduct was "wanton" turns on whether force was applied in a good-faith effort to further a legitimate penal objective, or maliciously and sadistically to cause harm. *Hudson,* 503 U.S. at 7; *see also* *Blyden v. Mancusi,* 186 F.3d at 262-63. Applying that principle to the uncontested facts of this case, the deliberate adulteration of food without any connection whatsoever to a legitimate penological objective, a rational jury could reasonably find that the actions of Lee and Hurteau were wanton.

***10** The objective component of a cruel-and-unusual-punishment claim focuses on the harm done; but the amount of harm that must be shown depends on the nature of the claim. *See, e.g., Hudson,* 503 U.S. at 8. This objective component is "contextual and responsive to contemporary standards of decency," *id.* (internal quotation marks omitted), and there are significant differences between the harm that must be shown to support a claim based on prison conditions and the harm that will suffice to support a claimed use of excessive force. No showing of extreme injury is required when the claim is that prison officials used excessive force:

> In the excessive force context, society's expectations are different. When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.

*Hudson,* 503 U.S. at 9. Applying that principle to the facts in the case before the Court, a rational jury could reasonably find that the deliberate inclusion of a harmful substance in food and serving it to a prisoner was done maliciously and sadistically intending to cause harm, thereby violating contemporary standards of decency. In that case, irrespective of whether Lee and Hurteau, or either of them, intended to cause Livingston serious bodily harm or death and only to make him ill, they subjected him to cruel and unusual punishment.

Based on the undisputed facts in the record before it the Court can not say that a rational jury could not reasonably find in favor of Plaintiff. The Court agrees that there is no direct objective evidence corroborating Livingston and the circumstantial evidence is weak.[FN7] Nonetheless, a jury could find, based upon the uncontradicted testimony of Livingston that he ingested food and became ill shortly thereafter, in the absence of any other plausible cause, more likely than not he became ill because of some harm substance added to the food. The jury could also find that Lee and Hurteau had both the opportunity (as the persons who delivered the food) and the motive (retaliation) to place a harmful substance in the food.[FN8]

FN7. In the context of a summary judgment motion, not only must the Court accept as true the factual assertions of the non-moving party, but in this case neither Lee nor Hurteau have denied under oath Livingston's factual statements that they served him drugged, poisoned, or otherwise contaminated or adulterated food.

FN8. To the extent that Livingston asserts a retaliatory animus claim based on temporal proximity to previously filed grievances against Lee and Hurteau, strength of temporal proximity weighs greater than that of the claim against Gawlicky discussed below. The issuance of an inmate misbehavior report is a normal function of a correctional officer entitled to a presumption of regularity. On the other hand, spiking an

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

> inmate's food with drugs, poison, or another harmful substance is most decidedly not. Moreover, unlike the claim against Gawlicky, Lee and Hurteau have as yet presented no evidence to counter its weight.

In his Seventh and Ninth Causes of Action Livingston alleges that the acts of Lee and Hurteau violated N.Y. PEN. LAW § 120.05(5) (Assault in the second degree). Defendants argue that Livingston lacks standing to bring the claim citing *Leeke v. Timmerman,* 454 U.S. 83, 91 (1981). While the Court agrees that Livingston lacks standing to bring a criminal action, that is not the issue. The issue, as it relates to N.Y. PEN. LAW 120.05(5), is whether it gives rise to a private cause of action under New York law. Defendants have not cited any case that no private cause of action lies for a violation of that provision and independent research by the Court has not found any such authority. It is clear that New York recognizes the existence of a private cause of action for violations of its Penal Law. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 451 N.E.2d 459, 463 (N.Y.1983). Under New York law, as applied by the New York Court of Appeals, unless the legislature specifically provides that the provisions of the penal law are exclusive and private litigants are not intended to have a cause of action for its violation, it is for the courts to determine, in light of statutory provisions, particularly those relating to sanctions and enforcement, and their legislative history, and of existing common-law and statutory remedies, whether legislature intended private litigants to have cause of action for violation of provisions. *Id.* Whether a private cause of action was intended under a penal statute turns in the first instance on whether Livingston is one of the class for whose especial benefit statute was enacted. However, inquiry does not end there, rather, factors include what indications there are in statute or its legislative history of intent to create or deny such remedy and, most importantly, consistency of doing so with purposes of underlying legislative scheme. *Id.* Although they have the burden of establishing entitlement to judgment as a matter of law, Lee and Hurteau have not briefed this critical issue.

***11** Additionally, it appears that New York would recognize a civil tort cause of action under the facts of this case. *Cf. McCrory v. State,* 721 N.Y.S.2d 712, 713 (N.Y.A.D.2001) (dismissing food poisoning claim for failure to prosecute); *Hakeem v. Wong,* 636 N .Y.S.2d 440, 441 (N.Y.A.D.1996) (dismissing a prisoner's claim that prison officials deliberately poisoned foods purchased from a vending machine for failure to exhaust administrative remedies). In addition, the Second Circuit has indicated that a civil battery claim lies under N.Y. PEN. LAW § 35.30. *See Nimely v. City of New York,* 414 F.3d 381, 391 (2d Cir.2005). This Court perceives no principled reason to assume that a civil battery claim may not be asserted under § 120.05(5).

Having failed to establish that they are entitled to judgment in their favor as a matter of law, Lee and Hurteau are not entitled to judgment on Count Six (Sixth, Seventh, Eighth, and Ninth Causes of Action).

**C. False Misbehavior Report (Fifth Count-Gawlicky)**

The basic facts of the events and sequence in this case are undisputed. Livingston lodged complaints with the Superintendent against Gawlicky on March 17 and April 6, 2003. On April 11, 2003, Gawlicky issued a misbehavior report against Livingston charging him with making threats against her and disobeying a direct order. Following a hearing, Livingston was found guilty of making of the threat charge and not guilty of violating a direct order and sentenced to four months punitive confinement, with loss of privileges.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Livingston contends that the report was false and Gawlicky fabricated it in retaliation for Livingston having filed the complaints against her and that she falsely testified that she feared Livingston might reach through the cell bars to assault her so that he would be placed in a plexiglass cell.

Because they involve questions of intent and are easily fabricated and pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, courts must approach prisoner claims of retaliatory action with skepticism and care. *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002). To sustain a First Amendment retaliation claim Plaintiff must show that: (1) the speech or conduct at issue was protected; (2) the defendant took an action adverse to him; and (3) a causal connection between the protected speech or activity and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004); *Dawes v. Walker,* 239 F.3d at 492. Defendant concedes that the complaints filed by Livingston constituted a protected activity and it appears beyond cavil that the filing of a misbehavior report that results in disciplinary action is adverse. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996). This leaves as the only open issue the causal connection between the two.

The only evidence that Livingston offers for his retaliation claim is the temporal proximity between his complaints against Gawlicky and the filing of the disciplinary charges against him. This is circumstantial evidence of retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002); *Colon v. Coughlin, supra,* 58 F.3d at 872. The question becomes whether this, standing alone, is sufficient to defeat summary judgment. In *Colon* the Second Circuit suggested that if this were the sum and total of plaintiff's case, it might be inclined to affirm the grant of summary judgment to the defendants based upon the weakness of plaintiff's case. 58 F.3d at 873. In this case, unlike *Colon,* Livingston offers no direct evidence of a retaliatory motive. Other circumstantial evidence that might lend support to his case, *e.g.,* his disciplinary record and the nature of the more recent disciplinary violations, *see Flaherty v. Coughlin,* 713 F.2d 10, 14 (2d Cir.1983), in reality undercut Livingston's claim. The record shows that between December 1989 and April 2003 Livingston was the subject of more than 100 disciplinary actions, several of which involved assaults on or threats made to staff. In *Gayle,* unlike this case, the misbehavior report was not only temporally close but arose from statements made in a protected activity (discussion of a grievance) and the conviction was reversed on appeal.

***12** The Court, balancing the principles of the special solicitude to be given to *pro se* plaintiffs and the general rule against weighing the evidence against the skepticism with which it must view retaliation claims, is of the opinion that, based on the evidence in this case, no rational trier of fact could reasonably find in favor of Livingston. Gawlicky is entitled to summary judgment in her favor on the Count Five (Tenth, Eleventh, and Twelfth Causes of Action).

**D. Interference with Religious Beliefs (Count Six-LeFrance and Foster; Count Seven-Abair, Salls, and Bouyea).**

Both Count Six and Count Seven appear to be predicated upon an alleged infringement of Plaintiff's religious beliefs as a Rastafarian. In his complaint, Livingston alleges that LeFrance tried to force him to be handcuffed or sit next to a person who was clearly a transsexual/homosexual and that because of this Foster fabricated a misbehavior report that Livingston disobeyed a direct order. He further alleges that Abair, Salls and Bouyea refused to serve him alternative religious meals, *i.e.,* substitute meals when red

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

meat was served. Livingston's claim of religious belief is clouded by certain undisputed facts. Livingston admits to having been raised as a Seventh Day Adventist. In approximately 1984 he became a Muslim. At some subsequent date that does not appear in the record, Livingston converted to Rastafarianism. However, irrespective of the date of his conversion, Livingston did not inform prison officials of this conversion until on or after August 21, 2004, after the dates that the events of which Livingston complains occurred.

1. *LeFrance and Foster.*

In his affidavit, Livingston testified:

38. On July 21, 2003 when Plaintiff was being transferred out of Upstate C.F. SHU, defendant LaFrance tried to force him to be shackled with an inmate that was clearly a transsexual/homosexua1. Due to Plaintiffs religious belief he refused to be shackled with the transsexual/homosexual inmate.

39. When Plaintiff was called to the pen gate to be shackled, and he saw the inmate whom was to be shackled with him Plaintiff calmly asked defendant LaFrance, “is this person going to be handcuffed to me”. Defendant LaFrance answered “yes”. That is when Plaintiff clearly, calmly and respectfully told defendants LaFrance, M. Foster, and the other c.o.'s in the area that it's against his religion to be in such a close proximity with a transsexual/homosexual person, and could he be shackled to somebody else. The defendants said “no”. Plaintiff then sat beck [*sic* ] down.

40. Plaintiff was again asked to be shackled to the transsexual/homosexual inmate. Plaintiff again refused to be shackled to that inmate, and again stating his religious concerns.

41. Defendant LaFrance then got on the telephone and spoke to someone about Plaintiff and the situation. While on the telephone defendant LaFrance suggested an alternative solution to the situation. The alternative was that Plaintiff would not be shackled to this person, but he still had to be seated next to the same person, Plaintiff agreed to not being shackled to this person, but questioned the logic of being forced to being seated next to this person still. Defendant LaFrance then told the person on the telephone that Plaintiff still refused to get on the bus. If Plaintiff were not shackled to this person it would be no need for him to be seated next to this person for the long bus ride. Sitting next to the transsexual/homosexual person was the same as being shackled to him.

***13** 42. Plaintiff would have been force to be seated next to the transsexual/homosexua1person for six to eight uncomfortable hours. Plaintiff did not want to violate his religious belief, and be stressed out for not adhering to his religious dogma.

43. Plaintiffs religious belief comes from the Holy Bible, and the way his mother raised him. In the book of Leviticus chapter 18 verse 22 through 26states that, “you shall not lie with a male as with a woman; it is an abomination ...” There are many other verses in the Bible such as this one that forbid homosexual acts and association. Jamaican parents who were strict with the teachings of the Bible raised plaintiff. Also, the Jamaican people when Plaintiff was growing up took anti-homosexual stance very serious, because of what the Holy Bible states regarding any homosexual activities. God did destroy Sodom and Gomorrah, because of the abundance of homosexual abomination

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that was occurring in these two cities.

44. Plaintiff stated his religious concerns to both defendants LaFrance and Foster, but they were hell bent on violating Plaintiffs religious beliefs.

45. Plaintiff was escorted back to SHU, and the next day, July 22, 2003 was issued a bogus fabricated misbehavior report written by defendant M. Foster.

46. Defendant Foster fabricated that Plaintiff stated that he “wasn't gonna be shackled to any Homo”. And also said, “You guys might be Homo's, but I'm not and you ain't putting me with that Homo”. Plaintiff never said any of these alleged quotes. At all time during the incident Plaintiff calmly, clearly and respectfully expressed his religious position to defendants LaFrance and Foster regarding his religious belief and the reason why he did not want to be shackled to the transsexual/homosexual person. At no time did Plaintiff verbally harass or abuse anyone. These defendants asked Plaintiff to be shackled to get on the bus; they did not give a direct order. Either way Plaintiff would have still stand on his religious rights and beliefs to not be shackled to the transsexual/homosexual person.

47. There were other inmates that were associating with the transsexual/homosexual while in the pen that would have been willing to be shackled to this person.

48. Plaintiff was found guilty at the disciplinary hearing by the H.O., and sentenced to four (4) months SHU with loss of all privileges, and sixty (60) days was suspended and deferred.

49. Plaintiff submitted an administrative appeal. The hearing disposition was reversed and expunged on administrative appeal after Plaintiff completed his SHU sentence. In all Plaintiff did sixty-one (61) days in SHU due to the fabricated misbehavior report written by defendant Foster and endorsed by defendant LaFrance.

In his Deposition, Livingston testified:

Q Okay. I'm going to turn now to the events that you've included in this Complaint that occurred on the date of July 21 st, 2003, at Upstate Correctional Facility.

***14** Could you please describe what. happened on July 21 st, 2003?

A Well, I got-I was escorted to the receiving room to be processed to be released from S.H.U. Upstate, and at one point I saw that the Sergeant wanted me to be handcuffed to this inmate that was, say-he was a transsexual. Like-I don't know. He had-he had fake breasts or whatever you want to call it, and he made himself up to look like a girl-female or whatever. And I told the Sergeant I don't want to be handcuffed to this dude right here, and I told him the reason why, and he tried to force me to still. I told him, no, I'm not going to. And he-after going back and forth, I still told him I refused, and he got on the phone. He spoke to somebody. And he came with an alternative way to be-to be placed on the bus, but it was still something to do with being handcuffed to the dude. And I told him no. So he said well, you know, you get put back in your cell. I said: If that's how it's going to be, that's how it was going to be. It's my religious right not to be forced to be handcuffed to this person. That's what I told him. So they put my back in my cell and wrote me a force ticket saying this and that happened, when none of that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

happened in the ticket. And I went to a hearing. They found me guilty. And I appealed it, and they found in my favor.

Q So the ticket was ultimately reversed?

A Yes.

Q Who first gave you the order to be handcuffed to this transsexual inmate?

A. I think it was LeFrance 'cause I turned to him after I saw what was-what was taking place, I turned to him and said: I'm not gonna be handcuffed to this person right here.

Q And what did LeFrance do?

A He said if you want-he said-he said something like if you want to get on the bus you are. And I said I'm not, and we went back and forth with it. And I told him the reason why, and he still didn't care. And I told him, well, I refused. And he made a phone call to somebody.

Q Did LeFrance give you a direct order to be handcuffed to the transsexual inmate?

A You could probably say it was an order, but I still wasn't going to.

Q And you refused the direct order?

A If it was an order, I refused it.

Q And you refused to obey the direct order on religious grounds

A Yes.

Q And what are those religious grounds

A Not to be in close proximity and interactive with persons of that persuasion.

Q And is that part of your Rastafarian beliefs?

A It's my belief. It comes out of the Bible. I think I sited [*sic* ] the place in the Bible where it states Leviticon-Leviticus.

Q In Paragraph 71 of your Complaint you correctly note that you cite Leviticus 18[:]22 through verse 26. Do you know what that verse states?

A Not verbatim.

Q Could you summarize it for me?

A Basically what I just said about, yon know, being associated, proximity, interaction, you know, with persons like that person was.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q And did you cite this verse to Sergeant LeFrance?

***15** A No. But I told him that's my religious belief not to be handcuffed to this person like that.

Q Were you actually ever handcuffed to this other inmate?

A No.

Q So the only injury suffered as a result of the events of July 21 st, 2003, is the ticket that was issued to you?

A I had to do 61 days, and my religious belief was compromised.

Q How was your religious belief compromised?

A Because they wanted me-to handcuff me to the person-this person knowing that. And since I refused, they gave me 61 days because of my religious belief.

Q So the injuries suffered was the 61 days in S.H.U.?

A And my religious beliefs.

Q In Paragraph 74 of your Complaint you say: Defendant M. Foster fabricated a misbehavior report stating that Plaintiff disobeyed a direct order, verbal harassment, and staff direction for movement.

Why was the ticket fabricated?

A Because in the description of the incident, none of that happened. He said I start-I don't remember what he wrote, but he's saying that I start yelling, screaming, and causing a scene and all kinds of stuff. But I never did that. All I stated was my religious belief and my reason for refusing to be handcuffed to this person. But he just made up lies, fabrication, and said all kind of stuff happened beside, you know, that really happened.

Q A hearing was conducted on this incident?

A Yes.

Q What was your defense at the hearing?

A That because of my religious belief I didn't want to be handcuffed to this person and none of the description of the incident was true.

Q Did Defendant Foster give you a direct order?

A Not that I remember. All I kept speaking to was the Sergeant because he was the one in charge. So all my verbal comments was directed to him.

A little later he further testified.

Q Were you ever given an order to get onto the bus?

A I guess so if-‘cause that's what they was trying to do. It might not have been an order-order, but it was, you

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

know, they wanted me to get on the bus.

Q And did you refuse because of your religious beliefs?

A Yes

Four facts emerge from Livingston's testimony. First, he refused to be shackled or, alternatively, sit unshackled next to a person he described as being a transsexual or homosexual for transport between two prison facilities. Second, his refusal was based upon his professed religious beliefs. Third, his refusal to be shackled resulted in his not being transported and was, at the very least, the functional equivalent of refusing to obey a direct order. Fourth, Livingston was subjected to disciplinary action for his failure to obey the order.

Livingston has the threshold burden of establishing that the action of which he complains substantially burdened his sincerely held religious belief. *Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006). Once Livingston has met this burden, the burden shifts to the Defendants to identify the legitimate penological purpose justifying impingement upon that right and that the burden is reasonable. *Id.* In making the reasonableness determination, this Court must evaluate four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether Plaintiff had an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating Plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id.,* citing *Turner v. Safley,* 482 U.S. 78, 90-91 (1987).

***16** The question is twofold: what was believed and how was it burdened? Livingston's belief in this case is that homosexuality is an abomination and that he should "not be in close proximity and interactive with persons of that persuasion." [FN9] By his own admission Livingston was not handcuffed nor was he forced to ride seated next to the homosexual/transsexual. The burden he alleges imposed was that Foster issued him a fabricated misbehavior report and he was subjected to disciplinary action for refusing to be handcuffed to a homosexual/transsexual.

FN9. In addressing Plaintiff's threshold burden, this Court starts with the assumption that Plaintiff's religious belief is sincerely held. *See Ford v. McGinnis,* 352 F.3d 582, 590 n. 8 (2d Cir.2003).

The fatal infirmity in Livingston's case against LeFrance is that there is no factual support for a finding that LeFrance infringed upon any religious belief. He admits that he does not know and is only guessing that LeFrance ordered Foster to issue the ticket. Other than to order him to be handcuffed to the homosexual/transsexual person and board a transport bus, which order Livingston admittedly refused to obey, LeFrance had no further direct or personal involvement in the incident. While perhaps showing that LeFrance *attempted* to burden Livingston's religious beliefs, Livingston falls far short of establishing that LeFrance burdened them. Moreover, even assuming LeFrance ordered the misbehavior report be issued, as discussed further below, it does not establish his liability. LeFrance is entitled to judgment in his favor on the Thirteenth Cause of Action.

Livingston's action against Foster suffers from several infirmities. The misbehavior report charged Livingston with disobeying a direct order, verbal harassment, and staff direction for movement. Livingston claims the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

misbehavior report was fabricated. The fabrication claimed by Livingston was in the description of his behavior, *e.g.,* "yelling, screaming, and causing a scene and all kinds of stuff." What Livingston fails to contend is that he did not disobey an order or staff direction for movement. Quite to the contrary, Livingston admits he refused to be handcuffed or sit next to the transsexual/homosexual for movement and as a consequence missed the movement. Even accepting as true Livingston's conclusory allegation that the description was false, having admitted he refused to be handcuffed and board the bus, Livingston's conclusory assertion that the infraction of the rules with which he was charged was fabricated lacks factual foundation.[FN10]

FN10. The Court is not unmindful of the fact that Defendant's conviction of this charge was later reversed on appeal. Not only is no reason shown for the reversal, but the fact that Livingston may have been exonerated on appeal does not render the misbehavior report "bogus" or "fabricated" in a case where he admits the facts that underlie the charges in the misbehavior report to be true.

Plaintiff's only defense to the misbehavior report was the exercise of his religious beliefs was being infringed. The question becomes whether being handcuffed or, alternatively, forced to sit next to a homosexual/transsexual on a bus would substantially burden Plaintiff's religious beliefs. It would not. According to Plaintiff, being forced to sit next to a homosexual/transsexual for six to eight hours would have been uncomfortable and he would have been stressed out for not adhering to his religious dogma. This case does not rise to level of those cases in which a substantial burden on religious tenets was found to exist. Plaintiff was not denied the right to participate in congregate services ( *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); right to participate in a religious ceremony of his choice (separate Shia and Sunni services during Ramadan) (*Salahuddin v. Goord, supra* ); denied a religious meal ( *Ford v. McGinnis,* 352 F.3d 582, 594 (2d Cir.2003)); or forced to swear on a bible in church ( *Doe v. Phillips,* 81 F.3d 1204, 1211-12 (2d Cir.1996)). Plaintiff was simply going to be uncomfortable sitting next a person whom he believed to be a moral abomination. This fits within those cases in which it can comfortably be said that is so peripheral to Plaintiff's religion that the burden is constitutionally *de minimis. See Ford v. McGinnis, supra,* 352 F.3d at 593. Moreover, nowhere has it been clearly established that no matter how strongly or sincerely held his religious beliefs may be, a prison inmate has the right to be free from being in the proximity of or interactive with another person because of that person's sexual orientation. Indeed, such a rule, just as one founded upon color, creed, religious beliefs, gender, or national origin, would be repugnant to the strong public policy of this country and this Court declines to adopt such a rule.

***17** Defendants argue that, assuming that the misbehavior report constituted an impermissible burden on his religious beliefs, Livingston is not entitled to recover because LeFrance and Foster have qualified immunity. Under the doctrine of qualified immunity, *i.e.,* freedom from being sued, the court follows a two-step process: first was there a violation of a constitutional right and second was the right clearly established at the time of the violation. *Clubside, Inc. v. Valentin,* 468 F.3d 144, 152 (2d Cir.2006) citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001). "The relevant dispositive in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct is unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. at 202. If the facts establish a violation, the inquiry becomes whether the evidence, when viewed in the light most favorable to plaintiff and all permissible inferences drawn in his favor, is such that no rational jury could fail to conclude that it was objectively reasonable for the defendant to believe that he was acting in a fashion that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

did not violate a clearly established right. *Salahuddin v. Goord,* 467 F.3d at 273.

While a general right of a prisoner to freely exercise his religious beliefs, although subject to some restriction, was clearly established in 2003, the question is whether that right extended to Livingston's conduct. *See, e.g., Shabazz v. Coughlin,* 852 F.2d 697, 700-701 (2d Cir.1988) (holding that while the right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not). As noted above, no such right as that claimed by Livingston in this case has been clearly established and defendants are entitled to qualified immunity.

LeFrance and Foster are entitled to judgment in their favor on the Sixth Count (Thirteenth and Fourteenth Causes of Action).

2. *Abair, Salls, and Bouyea.*

In his affidavit Livingston testified:

50. On August 5, 2003 defendant D. Abair started denying Plaintiff his alternative/religious meals while in Upstate C.F. Plaintiff notified sergeant Trim, but nothing was done about this problem. Plaintiff had to go hungry for the last two chows (lunch & dinner). Plaintiff told defendant Abair that he have been getting the religious/alternative since he arrived in Upstate C.F. on May 2, 2003. Defendant Abair still refused to give Plaintiff his meal.

51. On August 6, 2003 again Plaintiff did not get his religious/alternative meals. Plaintiff spoke to defendant S. Salls on the 7 to 3 shift about the problem. Plaintiff had to go hungry because his meal was not given to him, and he did not eat meat for religious reasons. When the 3 to 11 shift came on Plaintiff spoke to Sgt. Bass about the problem, but nothing changed Plaintiff still had to go hungry.

52. On August 7, 2003 during the 7 to 3 shift Plaintiff again spoke to defendant Salls twice. Defendant Salls told Plaintiff he wouldn't be getting the religious/alternative meal until September 1,2003.

***18** 53. Plaintiff even spoke to the Muslim Iman [*sic* ] Dr. Ali on August 7, 2003 about him being denied his religious/alternative meal. Dr. Ali said he would tell somebody about the problem. Plaintiff still did not get his meals.

54. On August 11, 2003 defendant J. Bouyea came back to work on A-gallery in 8-Building, for which he was the steady C.O. Plaintiff spoke to defendant Bouyea about the problem of him not getting his religious/alternative meal. Defendant Bouyea wrote the sign back on the door indicating that Plaintiff was to get a religious/alternative meal. Defendant Bouyea told Plaintiff that he must have “pissed off somebody for them to change his alternative meal to regular.” Plaintiff started getting his religious/alternative meal then.

55. On August 13, 2003 defendant Salls came to Plaintiff cell during feed-up time and made defendant Bouyea change the religious/alternative meal tag on the cell door to regular meal. Defendant Salls told Plaintiff he “will make sure you don't get your religious meal.” Plaintiff did not get his meal and he went hungry again.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

56. On August 14,2003 defendant Salls came to Plaintiff on the pretense of investigating him not get his allotted cell property. Defendant Salls tried to make a mockery of Plaintiff situation. At one point defendant Salls told Plaintiff "you just don't understand you are not getting anything."

57. On August 14, 2003 defendant Bouyea refused to give Plaintiff his religious/alternative meal during the lunch feed-up. Defendant Bouyea told Plaintiff that defendant Salls said, "you not alternative, so you not getting it." It was reported to the console that Plaintiff refused chow. Plaintiff still was not getting his meals.

58. On August 17, 2003 Plaintiff was not feed [*sic* ] at all because there was no religious/alternative meals on the food cart for him. This was not reported to the console to be recorded in the logbook.

59. On August 20,2003 Plaintiff spoke to Correction Lieutenant D. Phelix about his meal being changed from religious/alternative to regular without him requesting the change. He said he would check into the situation. Plaintiff did this when he was moved from 8-B-2cell to 8-A17cell.

60. On August 22, 2003 Plaintiff spoke to Correction Captain Bezio regarding him not getting his religious/alternative meal. He told Plaintiff that defendant Salls investigated the matter. Defendant Salls never investigated Plaintiff about the food after August 7,2003. In fact, it was defendant Salls whom had Plaintiff [*sic* ] meal changed without consent or a request after the problem was corrected on August 13, 2003 Plaintiff told this to Capt. Bezio.

61. On August 28, 2003 Plaintiff told Correction Captain Racette about the problem he was having regarding not getting his religious/alternative meals, and it being changed to regular meals without his request. Capt. Racette saw for himself that the alternative meal sign on the cell door was scratched off with a black marker and regular was written on the place card.

***19** 62. All of the discrepancies about Plaintiff's religious/alternative meals started after he refused to be shackled to the transsexual/homosexua1 inmate on July 21, 2003. Which was a deliberate attempt to violate Plaintiff's religious beliefs.

63. The denial of Plaintiff [*sic* ] religious/alternative meals was once again an attempt to violate his religious beliefs. Because of Plaintiff's religious beliefs he do not eat red meat, pork, crustaceans or fishes without scales. Plaintiff went hungry when red meat was served.

In his Deposition Livingston testified in part:

Q What are your religious dietary restrictions under Rastafarianism?

A I don't eat any red meat and stuff like that.

Q You're going to need to elaborate on what "stuff like that" is?

A Just red meat and you know ...

Q Do you eat other forms of meat?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A. Yes.

Q Chicken?

A Yes, I eat chicken.

Q Fish?

A Fish.

Q So it's basically just no red meat like-

A Yes.

Q -beef?

A Yes. And I don't eat shrimps, crabs, oysters, and those things without scales and stuff like that.

Q So no seafood?

A No. I eat seafood but certain seafood like unscaled seafood. Like, you know, certain-it's basically what the Bible said not to eat. The Bible said not to eat unscaled fish and basically that's what I-I don't eat shrimps, crabs and lobsters.

Q I can't imagine that the Department of Correctional Services serves lobster too often.

A They never do. But you can buy it, though.

Q Really?

A Yeah.

Q Hmm. And the dietary restriction of red meat and no unscaled seafood, is that a basic tenant of Rastafarianism?

A That's how I grew up from my mother. My mother never cooked pork and stuff like that. That's one other thing. Unscaled fish, she never cooked those.

Q And is your mother a Rastafarian?

A. No, she's Seven [*sic* ] Day Adventist. But she followed-she just followed the Bible strict, like, you know, as far as dietary things.

Q So even though you converted to Rastafarianism, you kept the dietary restriction of a Seven [*sic* ] Day Adventist?

A Basically. It's basically the same thing, but they just follow the Old Testament, you know, Torah and all that other stuff.

Q Now, it was my understanding that Rastifarians are

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

complete vegetarians; is that true?

A Some. Some.

Q Why have you chosen not to be a complete vegetarian?

A Because I think I need some-some of that, you know, protein and things.

Q Now, in August of 2003, were you serving a S.H.U. sentence?

A Yes, I think so. I think-yeah, 2003.

Q When you came into DOCS custody, did you inform them of your no red meat dietary restriction?

A At one point.

Q When?

A Every time that I went to the box or S.H.U. I informed them that, you know, I'd like the alternative meal-the religious meal.

Q Now, how do you go about telling them that you want the alternative meal?

***20** A You know, each facility prison, you know, verify how they want to be told. Some make you sign a paper-documents that all you want is the alternative meal, and others they just ask you when you come in what kind of food you want and you tell them.

Q How does Upstate do it?

A When I first went there in '01, I think it was I went there-or '02 I told-I signed a piece of paper before. But when I returned the most-last one-recent one-the most recent one I just told them. They just put it up on the door of the cell that, you know, he eats alternative.

Q And how about in '03, what was the process at Upstate?

A '03, that's the most recent one. I think I told-that's why I told them. I told them-the first time I went there, I had to sign a document saying I wanted the religious meal. The last time I went there, they just put it on the door after I told them I only eat alternative meal.

Q. And how do they put it on the door?

A. They write it on a piece of paper and they have some magnets like, you know, you might use on your refrigerator to stick it up there on the metal door.

Q And what's the difference between the regular meal and the religious alternative meal?

A They don't serve meat. Soy beans and-

Q So the religious alternative meal is completely

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

vegetarian?

A Yes. And fish.

Q It includes fish, though?

A Yes.

Q And when you were in S.H.U., your meals are delivered to you?

A Yes.

Q And how many times a day are meals delivered to S.H.U. inmates?

A Three times.

Q And generally what would be in your breakfast?

A Everybody get the same breakfast generally. I can't-it varies everyday; toast and hot cereal, cold cereal, coffee cake and jelly, milk, coffee if you drink coffee, juice.

Q Is there ever any meat products in the breakfast?

A If you consider eggs or they have some, I think, turkey sausages/links.

Q And do you eat eggs under your religious dietary restriction?

A Yes, I eat eggs.

Q And do you eat turkey sausage as part of your religious-

A I eat turkey.

Q So any breakfast that was delivered to you would have complied with your religious dietary needs?

A. Yes.

Q What generally is in a lunch that was delivered to you in S.H.U.?

A Non-meat. Alternative-on the alternative meal it's non-meat, that's all. But it varies from meal to meal.

Q What about in the general-the non-alternative meal, what would be included in that?

A It varies too, but they have meat in theirs, most likely.

Q Would there be non-meat products included in the lunch?

A Like potatoes, and rice, and stuff like that?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q Yeah.

A Mm-hmm. Vegetables. But the main course would be something with meat, most likely. They also get chicken and fish, turkey.

Q And for dinner on the non-alternative meal, what was generally served?

A Basically the same thing; meat biproducts [*sic* ] and carbohydrates, bread.

***21** Q So the main entree would have either chicken, fish or beef-

A Right.

Q -and then there would be two sides-

A Two sides.

Q-like a serving of vegetables?

A Yeah.

Q And then maybe a serving of potatoes and rice?

A Yeah, dessert. Mm-hmm.

Q And bread?

A Yes.

Q You allege in your Complaint that from August 5th to August 11th, 2003, you had to go hungry when red meat was served. How many times was red meat served to you in S.H.U. from August 5th to August 11th, 2003?

A I didn't count but basically every day red meat is served. Sometime it be mixed into it where you can't even, you know, separate and eat what's not red meat like potatoes or rice.

Q What do you mean “every day red meat was served”?

A Some kind of red meat was served-I wouldn't say every day, but most days it would be red meat. You know, beef, chopped beef, Salisbury steak, stuff like that.

Q And which meal of the day, breakfast, lunch or dinner, could you not eat because it had red meat?

A Probably the last two lunch and dinner.

Q So you were always able to eat your breakfast?

A Yes.

Q And were there days when both lunch and dinner on the same day included red meat?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A Yes.

Q How many days was that?

A I didn't count them, so I couldn't really give you a specific answer on that.

Q Were there ever consecutive days in which both lunch and dinner included red meat?

A Yes.

Q How many?

A I couldn't say.

Q When you arrived at Upstate, who did you tell about your dietary restriction?

A Officer on the gallery.

Q Do you remember his name?

A No.

Q And when did you first arrive in S.H.U. at Upstate in 2003?

A I think I got there May.

Q And from May to August of 2003, you had no problems receiving your alternative meal?

A No. I think it was from May to July 'cause I was gonna get out in July on the 21 st. And then when I told them I didn't want to be handcuffed to that other inmate and they put me back into the cell, that's when all the problems started about my meal.

* * * *

Q But your only complaint was when the meal contained read meat?

A My complaint is them not wanting to comply with my request for religious meal because that's what I was getting and they knew it. And they just outright refused me because, I think, in retaliation of what they-what I did when I said I didn't want to be handcuffed to that-to that person.

* * * *

Q Did you ever complain to Officer Abair that he was denying you your religious meal?

A Yes, I did.

Q. When did you have this conversation?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A At the time he denied it.

Q And what did he say to you?

A What did he say? Basically you're not getting it. You're not getting an alternative meal. We went back and forth. I told him: I been getting it. He said: You're not getting it now. I said: Why not? He didn't give me no reason.

Q What are your claims again Defendant Bouyea?

***22** A Yeah. He started not giving me my alternative meal, also.

Q When?

A Shortly after that incident. Shortly after Abair started that and he knew. 'Cause when Abair started that, not giving me my alternative meal, he wasn't on. He was the steady officer. And when he came back, he knew I was there for a while on that gallery, and he put the alternative tag back on my cell. Because he knew, you know, since I been there I was getting the alternative meal. And then about a week or so after, Sergeant Salls, S-A-L-L-S-

Q Mmhmm.

A-Salls told him to take it off right in front of me. Take it off. Take that off the door, he's not getting it. So he start not giving me my alternative meal.

Q So who's the officer who was in charge of the gallery at Upstate S.H.U. that you were housed at in August and September 2003?

A August? That's when they moved me from one side to the other. So I don't really know who was the officer that was in charge. But on the gallery, on B Gallery where I was before where this-where it started, he-that other officer who you said his name, he was the steady officer and he knew my dietary requirements.

Q So in July of 2003, where were you housed?

A In 8 Building, B Block, in Two Cell.

Q And when you were going to be transferred out of Upstate in July of 2003, you had an incident with Officer LeFrance and Officer Foster, so you were not transferred out of Upstate; correct?

A Yeah, I was-yep, they sent me back to my cell. That cell right there.

Q So they sent you to the 8 Building, B Block?

A No. They sent me right back to the same cell, 8 Building, B Block, Two Cell.

Q And was this the cell you were in from August 5th to August 11th, 2003?

A August 5th to August 11th, 2003. I might have the dates

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

mixed up, but at one point they had moved me from A Building, B Gallery, Two Cell to A Block-A Building, A Block-A Gallery, 19 cell or something, if I'm not mistaken.

Q And this is where you were denied your religious meals?

A Most of the time. But it was happening on the other gallery, too, before I got moved.

Q And was it Officer Bouyea who was in charge of 8 Building,

A Block-A B Block.

Q B Block?

A No, B Gallery. It's 8 Building, B Gallery and the cell. Yeah, he was the officer-he was the main officer that was on. Him and another officer.

Q And just so I'm getting this straight, he was the officer in charge of the 8 Building or the A Building?

A Eight. Eight. The number eight.

Q Who was in charge of A Building?

A I don't know.

Q Did you see Officer Bouyea from August 5th, 2003, to August 11th, 2003?

A Did I see him? Occasionally, yeah. Mm-hmm.

Q And did you complain to him that you weren't getting your religious meals?

A He knew I wasn't getting my religious meals after that Sergeant told him to take the religious alternative meal that was posted on my door down. That's when I stopped getting it again.

***23** Q Right. And that's on August 13th, 2003. But prior to that, from August 5th to August 11th, 2003, did you complain to Officer Bouyea that you weren't getting your religious meals?

A Yeah. Because when he came back to work. 'Cause before that-before that, he wasn't on. But when he came back to work I was like-I was telling him they stopped giving my religious meal, and I told him: You knew I 1was getting that before. And he said: Yeah. And then he put it back up. He post it back on the door, and I start getting it again. And then that's when Salls-a Sergeant Salls told him to take it down and not to give me no more-give me the trays of the alternative meal anymore.

Q How do you know Sergeant Salls told Officer Bouyea to take the sign off of your door?

A Did it right in front of me.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q What did Sergeant Salls say?

A He told him to take it down and don't give him no more alternative meal.

Q Why did Sergeant Salls tell him to do that?

A I don't know.

Q So what are your claims again Officer Bouyea?

A That he took-he stopped giving me my alternative meal when he know that I was supposed to be getting it.

Q Why do you think Sergeant Salls stopped giving you your alternative meals?

A I think it came out of that incident that happened when I was getting transferred. 'Cause after that happened then, that's when all the things about my food started. Before that incident, it was no problem getting my trays-my food tray-alternative food trays. But after that incident, just all kinds of problems about that.

* * * *

Q Now, after the sign was taken off of your door on August 13th, 2003, how long did you go without your alternative meals?

A From then on I never got it until sometime in September.

Q What happened in September?

A After complaining to everybody that walked past, even writing complaints to the Superintendent and others, and they came up with an idea that I had to sign a request form for that kind of a meal, which I did, and they started giving me my meal-the alternative meal again.

Q Now, from August 13th to September 1 st, 2003, the breakfast that was served always complied with your religious dietary restrictions?

A I was able to eat, yeah.

Q From August 13th to September 1 st, 2003, how many lunches could you not eat because it had red meat?

A I didn't count it.

Q More than one?

A Yes.

Q More than five?

A Probably.

Q More than ten?

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

A Probably.

Q. More than 15?

A Probably.

Q More than 20?

A Probably.

Q Sir, how many lunches were severed to you from August 13th to September 1st?

A I don't know. I didn't count.

Q You get one lunch a day; correct?

A Yep. I still didn't count them.

Q How many dinners were served to you from August 13th to September 1st, 2003?

A I don't know. I didn't count them.

Q Well, you get one dinner a day; correct?

A Right. If you want to do math, probably could figure it out.

***24** Q And how many dinners had red meat?

A I don't know. Probably the majority of them had red meat, though. Sometimes there was fish and turkey, depending on the meal or the menu.

Defendants' argument is essentially twofold. First, Defendants argue that Livingston's dietary restrictions are not central to his Rastafarian religion but are based upon his having been raised as a Seventh Day Adventist. Therefore, Defendants argue his religious beliefs are not sincere. Second, that Livingston did not inform the DOCS officials of his conversion to Rastafarianism until approximately one year after the incidents forming the basis for his claims. For the reasons that follow, the Court rejects those arguments.

Defendants' first argument is contrary to controlling authority. In determining whether a prisoner's particular religious beliefs are entitled to free exercise protection, the relevant inquiry is not whether, as an objective matter, the belief is accurate or logical, but whether the beliefs professed by a claimant are sincerely held and whether they are, in his own scheme of things, religious; a claimant need not be a member of a particular organized religious denomination to show sincerity of belief. *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir.1999). In the very case cited by Defendants in support of their argument, *Ford v. McGinnis, supra,* the Second Circuit rejected a narrow reading of *Jackson*. Instead, following *Frazee v. Illinois Department of Employment Security,* 489 U.S. 829, 832-33 (1989) (free exercise of religious beliefs does not turn on a membership in a particular sect or a particular tenet of the sect involved), *Ford* rejected any objective test in determining the sincerity of religious beliefs. 352 F.3d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 588-91; *see also* *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996); *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir .1984) ("differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud"). At best, Defendants' argument raises a triable issue of fact as to Livingston's sincerity.

Defendants' second argument rings hollow. First, there is no indication in the record that Livingston was denied alternative religious meals because of his failure to formally advise DOCS of his conversion to Rastafarianism until approximately a year later. Second, the testimony of Livingston that he advised the Defendants of his religious preferences is uncontradicted and there is no evidence that Defendants made any investigation into his claim. Third, and perhaps more importantly, the uncontradicted testimony of Livingston that, notwithstanding the lack of formal notification of conversion to Rastafarianism, he had received alternative religious meals prior to August 2003 eviscerates any suggestion that such formal notification was required. Moreover, even by his official stated religious belief as a Muslim, Livingston was entitled to receive alternative religious meal.

***25** Abair, Salls, and Bouyea contend that they are entitled to qualified immunity. The Court disagrees. Not only have they failed to adequately develop that issue but they lose on the merits as well. As noted above, qualified immunity does not exist where there is a clearly established right and no reasonable officer could not be aware that his conduct violated that right. It was clearly established law in 2003 that prison inmates have a right to a diet consistent with the prisoner's religious scruples. *See* *Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir.1975).

Defendants have not advanced any legitimate penological justification for denying Livingston alternative religious meals and none appears from the record before this Court. Consequently, this Court rejects the qualified immunity argument of Abair, Salls, and Bouyea for the same reason as did the Second Circuit in *Ford,* 352 F.3d at 597 ("prior cases make it sufficiently clear that absent a legitimate penological justification, which for present purposes we must assume defendants were without, prison officials' conduct in denying [Plaintiff a meal consistent with his religious tenets] was unlawful."). *See also* *Salahuddin v. Goord,* 467 F.3d at 275.[FN11]

FN11. Put another way, if the actions of Abair, Salls, and Bouyea did not infringe on Livingston's First Amendment free exercise right, there is no liability in any event and the Court need not reach the issue of qualified immunity. On the other hand, if those actions did, in fact, constitute violation of a clearly established First Amendment free exercise right, in the absence a legitimate penological justification Abair, Salls, and Bouyea are not entitled to qualified immunity.

Abair, Salls, and Bouyea are not entitled to judgment as a matter of law on the Seventh Count.[FN12]

FN12. The Court notes that, as it appears he was following the orders of a superior, the liability of Bouyea is questionable. However, that argument has not been presented to the Court for consideration.

VI. CONCLUSION

Based upon the foregoing, Defendants' Motion for Summary Judgment at Docket No. 56 is GRANTED in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 32

Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)
(Cite as: 2007 WL 1500382 (N.D.N.Y.))

part and DENIED in part.

IT IS ORDERED THAT the First, Second, Third, Fourth, Fifth, Tenth, Eleventh, Twelfth, Thirteenth, and Fourteenth Causes of Action are hereby DISMISSED, with prejudice.

IT IS FURTHER ORDERED THAT this action is DISMISSED, with prejudice in its entirety, as against Defendants P. Griffin, Donald Selsky, S. Gawlicky, G. LeFrance, and M. Foster.

N.D.N.Y.,2007.
Livingston v. Griffin
Not Reported in F.Supp.2d, 2007 WL 1500382 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Bobby KING and James Ford, Plaintiffs,
v.
Floyd BENNETT, John Hayes, John Laconte and Glenn Goord, Defendants.
**No. 02-CV-349Sr.**

March 30, 2007.

Bobby King, Wallkill, NY, pro se.

James Ford, Gainesport, NY, pro se.

Michael J. Russo, New York State Attorney General's Office, Buffalo, NY, for Defendants.

***DECISION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

***1** In accordance with 28 U.S.C. § 636(c), the parties have consented to have the undersigned conduct all further proceedings in this case, including entry of final judgment. Dkt. # 23.

Currently before the Court is defendants' motion for summary judgment dismissing plaintiffs' complaint of denial of the right to free exercise of religion by virtue of DOCS' policy of holding joint Friday prayer services for both Shi'a and Sunni Muslims. Dkt. # 33. For the following reasons, defendants' motion is granted.

***BACKGROUND***

In *Cancel v. Goord,* a Shi'a Muslim incarcerated at the Fishkill Correctional Facility filed a grievance "requesting that Shi'a Muslims be allowed to have religious study meetings, classes or study group specific to their religious beliefs and that they be allowed access to outside Shi'a clergy persons." 181 Misc.2d 363, 364 (Sup.Ct. Dutchess County 1999), *aff'd as modified,* 278 A.D.2d 321 (2d Dep't 2000), *leave to appeal denied,* 96 N.Y.2d 707 (2001). The Department of Correctional Services ("DOCS"), denied the grievance, prompting the inmate to commence an article 78 proceeding challenging DOCS' determination as arbitrary and capricious. *Id.* The trial court concluded that DOCS' determination that the spiritual needs of the inmates of the Shi'a Muslim faith could be met in religious services led by chaplains of the Sunni Muslim faith was arbitrary and capricious. *Id.* at 365. Accordingly, the trial court granted the petition and annulled DOCS' resolution of the grievance. *Id.* at 365-66. The trial court also ordered that DOCS permit Shi'a inmates "to have contact with a volunteer Shi'a scholar" or, if no such volunteer was available, to permit Shi'a inmates "to participate in a religious education class or study group up to once per week with an approved inmate acting as facilitator and with security staff present...." *Id.* at 366.

The Appellate Division affirmed the trial court's order insofar as it granted the petition and annulled DOCS'

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

resolution of the grievance, but vacated that portion of the trial court's decision "which directed the manner in which [DOCS] was to permit the petitioner and his fellow adherents of the Shi'a sect of Islam to practice their faith, and remit[ted] the matter to ... DOCS to conduct administrative proceedings, with Shi'a participation, to determine the manner in which to best afford Shi'a inmates spearate religious services, under appropriate Shi'a religious leadership, in a time and place that comport with legitimate penological concerns." 278 A.D.2d at 323.

In accordance with that decision, DOCS implemented an official policy entitled "Protocol for Shi'ite Muslim Programs and Practices" ("Protocol"). Dkt. # 36, ¶ 5. The Protocol requires DOCS to: (1) refrain from disparaging the doctrines of any religious faith; (2) endeavor to consult with ecclesiastical authorities on Shi'ite Islam in the community at large to obtain advice and guidance regarding accommodation of the religious needs of Shi'ite inmates; (3) afford Shi'ite inmates the right to attend Shi'ite religious education and study classes; (4) afford Shi'ite inmates full and equal opportunity to participate in, without discrimination, the weekly Friday Jumah [FN1] services and ensure that the Muslim Council has at least one Shi'ite member; and (5) revise it's religious observance calendar to include observances unique to Shi'ite Muslims. Dkt. # 36, ¶ 5.

> FN1. Jumah is a weekly congregational service commanded by the Quran which must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 344 (1987).

***2** Following implementation of the Protocol, *Cancel* moved for civil contempt, arguing that DOCS "disobeyed the express mandate of the Court to afford Shi'a inmates separate religious services under appropriate Shi'a leadership." Dkt. # 36, Exh. D, p. 4. Despite the language used by the Appellate Division, the Hon. Mark C. Dillon, J.S.C., determined that

> The Order of the Appellate Division remitting this matter to ... DOCS does not mandate separate religious services for the Shi'a inmates. If it had, there would have been no need of a remittal. The Order only mandates that ... DOCS determine the manner in which the Shi'a inmates can practice their faith, apart [from] Sunni prisoners.

Dkt. # 36, Exh. D, p. 5.

On January 24, 2002, plaintiffs filed grievances at the Elmira Correctional Facility ("Elmira"), claiming that the Protocol did not conform to *Cancel v. Goord* and violated their right to attend separate Shi'a prayer services. Dkt. # 5, Exh. 2. DOCS denied the grievances, stating:

> Jumah services are held on Friday afternoon with Shi'ite and Sunni Muslims in the mosque. Worship classes for Sunni and Shi'ite are held separately each week. Therefore, the facility is in accordance with the state directive and the *Cancel v. Goord* decision.

Dkt. # 5, Exh. 2.

Plaintiffs commenced this action by filing a complaint in the Northern District of New York on April 12, 2002, which was transferred to this district for proper venue. Dkt. # 5. Although plaintiffs' complaint acknowledges that the Islamic Chaplin at Elmira had authorized a Shi'a study group one night per week to enable Shi'ite Muslim

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

inmates to learn and study the Shi'ite Muslim Sect of Islam, plaintiffs allege that Shi'ite inmates have not been afforded a meaningful or reasonable opportunity to freely participate and practice the Shi'a faith in a separate religious service as set forth in *Cancel v. Goord* and as required by the First Amendment to the United States Constitution. Dkt. # 5, ¶ 4. Plaintiffs demand Jumah services separate and apart from Sunni Muslims and seek monetary damages to compensate for their mental anguish and to punish DOCS' refusal to comply with *Cancel v. Goord* . Dkt. # 5, ¶ 11 & p. 6.

In support of their motion for summary judgment, defendants submit the affidavit of Richard Cerio, Deputy Superintendent for Programs at Elmira. Dkt. # 36. Deputy Superintendent Cerio declares that Elmira

> is in accordance with the Protocol, as Elmira has one general Muslim service on Fridays, Shi'a Muslims participate in these services, and at least one Shi'a is on the Muslim Majlis. When Elmira occasionally has inmate facilitators assist in the prayer service, the responsibility is shared by both Sunni and Shi'a Muslims. Shi'a inmates also have the right to attend Shi'a Muslim religious education and study classes apart from Sunni Muslims (as Elmira has a weekly study class that is held on Thursdays from approximately 6:30 to 9:00 pm). Shi'a Muslim inmates can also participate in Arabic language classes and Islamic studies classes, which are conducted by an Imam. Finally, Elmira's Religious Observance Calendar for 2003 is being revised to include the Day of Ghadi (March 3), which is a day of prayer and reflection for Shi'a Muslims, and to include Ashura (March 24), a further day of prayer and reflection for Shi'a Muslims.

***3** Dkt. # 36, ¶ 8.

Defendants also rely upon the October 3, 2001 affidavit of John LoConte, Director of Ministerial and Family Services for DOCS, which was submitted to the district court with respect to a motion for preliminary injunction by a Shi'a inmate at the Fishkill Correctional Facility seeking religious services separate from Shi'ite inmates. *Pugh v. Goord,* 184 F.Supp.2d 326 (S.D.N.Y.2002), *vacated,* 345 F.3d 121 (2d Cir.2003). Director LoConte affirms that although "plaintiffs may be viewed as simply asking that DOCS accommodate their request for a separate prayer area and religious services for a single religious sub-group-Shi'ite Muslims-in reality, establishing a separate organization and program for such inmates would increase pressure on DOCS to make such distinctions for other groups, or subgroups, now and in the future." Dkt. # 37, ¶ 27. For example, Director LoConte notes that there are over 200 protestant denominations encompassed within the Protestant program and three major denominations within the Jewish program. Dkt. # 37, ¶ 42. Director LoConte also avers that "[s]eparate programs would raise security concerns and are fiscally prohibitive because each such program would have to be overseen by prison staff." Dkt. # 37, ¶ 28. In addition, DOCS lacks sufficient space for separate worship areas. Dkt. # 37, ¶ 32. Furthermore, Director LoConte affirms that

> dividing DOCS' Islamic program into separate programs for each sect represented in the prison system would encourage rivalries among the different sects by promoting power struggles and competition for new members or converts. By way of example, in the late 1970's and into the 1980's there had been two major Islamic programs in the state's prison system: a generic Islamic Program and the American Muslim Mission. The inmates in each of the two programs competed for new members and converts from the other. On many occasions this competition turned violent. Recognizing the divisiveness of having the two programs, the religious leadership agreed to a unification and a singular Islamic program, since which the various

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

> Muslim sects have coexisted peacefully within DOCS' Islamic program.

Dkt. # 37, ¶ 29. As a result, DOCS has structured the current Muslim program "to accommodate beliefs and practices common to all Muslims." Dkt. # 37, ¶ 17.

In opposition to the motion for summary judgment, plaintiff King [FN2] argues that the Protocol does not provide for separate religious services under appropriate Shi'a leadership as required by *Cancel v. Goord* and the free exercise clause of the First Amendment. Dkt. # 40. To support the sincerity of his belief in the necessity of separate Jumah, plaintiff King avers that "the Practical Laws of Islam" by Imam Khomenini, requires that "one who conducts congregational prayer must," *inter alia,* be a believer in "the twelve Imam Shia." Dkt. # 60, p. 2. Plaintiff King also avers that

> FN2. Plaintiff Ford has not participated in this action since his release to parole on June 10, 2002.

***4** Sunni Muslim adherents perform certain religious functions that invalidate prayer for Shi'a adherents, i.e., the folding of the hands in prayer on the chest, stomach, turning of the head in prayer and the recitation of the words AMIN after the recitation of the Fatiah chapter of the Quran, all of which invalidate prayers for any Shi'a adherents ... which ultimately means that it's an invalidation of the central tenant [sic] of worship....

Dkt. # 60, pp. 2-3.

***DISCUSSION AND ANALYSIS***

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), *citing Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials chaged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), *citing O'Lone,* 482 U.S. at 349 *and Turner v. Safley,* 482 U.S. 78, 89 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs. *Salahuddin,* 467 F.3d at 274-75. In assessing the sincerity of an inmate's religious belief, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford,* 352 F.3d at 593. Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford,* 352 F.3d at 590. A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Assuming, without deciding, the sincerity of plaintiff King's belief that engaging in Jumah with Sunni Muslims invalidates his prayers and substantially burdens the exercise of his religious faith, DOCS' refusal to afford Shi'a separate Jumah will still be permissible if it is reasonably related to some legitimate penological interests. "Courts must evaluate four factors in making the reasonableness determination: whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates and prison resources of accommodating the right; and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274, *citing Turner,* 482 U.S. at 90-91; *Ford,* 352 F.3d at 595. Once prison officials put forward a legitimate penological interest to justify an infringement upon a prisoner's religious free exercise, the burden remains with the prisoner to show that these penological concerns are irrational. *Ford,* 352 F.3d at 595.

***5** In the instant case, DOCS has articulated a rational basis for their refusal to afford Shi'a inmates an opportunity to attend Jumah separate from Sunni inmates. Director LoConte expresses concern that permitting separate Jumah for Sunni and Shi'a inmates would pressure DOCS to afford separate services for numerous subgroups within the Protestant and Jewish faiths which would increase fiscal and administrative burdens and encourage rivalries among different groups by promoting power struggles and competition for new members and converts. Dkt. # 37, ¶ ¶ 29, 42. As justification for his security concerns, Director LoConte recounts that DOCS previously recognized two major Islamic programs but unified them because of violent competition between the groups. Dkt. # 37, ¶ 17. Director LoConte also affirms that DOCS lacks sufficient resources, staff and space to accommodate separate Jumah services, a consideration under both the first and third factors. Dkt. # 37, ¶ ¶ 28, 32.

With respect to the second and fourth considerations, Director LoConte affirms that DOCS has structured the general Muslim program "to accommodate beliefs and practices common to all Muslims" and has endeavored to equalize participation by Sunni and Shi'a with respect to Jumah by sharing responsibility between Shi'a and Sunni inmate facilitators when such facilitators are utilized and by including at least one Shi'ite member on the Muslim Council. Dkt. # 36, ¶ ¶ 8 & 17. In addition, DOCS has afforded Shi'a inmates, including plaintiff King, the opportunity to attend weekly Shi'a religious education and study classes and has added holy days unique to Shi'a Muslims to Elmira's Religious Observance Calendar. Dkt. # 36, ¶ 8.

As a result, it is the decision of this Court that DOCS' Protocol, as currently implemented at Elmira, strikes a reasonable balance between the accommodation of plaintiff King's religious beliefs and DOCS' legitimate penological interests and does not, therefore, violate plaintiff King's constitutional right to free exercise of religion. *See, e.g., Orafan v. Goord,* 411 F.Supp.2d 153 (N.D.N.Y.2006 (DOCS did not deny Shi'a inmates statutory rights under Religious Land Use and Institutionalized Person Act or First Amendment free exercise rights by refusing to provide Jumah service separate from Sunni inmates); *Muhammad v. City of N.Y. Dep't of Corrs,* 904 F.Supp. 161, 197 (S.D.N.Y.1995) (First Amendment did not require accommodation of Nation of Islam inmate's request for separate services), *appeal dismissed,* 126 F .3d 119 (1997); *Matiyan v. Commissioner Dep't of Corrs.,* 726 F.Supp. 42, 44 (W.D.N.Y.1989) (DOCS' refusal to honor Sunni inmate's request for Jumah separate from Shi'a inmates did not offend the Free Exercise Clause of the First Amendment).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

***CONCLUSION***

Based on the foregoing, defendants' motion (Dkt.# 33), for summary judgment dismissing plaintiff's complaint is **GRANTED.**

The Clerk of the Court is directed to enter judgment in favor of the defendants.

***6** The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**SO ORDERED.**

W.D.N.Y.,2007.
King v. Bennett
Not Reported in F.Supp.2d, 2007 WL 1017102 (W.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Page 1

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Mortimer EXCELL, Plaintiff,
v.
Robert K. WOODS, Supt., Upstate C.F.; N. Bezio, Dep. Supt., Upstate C.F.; Glenn S. Goord, Comm'r, Docs; Lucien J. LeClaire, Jr., Dep. Comm'r, Docs; Donnie Wood, C.O., Upstate C.F.; Brian Lewis, C.O ., Upstate C.F.; Timothy Ramsdell, C.O., Upstate C.F.; John Moore, Corr. Supervisor, Upstate C.F.; Kenneth McLaughlin, Dir. of Ops., Inspector Gen.; D. Quinn, Captain, Upstate C.F.; R.N. Maria Travers, Nurse, Upstate C.F.; Gary Steinberg, C.O., Auburn C.F.; Dr. Lester Wright, Assoc. Comm'r, Docs; Brad Smith, C.O., Auburn C.F.; Joseph Belliner, Dep. Supt., Auburn C.F.; Jeffrey Clafflin, C.O., Auburn C.F.; John Burge, Supt., Auburn C.F.; Joseph Wolczyk, Hearing Officer, Auburn C.F.; Donald Hess, C.O., Auburn C.F.; D. Selsky, Dir. of Special Housing, Docs; Gordon Simons, C.O., Auburn C.F., Brian Fischer; Comm'r, Docs; Richard Roy, Inspector Gen.; Alan Croce, Chairman, Comm'n of Corr., and Comm'r, Div. of Parole; Daniel Stewart, Chairman, Comm'r, Comm'n of Corr.; Vernon Manley, Comm'r, NYS Div. of Parole; Thomas Grant, Comm'r, NYS Div. of Parole; John Capacci, NYS Div. of Parole; Maria Tirone, Dep. Supt., Upstate C.F.; Ashley Allen, Corr. Counselor, Upstate C.F.; Linda A. Hayes, KBSI, Upstate C.F.; Patricia Salvage, Auburn C.F.; Raymond Head, Lt., Auburn C.F.; James Anctil, Lt., Upstate C.F.; R.N. Nancy Smith, Nurse Administrator, Upstate C.F.; Labetz, Correctional Supervisor, Auburn C.F.; William Devito, C.O., Auburn C.F.; J. Sourwine, C.O., Auburn C.F.; Michael Bray, C.O., Auburn C.F.; Kevin Premo, C.O., Upstate C.F.; Darrin Corrigeux, C.O., Upstate C.F.; Sheila Sauve, C.O., Upstate C.F.; and M. Mackdonal, C.O., Upstate C.F., Defendants.
**No. 9:07-CV-0305 (GTS/GHL).**

Sept. 29, 2009.

Mortimer Excell, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Adele M. Taylor-Scott, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

***1** Currently before the Court in this *pro se* prisoner civil rights action filed by Mortimer Excell ("Plaintiff") against forty-three employees of several New York State departments and/or agencies ("Defendants") pursuant to 42 U.S.C. § 1983 are the following: (1) a motion, filed by thirty-six of the Defendants, to dismiss part of Plaintiff's Second Amended and Supplemental Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6); (2) United States Magistrate Judge George H. Lowe's Report-Recommendation recommending that the motion be granted in part and denied in part; (3) Plaintiff's Objections to those portions of the Report-Recommendation recommending dismissal; and (4) Plaintiff's fourth motion for the appointment of counsel. (Dkt.Nos.67, 84, 87, 93.) For the reasons set forth below, the Report-Recommendation is accepted and adopted in its entirety; Defendants' motion is granted in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

part and denied in part; Plaintiff's Second Amended and Supplemental Complaint is dismissed in part, as detailed in the "Ordered" Clauses of this Decision and Order; and Plaintiff's fourth motion for the appointment of counsel is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Pleadings in This Action**

On March 23, 2007, Plaintiff filed his original Complaint in this action pursuant to 42 U.S.C. § 1983, asserting numerous claims arising out of his confinement at Auburn and Upstate Correctional Facilities between approximately August 9, 2005, and March 16, 2007 (the date of the Complaint). (Dkt. No. 1, at 36.) On April 18, 2007, the Court required Plaintiff to file an Amended Complaint. (Dkt. No. 6.) On May 17, 2007, Plaintiff filed an Amended *and Supplemental* Complaint asserting similar claims arising out of his confinement at Auburn Correctional Facility between approximately May 5, 2005, and May 14, 2007 (the date of the Amended and Supplemental Complaint). (Dkt. No. 10.) On July 3, 2007, with leave of the Court, Plaintiff filed a Second Amended and Supplemental Complaint asserting similar claims arising out of his confinement at Auburn and Upstate Correctional Facilities between approximately June 17, 2005, and July 3, 2007 (the date of the Second Amended and Supplemental Complaint). (Dkt. No. 17.)

Generally, in his Second Amended and Supplemental Complaint, Plaintiff alleges that, on at least five separate occasions, between approximately June 17, 2005, and July 3, 2007, correctional officers at Auburn and Upstate Correctional Facilities harassed him based on his race and religion. (*See generally* Dkt. No. 17.) As a result, Plaintiff brings claims arising under First, Fourth, Eighth and Fourteenth Amendments, against forty-three employees of several New York State departments and/or agencies, listed in the caption of this Decision and Order. (*Id.*) In his Report-Recommendation, Magistrate Judge Lowe accurately and thoroughly recites the allegations, and prayer for relief, of Plaintiff's Second Amended and Supplemental Complaint. (*See* Report-Recommendation at Parts I.B. and I.C.) As a result, that recitation is incorporated by reference herein.

**B. Plaintiff's Related Action**

***2** In his Report-Recommendation, Magistrate Judge Lowe also accurately and thoroughly recites the allegations, claims and procedural posture of Plaintiff's Complaint in a previously filed action that is currently pending in this Court before the undersigned-*Excell v. Burge,* 05-CV1231-GTS-GJD (N.D.N.Y.). (*See* Report-Recommendation at Part I.A.) As a result, that recitation is incorporated by reference herein. The Court would note two additional facts regarding that action's procedural posture.

First, although this fact is not expressly stated in Magistrate Judge Lowe's Report-Recommendation, Senior United States District Judge Lawrence E. Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See Excell v. Burge,* 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). Then, after being assigned the case on October 2, 2008, the undersigned denied Plaintiff's motion for reconsideration of Judge Kahn's decision and order on January 21, 2009. *See Excell v. Burge,* 05-CV-1231, 2008 WL 152585 (N.D.N.Y. Jan. 21, 2009) (Suddaby, J.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Second, after Magistrate Judge Lowe issued his Report-Recommendation in this action, the undersigned scheduled trial in the action of *Excell v. Burge,* 05-CV-1231, for December 14, 2009, and appointed *pro bono* trial counsel for Plaintiff.

**C. Defendants' Motion to Dismiss**

On March 6, 2008, thirty-six of the forty-three Defendants in this action filed a motion to dismiss part of Plaintiff's Second Amended and Supplemental Complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 67.) [FN1] In his Report-Recommendation, Magistrate Judge Lowe accurately summarizes Defendants' arguments on their motion to dismiss. (*See* Report-Recommendation at Part I.D.) As a result, that summary is incorporated by reference herein.

FN1. To the extent that the current motion is filed on behalf of Defendants who had already filed an Answer to Plaintiff's Second Amended and Supplemental Complaint (*see* Dkt. No. 66), that motion is properly brought under Fed.R.Civ.P. 12(c), which governs the entry of judgment on the pleadings. However, courts analyzing a motion filed under Rule 12(c) must apply the same standard as that applicable to a motion filed under Rule 12(b)(6). *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.), *cert. denied,* 513 U.S. 816 (1994); *Wynn v. Uhler,* 941 F.Supp. 28, 29 (N.D.N.Y.1996) (Pooler, J.).

After being granted two extensions of time by Magistrate Judge Lowe to file a response to the motion, Plaintiff filed a lengthy response on June 30, 2008, and July 7, 2008. (Dkt.Nos.74, 75.) More specifically, Plaintiff's response consisted of thirty pages of singled-spaced legal argument and affidavit testimony, as well as forty-nine pages of exhibits. (*Id.*) Liberally construed, the crux of Plaintiff's response is that Defendants' motion should be denied for three reasons: (1) his lengthy Second Amended and Supplemental Complaint and his declaration in response to Defendants' motion provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); (2) his response exhibits and his declaration in response to Defendants' motion, demonstrate genuine issues of material fact for trial; and (3) Defendants have failed to comply with Plaintiff's discovery requests. (*Id.*)

***3** On March 12, 2009, Magistrate Judge Lowe issued a Report-Recommendation recommending that the motion be granted in part and denied in part. (Dkt. No. 84.) Familiarity with the specific recommendations and analysis therefor offered in Magistrate Judge Lowe's Report-Recommendation is assumed in this Decision and Order. (*See* Report-Recommendation at Part III.)

On March 27, 2009, Plaintiff filed his Objections to those portions of the Report-Recommendation recommending dismissal. (Dkt. No. 87.) [FN2] Liberally construed, the crux of Plaintiff's Objections argue that the undersigned should reject Magistrate Judge Lowe's Report-Recommendation for two reasons: (1) Plaintiff's lengthy Second Amended and Supplemental Complaint, his declaration in response to Defendants' motion, and his Objections to Magistrate Judge Lowe's Report-Recommendation provide sufficient factual allegations for purposes of Fed.R.Civ.P. 8(a); and (2) Plaintiff's response exhibits, his declaration in response to Defendants' motion, and his verified Objections to Magistrate Judge Lowe's Report-Recommendation demonstrate genuine issues of material fact for trial. (*Id.*)

FN2. The Court notes that, on March 20, 2009,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff filed a document entitled "Declaration," which was mistakenly docketed as an "Objection" to the Report-Recommendation. (Dkt. No. 85.) The Court concludes that the Declaration does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation, and it constitutes evidence (which is immaterial on a motion to dismiss). (*Id.*) The Court notes also that, on March 25, 2009, Plaintiff filed a "Respon[se] to Opposition of Defendants ['] Memorandum Motion for Preliminary Injunctive Relief," which was incorrectly docketed as a "Supplemental Objection" to the Report-Recommendation. (Dkt. No. 86.) The Court concludes that this document does not constitute an Objection to the Report-Recommendation, because it is dated February 26, 2009 (two weeks before the issuance of the Report-Recommendation), it does not reference the Report-Recommendation but Plaintiff's then-pending motion for preliminary injunction. (*Id.*) *As a result, the Clerk's Office is directed to re-docket Dkt. No. 85 as "Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction," to re-docket Dkt. No. 86 as "Reply to Response to Motion for Preliminary Injunction," and to re-docket Dkt. No. 87 as "Objection to Report-Recommendation."*

**D. Plaintiff's Fourth Motion for Counsel**

On June 2, 2009, Plaintiff filed his fourth motion for the appointment of counsel. (Dkt. No. 93.) Plaintiff's first three such motions were filed on May 27, 2008, June 2, 2008, and March 4, 2009, and were denied on December 29, 2008, and April 7, 2009. (Dkt.Nos.71, 72, 80, 82, 88.)

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review of a Report-Recommendation

When specific objections are made to a magistrate judge's report-recommendation, the Court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C).[FN3] When only general objections are made to a magistrate judge's report-recommendation, the Court reviews the report-recommendation for clear error or manifest injustice. *See Brown v. Peters,* 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], aff'd without opinion, 175 F.3d 1007 (2d Cir.1999).[FN4] Similarly, when a party makes no objection to a portion of a report-recommendation, the Court reviews that portion for clear error or manifest injustice. *See Batista v. Walker,* 94-CV-2826, 1995 WL 453299, at *1 (S.D.N .Y. July 31, 1995) (Sotomayor, J.) [citations omitted]; Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition [citations omitted]. After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

FN3. On *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1)(C). However, a district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g ., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate").

FN4. *See also Vargas v. Keane,* 93-CV-7852, 1994 WL 693885, at *1 (S.D.N.Y. Dec. 12, 1994) (Mukasey, J.) ("[Petitioner's] general objection [that a] Report ... [did not] redress the constitutional violations [experienced by petitioner] ... is a general plea that the Report not be adopted ... [and] cannot be treated as an objection within the meaning of 28 U.S.C. § 636."), aff'd, 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895 (1996).

**B. Standard Governing a Motion to Dismiss for Failure to State a Claim**

Magistrate Judge Lowe thoroughly and correctly recited the legal standard governing a motion to dismiss for failure to state a claim, including the standard governing such motions to dismiss pleadings drafted by *pro se* litigants. (*See* Report-Recommendation at Part II.) As a result, that standard is incorporated by reference herein.

**III. ANALYSIS**

**A. Defendants' Motion to Dismiss**

***4** As indicated above in Part I.C. of this Decision and Order, Plaintiff's Objections do not contain specific challenges to those portions of the Report-Recommendation recommending the partial denial of Defendants' motion to dismiss. Thus, the Court reviews those portions of the Report-Recommendation for only clear error. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental Complaint, and the referenced portions of Magistrate Judge Lowe's Report-Recommendation), the Court concludes that the referenced portions of the Report-Recommendation are well-reasoned and not clearly erroneous. As a result, the Court accepts and adopts these portions of the Report-Recommendation for the reasons stated therein.

With regard to the one portion of Magistrate Judge Lowe's Report-Recommendation to which Plaintiff's Objections do specifically challenge-i.e., Magistrate Judge Lowe's recommendation that Defendants' motion to dismiss be partially granted-a *de novo* review is appropriate. *See, supra,* Part II.A. of this Decision and Order. After carefully reviewing all of the papers in this action (including Plaintiff's Second Amended and Supplemental Complaint, the referenced portion of Magistrate Judge Lowe's Report-Recommendation, and Plaintiff's Objections), the Court concludes that the referenced portion of the Report-Recommendation is correct in all respects. Magistrate Judge Lowe employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court also accepts and adopts this portion of the Report-Recommendation for the reasons stated therein. The Court would add only five points.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

First, contrary to Plaintiff's reading of Magistrate Judge Lowe's Report-Recommendation, the vast majority of Magistrate Judge Lowe's recommendations were not premised on a failure by Plaintiff to allege sufficient facts for purposes of Fed.R.Civ.P. 8(a). Rather, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question, though factually detailed, were simply not cognizable under Fed.R.Civ.P. 12(b)(6). (*See* Report-Recommendation at Part II [describing the two grounds on which a defendant may move to dismiss for failure to state a claim].) [FN5] As a result, his argument that he provided a "short and plain statement of [his] claim," as required by Fed.R.Civ.P. 8(a), is almost entirely irrelevant.

FN5. More specifically, the vast majority of Magistrate Judge Lowe's recommendations were based on the fact that the claims in question were not actionable under the following legal authorities: (1) the proscription against duplicitous and malicious prosecutions, pursuant to Fed.R.Civ.P. 11(b)(2), the first-in-time rule, and the Court's inherent power to manage its docket; (2) the principle of sovereign immunity under the Eleventh Amendment; (3) the doctrine of absolute immunity; (4) the requirement that supervisors be personally involved in constitutional violations under 42 U.S.C. § 1983; (5) the legal standard governing substantive and procedural due process claims arising from prison disciplinary hearings under the Fourteenth Amendment; (6) the legal standard governing access-to-courts claims arising under the First Amendment; (7) the legal standard governing free-exercise claims arising under the First Amendment; (8) the legal standard governing unreasonable-search claims under the Fourth Amendment; (9) the legal standard governing due process claims arising from the receipt of a false prison misbehavior report in prison under the Fourteenth Amendment; (10) the intra-corporate conspiracy doctrine; and (11) the legal standard governing claims of deliberate indifference to a serious medical need and inadequate prison conditions arising under the Eighth Amendment. (*See* Report-Recommendation at Part III.)

Second, contrary to Plaintiff's understanding of the legal standard governing motions to dismiss under Fed.R.Civ.P. 12(b) (6), extrinsic evidence cannot be considered by the Court when deciding such motions. *See* Fed.R.Civ.P. 12(d). Nor can matters outside the four corners of the pleadings be considered by the Court when deciding such motions, with a few exceptions. Here, the Court finds none of the exceptions are applicable. The exhibits and declarations on which Plaintiff relies in opposition to Defendants' motion were not exhibits to his lengthy Second Amended and Supplemental Complaint. (*See* Dkt. No. 17, Part 1.) Thus, they are not deemed part of that pleading pursuant to Fed.R.Civ.P. 10(c). Moreover, Plaintiff has already had three chances to amend his operative pleading in this action. As a result, he has no absolute right, under Fed.R.Civ.P. 15(a)(2), to constructively amend it through the Court's consideration of the materials in question. Finally, Plaintiff has not shown that the materials in question are sufficiently consistent with the allegations of his Second Amended and Supplemental Complaint.[FN6] As a result, it would not be appropriate for the Court to consider them out of an extension of special solicitude to Plaintiff.[FN7] For all these reasons, it is irrelevant (for purposes of the motion to dismiss currently pending before the Court) whether or not Plaintiff has submitted response exhibits, a declaration in response to Defendants' motion, and verified Objections to Magistrate Judge Lowe's Report-Recommendation, which demonstrate genuine issues of material fact for trial.

FN6. The Court notes that, under the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances, considering the materials in question would result in piecemeal litigation, requiring Defendants, in their Answer or Amended Answer (*see* Dkt. No. 66), to admit or deny-at their peril-facts never plausibly alleged in Plaintiff's Second Amended and Supplemental Complaint.

FN7. The Court notes that an additional reason it should not treat his Objections as effectively amending his Second Amended and Supplemental Complaint is that such a treatment would contravene the rule that a district court will ordinarily refuse to consider material that could have been, but was not, presented to the Magistrate Judge in the first instance. *See, supra,* note 3 of this Decision and Order.

***5** Third, Plaintiff neglects to mention, in his Objections, that several of the dismissals recommended by Magistrate Judge Lowe are dismissals *with leave to amend.* Such a recommendation is extremely generous to Plaintiff, who has already had three chances to amend his operative pleading in this action, and who, on one occasion, took the opportunity to file a *supplemental* pleading without prior leave of the Court. (*Compare* Dkt. No. 15 *with* Dkt. No. 17.) *See* Fed.R.Civ.P. 15(d); Local Rule 7.1(a)(4). While the Court accepts Magistrate Judge Lowe's recommendation, *the Court cautions Plaintiff that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

Fourth, as stated above in Part I.B. of this Decision and Order, although this fact is not relied on in Magistrate Judge Lowe's Report-Recommendation, Judge Kahn granted part of Defendants' motion for summary judgment in the action of *Excell v. Burge,* 05-CV-1231, on September 25, 2008, dismissing *with prejudice* all of Plaintiff's claims against Defendant Head, and Plaintiff's First Amendment free-exercise claim against Defendants Hess, Devito, Bray, and Sourwine. *See Excell v. Burge,* 05-CV-1231, 2008 WL 4426647 (N.D.N.Y. Sept. 25, 2008) (Kahn, J.). As a result, Plaintiff's litigation of those claims in this action are precluded for the additional reason of res judicata, also known as claim preclusion.

Fifth, and finally, in addition to the intracorporate-conspiracy-doctrine cases cited by Magistrate Judge Lowe, the Court relies on the cases cited by the undersigned in *Murray v. Pataki,* 03-CV-1263, 2009 WL 981217, at *4 & n. 11 (N.D.N.Y. Apr. 9, 2009) (Suddaby, J.).

**B. Plaintiff's Motion to Appoint Counsel**

Plaintiff's fourth motion for the appointment of counsel is denied for the same reasons that his third such motion was denied by Magistrate Judge Lowe on April 7, 2009. (Dkt. No. 88.) More specifically, after carefully reviewing the file in this action, the Court finds as follows: (1) it appears as though, to date, Plaintiff has been able to effectively litigate this action; (2) it appears that the case does not present issues that are novel or more complex than those raised in most prisoner civil rights actions; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial (as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants), it is highly probable that this Court will appoint trial counsel at the final pretrial conference (should this case survive the filing of any further dispositive motions); and (4) the Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**ACCORDINGLY,** it is

***6 ORDERED** that Magistrate Judge Lowe's Report-Recommendation (Dkt. No. 84) is ***ACCEPTED*** and ***ADOPTED*** in its entirety; and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 67) is ***GRANTED* in part** and ***DENIED* in part;** and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are ***DISMISSED* without leave to amend:**

(1) all claims against Defendants Devito, Head, Labetz, Simons, and Sourwine;

(2) the First Amendment religion claims alleged in ¶¶ 1-26 of the Second Amended and Supplemental Complaint against Defendant Hess;

(3) all claims against Defendant Burge;

(4) all claims against Defendants in their official capacities;

(5) all claims against Defendants Manley, Grant, and Capacci;

(6) the claim against Defendant Croce regarding his decision to deny Plaintiff parole;

(7) the claims against Defendants Goord, Burge, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they ignored complaints and grievances;

(8) the procedural due process claims against Defendants Salvage, Hayes, and Allen;

(9) the Fourth Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(10) the conspiracy claims against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(11) the conspiracy claim against Defendant Lewis arising from the June 17, 2006, request for a urine sample;

(12) the conspiracy claim against Defendants R. Woods and Anctil arising from Anctil's May 19, 2007, threats; and

(13) the claim that Defendant McDonald used “racial and discrimination and indecent and profane language”; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) are ***DISMISSED* with leave to amend:**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1) the claims against Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they falsified documents in response to Plaintiff's grievances;

(2) the substantive due process and First Amendment access to the courts claims against Defendants Salvage, Hayes, and Allen;

(3) the due process claim against Defendants B. Smith and Claflin arising from the August 23, 2005, misbehavior report;

(4) the due process claim against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests;

(5) the due process claim against Defendant Lewis arising from the June 22, 2006, misbehavior report;

(6) the Eighth Amendment medical care claims against Defendants Moore and Travers arising from Plaintiff's discovery of glass in his food;

(7) the Eighth Amendment claims arising from Anctil's May 19, 2007, threats;

(8) the Eighth Amendment conditions of confinement claim against Defendant McDonald arising from the denial of food and spitting in Plaintiff's coffee; and

***7** (9) the Eighth Amendment medical care claim against Defendant McDonald arising from her interference with Plaintiff's medical interview; and it is further

**ORDERED** that the following claims of Plaintiff's Second Amended and Supplemental Complaint (Dkt. No. 17) hereby survive Defendants' motion to dismiss:

(1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test;

(2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test;

(3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell;

(4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report;

(5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and

(6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements; and it is further

**ORDERED** that, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff shall file, for the Court's review and acceptance, a **THIRD AMENDED AND SUPPLEMENTAL COMPLAINT,** in which he

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

asserts the six claims described in the preceding paragraph, and in which he amends the nine claims that have been hereby dismissed with leave to amend; and it is further

**ORDERED** that, after Plaintiff's Third Amended and Supplemental Complaint, Defendants shall file an Answer (or an Amended Answer, if appropriate) in accordance with the Federal Rules of Civil Procedure; and it is further

**ORDERED** that Plaintiff's fourth motion for the appointment of counsel (Dkt. No. 93) is ***DENIED;*** and it is further

**ORDERED** that the Clerk's Office shall re-docket Dkt. No. 85 as “Declaration in Support of Plaintiff's Motion for Counsel and/or Motion for Preliminary Injunction,” re-docket Dkt. No. 86 as “Reply to Response to Motion for Preliminary Injunction,” and re-docket Dkt. No. 87 as “Objection to Report-Recommendation.”

*Plaintiff is advised that, should his Third Amended and Supplemental Complaint fail to state a claim with regard to the nine claims that have been hereby dismissed with leave to amend, those claims will be sua sponte dismissed by the Court. Plaintiff is also advised that, should his Third Amended and Supplemental Complaint allege any facts occurring after July 3, 2007 (the date of the Second Amended and Supplemental Complaint), those allegations will be sua sponte struck by the Court.*

**REPORT-RECOMMENDATION**

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Currently pending before the Court is a motion by some of the Defendants to dismiss for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). (Dkt. No. 67.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. BACKGROUND**

**A. Plaintiff's complaint in Case No. 9:05-CV-1231 (GTS/GJD)**

***8** On September 28, 2005, Plaintiff Mortimer Excell filed a previous action in this Court. *Excell v. Burge,* No. 9:05-CV-1231 (GTS/GJD) (*“Burge”* ). The operative complaint in that case alleges that on five separate occasions, correctional officers at Auburn Correctional Facility harassed Plaintiff based on his race and religion. (*Burge* Dkt. No. 7.)

Specifically, the *Burge* complaint alleges that on June 17, 2005, officers G. Simons and Labetz taunted Plaintiff with religious and racial epithets, threw his religious headgear (“Tsalot-Kob”) on the ground, and threatened to harm Plaintiff if he filed any grievances. (*Burge* Dkt. No. 7 at ¶¶ 1-8.) The officers then issued a misbehavior report charging Plaintiff with violating various disciplinary rules. *Id.* at ¶ 9. After a disciplinary hearing, Plaintiff was found guilty of the charges. *Id.* at ¶ 10. Plaintiff filed an administrative appeal with John W. Burge, the superintendent of the facility, which was denied. Plaintiff's written complaint to DOCS commissioner Glenn Goord was ‘neglected.’ *Id.* at ¶ 11.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

On July 20, 2005, officer Hess removed Plaintiff from a religious studies class and informed him that he was not allowed to wear a colored Tsalot-Kob. When Plaintiff protested that DOCS directives allowed him to wear a colored Tsalot-Kobb, Hess summoned several officers, who returned Plaintiff to his cell and placed him on keeplock status. (*Burge* Dkt. No. 7 at ¶ 12.) Plaintiff subsequently received a misbehavior report charging him with "out of place." *Id.* at ¶ 13. Plaintiff was found not guilty after a disciplinary hearing, but did not receive a copy of the written disposition. *Id.* at ¶ 14.

On July 26, 2005, officer Simons approached Plaintiff in the mess hall, began calling him racially derogatory names, and ordered him to remove his Tsalot-Kob. *(Burge* Dkt. No. 7 at ¶ 15.) Simons and two other officers then removed Plaintiff from the mess hall, confiscated his Tsalot-Kob, and returned him to his cell on keeplock status. *Id.* at ¶ 16. Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id.* at ¶ 17. After a disciplinary hearing, Plaintiff was found not guilty. *Id.* at ¶ 18.

On August 4, 2005, officer Devito removed Plaintiff from his religious class and demanded to know why he was wearing a colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 20.) Devito threatened to kill Plaintiff if he filed any complaints against him. *Id.* He then went into the class and stated that the organization would not be allowed to continue to operate if Plaintiff remained in the organization. *Id.* Devito returned Plaintiff to his cell and placed him on keeplock status. *Id.* at ¶ 21. Devito subsequently issued Plaintiff a misbehavior report charging Plaintiff with refusing a direct order. *Id.* at ¶ 22. Plaintiff was found not guilty after a disciplinary hearing. *Id.* at ¶ 23. However, when he requested a written disposition, hearing officer Head told him to "get the fuck out [of] the hearing office [FN1]." *Id.*

FN1. Because a motion to dismiss tests the face of a plaintiff's complaint, this Report-Recommendation includes many direct quotes from Plaintiff's complaint. Any grammatical errors or idiosyncratic turns of phrase are Plaintiff's, not the Court's.

***9** On August 9, 2005, officer Sourwine approached Plaintiff in the mess hall and ordered him to remove his colored Tsalot-Kob. (*Burge* Dkt. No. 7 at ¶ 24.) When Plaintiff showed Sourwine a copy of the DOCS directive allowing colored Tsalot-Kobs, Sourwine began calling Plaintiff racially derogatory names. *Id.* Officer Bray then approached Plaintiff, began calling Plaintiff racially derogatory names, said he did not "give a dam[n] fuck about ... the Directive," and ordered Plaintiff to leave the mess hall. *Id* . Bray returned Plaintiff to his cell and placed him on keeplock status. *Id.* Subsequently, Plaintiff received a misbehavior report charging him with violating various disciplinary rules. *Id* . at ¶ 25. At the disciplinary hearing on the charges, hearing officer Head would not allow Plaintiff to present a defense and ordered that Plaintiff be removed from the hearing room. *Id.* at ¶ 26. Plaintiff was found guilty of the charges. *Id.*

In addition to these five incidents, Plaintiff alleged that he had filed a grievance against officer G. Steinberg for mail theft, sexual harassment, and threats. (*Burge* Dkt. No. 7 at ¶ 30.) However, Plaintiff did not name Steinberg as a defendant in the *Burge* action. Rather, he stated that he was simply 'notifying' the Court about the incident. *Id.* The Court did not interpret the *Burge* complaint as making any allegations against Steinberg. (*Burge* Dkt. No. 52 at 8.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The *Burge* case has proceeded past the summary judgment stage. On summary judgment, the Court dismissed all claims against Head and the First Amendment religion claims against Hess, Devito, Bray, and Sourwine. Retaliation claims against those defendants remain pending.

**B. Plaintiff's complaint in this case**

On March 23, 2007, Plaintiff filed the case pending before the undersigned. The operative complaint is the amended complaint filed on July 9, 2007. (Dkt. No. 17) ("the complaint.") The first 27 paragraphs of the complaint's statement of facts repeat, nearly verbatim, the allegations of the *Burge* case. (Compare Dkt. No. 17 at ¶¶ 1-27 with *Burge* Dkt. No. 7 at ¶¶ 1-30.) In addition, the complaint includes allegations about the lack of response to Plaintiff's complaints and grievances, the denial of Plaintiff's parole, and ten other incidents of mistreatment by staff.

1. *Allegations against Defendants Hess, Bellinger, Steinberg, Smith, Claflin, Wolczyk, Salvage, Goord and Burge re: urine sample, cell search and falsified transcript*

On August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess, whom Plaintiff had not seen for two or three weeks. *Id.* As Plaintiff was being escorted, Defendant Joseph Bellinger [FN2] told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" the July 20, 2005, misbehavior report. *Id.*

FN2. The complaint refers to this defendant as "Joseph Bellnier." (Dkt. No. 17 at A-5.) I have used the spelling provided in Defendants' motion to dismiss.

***10** While Plaintiff was giving the urine sample, Defendants Steinberg, B. Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, B. Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.*

On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty after an August 25, 2005, disciplinary hearing conducted by Defendant Joseph Wolczyk at which Plaintiff was not allowed to present a defense. *Id.* He was sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

On August 26, 2005, Plaintiff filed complaints with Defendants Goord and Burge. He did not receive a response. (Dkt. No. 17 at ¶ 32.)

Plaintiff appealed his disciplinary sentence through the prison appeals system and filed an Article 78 proceeding in state court. (Dkt. No. 17 at ¶ 33.) Plaintiff alleges that defendant stenographer Patricia Salvage "falsified the transcri[pt] of the Tier Three hearing ... in an effort to cover up staff misconduct ." *Id.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

I construe the complaint as asserting the following causes of action as a result of these events: (1) a retaliation claim against Defendants Hess and Bellinger; (2) a First Amendment religion claim, a Fourth Amendment claim, and substantive and procedural due process claims against Defendants Steinberg, B. Smith, and Claflin; (3) a procedural due process claim against Defendant Wolczyk [FN3]; and (4) a First Amendment access to the courts claim, a substantive due process claim, and a procedural due process claim against Defendant Salvage.

FN3. Defendant Wolczyk has answered the complaint. (Dkt. No. 66.)

2. *Allegations against Defendants Premo, Wood, and Corrigeux re: falsified drug test*

On April 29, 2006, Plaintiff was moved into a cell with an inmate who had a long history of drug use. (Dkt. No. 17 at ¶ 38.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a urine specimen. Premo said “Albany” had requested the sample. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered to submit urine specimens. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen “to give me a false positive.” (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood drafted the report in a way that ensured that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) Defendant N. Bezio conducted a disciplinary hearing on May 25, 2006. (Dkt. No. 17 at ¶ 40.) As part of his defense, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than “Albany,” had requested the test. *Id.* Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

***11** I construe the complaint as asserting the following causes of action as a result of these events: (1) a Fourth Amendment claim, a conspiracy claim, and a due process claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants Wood and Corrigeux.

3. *Allegations against Defendants Lewis, Moore, Ramsdell and Woods re: drug test*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff, citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis said to another officer “Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen.” *Id.* No one returned to take Plaintiff's specimen. *Id.* Plaintiff complained verbally to the building supervisor, Defendant Moore, and filed a written complaint with Defendant R. Woods. *Id.*

On June 22, 2006, Defendant Lewis issued a misbehavior report charging Plaintiff with refusing a direct order. (Dkt. No. 17 at ¶¶ 42, 45.) On July 10, 2006, Defendant T. Ramsdell and another officer escorted Plaintiff to a disciplinary hearing. (Dkt. No. 17 at ¶ 45.) When Plaintiff protested, Defendant Ramsdell and another officer told Plaintiff that “if he do[es] not stop his jail house lawyer shit and plead guilty they will issue[ ] the Plaintiff

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

[another] false misbehavior report." *Id.* When Plaintiff refused and began to present a defense, Defendant Ramsdell and the other officer ordered the hearing officer to stop the hearing tape. *Id.* They threatened Plaintiff with bodily harm, escorted him back to his cell, and ordered him to assume the frisk position. *Id.* While Plaintiff was positioned against the wall, the officers put all of his personal items on the floor, including his Bible [FN4], and removed Plaintiff's pillow and toilet paper. *Id.* Plaintiff immediately verbally complained to the housing supervisor. (Dkt. No. 17 at ¶ 46.)

FN4. Plaintiff does not claim that Defendant Ramsdell violated his First Amendment rights. (Dkt. No. 17 at 56.)

On July 11, 2006, Plaintiff filed a "complaint to Defendant Woods and a grievance against Defendant Ramsdell" regarding the July 10 hearing room incident. (Dkt. No. 17 at ¶ 48.) Plaintiff alleged that Ramsdell acted in retaliation for a grievance Plaintiff filed against N. Bezio on July 9, 2006. *Id.*

On July 12, 2006, Plaintiff received a copy of a not guilty disposition from the July 10 hearing. (Dkt. No. 17 at ¶ 47.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) a substantive due process claim, a procedural due process claim, and a conspiracy claim against Defendant Lewis; and (2) an Eighth Amendment claim, a substantive due process claim, and a procedural due process claim against Defendant Ramsdell [FN5].

FN5. Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

4. *Allegations against Defendants Moore and Travers re: glass in food*

On June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.*

***12** On June 30, 2006, Defendants Moore and Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

I construe the complaint as asserting Eighth Amendment medical care claims against Defendants Moore and Travers as a result of these events.

5. *Allegations against Defendants Bezio, LeClair, Ramsdell, and Sauve re: excessive force*

As mentioned above, on July 9, 2006, Plaintiff filed a grievance complaint against Defendant N. Bezio. (Dkt. No. 17 at ¶ 45.) On July 12, 2006, Plaintiff received a misbehavior report. (Dkt. No. 17 at ¶ 47.)

On July 21, 2006, Defendant Bezio commenced a disciplinary hearing. (Dkt. No. 17 at ¶ 49.) He denied Plaintiff's requests for the video of the July 10 hearing and copies of the July 11 complaint letters and grievance. *Id.*

On July 24, 2006, Plaintiff filed a complaint against Defendant Bezio with Defendant LeClaire. (Dkt. No. 17

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

at ¶ 50.) Plaintiff requested that Bezio be removed as his hearing officer. *Id.*

On July 27, 2006, Defendants Ramsdell and Sheila Sauve and five other officers arrived at Plaintiff's cell to escort him to a disciplinary hearing. (Dkt. No. 17 at ¶ 51.) Ramsdell ordered Plaintiff to turn his back to the cell door and put his hands behind his back and through the slot in the door. *Id.* Plaintiff complied, and Sauve applied mechanical restraints. *Id.* Plaintiff told Defendants that the restraints were too tight. *Id* . Ramsdell pat frisked Plaintiff "in a very hostile and sexual assault manner that offended Plaintiff['s] manhood and offend[ed] his dignity." *Id.* When Plaintiff arrived at the hearing room, Defendant Bezio told him to stop resisting. *Id.* Ramsdell and Sauve then pushed Plaintiff into the wall and tried to break Plaintiff's right index finger. *Id.* Defendant Bezio and five other officers pushed Plaintiff's face into the wall until it "burst open" and bled. *Id.* Plaintiff's wrists were also bleeding. *Id.* Plaintiff was escorted back to his cell and his legal documents were not returned. *Id.* Plaintiff did not receive medical care despite filing numerous complaints. (Dkt. No. 17 at ¶¶ 51, 58.)

Bezio found Plaintiff guilty of all charges and sentenced him to six months' SHU confinement, three months' loss of good time, and six months' loss of recreation, commissary, packages, and telephone privileges. (Dkt. No. 17 at ¶ 51.)

Plaintiff alleges that Defendant Linda A. Hayes, the stenographer for the hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 77 [FN6].)

FN6. Plaintiff alleges that Defendant Hayes also "knowingly and willfully ma[d]e a false official report" on another occasion, but it is not clear from the complaint to which disciplinary hearing Plaintiff is referring. (Dkt. No. 17 at ¶ 79.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment, substantive due process, and procedural due process claims against Defendant Bezio [FN7]; (2) Eighth Amendment claims against Defendants Ramsdell [FN8] and Sauve [FN9]; and (3) First Amendment access to the court, substantive due process, and procedural due process claims against Defendant Hayes.

FN7. Defendant Bezio has answered the complaint. (Dkt. No. 66.)

FN8. As noted above, Defendant Ramsdell has answered the complaint. (Dkt. No. 66.)

FN9. Defendant Sauve has answered the complaint. (Dkt. No. 66.)

6. *Allegations against Defendants Ramsdell, Bezio, Allen, Goord and Selsky re: false misbehavior report and transcription*

***13** On July 28, 2006, Defendant Ramsdell and officer Comstock issued misbehavior reports charging Plaintiff with refusing a direct order, violating lock in/lock out procedures, violent conduct, interference with employees, and harassment. (Dkt. No. 17 at ¶ 52.) Officer Comstock's report "said he had only written [it] because he was ordered to do so by Defendant Bezio." *Id.* The disciplinary hearing on the charges was conducted on several dates in August 2006. (Dkt. No. 17 at ¶ 53.) The hearing officer, Defendant D. Quinn, denied Plaintiff's requests to present evidence. *Id.* Plaintiff did not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

immediately receive a disposition document or any determination of guilt. *Id*

On October 15, 2006, Plaintiff filed a grievance with Defendant Goord. (Dkt. No. 17 at ¶ 54.) In response, Defendant Selsky sent Plaintiff a copy of a disposition from an August 29 hearing. *Id.* Plaintiff had been found guilty and sentenced to three months' SHU confinement, three months' loss of good time, and three months' loss of recreation, commissary, packages and telephone privileges. *Id.* Plaintiff alleges that Defendant Ashley Allen, the stenographer for the August 29 hearing, falsely certified that her transcript was accurate. (Dkt. No. 17 at ¶ 78.)

I construe the complaint as asserting the following causes of action as a result of these events: (1) substantive due process, procedural due process, and conspiracy claims against Defendants Ramsdell and Bezio [FN10]; (2) a procedural due process claim against Defendant Quinn [FN11]; and (3) First Amendment access to the courts, substantive due process, and procedural due process claims against Defendant Allen.

FN10. As noted above, Defendants Ramsdell and Bezio have answered the complaint. (Dkt. No. 66.)

FN11. Defendant Quinn has answered the complaint. (Dkt. No. 66.)

7. *Allegations against Defendant Travers re: bloody bowel movements*

On May 8, 2007, Plaintiff filed a sick call request regarding stomach pain, heart pain, and blood in his bowel movements. (Dkt. No. 17 at ¶ 65.) On May 9, 2007, a nurse gave Plaintiff three stool sample test cards. *Id.* On May 11, 2007, Plaintiff returned the three stool sample cards to Defendant Travers. (Dkt. No. 17 at ¶ 65.) On May 12, 13, and 14, 2007, Plaintiff filed sick call requests regarding heart pain and bloody bowel movements. *Id.* When Plaintiff asked Travers about the stool sample cards, she said that Plaintiff would soon see a nurse-practitioner because the samples had blood in them. *Id.* Travers would not give Plaintiff any pain killers. *Id.* Plaintiff filed "numerous" complaints against Nurse Travers and had blood in his bowel movements for nine months but never received care. (Dkt. No. 17 at ¶ 58, 65.)

I construe the complaint as asserting an Eighth Amendment medical care claim against Defendant Travers as a result of these events. I note that Defendants have explicitly declined to move to dismiss this cause of action. (Dkt. No. 67-4 at 21, 22 n. 4.)

8. *Allegations against Defendants McDonald, Woods and Fisher re: spitting in coffee cup, interfering with medical interview, and profane language*

***14** On May 9, 2007, Plaintiff filed a grievance against Defendant Michele McDonald [FN12] for spitting in his coffee cup, interfering with a medical interview and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I construe the complaint as asserting Eighth Amendment medical care and conditions of confinement claims against Defendant McDonald.

FN12. The complaint refers to this defendant as "Macdonal." (Dkt. No. 17 at ¶ 62.) I have used the spelling provided in Defendants' motion to dismiss.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

9. *Allegations against Defendants Woods, Anctil and Tirone re: laughing at Plaintiff's report of pain and the misbehavior report alleging threats by Plaintiff*

On May 17, 2007, Defendant Woods walked by Plaintiff's cell. (Dkt. No. 17 at ¶ 66.) Plaintiff complained about his heart and stomach pains and the blood in his bowel movements. *Id.* Woods laughed in Plaintiff's face and walked away. *Id.* That same day, Plaintiff filed a complaint with Woods, stating that he was receiving cruel and unusual punishment and that "he would not just sit and be physically assaulted ... he will start to fight back to protect hi [m]self and he will not let these defendants kill him and he do not try to take one of them with him and he will feel better to die fighting for his justice." *Id.* On May 21, 2007, Defendant Anctil issued a misbehavior report charging Plaintiff with violent conduct and threats [FN13]. (Dkt. No. 17 at ¶ 68.) Defendant Tirone presided over the disciplinary hearing on June 7, 2007. (Dkt. No. 17 at ¶ 69.) Plaintiff protested that the hearing was untimely. He asked to see a copy of any extension. Tirone denied that request and Plaintiff's requests to present documentary evidence and witnesses. *Id.* Tirone found Plaintiff guilty and sentenced him to nine months' SHU confinement and nine months' loss of recreation, packages, telephone and commissary privileges. *Id.*

FN13. To the extent that this allegation raises any due process claim against Defendant Anctil on the basis that Defendant Anctil issued a false misbehavior report, I dismiss that claim *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B) for two reasons. First, it is clear from the face of the complaint that Plaintiff did, in fact, make threats. Thus, the report was not false. Second, as discussed at length below, even if the report were false, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997).

I construe the complaint as asserting the following causes of action as a result of these events: (1) Eighth Amendment medical care and substantive due process claims against Defendant Woods; and (2) a procedural due process claim against Defendant Tirone [FN14].

FN14. Defendant Tirone has answered the complaint. (Dkt. No. 66.)

10. *Allegations against Defendants Woods and Anctil regarding threats of physical force*

On May 19, 2007, Woods sent Defendant Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) The complaint does not describe this event in any more detail. I liberally construe the complaint as asserting the following causes of action as a result of this event: (1) Eighth Amendment and conspiracy claims against Defendant Anctil; and (2) substantive due process and conspiracy claims against Defendant Woods.

**C. Plaintiff's prayer for relief**

Plaintiff requests (1) a declaration that Defendants violated his rights under the First, Eighth and Fourteenth Amendments; (2) "compensatory damages from each one of the defendants in their individual capacity and in their official capacity" of $14 million; (3) "punitive damages from each defendant in their individual capacity and official capacity in the amount of $20 million"; (4) a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

permanent injunction preventing Defendants "from depriving the Plaintiff of his programs he need for parole release, and the right to adequate medical care and the right to receive his adequate rehabilitation adjustment programs and all his good time that was stolen from the Plaintiff ... and to stop deny Plaintiff his outside correspondence with acts of mail theft and stop physical assault ... and put things in his food to harm him and stop using false misbehavior reports to keep Plaintiff's false confinement and stop putting mentally ill inmates in the same cell with Plaintiff or other inmate like Charles Ramball because his child mother is his woman." (Dkt. No. 17 at A-60 [FN15].)

FN15. Page numbers refer to the handwritten page numbers in the upper right-hand corner of the complaint.

**D. Summary of Grounds in Support of Defendants' Motion**

***15** Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No 67.) Defendants argue that (1) the causes of action against Defendants Burge, Devito, Head, Hess, Labetz, Simmons and Sourwine arising out of the events of June 17-August 18, 2005, should be severed and dismissed because they are duplicative of the *Burge* action; (2) the claims against supervisory personnel in their official capacities are barred by the Eleventh Amendment; (3) Defendants Manley, Grant, Capacci and Croce have absolute immunity barring the claims regarding the denials of parole; (4) the complaint insufficiently alleges personal involvement by Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright and N. Smith; (5) the complaint does not state a cause of action against stenographers Linda Hayes, Patricia Salvage and Ashley Allen; and (6) the complaint fails to state a cause of action against Defendants Steinberg, Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Anctil or Travers. (Dkt. No. 67-4.)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); [FN16] or (2) a challenge to the legal cognizability of the claim.[FN17]

FN16. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN18] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN19] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN20]

FN18. *Dura Pharm., Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168 (1993) [citation omitted].

FN19. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN20. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN21] However, it is well established that even this liberal notice pleading standard "has its limits." [FN22] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN23]

FN21. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN22. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN23. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a] [2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 FN24 (2007).FN25 Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN24. All citations to the *Bell Atlantic* decision will be to the S.Ct. cite rather than the U.S. cite because page numbers are not available for the U.S. version.

FN25. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

***16** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).FN26 The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).FN27

FN26. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that *"Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....'") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ( "We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

FN27. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. FN28 There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN28. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN29] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN30] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN29. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN30. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

***17** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN31] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN32] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN33] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN34] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN35]

FN31. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See* *Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN32. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN33. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN34. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN35. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also* Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See* *Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 25

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), [FN36] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. [FN37] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN38] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [FN39]

FN36. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN37. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN38. *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN39. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

**III. ANALYSIS**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

**A. Allegations in Paragraphs 1-27 of the Amended Complaint**

Defendants argue that any claims arising from the allegations in Paragraphs 1-27 of the complaint should be dismissed because they are duplicative of the allegations in the *Burge* case. (Dkt. No. 67-4 at 10-11.) With the exception of Paragraph 27, Defendants are correct.

As a general rule, "[w]here there are two competing lawsuits, the first suit should have priority." *First City Nat'l Bank & Trust Co. v. Simmons,* 878 F.2d 76, 79 (2d Cir.1989) (quoting *Motion Picture Lab. Technicians Loc. 780 v. McGregor & Werner, Inc .,* 804 F.2d 16, 19 (2d Cir.1986)) (alteration in original). This rule "embodies considerations of judicial administration and conservation of resources" by avoiding duplicative litigation ... *Id.* at 80. We have recognized only two exceptions to the first-filed rule: (1) where the "balance of convenience" favors the second-filed action, see, e.g., *Motion Picture Lab. Technicians Loc. 780,* 804 F.2d at 19; *Remington Prods. Corp. v. Am. Aerovap, Inc.,* 192 F.2d 872, 873 (2d Cir.1951), and (2) where "special circumstances" warrant giving priority to the second suit, see, e.g., *First City Nat'l Bank,* 878 F.2d at 79.

***18** *Employers Ins. of Wausau v. Fox Entertainment Group, Inc.,* 522 F.3d 271, 275 (2d Cir.2008). Claims are duplicative if they arise from the same nucleus of fact. *See Alden Corp. v. Eazypower Corp.,* 294 F.Supp.2d 233, 235 (D.Conn.2003).

Here, the claims in Paragraphs 1-26 of the operative complaint (Dkt. No. 17) are duplicative of Plaintiff's claims in Case No. 9:05-CV-1231 GTS/GJB because they allege precisely the same facts. Neither the balance of convenience nor any special circumstance warrants giving priority to this suit. Rather, giving priority to this suit would undermine the judicial resources that have already been devoted to the *Burge* action, which has proceeded past the summary judgment stage. Therefore, I recommend that the Court dismiss the claims set forth in Paragraphs 1-26 of the operative complaint without leave to amend.

Paragraph 27, however, does not arise from the same nucleus of fact as a pending claim in the *Burge* case. Although Plaintiff alleged in that action that he had filed a grievance against officer Steinberg for mail theft, sexual harassment, and threats (*Burge* Dkt. No. 7 at ¶ 30), Plaintiff did not name Steinberg as a defendant and the Court did not construe the complaint as raising a claim against Steinberg. (*Burge* Dkt. No. 52 at 8.) Here, on the other hand, Plaintiff named Steinberg as a defendant (Dkt. No. 17 at A-7) and alleged that Steinberg violated his First Amendment rights. (Dkt. No. 17 at 56.) Therefore, I recommend that Defendants' motion to dismiss the allegations in Paragraph 27 be denied.

**B. Eleventh Amendment**

Plaintiff requests damages from Defendants "in their individual capacity and in their official capacity." (Dkt. No. 17 at A-60.) Defendants argue that Plaintiff's claims against the supervisory Defendants in their official capacities are barred by the Eleventh Amendment. (Dkt. No. 67-4 at 11-12.) Defendants are more than correct: Plaintiff's claims against *all* of the Defendants in their official capacities are barred by the Eleventh Amendment [FN40].

FN40. The Court has the authority to dismiss the claims against the non-supervisory Defendants in

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

their official capacities pursuant to 28 U.S.C. § 1915(e)(2)(B) and Federal Rule of Civil Procedure 12(h)(3).

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." *See* U.S. Const. amend XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). State immunity extends not only to the states, but to state agencies and to state officers who act on behalf of the state. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf,* 506 U.S. 139, 142-47 (1993); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101-06 (1984).

***19** The Eleventh Amendment bars suits against state officials acting in their official capacities.[FN41] All DOCS employees, not merely supervisors, are state officials for the purposes of the Eleventh Amendment. *See e.g. Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002); *Tolliver v. N.Y. State Correctional Officers,* No. 99 CIV 9555, 2000 WL 1154311, at *2 (S.D.N.Y. Aug. 14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."). Where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case, and "the case must be stricken from the docket." *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) (citation omitted); *see also* Fed.R.Civ.P. 12(h)(3). Here, the face of the complaint alleges that each Defendant has an official position with DOCS or the Division of Parole. (Dkt. No. 17 at ¶ 3.) Therefore, any claims against the Defendants in their officials capacities are barred by the Eleventh Amendment. Accordingly, I recommend that the Court dismiss those claims without leave to amend.

FN41. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v.. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 (1989) ( "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

is not a suit against the official personally, for the real party in interest is the entity."); *see also* *Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb. 6, 2007) (Sharpe, J.) [citing cases].

**C. Absolute Immunity for Parole Decisions**

Plaintiff alleges that he was wrongfully denied parole twice. At Plaintiff's first parole hearing on November 8, 2005, the parole record stated that Plaintiff had pleaded guilty to three crimes. (Dkt. No. 17 at ¶ 71.) Plaintiff informed the commissioners-Defendants Vernon J. Manley, Thomas Grant, and John C. Capacci-that he had not pleaded guilty and that one of the charges had been dismissed on appeal. *Id.* Plaintiff told the commissioners that DOCS officials had imposed "numerous false disciplinary sanctions" and denied Plaintiff his programming and that Plaintiff's life was in danger if he remained in prison. (Dkt. No. 17 at ¶ 72.) Plaintiff's parole was denied. *Id.*

On November 14, 2006, Plaintiff appeared for his second parole hearing. (Dkt. No. 17 at ¶ 75.) One of the commissioners was Defendant Croce. *Id.* Plaintiff provided documentation to the commissioners that the underlying charges against him were the result of a false police report and that DOCS officials had repeatedly brought false disciplinary charges against him and denied him access to the law library. *Id.* Parole was denied. (Dkt. No. 17 at ¶ 76.)

Plaintiff claims that Defendants Manley, Grant, and Capacci violated his rights by considering false documents when denying him parole. (Dkt. No. 17 at ¶¶ 71-74 and pp. 58-59.) He claims, further, that Defendant Croce violated his rights by serving as a parole commissioner at a time when he was "knowingly and willfully" disregarding Plaintiff's complaints about his treatment. (Dkt. No. 17 at ¶¶ 75-76 and pp. 58-59.)

Defendants Manley, Grant, Capacci, and Croce argue that they are absolutely immune from liability for damages regarding their decisions to deny parole. (Dkt. No. 67-4 at 12-13.) Defendants are correct.

***20** State actors are entitled to some degree of immunity from liability for damages for their official acts. Most actors receive qualified immunity, but a limited number are entitled to absolute immunity. *Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir.1998). Parole board officials are "absolutely immune from liability for damages when [deciding] to grant, deny, or revoke parole because this task is functionally comparable to that of a judge." *Scotto,* 143 F.3d at 111 (internal citations and punctuation omitted). A parole hearing officer is entitled to absolute immunity even if he acted erroneously or maliciously. *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir.1999). *See also* *Farid v. Bouey,* 554 F.Supp.2d 301, 317-18 (N.D.N.Y.2008). Moreover, injunctive relief against parole board officials is not available unless the plaintiff demonstrates that the officials violated a federal decree or that declaratory relief is not available [FN42]. *Id.* at 318.

FN42. Plaintiff requests injunctive relief, but it is not clear from the complaint whether or not Plaintiff is requesting injunctive relief against Defendants Manley, Grant, Capacci, and Croce. (Dkt. No. 17 at A-60.) Defendants did not address the issue of immunity from claims for injunctive relief. I raise this issue *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B).

Here, Plaintiff's claims against Defendants Manley, Grant, Capacci, and Croce are premised on their decision to deny

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

him parole. These Defendants are absolutely immune. Moreover, because Plaintiff has not alleged that these Defendants violated a federal decree or that declaratory relief is unavailable, Plaintiff has not stated a claim for injunctive relief against these Defendants. Thus, I recommend that all claims against Defendants Manley, Grant, and Capacci be dismissed and that the claims arising from the denial of parole against Defendant Croce be dismissed without leave to amend.

**D. Personal Involvement**

Defendants argue that the complaint insufficiently alleges that Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith were personally involved in any alleged constitutional violation. (Dkt. No. 67-4 at 13-15.)

The allegations against these defendants focus on their handling of Plaintiff's grievances and complaints. Plaintiff alleges both that these Defendants acted passively by "knowingly and willfully disregarding Plaintiff's complaints" (Dkt. No. 17 at ¶¶ 32, 34, 55, 59, 60-62, 64, 70) and that they actively interfered with his grievances and complaints by falsifying documents and "causing the filing of false misbehavior reports." (Dkt. No. 17 at ¶¶ 44, 57-59.)

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN43] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN44] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN45] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN46] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN47]

FN43. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087 (1978); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN44. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN45. *Polk County v. Dodson,* 454 U.S. 312, 325 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN46. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN47. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

***21** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official "failed to remedy that violation after learning of it through a report or appeal" or "exhibited deliberate indifference ... by failing to act on information indicating that the violation was occurring." *Rivera v. Goord,* 119 F.Supp.2d 327, 344-45 (S.D.N.Y.2000). *See also* *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). District Court decisions in this Circuit have established that:

> where a supervisory official like the Commissioner of Corrections or a prison Superintendent receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable. On the other hand, where a supervisor receives an inmate grievance or other complaint and responds to it, the supervisor may be liable ... At first glance, these holdings might seem counter-intuitive, as giving supervisors an incentive to inaction in order to avoid personal liability. However, it must be noted that the Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them. Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability.

*Walker v. Pataro,* No. 99 CIV. 4607, 2002 WL 664040, at *12-13 (S.D.N.Y. Apr. 23, 2002) (internal citations omitted) (collecting and analyzing decisions) [FN48].

> FN48. The undersigned will provide a copy of the *Walker v. Pataro* decision to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76, 2009 WL 399215 (2d Cir. Feb. 19, 2009).

Here, as discussed above, Plaintiff alleges both that the supervisory Defendants ignored his complaints and that they took action by falsifying documents. I recommend that the claims that Defendants merely ignored complaints be dismissed without leave to amend. Regarding Plaintiff's claims that the supervisory Defendants falsified documents in response to grievances, I find those allegations conclusory. The complaint does not include any facts supporting those allegations, relying instead on legal conclusions masquerading as factual conclusions. Such conclusory allegations do not state a claim. *Rolon v. Henneman,* 517 F.3d 140, 148-49 (2d Cir.2008). I therefore recommend that these claims be dismissed with leave to amend.

**E. Stenographers**

Plaintiff has named stenographers Patricia Salvage, Linda A. Hayes, and Ashley Allen as defendants. (Dkt. No. 17 at ¶¶ 33, 77-79.) In their motion to dismiss, Defendants assert that Plaintiff "does not allege that defendant stenographers altered or erred in transcribing exactly what took place at the hearings. Rather, it appears that plaintiff is alleging that they violated his rights by memorializing the purported falsity of the underlying allegations and the alleged wrongdoing of the hearing officers." (Dkt. No. 67-4 at 15.) Contrary to Defendants' assertion, the complaint does allege that the stenographers altered the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 31

Slip Copy, 2009 WL 3124424 (N.D.N.Y.)
(Cite as: 2009 WL 3124424 (N.D.N.Y.))

transcripts. For example, Plaintiff alleges that Defendant Salvage "falsified the transcribed (*sic* ) of the Tier Three Hearing Transcript ... to contempt [an] Article 78 Procedure." (Dkt. No. 17 at ¶ 33.) He alleges that Defendant Hayes' transcript of the July 27, 2006, disciplinary hearing "is all a falsification ... in a effort to cover-up staff misconduct and this transcribed (*sic* ) .... is false information" that will "prevent the Acting Supreme Court Justice of Franklin County Court to performing a lawful duty with this falsification of the records of her transcribed information that is false." (Dkt. No. 17 at ¶ 77.) He alleges that Defendant Allen prepared a "false transcribed document in a effort to cover-up staff misconduct ... to obstruct ... the Supreme Court Justice in their function with Plaintiff Article 78 proceeding ... to prevent the court from performing a lawful duty with the true and accurate transcribed documents of this Tier Three Hearing." (Dkt. No. 17 at ¶ 78.) It appears to the undersigned that Plaintiff is, indeed, alleging that the stenographers falsified transcripts and that they did so to prevent a New York state court from reviewing Plaintiff's disciplinary sentences in Article 78 proceedings.

***22** Construed accordingly, the complaint appears to allege that the stenographers violated Plaintiff's procedural and substantive due process rights and his right of access to the courts. Defendants argue that Plaintiff has failed to state a claim against the stenographers. (Dkt. No. 67-4 at 15-16.) Defendants are correct.

1. *Procedural Due Process*

The Supreme Court has held that in the context of a prison disciplinary hearing, procedural due process requires that (1) the inmate receive advance written notice of the disciplinary charges; (2); the inmate be allowed to call witnesses and present documentary evidence; and (3) the fact finder prepare a written statement describing the evidence relied upon and the reasons for the determination. *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974). A transcript of the disciplinary hearing is not constitutionally required. *Dixon v. Goord,* 224 F.Supp.2d 739, 744-45 (S.D.N.Y.2002). Courts have repeatedly held that the Fourteenth Amendment does not require any administrative review of disciplinary convictions [FN49]. Moreover, courts have repeatedly held that, where such administrative review is conducted, the Fourteenth Amendment does not require the review of (much less the existence of) a tape recording or transcript of the disciplinary hearing [FN50]. Even where a party claims that a transcript was deliberately tampered with, there is no procedural due process violation if the state provides adequate post-deprivation remedies. *Curro v. Watson,* 884 F.Supp. 708, 717-19 (E.D.N.Y.1995) (prisoner who alleged that court reporters deliberately altered the transcript of his criminal trial did not state procedural due process claim because New York provides a procedure for challenging inaccuracies in trial transcripts). In New York, a prisoner who disputes the accuracy of the transcript of a disciplinary hearing may raise that issue in an Article 78 proceeding. N.Y. C.P.L.R. § 7804(d) (McKinney 1994).

FN49. *See, e.g., Wolff v. McDonnell,* 418 U.S. 539, 563-570 (1974) (not listing right to appeal among due process requirements of disciplinary hearing), *accord, Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004); *Amato v. Ward,* 41 N.Y.2d 469, 473, 393 N.Y.S.2d 934, 937 (N.Y.1977) ("This type of administrative review [of prison disciplinary hearings pursuant to New York State regulations] is not required by the Federal Constitution.") (*citing Wolff v. McDonnell), accord, Giovanni v. Lynn,* 48 F.3d 908, 911 n. 7 (5th Cir.1995) ("Nor, indeed, is provision for appeal, following an [otherwise] adequate [disciplinary] hearing, required under the more stringent standards of *Wolff v. McDonnell* ....").

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN50. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N . Y.2002) ("According to *Wolff,* the only written or audio record of a disciplinary hearing that must be maintained to comply with minimal due process standards is a written statement describing the evidence relied upon and the reason for the determination.... The Court therefore agrees with Defendants that any alleged defect in the tape would not rise to the level of a constitutional violation."); *Cherry v. Selsky,* 99-CV-4636, 2000 U.S. Dist. LEXIS 9451, at *15-16 (S.D.N.Y. July 7, 2000) ("This allegation [that defendant failed to review the audio tape recording of the disciplinary hearing, prior to affirming the decision of the hearing officer], without more, is insufficient to state a claim for violation of a liberty interest."); *Afrika v. Selsky,* 750 F.Supp. 595, 600, 602 (S.D.N.Y.1990) (granting defendant's motion for summary judgment because, among other reasons, plaintiff had no liberty interest in the review of an audio tape of his disciplinary hearing as part of his administrative appeal, stating that "because both the hearing and review reached the minimal standards, [defendant] did not violate [plaintiff's] liberty interest in not being confined without due process"); *Brito v. Coughlin,* No. 88-CV-8064, 1989 WL 241718, at *2 (S.D.N.Y. July 31, 1989) ("[The due process clause] does not require, however, that a transcript be made or given to an inmate after a disciplinary hearing.").

Thus, because Plaintiff was not constitutionally entitled to a transcript and because he could have challenged any deficiencies in the transcripts in his Article 78 proceeding, he has not stated a claim. I therefore recommend that the Court dismiss Plaintiff's procedural due process claims against the stenographers without leave to amend.

2. *Substantive Due Process/Access to Courts*

Construed liberally, Plaintiff's complaint raises substantive due process and First Amendment access to the courts claims against the defendant stenographers. I will analyze these claims together. The substantive component of the Due Process Clause "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon v. Burch,* 494 U.S. 113, 125 (1990) (internal quotations marks and citation omitted). "Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotations marks and citations omitted).

***23** The first step in a substantive due process analysis is to identify the precise constitutional right at stake. *Lowrance,* 20 F.3d at 537 (citing *Collins v. City of Harker Heights,* 503 U.S. 115, 123-25 (1992)). "Substantive due process embraces an individual's right of access to the courts." *Curro,* 884 F.Supp. at 719. Prisoners' right to access to the courts includes proceedings to "attack their sentences, directly or collaterally, and ... to challenge the conditions of their confinement." *Lewis v. Casey,* 518 U.S. 343, 355 (1996). "[A]n Article 78 petition that challenges an inmate's ... SHU confinement is an action for which access to the courts is constitutionally guaranteed .... [because it] relates directly to the conditions of confinement." *Collins v. Goord,* 438 F.Supp.2d 399, 417 (S.D.N .Y.2006). Plaintiff claims that the defendant stenographers thwarted his efforts to pursue Article 78 proceedings by providing false transcriptions. (Dkt. No. 17 at ¶¶ 33, 77, 78.) Thus, the constitutional right at stake is the right of access to the courts.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In order to state a claim for denial of access to the courts, Plaintiff must allege that the stenographers "hindered his efforts to pursue a legal claim." *Collins,* 438 F.Supp.2d at 416 (citing *Lewis,* 518 U.S. at 351). Similarly, in order to state a cause of action for substantive due process, a plaintiff must allege that he suffered "some tangible harm." *Curro,* 884 F.Supp. at 720. *See also* *Collins,* 438 F.Supp.2d at 415-16 (plaintiff alleging violation of right to access to the courts must allege an "actual injury."). Plaintiff has not alleged any tangible harm. Plaintiff does not allege that he was not successful in his Article 78 proceedings. Even if he was unsuccessful in those proceedings, he does not allege that any such failure stemmed from the transcriptions. *Compare* *Collins,* 438 F.Supp.2d at 417 (prisoner adequately alleged tangible harm where he alleged that his Article 78 proceeding was dismissed when prison officials failed to provide him with necessary copies of documents). Therefore, Plaintiff has not stated a substantive due process or First Amendment access to the courts claim against Defendants Salvage, Hayes, or Allen and I recommend that these claims be dismissed with leave to amend [FN51].

FN51. Defendants also argue that any claim against the stenographers is barred by the doctrine of qualified immunity. (Dkt. No. 67-4 at 15-16.) In light of my finding that Plaintiff has not stated a claim, I have not addressed this argument.

**F. Failure to state a cause of action against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald**

Defendants argue that Plaintiff has failed to state a claim against Defendants Steinberg, B. Smith, Clafin, Corrigeux, Lewis, Premo, Bellinger, Hess, Moore, Travers, Anctil, or McDonald. (Dkt. No. 67-4 at 16-23.)

1. *Bellinger and Hess*

Defendants argue that Plaintiff has failed to state a claim against Defendants Bellinger and Hess. (Dkt. No. 67-4 at 16-17.) I disagree.

Regarding Defendants Bellinger and Hess, the surviving paragraphs of the complaint allege that on August 22, 2005, Plaintiff was removed from his cell and escorted to the medical unit to give a urine sample. (Dkt. No. 17 at ¶ 28.) This sample was required because of a report by Defendant Hess. *Id.* Plaintiff had not seen Hess for two or three weeks prior to August 22. *Id.* As Plaintiff was being escorted, Defendant Bellinger told the escort officers to be sure that Plaintiff's urine test was positive. *Id.* Plaintiff asserts that Hess' report and Bellinger's comment were made in retaliation for Plaintiff submitting a grievance and for "beating" a July 20, 2005, misbehavior report. *Id.*

***24** Defendants argue that Plaintiff has failed to state a retaliation claim against Defendant Hess because (1) Plaintiff was not, in fact, deterred from filing grievances, writing letters of complaint, or filing lawsuits; and (2) the allegations regarding a possible retaliatory motive are implausible [FN52]. (Dkt. No. 67-4 at 16-17.)

FN52. Defendants also argue, cursorily and without citation to authority, that these claims should have been raised in an amended complaint in the *Burge* case.

In order to state a cause of action for retaliation, a plaintiff must plead facts plausibly suggesting that (1) the speech or conduct at issue was protected; (2) the defendant took

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001)).

Defendants argue that Plaintiff has not properly alleged that Hess took adverse action because the "complaint makes it clear that [Plaintiff] was not deterred, in any way from filing grievances, writing letters of complaint, o[r] filing new actions in the federal District Courts for relief of his alleged grievances." (Dkt. No. 67-4 at 17.) Defendants essentially argue that this Court should apply a *subjective* test: was Plaintiff actually deterred? However, the Second Circuit defines " 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004) (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superceded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10, 2003) (emphasis in original). The Second Circuit has "made clear that this objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill,* 389 F.3d at 381. The issue of whether the facts "demonstrate that [a defendant's actions] would deter a reasonable inmate from pursuing grievances" should not be determined at the motion to dismiss stage. Rather, a prisoner plaintiff should be allowed "the opportunity to develop [those] facts." *Davis,* 320 F.3d at 354 (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (abrogated on other grounds by *Porter v. Nussle,* 534 U.S. 516 (2002))). Therefore, dismissal is not appropriate on this ground at this stage in the litigation.

Defendants argue that Plaintiff cannot establish a causal connection between Plaintiff's defense of the disciplinary charge and Hess' actions because Plaintiff "admits that he had not seen defendant for two or three weeks" before the urine test. (Dkt. No. 67-4 at 16.) The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension,* 252 F.3d 545, 554 (2d Cir.2001). The Second Circuit has, however, found that lapses of time far longer than two or three weeks are sufficient to support a cause of action for retaliation. *Espinal v. Goord,* 554 F.3d 216, 228 (2d Cir.2009) (the "passage of only six months between the dismissal of Espinal's lawsuit and an allegedly retaliatory beating by officers ... is sufficient to support an inference of a causal connection"); *Gorman-Bakos,* 252 F.3d at 555 (lapse of five months between protected activity and retaliation may show a causal connection); *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir.1980) (lapse of eight months between an EEOC complaint and retaliatory act indicated a causal connection). As explained above, Rule 8 requires a plaintiff to provide "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Bell Atlantic,* 127 S.Ct. at 1965. Plaintiff alleges that Hess wrongfully interfered with his right to wear a colored Tsalot-Kob, that Hess issued a false misbehavior report after that incident, and that Plaintiff was found not guilty of the disciplinary charges. (Dkt. No. 17 at ¶¶ 12-14.) It is not implausible that, based on these events, Hess would have the motive to retaliate. Moreover, the "two or three" weeks that Plaintiff alleges had passed since he last saw Defendant Hess appear to be the two or three weeks between the time Plaintiff was found not guilty of the disciplinary charges on July 23, 2005 (Dkt. No. 17 at ¶ 14), and the encounter on August 22. These facts plausibly suggest that Defendant Hess took his first opportunity to retaliate [FN53]. Accordingly, Plaintiff has stated a claim for retaliation against Defendant Hess and I recommend that Defendants' motion to dismiss this claim be denied.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN53. By finding that such an allegation is "plausible," I express no opinion on whether this allegation can be established by evidence and/or survive a more stringent inquiry.

***25** Defendants argue that Plaintiff has not stated a retaliation claim against Defendant Bellinger because "insulting, disrespectful, or sarcastic comments are considered *de minimus,* and are not actionable." (Dkt. No. 67-4 at 17.) Defendants are correct that insulting comments generally do not rise to an actionable level. *Davis,* 320 F.3d at 353. If Defendant Bellinger were simply a correctional officer who had made the comment to other officers, the undersigned would be inclined to agree that the claim should be dismissed. However, the complaint alleges that Defendant Bellinger was the Deputy Superintendent of Auburn Correctional Facility. (Dkt. No. 17 at A-5.) As such, the complaint construed liberally alleges that the Deputy Superintendent of the facility ordered subordinate officers to falsify the results of a drug test. This is more than a mere insulting comment. Accordingly, I recommend that Defendants' motion to dismiss the retaliation claim against Defendant Bellinger be denied.

2. *Steinberg, B. Smith, and Clafin*

Defendants argue that Plaintiff has failed to state a cause of action against Defendants Steinberg, B. Smith, or Claflin. (Dkt. No. 67-4 at 17-18.) I find that Defendants are partially correct.

Regarding Defendants Steinberg, B. Smith and Claflin, Plaintiff alleges that while he was giving the urine sample ordered by Hess, Defendants Steinberg, Smith and Claflin searched his cell. (Dkt. No. 17 at ¶ 29.) When Plaintiff returned to his cell, his legal documents and belongings were on the floor and his three Tsalot-Kobs were in the toilet. *Id.* A cell search contraband receipt signed by Steinberg, Smith and Claflin stated that tobacco and marijuana had been found in the cell. *Id.* On August 23, 2005, Plaintiff received a misbehavior report charging him with possession of a controlled substance. (Dkt. No. 17 at ¶ 30.) Plaintiff was found guilty and sentenced to 12 months' SHU confinement, 12 months' loss of good time credits, and 12 months' loss of recreation, commissary, package and telephone privileges. *Id.*

Construed liberally, the complaint alleges that these Defendants violated Plaintiff's First, Fourth and Fourteenth Amendment rights. Defendants have not moved to dismiss Plaintiff's allegation that these Defendants violated his First Amendment rights by throwing his religious headgear in the toilet. I find that Plaintiff's First Amendment claim is sufficient to withstand a *sua sponte* review pursuant to 28 U.S.C. § 1915(e)(2)(B). In *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest." The complaint sufficiently alleges, for the purposes of *sua sponte* review, that the wearing of the Tsalot-Kob is a part of Plaintiff's sincerely held Rastafarian beliefs, that throwing Plaintiff's Tsalot-Kobs in the toilet infringed that belief, and that there was no legitimate penological reason for throwing the Tsalot-Kobs in the toilet. Therefore, I recommend that Defendants be directed to answer this claim.

***26** Defendants argue that Plaintiff has failed to state a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

cause of action against Defendants B. Smith, Steinberg, and Claflin because (1) prisoners have no Fourth Amendment right of protection against unreasonable searches; and (2) prisoners have no constitutional right to be free from being falsely accused. (Dkt. No. 67-4 at 17-18 .) Defendants are correct, with the exception of the false accusation claim against Defendant Steinberg.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." *Skinner,* 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559 (1979) [citations omitted], *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). The Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer* 468 U.S. 517, 526 (1984); *see also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N .D.N.Y. March 31, 1997) (Pooler, J., adopting Report-Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."). Therefore, Plaintiff has not stated a Fourth Amendment claim against Defendants Steinberg, B. Smith or Claflin and I recommend that this claim be dismissed without leave to amend.

Plaintiff has not stated a Fourteenth Amendment due process claim against Defendants Smith or Claflin. "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing [FN54]." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862. The complaint does not allege that Smith or Claflin acted in retaliation. Read extremely broadly, however, it does suggest that Steinberg had a retaliatory motive becaues it states that four days prior to the search, Plaintiff filed a grievance against Steinberg. (Dkt. No. 17 at ¶ 27.) Therefore, I recommend that the due process claims be dismissed as to Defendants Smith and Claflin with leave to amend but that Defendants' motion to dismiss the false accusation claim against Defendant Steinberg be denied.

FN54. Plaintiff alleges that he was not allowed to present a defense at the disciplinary hearing. (Dkt. No. 17 at ¶ 30.)

3. *Corrigeux, Premo, and D. Wood*

***27** The complaint alleges that on April 29, 2006, Plaintiff was moved into a cell with an inmate who had a long history of drug use. (Dkt. No. 17 at ¶ 3 8.) On May 7, 2006, Defendant Premo ordered Plaintiff to submit a random urine specimen. Premo said "Albany" had made

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the request. (Dkt. No. 17 at ¶ 36.) On May 9, 2006, Plaintiff and his cell mate were both ordered by a non-defendant correctional officer to submit a random urine specimen. (Dkt. No. 17 at ¶ 37.) Plaintiff alleges that the reason for the second test was to use his cell mate's specimen "to give me a false positive of cocaine and cannabinoid." (Dkt. No. 17 at ¶ 38.)

On May 12, 2006, Defendant Wood issued misbehavior reports charging Plaintiff and his cell mate with use of controlled substances. Plaintiff alleges that Defendant Wood listed the date that he took the specimens as May 11 rather than May 9 so that Plaintiff's cell mate would have his misbehavior report dismissed as a reward for helping to set up Plaintiff. (Dkt. No. 17 at ¶ 39.) As part of his defense at the ensuing disciplinary hearing, Plaintiff requested a copy of the urinalysis test. Plaintiff alleges that Defendants Premo and Corrigeux falsified the document to make it appear that Corrigeux, rather than "Albany," had requested the test. (Dkt. No. 17 at ¶ 40.) Plaintiff was found guilty and sentenced to six months' SHU confinement, six months' lost good time, and six months' lost package, commissary, recreation, and telephone privileges. *Id.*

I have construed the complaint as asserting (1) a Fourth Amendment claim, a due process claim, and a conspiracy claim against Defendant Premo; and (2) due process and conspiracy claims against Defendants D. Wood and Corrigeux.

Defendants have not moved to dismiss the Fourth Amendment claim against Defendant Premo. I find that the claim is sufficient to withstand initial review pursuant to 28 U.S.C. § 1915(e)(2)(B). Urinalysis testing constitutes a search subject to the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614 (1989); *Harris v. Keane,* 962 F.Supp. 397, 407 (S.D.N.Y.1997). However, if the intrusion into one's privacy is found to be minimal, the expectation of privacy is minimal, and there is a governmental reason advanced supporting a search, then the search will not violate one's Fourth Amendment rights. It is equally well-established that a prisoner's right to be free from unreasonable searches is diminished once he or she steps through the prison door. *Harris,* 962 F.Supp. at 407. Pursuant to New York Regulations, as long as the testing is not done with an intent to harass, a corrections officer may order an inmate to submit to urine testing "[w]hen correctional staff has reason to believe the inmate has used drugs ..., when correctional staff receives information from a source that the inmate is currently under the influence of or has recently used ... drugs ..., [or] as part of a computer-generated program for random testing of all inmates [or those] inmates who have been found guilty of drug ... related misconduct in the previous two-year period." N.Y. Comp.Codes R. & Regs. tit. 7, § 1020.4(a)(1), (4), (7), (8); *see also Rodriguez v.. Coughlin,* 795 F.Supp. 609 (W.D.N.Y.1992) (holding that two random drug tests within a twelve-month period, both producing negative results, did not constitute a constitutional violation). Here, the complaint alleges that Defendant Premo told Plaintiff that the May 7, 2006, drug test was a "random request made by Albany," but that at the disciplinary hearing Premo and Corrigeux represented that Corrigeux had requested the test. (Dkt. No. 17 at ¶¶ 36, 39.) These facts raise a sufficient inference of an intent to harass to survive initial review. The undersigned expresses no opinion about whether the evidence will support these facts or whether this allegation can withstand a more stringent inquiry.

***28** Defendants argue that the due process and conspiracy claims against Defendants Corrigeux, Premo, and D. Wood must be dismissed because (1) prisoners have no right to be free from being falsely or wrongly accused of conduct that may result in the deprivation of a protected liberty interest; and (2) under the intracorporate

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

conspiracy doctrine, DOCS officials are legally incapable of conspiring together. (Dkt. No. 67-4 at 19-20.) Defendants are correct.

As discussed above, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). In addition, "[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing [FN55]." *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

FN55. The hearing was conducted by Defendant Bezio, but the complaint does not allege any facts suggesting that Defendant Bezio conducted the hearing improperly.

None of the facts alleged in the complaint plausibly suggest that Defendants Premo, Corrigeux, or D. Wood acted in retaliation for Plaintiff's exercise of a constitutional right. Therefore, I recommend that all claims against these officers regarding the filing of false reports be dismissed with leave to amend.

The complaint alleges that Defendants are all DOCS employees. (Dkt. No. 17 at 1-A9.) The intra-agency conspiracy doctrine precludes conspiracy claims "against officers, agents, or employees of a single corporate entity." *Farid v. Bouey,* 554 F.Supp.2d 301, 324 (N.D.N.Y.2008) (granting summary judgment where prisoner claimed conspiracy between Board of Parole and various BOP commissioners to deprive him of his civil rights). "The intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances." *Id.* (citing *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002)). Therefore, I recommend that all conspiracy charges be dismissed without leave to amend.

4. *Lewis*

On June 17, 2006, Defendant B. Lewis ordered Plaintiff to submit a urine specimen. (Dkt. No. 17 at ¶ 41.) Plaintiff, citing a three-hour time limit to submit specimens, said he would submit the specimen when he finished eating. *Id.* Defendant Lewis then said to another officer "Fuck him ... we will just put down [that] he [is] refusing to submit his urine specimen." *Id.* No one returned to take Plaintiff's specimen. *Id.* On June 22, 2006, Plaintiff received a misbehavior report charging him with refusing a direct order. (Dkt. No. 17 at ¶ 42.) I have construed the complaint as asserting a due process claim and a conspiracy claim against Defendant Lewis.

***29** Defendants move to dismiss the claims against Lewis on the same grounds as asserted regarding Defendants Corrigeux, Premo and Wood. (Dkt. No. 67-4 at 18, 20.) As with those Defendants, the complaint fails to state a due process claim against Defendant Lewis because Plaintiff has not alleged any facts plausibly suggesting that Lewis acted with a retaliatory motive. Therefore, I

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

recommend that this claim be dismissed with leave to amend. Moreover, the complaint fails to state a claim for conspiracy because Lewis and the other officer are both DOCS employees. Therefore, I recommend that this claim be dismissed without leave to amend.

5. *Moore*

The complaint alleges that on June 29, 2006, Plaintiff found glass in his food. (Dkt. No. 17 at ¶ 43.) Plaintiff reported this to the housing unit supervisor, Defendant Moore. *Id.* Plaintiff requested medical care and a new food tray, but Moore refused. *Id.* I have construed the complaint as asserting an Eighth Amendment medical care claim against Defendant Moore.

Defendants argue that Plaintiff has not stated an Eighth Amendment claim against Defendant Moore because Plaintiff "did not know whether or not he swallowed glass, and he alleges no subjective facts from which to infer that he was in 'serious medical need' on June 29 or June 30, 2006 ... and thus, that Sergeant Moore ... knew of, and disregarded, an excessive risk to his health or safety." (Dkt. No. 67-4 at 21.)

To prevail on an Eighth Amendment claim of inadequate medical care, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). To be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1996), *cert. denied,* 513 U.S. 1154 (1995); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).

Here, Plaintiff has not sufficiently alleged that Moore was deliberately indifferent to a serious medical need. Plaintiff has not alleged that he had a serious medical need. He alleges that while eating his food he felt a piece of glass in his mouth. He removed the glass, inspected his food, and found three more pieces of glass. (Dkt. No. 17 at ¶ 43.) He does not allege that he swallowed glass or that he was cut by the piece of glass that he placed in his mouth. Rather, he merely alleges that "he did not know if any of the glass went down his belly." *Id.* While his fear that he *may* have swallowed glass is understandable, that fear, without more, is insufficient to constitute a serious medical need for Eighth Amendment purposes because fear, in and of itself, will not produce death, degeneration, or extreme pain. Given the lack of a serious medical need, the complaint does not allege facts plausibly suggesting that Moore was deliberately indifferent. Moreover, there is no allegation that Moore placed the glass in Plaintiff's food. *Cf. Robles v. Coughlin,* 725 F.2d 12 (2d Cir.1983) (allegation that defendants contaminated prisoners' food with glass sufficiently stated an Eighth Amendment claim to withstand initial review). Therefore, I recommend that the Eighth Amendment medical care claim against Defendant Moore be dismissed with leave to amend.

6. *Travers*

***30** Plaintiff complains that Defendant Travers denied him medical care on two occasions: (1) on June 30, 2006, after he discovered glass in his food (Dkt. No. 17 at ¶ 44); and (2) in May 2007, when Plaintiff reported bloody bowel movements. (Dkt. No. 17 at ¶ 58, 65.) Explicitly declining to move to dismiss the claims arising from the May 2007 incident (Dkt. No. 67-4 at 22, n. 1), Defendants move to dismiss Plaintiff's Eighth Amendment claim regarding the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

June 30 glass incident. (Dkt. No. 67-4 at 21.)

Regarding that incident, the complaint alleges that on June 30, 2006, Nurse Travers gave Plaintiff a form to fill out to request medical care. (Dkt. No. 17 at ¶ 44.) Travers, without examining Plaintiff, told him there was nothing wrong with him. *Id.*

Defendants argue that Plaintiff has failed to state an Eighth Amendment claim against Nurse Travers because (1) Plaintiff has not alleged a serious medical need; (2) prisoners do not have a right to the treatment of their choice, and an inmate's disagreement over proper treatment does not create a constitutional claim; and (3) an allegation of medical negligence does not raise a constitutional claim. (Dkt. No. 67-4 at 21-22.)

As discussed above with regard to Defendant Moore, Plaintiff has not alleged that he suffered a serious medical need after discovering glass in his food. Therefore, I recommend that the Eighth Amendment claim against Defendant Travers arising from the events described in ¶ 44 of the complaint be dismissed with leave to amend.

7. *Anctil*

The complaint alleges that on May 19, 2007, Woods sent Defendant J. Anctil to escort "Plaintiff to a hearing room and intimidation of threats of promise to use physical force." (Dkt. No. 17 at ¶ 67.) Although this allegation is extremely unclear, I have construed the complaint as alleging that Defendant Anctil violated Plaintiff's Eighth Amendment rights and conspired with Defendant Woods.

Defendants move to dismiss Plaintiff's claims against Defendant Anctil. Defendants argue that verbal harassment, abuse and threats do not amount to violations of constitutional rights. (Dkt. No. 67-4 at 22.) Defendants are correct. "It is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary*, 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). The complaint alleges that Anctil used "intimidation" and "threats" and "promises" of physical force, not that Anctil actually harmed Plaintiff. Therefore, the complaint fails to state an Eighth Amendment claim against Defendant Anctil and I recommend that the claim be dismissed with leave to amend.

Further, as discussed above, it is legally impossible for DOCS employees to be found liable for conspiring together. Woods and Anctil are both DOCS employees. Therefore, the complaint fails to state a conspiracy claim against Defendant Anctil and I recommend that the claim be dismissed without leave to amend.

8. *McDonald*

***31** The complaint alleges that on April 30, 2007, Plaintiff filed a complaint with Defendant Woods stating that Defendant McDonald had used racially abusive language to Plaintiff and denied him his food tray. (Dkt. No. 17 at ¶ 63.) On May 9, 2007, Plaintiff filed a grievance against Defendant McDonald for spitting in his coffee cup, interfering with a medical interview, and using racial and profane language. (Dkt. No. 17 at ¶ 62.) I have construed the complaint as alleging that Defendant McDonald violated Plaintiff's Eighth Amendment medical care and conditions of confinement rights.

In the Second Circuit, a prisoner's allegation that prison officials served unsanitary, spoiled or contaminated food

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

is sufficient to state an Eighth Amendment claim, so long as he or she alleges that he or she suffered a "distinct and palpable injury". *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983); *Harris v. Ashlaw,* No. 9:07-CV-0358, 2007 WL 4324106, at * 5 (N.D.N.Y. Dec. 5, 2007). Here, Plaintiff has not alleged that he suffered any injury as a result of being denied food or drinking the allegedly contaminated coffee. Therefore, Plaintiff has failed to state an Eighth Amendment claim against Defendant McDonald arising from this incident and I recommend that the claim be dismissed with leave to amend [FN56].

FN56. Defendants cite two unpublished Northern District of New York cases for the proposition that "Plaintiff's conclusory allegation ... that [McDonald] spit into his coffee cup is insufficient to state a constitutional ... claim." (Dkt. No. 67-4 at 23.) Neither of the cases cited by Defendants found that a prisoner's allegation that a correctional officer spit into his food failed to state an Eighth Amendment claim. Rather, both of those cases were decided on summary judgment and the Court dismissed the claims because the prisoner failed to *substantiate* them with evidence. *Chavis v. Kienert,* No. 9:03-CV-0039, 2005 U.S. Dist. LEXIS 41920, at *65-66 (N.D.N.Y. Sept. 30, 2005); *Zimmerman v. Seyfert,* No. 9:03-CV-1389, 2007 U.S. Dist. LEXIS 52388, at *80-81 (N.D.N.Y. July 19, 2007). Defendants provided copies of the decisions to Plaintiff in accordance with Local Rule 7.1(a)(1). The undersigned will provide a copy of the *Harris v. Ashlaw* opinion to Plaintiff in light of the Second Circuit's recent decision in *Lebron v. Sanders,* 557 F.3d 76, 2009 WL 399215 (2d Cir. Feb. 19, 2009).

Plaintiff's bare allegation that McDonald interfered with a medical interview is insufficient to state an Eighth Amendment medical care claim. As discussed above, a plaintiff asserting such a claim must allege that he or she suffered from a serious medical condition. Plaintiff has made no such allegation. It is not even clear from the complaint with what type of medical interview McDonald allegedly interfered. Therefore, I recommend that the Eighth Amendment medical care claim against Defendant McDonald be dismissed with leave to amend.

Regarding Plaintiff's claim that McDonald used "racial and discrimination and indecent profane language," as noted above, "[i]t is well established that mere threatening language and gestures of a custodial officer do not ... amount to constitutional violations." *Alnutt v. Cleary,* 913 F.Supp. 160, 165 (W.D.N.Y.1996) (punctuation omitted). Therefore, I recommend that this claim be dismissed without leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 67) be ***GRANTED IN PART AND DENIED IN PART;***

**RECOMMENDED** that the following claims be dismissed without leave to amend: (1) all claims against Defendants Devito, Head, Labetz, Simons, and Sourwine; (2) the First Amendment religion claims alleged in ¶ 1-26 of the complaint against Defendant Hess, because they are duplicative of the claims in Case No. 9:05-CV-1231(GTS/GJD); (3) all claims against Defendant Burge; (4) all claims against Defendants in their official capacities; (5) all claims against Defendants Manley, Grant, and Capacci; (6) the claim against Defendant Croce regarding his decision to deny Plaintiff parole; (7) the claims against Defendants Goord, Burge, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they ignored

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

complaints and grievances; (8) the procedural due process claims against Defendants Salvage, Hayes, and Allen; (9) the Fourth Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell; (10) the conspiracy claims against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests; (11) the conspiracy claim against Defendant Lewis arising from the June 17, 2006, request for a urine sample; (12) the conspiracy claim against Defendants R. Woods and Anctil arising from Anctil's May 19, 2007, threats; and (13) the claim that Defendant McDonald used "racial and discrimination and indecent and profane language."

***32 RECOMMENDED** that the following claims be dismissed with leave to amend: (1) the claims against Defendants Goord, Fischer, Roy, McLaughlin, Croce, Stewart, LeClaire, Wright, and N. Smith alleging that they falsified documents in response to Plaintiff's grievances; (2) the substantive due process and First Amendment access to the courts claims against Defendants Salvage, Hayes, and Allen; (3) the due process claim against Defendants B. Smith and Claflin arising from the August 23, 2005, misbehavior report; (4) the due process claim against Defendants Premo, D. Wood, and Corrigeux arising from the May 2006 drug tests; (5) the due process claim against Defendant Lewis arising from the June 22, 2006, misbehavior report; (6) the Eighth Amendment medical care claims against Defendants Moore and Travers arising from Plaintiff's discovery of glass in his food; (7) the Eighth Amendment claims arising from Anctil's May 19, 2007, threats; (8) the Eighth Amendment conditions of confinement claim against Defendant McDonald arising from the denial of food and spitting in Plaintiff's coffee; and (9) the Eighth Amendment medical care claim against Defendant McDonald arising from her interference with Plaintiff's medical interview.

**RECOMMENDED** that Defendants be directed to answer the following claims: (1) the retaliation claim against Defendant Hess arising from the August 22, 2005, drug test; (2) the retaliation claim against Defendant Bellinger arising from the August 22, 2005, drug test; (3) the First Amendment claim against Defendants Steinberg, B. Smith, and Claflin arising from their August 22, 2005, search of Plaintiff's cell; (4) the due process claim against Defendant Steinberg arising from the August 23, 2005, misbehavior report; (5) the Fourth Amendment claim against Defendant Premo arising from the May 7, 2006, drug test; and (6) the Eighth Amendment medical care claim against Defendant Travers arising from Plaintiff's May 2007 report of bloody bowel movements.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN57]

FN57. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept. 30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also* *Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v.. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by* *U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Excell v. Woods
Slip Copy, 2009 WL 3124424 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Nicholas ZIMMERMAN, Plaintiff,
v.
John W. BURGE, Superintendent of Auburn Correctional Facility, et al., Defendants.
**No. 06-cv-0176 (GLS-GHL).**

March 28, 2008.

Nicholas Zimmerman, Auburn, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Maria Moran, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

***MEMORANDUM-DECISION AND ORDER***

GARY L. SHARPE, District Judge.

**I. *Introduction***

***1** Nicholas Zimmerman, an inmate at Auburn Correctional Facility, brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, seven employees of the New York State Department of Correctional Services ("DOCS"), violated his constitutional rights when, in broad strokes, they sentenced him to a lengthy term of solitary confinement with limited visitation privileges and inadequate access to medical care. (*See* Compl.; Dkt. No. 1.) On February 9, 2006, Zimmerman moved for preliminary relief, seeking an order directing the defendants to place him in the Intermediate Care Program at Auburn Correctional Facility. (Dkt. No. 4.) Subsequently, on November 14, 2006, Zimmerman moved for summary judgment on three of his five claims. (Dkt. No. 25.) By submission dated December 19, 2006, defendants opposed both motions and sought dismissal of two of the three claims at issue in Zimmerman's motion for summary judgment. (Dkt. No. 28.) The motions were referred to Magistrate Judge George H. Lowe for report and recommendation. On September 28, 2007, Judge Lowe issued a Report-Recommendation ("R & R") recommending that Zimmerman's motions be denied and that three of Zimmerman's five claims be dismissed. (*See* Dkt. No. 31.) [FN1] Pending are Zimmerman's timely objections ("Objections") to the R & R. (Dkt. No. 33.) For the reasons that follow, the R & R is adopted.

FN1. The Clerk is directed to append the R & R to this decision, and familiarity therewith is presumed.

**II. *Discussion***

**A. *Equal Protection Claim***

Judge Lowe recommended dismissal of Zimmerman's purported equal protection claim on the grounds that no such claim was even arguably presented in Zimmerman's Complaint, and Zimmerman could not raise such a claim for the first time in his motion for summary judgment.[FN2] What is more, Judge Lowe concluded that even if he could liberally construe the Complaint as attempting to assert

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

such a claim, the facts alleged in the Complaint "do not plausibly, or even conceivably, suggest such a claim." (R & R at 6; Dkt. No. 31.) Zimmerman has specifically objected to Judge Lowe's recommendation in this regard. Accordingly, the court has reviewed this recommendation *de novo*. *See* *Brito v. Phillips,* 485 F.Supp.2d 357, 360 (S.D.N.Y.2007) ("[W]here objections to a report are specific and address only those portions of the proposed findings to which the party objects, district courts should conduct a *de novo* review of the issues raised by the objections.") (citations and quotations omitted).

> FN2. On the first page of his motion for summary judgment, Zimmerman asserts that he is seeking summary judgment only on his due process and cruel and unusual punishment claims. However, in "Point IIB" of his memorandum of law in support of summary judgment, he argues that the defendants violated his rights to equal protection. (*See* Dkt. No. 25.)

Upon *de novo* review, the court concurs with Judge Lowe that, even construed liberally, the Complaint does not assert an equal protection claim. As to Zimmerman's argument that he could provide factual support for such a claim if only he could conduct discovery, in filing a motion for summary judgment Zimmerman implicitly conceded that the claim was primed for resolution on the merits without the need for additional fact-finding.[FN3] Accordingly, because the Complaint makes no mention of an equal protection claim and because there are no factual predicates for such a claim, Zimmerman's equal protection claim is dismissed.

> FN3. Zimmerman's argument that he was forced to file his motion for summary judgment prematurely in light of impending deadlines is without merit. Zimmerman has not pointed to any relevant deadlines and the court's own review of the record in this case reveals none.

**B. *Fifth Amendment Double Jeopardy Claim***

***2** Zimmerman objects in cursory terms to Judge Lowe's recommendation that his double jeopardy claim be dismissed. (*See* Objections at 2 ("In any event, I object to Lowe's report and the defendants 'reply' on this point.").) In light of this general objection, the court has reviewed the R & R for clear error insofar as it addresses the double jeopardy claim. *See* *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007) ("If, however, the party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error.") (citations and quotations omitted). Upon such review, the court adopts Judge Lowe's reasoning and conclusion. Accordingly, Zimmerman's Fifth Amendment double jeopardy claim is dismissed.

**C. *Fourteenth Amendment Due Process Claim***

In light of Zimmerman's specific objections to the R & R's treatment of his due process claim, the court has reviewed that portion of the R & R *de novo.* Upon such review, the court concludes that Zimmerman's objections are without merit.

As an initial matter, there is no merit to Zimmerman's contention that Judge Lowe should not be permitted to raise arguments for the defendants. Judge Lowe merely pointed out that the defendants' brief had not properly set forth the complete legal standard for evaluating a procedural due process claim. Judge Lowe then proceeded to evaluate the claim under the proper legal standard. It

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

defies logic to suggest that Judge Lowe should have evaluated the claim under a faulty standard simply because the parties had proposed such a standard.

Turning to the standard itself, Zimmerman has argued that he recognizes that he has no constitutional right to contact visits, and that he is simply challenging the procedures that were utilized to deny him the privilege of contact visits. (*See* Objections at 7; Dkt. No. 33.) Zimmerman misses the point. He cannot state a claim for procedural due process without first establishing that he has been denied a liberty or property interest. *See* *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).[FN4] As Zimmerman concedes, there is abundant case law establishing that inmates have no liberty or property interest in contact visits. *See, e.g.,* *Baskerville v. Goord,* No. 97-cv-6413, 1998 WL 778396, at *6 (S.D.N.Y. Nov.5, 1998) ("It is well established ... that contact visits of prison inmates are a privilege for inmates, not a right, and thus do not give rise to a liberty interest protected by the due process clause."). Therefore, it is not necessary for the court to reach the second prong of the due process analysis, that is, "whether the procedures attendant upon th[e] deprivation were constitutionally sufficient." *Thompson,* 490 U.S. at 460.

FN4. In *Thompson,* the Court explained the standard as follows: "We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Thompson,* 490 U.S. at 460 (internal citations omitted).

There is some authority for the proposition that prison and/or state regulations may *create* a liberty interest in contact visits. *See* *Daniels v. Walker,* No. 93-cv-0570, 1995 WL 760707, at *3 (N.D.N.Y. Nov.25, 1995) ("Sections 200.2 through 200.5 of Title 7 of New York's Comprehensive Rules and Regulations clearly create and safeguard a liberty interest in contact visitation."). It is possible that this is the argument that Zimmerman is making. To the extent that Zimmerman so argues, however, Judge Lowe has persuasively rejected this position. As Judge Lowe notes, following the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), state regulations may create liberty interests that are protected by the Due Process Clause, "[b]ut these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484. In light of the post-Sandin cases cited by Judge Lowe in footnote 53 of the R & R, the court has no trouble adopting his conclusion that "restrictions on the conditions in which inmates may visit with non-inmates would appear to be a hardship on inmates that is rather typical and necessary (in relation to the ordinary incidents of prison life)." (R & R at 28-29; Dkt. No. 31.)

***3** In summary, upon *de novo* review, the court finds no flaws in Judge Lowe's analysis of Zimmerman's due process claim. Accordingly, the court adopts Judge Lowe's analysis, and Zimmerman's due process claim is dismissed.

**D. *Eighth Amendment Claim Based on Visitation Restrictions***[FN5]

FN5. Judge Lowe addressed the Eighth Amendment claim only insofar as it concerned the limitation on contact visits. Judge Lowe did

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

not address the Eighth Amendment claim insofar as it concerned the sentence to ten years in SHU.

Zimmerman has specifically objected to Judge Lowe's recommendation that his Eighth Amendment claim based on visitation restrictions be dismissed; accordingly, the court has reviewed Judge Lowe's recommendation *de novo*.

Zimmerman objects to the *sua sponte* dismissal of his Eighth Amendment claim because his motion for summary judgment on his Eighth Amendment claim was unopposed. However, the court need not grant summary judgment in favor of Zimmerman merely because his motion is unopposed. *See* *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 242 (2d Cir.2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law."). Moreover, the court may dismiss a case brought by a *pro se* prisoner at any time if it determines that the action is "frivolous or malicious" or "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2). Judge Lowe properly concluded that Zimmerman's Eighth Amendment claim regarding visitation restrictions fails to state a claim on which relief may be granted.

According to his Objections, Zimmerman has been denied contact visits for two and a half years.[FN6] It appears-though it is nowhere explicitly stated in the record-that the restriction on contact visits is ongoing and is to continue indefinitely.[FN7] Even so, this restriction does not violate the Eighth Amendment. In *Overton v. Bazzetta,* 539 U.S. 126, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003), the Supreme Court held that a visitation restriction which limited inmates with multiple substance abuse violations to no visitors except attorneys and members of the clergy for two years did not violate the Eighth Amendment. *See* *id.* at 130, 136-37. The Court suggested that it might have reached a different conclusion had the withdrawal of visitation privileges been permanent. *See* *id.* at 137. From this, Zimmerman argues that the indefinite visitation restriction to which he is currently being subjected is cruel and unusual punishment. However, the restriction at issue in *Bazzetta* was also indefinite, in the sense that it would not come to an end absent affirmative action on the part of prison officials. *See* *id.* at 130.[FN8] As in *Bazzetta,* the visitation restriction at issue in this case may be lifted if the Superintendent determines it is no longer necessary. *See* *supra* note 7. Moreover, unlike in *Bazzetta,* Zimmerman is not wholly prevented from having visitors; instead, he is subjected to the lesser imposition of non-contact visitation.

FN6. Zimmerman objects to the R & R to the extent that it misstates the date that Zimmerman was placed on non-contact status. The R & R fixes the date at June 30, 2005; Zimmerman says he was placed on non-contact status on June 15, 2005. It appears that the actual date was June 17, 2005. (*See* Memorandum Decision of Anthony Annucci dated June 23, 2006, attached as Ex. A to the Affirmation of Ed Thompson; Dkt. No. 28.) However, this slight discrepancy is immaterial to Judge Lowe's analysis.

FN7. The Memorandum Decision issued by Anthony Annucci, Deputy Commissioner and Counsel of DOCS, provides that "Inmate Zimmerman may write to the Superintendent to make a statement on the need for continuing these special precautions and to request that the Superintendent consider modifying the restrictions in place." (Memorandum Decision of Anthony Annuci dated June 23, 2006, attached as Ex. A to the Affirmation of Ed Thompson; Dkt. No. 28.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN8. As the Sixth Circuit described it, “once a ban is imposed it can only be removed at the discretion of prison officials, who need not explain their decisions and may continue the ban for any reason or no reason at all. The department has described the ban as a two-year ban, but in fact it is a permanent ban that may be removed after two years.” *Bazzetta v. McGinnis,* 286 F.3d 311, 322 (6th Cir.2002).

In light of the Supreme Court's decision in *Bazzetta,* as well as the other cases cited in the R & R, the court agrees with Judge Lowe's conclusion that the visitation restrictions to which Zimmerman is subjected do not violate the Eighth Amendment.[FN9] Accordingly, Zimmerman's Eighth Amendment claim is dismissed insofar as it concerns the visitation restrictions.

FN9. In his Objections, Zimmerman notes that he has “endured the painstaking process of scouring the digest for a case in this circuit that holds more than two years of non-contact visits is not a hardship,” and has found none. (Objections at 4; Dkt. No. 33.) Although the court recognizes that Zimmerman may not have access to electronic databases, at least one court has held that a loss of contact visitation privileges for a period of three years does not constitute cruel and unusual punishment. *See Phillips v. Girdich,* No. 03-cv-1019, 2007 WL 3046744, at *6 (N.D.N.Y. Oct.17, 2007) (“Here, Phillips' three-year loss of contact visits and six separate incidents of not being able to see his family did not dramatically depart from accepted standards for conditions of confinement, create inhumane prison conditions, or otherwise give rise to any conditions or events that would violate the Eighth Amendment's proscription of cruel and unusual punishments.”) (internal quotations and citations omitted).

**E. *Rule 7.1(a)(3) Violation***

***4** Judge Lowe recommended dismissal of the three claims on which Zimmerman sought summary judgment, *i.e.,* the double jeopardy claim, the due process claim, and the Eighth Amendment claim based on visitation restrictions. As discussed *supra* in sections II-B, C, and D of this opinion, the court has adopted said recommendation. In the alternative, Judge Lowe recommended that Zimmerman's motion for summary judgment on these three claims be denied for failure to comply with N.D.N.Y. R. 7.1(a)(3). Zimmerman has objected to this alternative recommendation. However, because the court has dismissed the three claims at issue, the court need not address the local rule violations.

**F. *Preliminary and Permanent Injunction***

Zimmerman has lodged a specific objection with respect to the R & R's treatment of his motion for a preliminary and permanent injunction. Upon *de novo* review, the court concurs with Judge Lowe's treatment of Zimmerman's motion. Zimmerman has not established irreparable harm or a likelihood of success on the merits. Accordingly, Zimmerman's motion for a preliminary and permanent injunction is denied.

**III. *Conclusion***

In summary, the following claims are dismissed: (1) the equal protection claim; (2) the double jeopardy claim; (3)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the due process claim; and (4) the Eighth Amendment claim relating to visitation restrictions. The following claims survive: (1) the Eighth Amendment claim relating to the length of SHU confinement; and (2) the Eighth Amendment deliberate indifference claim. It appears that the motion filing deadline in this case has not yet passed; accordingly, defendants may seek summary judgment on the outstanding claims should they so choose.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Lowe's Report-Recommendation is adopted; and it is further

**ORDERED** that Zimmerman's motion for a preliminary and permanent injunction (Dkt. No. 4) is DENIED; and it is further

**ORDERED** that Zimmerman's motion for partial summary judgment (Dkt. No. 25) is DENIED; and it is further

**ORDERED** that defendants' cross motion for partial dismissal (Dkt. No. 28) is GRANTED, and Zimmerman's double jeopardy and due process claims are DISMISSED; and it is further

**ORDERED** that Zimmerman's equal protection claim is DISMISSED; and it is further

**ORDERED** that Zimmerman's Eighth Amendment claim regarding visitation restrictions is DISMISSED; and it is further

**ORDERED** that the Clerk provide copies of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, in this *pro se* civil rights action brought pursuant to 42 U.S.C. § 1983, Nicholas Zimmerman ("Plaintiff"), an inmate at Auburn Correctional Facility ("Auburn C.F."), alleges that seven employees of the New York State Department of Correctional Services ("DOCS") violated his constitutional rights when, between July and December of 2005, they (1) punished him a second time for an offense for which he was already being punished, (2) punished him excessively for that offense, and (3) denied him adequate medical care during that punishment. (*See generally* Dkt. No. 1 [Plf.'s Compl.].)

***5** Currently pending before the Court are (1) Plaintiff's motion for a preliminary and permanent injunction, (2) his motion for partial summary judgment with respect to three of the five claims in his Complaint, under Rule 56 of the Federal Rules of Civil Procedure, and (3) Defendants' cross-motion for partial dismissal of Plaintiff's Complaint (in particular, two of the three claims placed at issue by Plaintiff's motion for partial summary judgment) for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 4; Dkt. No. 25; Dkt.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 28, Part 5.) For the reasons that follow, I recommend that Defendants' cross-motion be granted and that Plaintiff's two motions be denied. I also recommend that the Court *sua sponte* dismiss one of Plaintiff's five claims for failure to state a claim upon which relief may be granted under Rule 12(b)(6). The net effect of my recommendations, if adopted, would be that two of Plaintiff's five claims would survive the Court's final Order on the pending motions.

**I. BACKGROUND**

**A. Plaintiff's Complaint**

Liberally construed, Plaintiff's Complaint asserts five constitutional claims. Specifically, Plaintiff alleges that seven employees [FN1] of DOCS violated his rights under the Fifth, Eighth and Fourteenth Amendments when, between July 20, 2005, and December 14, 2005, they (1) violated his Eighth Amendment right to be free of cruel and unusual punishment by sentencing him to ten years of solitary confinement (in Auburn C.F.'s Special Housing Unit) without sufficient evidence for such punishment, (2) violated his Eighth Amendment right to be free of cruel and unusual punishment by improperly restricting his visitation privileges to "non-contact" visits, (3) violated his Fourteenth Amendment right to due process by refusing to grant his request to remove the aforementioned restriction on his visitation privileges, (4) violated his Eighth Amendment right to adequate medical care in prison by refusing to allow him to receive mental health treatment by participating in Auburn C.F.'s Intermediate Care Program, and (5) violated his Fifth Amendment right to not be twice placed in jeopardy for the same offense when, by placing him in SHU and restricting his visitation privileges, they effectively punished him a second time for a crime for which he was already being punished, namely, trying to escape from Sing Sing Correctional Facility. (*See generally* Dkt. No. 1 [Plf.'s Compl.].)

FN1. These seven employees are as follows: (1) DOCS Director of Special Housing / Inmate Disciplinary Program Donald Selsky, (2) DOCS Inmate Grievance Program's Director Thomas G. Eagen, (3) DOCS Counsel Anthony J. Annucci, (4) Auburn C.F. Superintendent Harold D. Graham, (5) former Auburn C.F. Superintendent John W. Burge, (6) Auburn C.F. Captain John R. Rourke, and (7) Auburn C.F. Hearing Officer Joseph Wolczyk ("Defendants"). I note that, although Plaintiff spells the hearing officer's last name "Wolzyeck," it appears to be spelled "Wolczyk." (*See* Dkt. No. 17, at 2 [Receipt of Service].)

I note that Plaintiff erroneously stylizes his due process right as a Fifth Amendment right, rather than as a Fourteenth Amendment right.[FN2] I note also that Plaintiff's Complaint makes no express mention of his apparent double jeopardy claim (under the Fifth Amendment), which appears to be expressly asserted, for the first time, in his papers in support of his motion for summary judgment. (*Compare* Dkt. No. 1 [Plf.'s Compl.] *with* Dkt. No. 25, at 14-22 [Plf.'s Mem. of Law].) However, I overlook such errors, because the Court's duty to construe the pleadings of *pro se* civil rights litigants with special solicitude requires me to interpret Plaintiff's Complaint to raise the strongest arguments that it suggests.[FN3]

FN2. *See* U.S. Const. amend v. ("No person shall ... *in any criminal case* ... be deprived of life, liberty, or property, without due process of law.") [emphasis added]; *Baxter v. Palmigiano,* 425 U.S. 308, 316, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1975) ("Prison disciplinary hearings are not criminal proceedings ...."); *Robinson v. Vaughn,*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

92-CV-7048, 1993 U.S. Dist. LEXIS 15566, at *17, 1993 WL 451495 (E.D.Pa. Nov. 1, 1993) ("The rights secured to individuals by the Fifth Amendment are generally applicable against the states only through the Fourteenth Amendment. The court's consideration of [the prisoner plaintiff's] allegations that the defendants' actions toward him [in the prison disciplinary hearing] violated due process is subsumed within its Fourteenth Amendment analysis of his claims."); *see also McCarthy v. Yost,* 01-CV-9590, 2003 U.S. Dist. LEXIS 3307, at *8, n. 4 (S.D.N.Y. Feb. 14, 2003) ("The Due Process Clause of the Fifth Amendment is plainly inapplicable to ... state actors."); *Shabazz v. Scully,* 91-CV-6319, 1994 U.S. Dist. LEXIS 6630, at *9, 1994 WL 198683 (S.D.N.Y. May 19, 1994) ("[T]he Fifth Amendment Due Process provision is inapplicable to state officials ....").

FN3. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) ("Although the thrust of Cruz's complaint is the (now abandoned) double jeopardy claim, courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest.") [internal quotation marks and citations omitted]; *see also Phillips v. Girdich,* 408 F.3d 124, 127, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.").

**B. Plaintiff's Motion for a Preliminary and Permanent Injunction and His Motion for Partial Summary Judgment**

***6** In his motion for a preliminary and permanent injunction, Plaintiff requests that the Court issue an Order enjoining Defendants from denying Plaintiff's request to participate in the Auburn C.F.'s Intermediate Care Program. *(See generally* Dkt. No. 4.)

In his motion for partial summary judgment, Plaintiff moves for summary judgment on three of his claims: (1) his claim of a violation of his Fifth Amendment right to be free from double jeopardy; (2) his claim of a violation of his Fourteenth Amendment right to due process regarding the restriction of his visitation privileges; and (3) his claim of a violation of his Eighth Amendment right to be free of cruel and unusual punishment through the imposition of overly harsh restrictions on his visitation privileges. (Dkt. No. 25, at 1, ¶ 1 [Plf.'s Decl.]; Dkt. No. 25, at 14-31 [Plf.'s Mem. of Law].) He does not move for summary judgment with respect to his remaining two claims: (1) his claim of a violation of his Eighth Amendment right to be free of cruel and unusual punishment through the imposition of a ten-year sentence in SHU without sufficient evidence; and (2) his claim of a violation of his Eighth Amendment right to adequate medical care in prison through the refusal to allow him to receive mental health treatment by participating in Auburn C.F.'s Intermediate Care Program. (*Id.*)

In his motion for partial summary judgment, Plaintiff also asserts, for the first time, a claim that his right to equal protection of the laws under the Fourteenth Amendment was violated, and he moves for summary judgment on that claim as well. (Dkt. No. 25, at 32 [Plf.'s Mem. of Law].) While I liberally construe Plaintiff's Complaint as implicitly attempting to assert another claim expressly raised for the first time in his motion for partial summary judgment (i.e., his double jeopardy claim), I cannot even liberally construe that Complaint as also attempting to assert an equal protection claim. First, to spring such a new theory of legal liability on Defendants at this late

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

stage in the proceeding (when Plaintiff concedes that sufficient discovery has occurred to warrant a motion for partial summary judgment) would be an affront to the principle of "fair notice," on which Rule 8 of the Federal Rules of Civil Procedure is premised.[FN4] Second, even if I could liberally construe the Complaint as attempting to assert such a claim (which, again, I cannot), I would find that the facts alleged in that Complaint do not plausibly, or even conceivably, suggest such a claim.[FN5]

FN4. *See, infra,* Part II.B. of this Report-Recommendation.

FN5. *See Phillips v. Norris,* 320 F.3d 844, 848 (8th Cir.2003) ( "Phillips also alleges that the prison officials violated his equal protection rights [by, among other things, restricting his visits to non-contact visits]. Because Phillips does not allege he was a member of a protected class or that a fundamental right was violated, he must show that 'similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest.' ... He also must show intentional or purposeful discrimination .... The existence of prison regulations is not enough to meet this burden and Phillips has not proven disparate treatment, the absence of a rational relationship to any legitimate penal interest, or intentional discrimination. Thus, his equal protection claim fails.").

**C. Defendants' Cross-Motion for Partial Dismissal of Plaintiff's Complaint**

In their opposition to Plaintiff's two motions, Defendants argue, among other things, that the double jeopardy claim and due process claim addressed by Plaintiff in his motion for partial summary judgment should be dismissed for failure to state a claim upon which relief may be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 28, Part 5, at 2-3 [Defs.' Mem. of Law].) In his rely papers, Plaintiff expressly recognizes this argument as a cross-motion of some sort by Defendants. (Dkt. No. 29, at 1 [Plf.'s Reply Papers, entitled, "Plaintiff's Reply to Defendant's [sic] Motion for Cross Summary Judgement [sic]."].) However, Plaintiff fails to squarely address that argument. (*Id.*)

**II. APPLICABLE LEGAL STANDARDS**

**A. Motion for Summary Judgment Under Rule 56**

***7** Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN6] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[FN7] Furthermore, before the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial," the moving party must meet its initial burden of establishing the absence of any genuine issue of material fact.[FN8] This initial burden, while modest, is not without some substance.[FN9] Among other things, it includes the burden to provide a Statement of Material Facts that complies with Local Rule 7.1 of the Local Rules of Practice for this Court.[FN10]

FN6. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN7. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

FN8. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN9. *See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[A] district court may not grant [a] motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]. This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the nonmoving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

FN10. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record the fact is established.").

**B. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)**

As noted above, in their opposition to Plaintiff's two

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

motions, Defendants argue, in part, that the double jeopardy claim and due process claim addressed by Plaintiff in his motion for partial summary judgment should be dismissed for failure to state a claim upon which relief may be granted under Rule 12(b)(6). (Dkt. No. 28, Part 5, at 2-3 [Defs.' Mem. of Law].) Moreover, it is important to note that, even where a defendant has not requested dismissal based on the failure of the plaintiff to state a claim upon which relief may be granted, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[FN11]

FN11. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

For these reasons, it is appropriate to briefly summarize the recently revised legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2);[FN12] or (2) a challenge to the legal cognizability of the claim.[FN13]

FN12. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN13. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [FN14] The purpose of this rule is to "facilitate a proper decision on the merits." [FN15] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN16]

FN14. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

FN15. *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

FN16. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

***8** The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN17] However, it is well established that even this liberal notice pleading standard "has its limits." [FN18] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN19]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN17. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN18. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN19. *See, e.g., Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [FN20] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

FN20. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN21 Moreover, it should be noted that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" FN22 In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN23 In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN24

FN21. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN22. *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also* *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN23. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN24. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." FN25 For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN26 In addition, "[t]here are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or status that is normally afforded *pro se* litigants. FN27

FN25. *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord,* *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M. J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

report-recommendation of Lowe, M.J.).

FN26. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also* *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

FN27. *Smith v. Burge,* 03-CV-0955, 2006 WL 2805242, at *3 & n. 3 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted]; *see also* *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994).

### C. Revocation of Special Status of Overly Litigious *Pro Se* Civil Rights Litigants

***9** Generally, the rationale for revoking the special status of overly litigious *pro se* civil rights litigants (at least in the Second Circuit) is not that the *pro se* litigant should be punished but that his excessive litigiousness demonstrates his *experience,* the lack of which is the reason for conferring the special status upon *pro se* litigants in the first place. FN28 Moreover, permitting experienced *pro se* litigants to retain their special status would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his opponents.FN29 As observed by Judge Irving R. Kaufman, of the Second Circuit, regarding an active *pro se* litigant nearly 45 years ago:

FN28. **Second Circuit Cases:** *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, at *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994).

**N.D.N.Y. Cases:** *See, e.g., Carlisle v. Goord,* 03-CV-0296, 2007 WL 2769566, at *9 (N.D.N.Y. Sept.21, 2007) (Scullin, J., adopting Report-Recommendation of Lowe, M.J.); *Shomo v. N.Y. D.O.C.S.,* 04-CV-0910, 2007 WL 2580509, at *3-4 (N.D.N.Y. Sept.4, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.); *Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *7-8 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting Report-Recommendation of Lowe, M.J.); *Tracy v. Freshwater,* 01-CV-0500, 2007 WL 2230068, at *2-4 (N.D.N.Y. July 31, 2007) (Munson, J., adopting Report-Recommendation of Lowe,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *6 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Eady v. Lappin,* 05-CV-0824, 2007 WL 1531879, at *4-6 (N.D.N.Y. May 22, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.); *Edwards v. Selsky,* 04-CV-1054, 2007 WL 748442, at *2-3 (N.D.N.Y. March 6, 2007) (Mordue, C.J., adopting Report-Recommendation of Lowe, M.J.); *Rolle v. Garcia,* 04-CV0312, 2007 WL 672679, at *4 (N.D.N.Y. Feb.28, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.); *Mora v. Bockelmann,* 03-CV-1217, 2007 WL 603410, at *4 (N.D.N.Y. Feb.22, 2007) (Mordue, C.J., adopting Report-Recommendation of Homer, M.J.); *Brown v. Goord,* 04-CV-0785, 2007 WL 607396, at *2-3 (N.D.N.Y. Feb.20, 2007) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Mitchell v. Harriman,* 04-CV-0937, 2007 WL 499619, at *3 (N.D.N.Y. Feb.13, 2007) (Sharpe, J., adopting Report-Recommendation of Homer, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 WL 951447, at *3-4 (N.D.N.Y. Feb.12, 2007) (Lowe, M.J.), *adopted by* 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Gill v. Pidylpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec.19, 2006) (Scullin, J., adopting Report-Recommendation of Treece, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01-CV0473, 2005 U.S. Dist. LEXIS 39576, at *20, 2005 WL 928620 (N.D.N.Y. March 31, 2005) Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554, 2006 WL 1877144 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV1456, 2005 U.S. Dist. LEXIS 5394, at *7, 2005 WL 755745 (N.D.N.Y. March 31, 2005) (Treece, M.J.).

**S.D.N.Y. Cases:** *See, e.g., Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct.11, 1991).

**W.D.N.Y. Cases:** *See, e.g., Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept.29, 2004).

**E.D.N.Y. Cases:** *Cf. Wechsler v. R D Mgmt. Corp.,* 861 F.Supp. 1153, 1157 (E.D.N.Y.1994) (explaining that special solicitude is extended to *pro se* litigants because of their lack of legal training, and questioning whether such solicitude should be extended to *pro se* litigants who are in fact sophisticated in the law); *Horton v. Trans World Airlines Corp.,* 169 F.R.D. 11, 16 (E.D.N.Y.1996) ("[*P* ]*ro se* litigants are held to a more lenient standard than professional counsel, with Rule 11's application determined on a sliding scale according to the litigant's level of sophistication.") [citing cases].

FN29. *Standley,* 2007 WL 2406909, at *7 & n.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 17

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

34; *Edwards,* 2007 WL 748442, at *2; *Sledge,* 2007 WL 951447, at *3; *see also* Hussein, 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer be afforded special leniency because continuing to afford him such leniency would be unfair to "numerous attorneys," whose time and energy had already been consumed by plaintiff); Jessica Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 *Ky. L.J.* 701, 735-740 (Spring 2001) (discussing how extending special leniency to *pro se* litigants in some circumstances "distorts the adversarial system and the role of trial judges") [citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55 *U. Chi. L.Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency to a *pro* se litigant risks undermining the impartial role of the judge in the adversary system") [citations omitted].

He comes before this Court wearing the cloak of a *pro se* applicant, and seeks to extract from us the solicitude ordinarily afforded one appearing without counsel. But this should not shield him from rebuke when merited. He is an intelligent, able and sophisticated litigant, who is no stranger to this Court, having appeared frequently in his own behalf both in the District Court and the Court of Appeals. We would expect that one possessed of his background would be conscious of the outer limits of forceful advocacy and fully aware when his acts transgress those limits. Moreover, we are not to be manipulated by resourceful but meritless moves .... [which] serve only to distract us from important judicial business.[FN30]

FN30. *Raitport v. Chem. Bank,* 74 F.R.D. 128, 133 (S.D.N.Y.1977) [citing *Ackert v. Bryan,* No. 27240 (2d Cir. June 21, 1963) (Kaufman, J., concurring) ].

Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety of factors in assessing whether or not the *pro se* litigant is experienced. Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals.[FN31]

FN31. *See, e.g., Eggersdorf,* 8 F. App'x at 143; *Gummerson,* 201 F.3d at *2; *Flynn,* 32 F.3d at 31; *Standley,* 2007 WL 2406909, at *7 & n. 35; *Frawley,* 2006 WL 1742738, at *3 & n. 2; *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10; 2005 WL 928620 *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3; 2005 WL 755745 *Dean,* 204 F.R.D. at 257; *Santiago,* 91 F.Supp.2d at 670; *McGann,* 1999 WL 173596, at *2, 8-10; *McClellan,* 1996 WL 328209, 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3; *Brown,* 1995 WL 13263, 1995 U.S. Dist. LEXIS 213, at *2 n. 1.

There is, of course, no formula for determining "How many is too many?" However, *generally,* if a *pro se* litigant has filed a dozen or more actions and/or appeals before the date of the decision in question, it is quite possible that he will be deemed to be "experienced."[FN32] Granted, there are some cases revoking the special status of a *pro se* litigant who has filed *fewer* than a dozen cases.[FN33] However, there appear to be *more* cases refusing to revoke the special status of a *pro se* litigant who has filed fewer than a dozen cases.[FN34]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN32. *See, e.g., Eggersdorf,* 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had ***twelve*** simultaneously pending lawsuits in Northern District alone); *Gummerson,* 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had ***twelve*** simultaneously pending lawsuits in Northern District alone); *Standley,* 2007 WL 2406909, at *8 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had previously filed ***sixteen*** federal or state court actions or appeals); *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10, 2005 WL 928620 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed ***twenty*** lawsuits in Northern District alone); *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3, 2005 WL 755745 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed ***twenty*** lawsuits in Northern District alone). Interestingly, this *de facto* "rule of twelve" is consistent with the California Code of Civil Procedure, which declines to extend a reduction in small-claims-court filing fees to those litigants who have filed more than 12 small-claims lawsuits in the state within the previous 12 months. *See* Cal. Civ. Proc. § 116.230 (2006).

FN33. *See, e.g., Santiago,* 91 F.Supp.2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had ***ten*** lawsuits pending in Southern District); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously filed ***eight*** federal court actions or appeals); *McClellan,* 1996 WL 328209, 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed ***seven*** previous lawsuits against prison officials); *Brown,* 1995 WL 13263, 1995 U.S. Dist. LEXIS 213, at *2 n. 1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had ***seven*** lawsuits pending in Western District).

FN34. *See, e.g., McEachin v. Faruki,* 03-CV-1442, 2006 WL 721570, at *2 n. 3 (N.D.N.Y. March 20, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***eleven*** other federal lawsuits since 2000); *Pritchett v. Portoundo,* 03-CV-0378, 2005 WL 2179398, at *2 n. 3 (N.D.N.Y. Sept.9, 2005) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***eight*** other federal lawsuits since 1996); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *2 n. 5 (N.D.N.Y. Feb.13, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***six*** other federal lawsuits in previous nine years); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *3 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (refusing to deny leniency to *pro se* civil rights inmate who had previously filed ***five*** actions or appeals in federal or state court); *Smith,* 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of ***five*** other lawsuits); *Abbas v. Senkowski,* 03-CV-0476, 2005 WL 2179426, at *2 n. 4 (N.D.N.Y. Sept.9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed ***three*** other federal actions since 1997); *Loren v. Feerick,* 97-CV-3975, 1997 WL 441939, at *1 & n. 9 (S.D.N.Y. Aug.6, 1997) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed ***three***

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

One reason for this array of cases is that, in determining whether or not a *pro se* litigant is "experienced," courts sometimes consider additional factors, such as (1) the quality of the *pro se* litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable affidavits, exhibits, and/or memoranda of law, etc),[FN35] (2) whether or not the *pro se* litigant has been victorious (or partially victorious) in any of his previous actions or appeals,[FN36] and (3) whether or not the *pro se* litigant has received sufficient formal legal training to familiarize him with legal procedure and terminology.[FN37]

FN35. *See, e.g., Saunders,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that, among other things, "with regard to the current action, ... the motion papers that [p]laintiff has submitted over the past several years have often been fairly good-being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc."), *accord, Standley,* 2007 WL 2406909, at *8.

FN36. *See, e.g., Standley,* 2007 WL 2406909, at *8 & n. 45 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had been victorious or partially victorious in at least four of his previous actions or appeals); *Saunders,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had settled two of his previous six federal court actions, receiving $25,000 in exchange for his agreement to voluntarily dismiss the actions, and the fact that some of plaintiff's motions in his many actions have been granted); *Ab v. Sekendur,* 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct.28, 2004) (considering, during decision of whether *pro se* plaintiff should be denied leniency normally afforded inexperienced *pro se* litigants, fact that "[plaintiff] has successfully applied for and received ... [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

FN37. *See, e.g., Walker v. Suburban Hosp. Ass'n,* No. 90-1506, 1991 WL 32283, 1991 U.S.App. LEXIS 4049, at *3, n. 2 (4th Cir. March 13, 1991) ("Walker is not due the lenient treatment accorded pro se litigants. Walker has ... a law degree.... Certainly, the policies underlying the Court's admonitions to accord pro se litigants an understanding view of their pleadings and conduct do not have force in this context."); *Heimbaugh v. San Francisco,* 591 F.Supp. 1573, 1577 (N.D.Cal.1984) ("While plaintiff appears [pro se], he is schooled in the law, having recently completed law school .... There is every reason to hold him to the certification he made by signing the pleadings he has filed in this action."); *Pham v. U.S.,* 317 F.3d 178, 186-188 (2d Cir.2003) (relying on fact that *pro se* prisoner was "not trained in the law," and that he was "untutored," when explaining reason for extending him special solicitude under the circumstances); *Iwachiw v. N.Y. City Bd. of Educ.,* 2007 U.S. Dist. LEXIS 8040, at *12, 2007 WL 433401 (E.D.N.Y. Feb. 5, 2007) ("This policy of liberally construing pro se submissions is driven by the understanding that implicit in the right of self-representation is an obligation on the part of the court to make

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training.") [internal quotation marks and citations omitted]; *cf.* John C. Rothermich, "Ethical and Procedural Implications of "Ghostwriting" for *Pro Se* Litigants: Toward Increased Access to Civil Justice," 67 *Fordham L.Rev.* 2687, 2697 (Apr.1999) (arguing that, when the papers of a *pro se* litigant are "ghostwritten" by a legal assistant, the "special leniency" normally afforded to *pro se* litigants is "unwarranted") [citations omitted], *accord, Saunders,* 2006 WL 3051792, at *2, n. 15.

***10** Here, Plaintiff has filed at least six other federal or state actions or appeals.[FN38] One of those actions was resolved in Plaintiff s favor. [FN39] Not surprisingly, Plaintiff's filings in this action have been quite good, always being well organized, and almost always being supported by exhibits and/or declarations. However, after thoroughly considering the matter, I find that Plaintiff's litigation experience is not sufficiently extensive to warrant the revocation of his special status as a *pro se* litigant. Plaintiff is cautioned, however, that he is fast becoming more a pro litigant than a *pro se* litigant.

FN38. *See Zimmerman v. Superintendent Burge,* 06-CV-1007 (E.D.N.Y.) (habeas corpus action, filed 2/16/06 in N.D.N.Y.; transferred to E.D.N.Y. on 3/6/06; dismissed on 6/26/07; Plaintiff's appeal to Second Circuit pending); *Zimmerman v. John Doe 1,* 04-CV-5032 (E.D.N.Y.) (prisoner civil rights action, filed 11/19/04; dismissed on 5/12/06, based on voluntary withdrawal of Plaintiff's claims in exchange for receipt of $400); *Zimmerman v. Seyfert,* 03-CV-1389 (TJM/GJD) (N.D.N.Y.) (prisoner civil rights action, filed 11/17/03; dismissed on 7/19/07; Plaintiff's appeal to Second Circuit pending); *Zimmerman v. Superintendent Smith,* Index No. 004118/2003 (N.Y. State Sup.Ct., Ulster County) (Article 78 proceeding, filed on 1/12/04; dismissed on 5/5/04).

FN39. *See Zimmerman v. John Doe 1,* 04-CV-5032 (E.D.N.Y.) (prisoner civil rights action, filed 11/19/04; dismissed on 5/12/06, based on voluntary withdrawal of Plaintiff's claims in exchange for receipt of $400).

## III. ANALYSIS

### A. Plaintiff's Fifth Amendment Double Jeopardy Claim

Defendants are correct when they argue that Plaintiff's double jeopardy claim should be dismissed for failure to state a claim upon which relief may be granted under Rule 12(b)(6). (Dkt. No. 28, Part 5, at 2 [Defs.' Mem. of Law].) It is, indeed, well settled in the Second Circuit that facing a hearing on a prison disciplinary charge cannot be construed as being "put in jeopardy of life or limb" for purposes of the Double Jeopardy Clause of the Fifth Amendment. *See* U.S. Const. amend V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb ...."). This is because prison disciplinary proceedings are civil, not criminal, in nature. *See Porter v. Coughlin,* 421 F.3d 141, 149 (2d Cir.2005) ("For all the reasons stated above, we find that the disciplinary proceeding was civil in nature and therefore presented no violation of the Double Jeopardy Clause."); *Encarnacion v. McGinnis,* 02-CV-6380, 2005 WL 3018728, at *3 (W.D.N.Y. Oct.26, 2005) ("[T]he double jeopardy clause is limited to criminal proceedings and does not pertain to prison disciplinary hearings.") [internal

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

quotations and citations omitted]; *Lisbon v. Goord,* 02-CV-3567, 2003 U.S. Dist. LEXIS 7135, at *6, 2003 WL 1990291 (S.D.N.Y. Apr. 28, 2003) ("[T]he double jeopardy clause [of the Fifth Amendment] is limited to criminal proceedings and thus it does not pertain to prison disciplinary hearings.") [internal quotations and citation omitted].

I reach the same conclusion (i.e., that Plaintiff's double jeopardy claim should be dismissed for failure to state a claim upon which relief may be granted) for the alternative reason that, by failing to address in his reply papers Defendants' argument in their properly filed response papers,[FN40] Plaintiff has "consented" to that argument under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court.[FN41]

FN40. (Dkt. No. 29, at 2 [Plf.'s Reply Papers].)

FN41. N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."); *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

Finally, I reach the same conclusion for the second alternative reason that, because Plaintiff has moved for summary judgment with regard to his double jeopardy claim, the Court may *sua sponte* grant summary judgment against him with regard to that claim, if the record evidence warrants such a disposition. *See Ramsey v. Coughlin,* 94 F.3d 71, 73 (2d Cir.1996) (one party's motion for summary judgment on a claim may lead to a *sua sponte* grant of summary judgment for the opposing party on that claim, even without a formal cross-motion addressing that claim). Here, I find that the record evidence does, indeed, warrant such a disposition. Specifically, the uncontroverted record evidence is that Plaintiff's disciplinary conviction was rationally connected to the nonpunitive purpose of maintaining institutional order. First, it is uncontroverted that, on June 7, 2005, Plaintiff was sentenced in Westchester County Court to at least nine years in prison based on his conviction of several offenses, including Escape in the First Degree.[FN42] Second, it is uncontroverted that, on July 20, 2005, Defendant Wolzyck (1) found that Plaintiff had violated Rule 1.00 of DOCS' Standards for Inmate Behavior due to his aforementioned criminal conviction in Westchester County Court, and (2) sentenced Plaintiff to 120 months confinement in the Auburn C.F. SHU, because the acts giving rise to his criminal conviction "pose[ ] the most serious threat ... [that] could be presented to ... correctional safety." [FN43] As a result, there is no evidence in the record from which a rational fact-finder could conclude that Plaintiff's disciplinary sentence was *not* rationally connected to the nonpunitive purpose of maintaining institutional order. [FN44] In short, Plaintiff's disciplinary sentence was not criminal, but remedial or

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

preventative, in nature.

FN42. (*Compare* Dkt. No. 25, at 10, ¶ 2 [Plf.'s Rule 7.1 Statement, asserting some of the referenced facts, along with other facts, but not supporting those factual assertions with record citations] *with* Dkt. No. 28, Part 4, ¶ 2 [Defs.' Rule 7.1 Response, admitting referenced facts, but not supporting their assertions with record citation]; *see also* Dkt. No. 25, at 36 [Ex. D to Plf.'s Motion, attaching Superintendent Hearing Disposition dated 7/20/05, reporting fact of Plaintiff's referenced criminal convictions and sentencing], *accord,* Dkt. No. 25, at 33 [Ex. A to Plf.'s Motion, attaching Inmate Misbehavior Report 6/8/05], Dkt. No. 25, at 38 [Ex. E to Plf.'s Motion, attaching Plaintiff's appeal from disciplinary hearing determination, in which he admits conviction in Westchester County Court for several offenses, including bribery and escape].)

FN43. (*Compare* Dkt. No. 25, at 10, ¶ 3 [Plf.'s Rule 7.1 Statement, asserting some of the referenced facts, along with other facts, but not supporting those factual assertions with record citations] *with* Dkt. No. 28, Part 4, ¶ 3 [Defs.' Rule 7.1 Response, admitting some of referenced facts, and supporting their assertions with accurate record citation]; *see also* Dkt. No. 25, at 36 [Ex. D to Plf.'s Motion, attaching Superintendent Hearing Disposition dated 7/20/05, reporting reason for Plaintiff's disciplinary conviction and sentence, namely, that the crime of which Plaintiff was convicted in County Court "poses the most serious threat ... [that] could be presented to ... correctional safety"], *accord,* Dkt. No. 25, at 35 [Ex. C to Plf.'s Motion, attaching Superintendent Hearing Disposition dated 7/20/05, reporting finding of guilt regarding referenced disciplinary charge, reporting referenced sentence, and reporting identity of referenced hearing officer], Dkt. No. 25, at 33 [Ex. A to Plf.'s Motion, attaching Inmate Misbehavior Report 6/8/05, reporting nature and basis of disciplinary charges filed against Plaintiff], Dkt. No. 25, at 38-39 [Ex. E to Plf.'s Motion, attaching Plaintiff's appeal from disciplinary hearing determination, in which he admits reason for disciplinary conviction and sentence, namely, the fact that he had been convicted in County Court of attempted escape].) *See also* 7 N.Y.C.R.R. § 270.2 (entitled "Standards of inmate behavior," and providing, in pertinent part, "[T]he following is a list of prohibited behavior in all correctional facilities. Violation of any of the rules will result in appropriate disciplinary sanction. A. PENAL LAW OFFENSES[.] Rule 1.00[.] Any Penal Law offense may be referred to law enforcement agencies for prosecution through the courts. In addition, departmental sanctions may be imposed based upon a criminal conviction.").

FN44. I note that the Second Circuit has recognized that "[w]hile [prison disciplinary] sanctions do have a deterrent effect, that deterrent effect is aimed exclusively at deterring conduct within the prison setting." *Porter,* 421 F.3d at 147 [internal quotation marks and citation omitted].

***11** For all of the foregoing alternative reasons, I recommend that the Court dismiss Plaintiff's Fifth Amendment double jeopardy claim.

**B. Plaintiff's Fourteenth Amendment Due Process**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

**Claim Based on Visitation Restriction**

I agree with Defendants' ultimate conclusion that, as a matter of law, Plaintiff did not possess a procedural due process right with respect to the decision to restrict his visitation privileges, although I disagree somewhat with their reasoning, which led Plaintiff to miss the point regarding the fatal flaw inherent in his claim. (*Compare* Dkt. No. 28, Part 5, at 3 [Defs.' Mem. of Law] *with* Dkt. No. 29, at 2 [Plf.'s Reply Mem. of Law].)

The procedural component of the Due Process Clause of the Fourteenth Amendment bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... without due process of law." *Zinernon v. Burch,* 494 U.S. 113, 125-26, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ...." *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). As a result, if a plaintiff possessed no liberty or property interest in whatever he was (allegedly) deprived of, then he possessed no right to due process with respect to that deprivation.[FN45]

FN45. By not expressly setting forth the above-referenced two-part legal standard, Defendants inadvertently failed to disabuse Plaintiff of the notion that he need not possess a liberty or property interest with regard to visitation, causing him to (erroneously) argue, "I am not arguing that the Constitution gives prisoners a right to visit. I am stating that the Defendants violated my due process [rights] by not following the rules," namely Section VIII of Directive 4403, which states, among other things, that, if a visitor requests a hearing on the restriction of visitation privileges, the facility superintendent should hold such a hearing. (*Compare* Dkt. No. 28, Part 5, at 3 [Defs.' Mem. of Law] *with* Dkt. No. 29, at 2 [Plf.'s Reply Mem. of Law].)

The first question, then, is whether Plaintiff possesses a liberty or property interest in what the courts have traditionally called "contact visitation privileges," while in prison.[FN46] In order to answer the question, it is necessary to step back and review the nature of Plaintiff's civil rights action, which is brought pursuant to 42 U.S.C. § 1983.

FN46. *See, e.g., Barnett v. Centoni,* 31 F.3d 813, 817 (9th Cir.1994) ("Barnett contends that the district court erred by dismissing his claim that he had a right to contact visitation privileges. We disagree. [P]risoners [have] no constitutional right to such privileges.") [citation omitted]; *Syncate-El v. Toombs,* No. 92-1421, 1992 U.S.App. LEXIS 27697, at *4, 1992 WL 301270 (6th Cir. Oct. 21, 1992) ("Syncate-El's allegation that he has a constitutionally protected liberty interest in contact visitation is meritless. It is well settled that there is no inherent constitutionally protected right of prisoners to contact visits.") [citation omitted], accord, *Nkrumah v. Clark,* No. 91-2466, 1992 U.S.App. LEXIS 25067, at *12-13, 1992 WL 238336 (7th Cir. Sept. 21, 1992) (using similar term and reaching same conclusion).

Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws.[FN47] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN48] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation;[FN49] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN50]

FN47. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States."* ) [emphasis added].

FN48. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at *10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ( "[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

FN49. *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN50. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

Having said that, it is true that a state may, *under certain circumstances,* create a liberty interest protected by the Fourteenth Amendment's Due Process Clause through its enactment of certain statutory or regulatory measures. At one point, the Supreme Court held that a state created such a liberty interest if it repeatedly used explicit language of an unmistakably mandatory character in connection with requiring specific substantive predicates. *Hewitt v. Helms,* 459 U.S. 460, 466-472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983).[FN51] However, that rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." *Sandlin v. Connor,* 515 U.S. 472, 477-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As a result, the Supreme Court changed the rule, shifting the courts' focus from the language of a particular state law or regulation to the nature of the deprivation. *Sandlin,* 515 U.S. at 483-84.[FN52] Specifically, in 1995, the Supreme Court held that, while states may still under certain circumstances create a liberty interest protected by the Fourteenth Amendment's Due Process Clause, the interest "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandlin,* 515 U.S. at 483-84.

FN51. Defendants appear to somewhat misperceive the state of the law with respect to due process claims, arguing that "there is no mandatory language in any New York State statute or regulation conferring the right to contact visits." (Dkt. No. 28, Part 5, at 3 [Defs.' Mem. of Law].) Whether a state statute or regulation contains mandatory language is no longer the determinative factor in deciding whether or not a due process right exists.

FN52. *See also* *Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord,* *Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *Watson v. City of N.Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

***12** As a result, the issue before the Court is whether the restriction on visitation privileges that Plaintiff alleges in his Complaint imposes on him *an atypical and significant hardship in relation to the ordinary incidents of prison life.* After reviewing the case law on the issue, I answer this question in the negative.

Following the Supreme Court's issuance of its decision in *Sandlin v. Connor* in 1995, it appears that in a majority (if not the entirety) of the circuits-including the Second Circuit-prisoners have no protected liberty interest in contact visits.[FN53] Notably, in 1997, then-District Judge Rosemary S. Pooler issued a decision holding, "It is well established that contact visits for prisoners are only a privilege and not a right.... Prohibition of contact visits can be vital to the internal security of a prison...." *Gatson v. Selsky,* 94-CV-0292, 1997 U.S. Dist. LEXIS 4210, at *9, 1997 WL 159258 (N.D.N.Y. Apr. 4, 1997) [citations omitted]. Although Judge Pooler did not expressly rely on the Supreme Court's decision in *Thornburgh v. Abbott,* 490 U.S. 401, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1988), in reaching her conclusion in *Gatson,* her sentiment regarding prison security is shared by the Supreme Court in that decision:

FN53. **Second Circuit:** *See* *Saxon v. Goord,* 06-CV-0826, 2007 U.S. Dist. LEXIS 41553, at *12, 2007 WL 1695582 (W.D.N.Y. June 7, 2007) ("It is well-established that contact visits are a *privilege* for inmates, not a *right.*" ) [emphasis in original; citations omitted]; *Baskerville v. Goord,* 97-CV6413, 1998 U.S. Dist. LEXIS 17603, at *17-18, 1998 WL 778396 (S.D.N.Y. Nov. 5, 1998) ("It is well established ... that contact visits of prison inmates are a privilege for inmates, not a right, and thus do not give rise to a liberty interest protected by the due process clause.") [citations omitted]; *Giano v. Goord,* 9 F.Supp.2d 235, 241 (W.D.N.Y.1998)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

("It is well-established that contact visits are a privilege for inmates, not a right.") [citations omitted], *vacated in part on other grounds,* 250 F.3d 146 (2d Cir.2000); *cf. Champion v. Artuz,* 76 F.3d 483, 486 (1996) ("The dismissal of Champion's due process claim was proper because the state regulations permitting correctional facilities to allow conjugal [contact] visits to prisoners did not give Champion a liberty interest in such visits.").

**Fifth Circuit:** *See Berry v. Brady,* 192 F.3d 504, 508 (5th Cir.1999) ( "Berry has no constitutional right to [any] visitation privileges.") [citation omitted]; *Brown v. Day,* 99-CV-1436, 1999 U.S. Dist. LEXIS 15970, at *18, 1999 WL 816378 (E.D.La. Oct. 7, 1999) ("Prisoners ... have no protected liberty interest in contact visits.") [citations omitted].

**Sixth Circuit:** *See Corley v. Burnett,* No. 95-6451, 1997 U.S.App. LEXIS 7181, at *3, 1997 WL 178876 (6th Cir. Apr. 11, 1997) ("[Plaintiff] has no constitutional right to contact visits.") [citations omitted]; *Bazzetta v. McGinnis,* 124 F.3d 774, 779 (6th Cir.1997) ("[T]here is no inherent, absolute right to contact visits with prisoners.") [citations omitted]; *Conway v. Wilkinson,* 05-CV-0820, 2007 U.S. Dist. LEXIS 21177, at *10-11, 2007 WL 901531 (S.D.Ohio March 26, 2007) ("[P]rison visitation is not a liberty interest which can be derived from the Fourteenth Amendment and which enjoys constitutional protection. Thus, Mr. Conway cannot prevail on his due process claim, because he simply has no protected liberty interest in being able to visit his family at all, let alone an interest in having the visit conducted under less restrictive circumstances than are presently allowed.").

**Seventh Circuit:** *See Reed v. Garnett,* 05-CV-0716, 2006 U.S. Dist. LEXIS 88936, at *8, 2006 WL 3543105 (S.D.Ill.Dec. 8, 2006) ("Plaintiff also claims that he was ... denied contact visits [among other things] .... However, these allegations also do not present a viable constitutional claim.").

**Eighth Circuit:** *See Phillips v. Norris,* 320 F.3d 844, 847 (8th Cir.2003) ("A prisoner does not have a liberty interest in contact visitation.") [citations omitted].

**Ninth Circuit:** *See Ransom v. Johnson,* 05-CV-0086, 2007 U.S. Dist. LEXIS 15234, at *7, 2007 WL 687006 (E.D.Cal. March 5, 2007) ("Plaintiff does not have a protected liberty interest in ... contact visitation.") [citations omitted]; *Rizzo v. Yates,* 05-CV-1270, 2006 U.S. Dist. LEXIS 37101, at *6, 2006 WL 1455444 (E.D.Cal. May 25, 2006) ("Plaintiff does not have a constitutionally protected right to contact visitation.") [citations omitted]; *Wiggins v. Gomez,* 94-CV-0607, 1996 U.S. Dist. LEXIS 2351, at 3-4 (N.D.Cal. Feb. 28, 1996) ("Prisoners ... have no constitutional right to contact ... visitation.") [citations omitted].

Many categories of noninmates seek access to prisons. Access is essential to ... [among other persons] families and friends of prisoners who seek to sustain relationships with them, ... All these claims to prison access undoubtedly are legitimate; yet prison officials

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is ill equipped to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world.

*Thornburgh v. Abbott,* 490 U.S. 401, 407-08, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1988) [internal quotation marks and citations omitted]. Simply stated, restrictions on the conditions in which inmates may visit with non-inmates would appear to be a hardship on inmates that is rather typical and necessary (in relation to the ordinary incidents of prison life).

Finally, I reach the same general conclusion (i.e., that the Court should dismiss Plaintiff's due process claim regarding visitation restrictions) on the alternative ground that, again, because Plaintiff has moved for summary judgment with regard to this claim, the Court may *sua sponte* grant summary judgment against him with regard to that claim, if the record evidence warrants such a disposition.[FN54] Here, I find that the record evidence does, indeed, warrant such a disposition. Specifically, the following two material facts appear undisputed:

FN54. *See Ramsey,* 94 F.3d at 73.

(1) In or around mid-June of 2005, a restriction was imposed on Plaintiff at Auburn C.F., limiting his visiting privileges to non-contact visits based upon a finding that Plaintiff posed a threat to the safety and security of Auburn C.F. due to his involvement in a prior plot to escape from Sing Sing C.F.; [FN55] and

FN55. (*Compare* Dkt. No. 25, at 10, ¶¶ 4, 7 [Plf.'s Rule 7.1 Statement, asserting some of the referenced facts, along with other facts, but not supporting those factual assertions with record citations] *with* Dkt. No. 28, Part 4, ¶¶ 4, 7 [Defs.' Rule 7.1 Response, admitting some of referenced facts, and asserting other facts, but not supporting their factual assertions with record citations], Dkt. No. 25, at 42 [Ex. G to Plf.'s Motion, attaching Plaintiff's grievance dated 6/15/05, reporting restriction on contact-visits on 6/15/05], Dkt. No. 25, at 46 [Ex. H to Plf.'s Motion, attaching Auburn C.F. Interdepartmental Communication dated 6/17/05, from Defendant Burge to Plaintiff, informing him that his visiting privileges will be limited to non-contact status only, and reason for limitation], Dkt. No. 25, at 54-55 [Ex. M to Plf.'s Motion, attaching letter from Defendant Annucci to Plaintiff dated 8/3/05, regarding Defendant Burge's decision and rationale therefor].)

***13** (2) Neither Plaintiff nor his family members have participated in an in-person hearing to challenge the imposition of the restriction limiting Plaintiff's visiting privileges to non-contact visits, although Plaintiff's several grievances challenging the aforementioned restriction of his visiting privileges have all been denied (and those denials have repeatedly been affirmed on appeal), after full consideration of the relevant facts and circumstances.[FN56]

FN56. (*Compare* Dkt. No. 25, at 10, ¶ 6 [Plf.'s Rule 7.1 Statement, asserting some of referenced facts, but not supporting those factual assertions with record citations] *with* Dkt. No. 28, Part 4, ¶ 5 [Defs.' Rule 7.1 Response, admitting referenced fact, and implicitly denying another fact, but not supporting their assertions with

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

record citations]; *see also* Dkt. No. 25, at 42-49 [Exs. G, H, I, J, K to Plf.'s Motion, attaching Plaintiff's grievance dated 6/15/05 challenging referenced restriction of his visiting privileges, the Auburn C.F. IGRC's response, Defendant Burge's decision on appeal, Defendant Eagen's decision on appeal]; Dkt. No. 25, at 50-56 [Exs. L, M, N to Plf.'s Motion, attaching Plaintiff's letter of appeal to Defendant Goord, dated 6/21/05, challenging referenced restriction of his visiting privileges, and Defendant Annucci's responses thereto]; Dkt. No. 25, at 57-58 [Exs. O, P to Plf.'s Motion, attaching Plaintiff's letter of appeal to newly appointed Auburn C.F. Superintendent, Defendant Graham, dated 11/5/05, requesting reconsideration of restriction on visiting privileges, and Defendant Graham's response thereto].)

Based on these undisputed facts, I would find that, even if the Court were to assume for the sake of argument that Plaintiff possessed some sort of limited due process right to contact visits, he was, under the circumstances, afforded all the process that he was due, as a matter of law.

For each of these alternative reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due process claim regarding the decision to impose restrictions on his visitation privileges.

**C. Plaintiff's Eighth Amendment Claim Based on Visitation Restriction**

Although Defendants do not cross-move for dismissal of Plaintiff's Eighth Amendment claim arising from the restriction of his visitation privileges to "non-contact" visits, I have, in addressing Plaintiff's motion for partial summary judgment on that claim, carefully reviewed Plaintiff's Complaint (and the record evidence) with regard to that claim, and, as a result, I find that the Court should *sua sponte* review the pleading sufficiency of that claim, pursuant to its authority (and duty) to do so under 28 U.S.C. § 1915. *See, supra,* note 11 of this Report-Recommendation.

In this claim, Plaintiff alleges that Defendants violated his Eighth Amendment right to be free of cruel and unusual punishment by improperly restricting his visitation privileges to "non-contact" visits.[FN57] Plaintiff does not, in his Complaint, in any way allege that Defendants have denied him "non-contact" visitation privileges.[FN58] Nor does Plaintiff, in his Complaint, expressly articulate the *duration* of this restriction on his visitation privileges to "non-contact" visits.[FN59] Implicitly, however, he alleges that, at the very least, the restriction has occurred for at least seven months and one week, by alleging that the restriction was first imposed on June 30, 2005, and implying that the restriction is on-going as of the date of signing of the Complaint (February 7, 2006) [FN60]

FN57. (Dkt. No. 1, ¶¶ 11-15 [Plf.'s Compl.].)

FN58. (*Id.*)

FN59. (*Id.*)

FN60. (*Id.* ¶ 11 [alleging that the restriction was first imposed on 6/30/05].) I note that, in his motion papers, Plaintiff claims that one or more corrections officers remarked that the restriction would endure until the year 2050. (*See, e.g.,* Dkt. No. 29, at 5 [Ex. B to Plf.'s Reply Papers].) However, Plaintiff does not allege (or adduce

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

any evidence) indicating that he will even be incarcerated by DOCS until the year 2050. *See* NYS DOCS Inmate Locator Service, http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ3/WINQ130 [last visited 9/28/07] [indicating that the "Maximum Expiration Date" of Plaintiff's sentence is 5/14/2033].)

In any event, and more importantly, Plaintiff's Complaint expressly acknowledges that the restriction was imposed ten days after the imposition of a ten-year sentence in "solitary confinement." [FN61] This alleged ten-year sentence is referenced in, and explained by, documents submitted by Plaintiff on his motion for partial summary judgment (and his response to Defendants' cross-motion to dismiss). Those papers, which effectively amend the allegations of Plaintiff's Complaint for purposes of a motion to dismiss analysis, make clear that the referenced ten-year sentence was imposed due to Plaintiff's criminal conviction in Westchester County Court for, among other things, trying to escape from Sing Sing C.F.[FN62] As a result, built into Plaintiff's Eighth Amendment claim is an acknowledgment that the restriction is, at least in some way, tied to his criminal conviction for trying to escape from prison.

FN61. (Dkt. No. 1, ¶ 9 [Plf.'s Compl.].)

FN62. *See* *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) ("Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.") (citing, *inter alia,* *Gill v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ); *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (Hurd, J.) ("[I]n cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' ") [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

***14** Even viewed with the utmost of special solicitude, Plaintiff's Eighth Amendment visitation claim fails to state a claim upon which relief may be granted. From a review of the relevant law, it appears that, in a majority (if not the entirety) of the circuits-including the Second Circuit-the denial of contact visitation that Plaintiff alleges does not amount to the infliction of pain at all, and that, even it did, it does not amount to the sort of wanton (and penologically unjustified) infliction of pain prohibited by the Eighth Amendment.[FN63]

FN63. **Supreme Court:** *See* *Overton v. Bazzetta,* 539 U.S. 126, 136-137, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003) (prison regulation that subjected inmates with two substance-abuse violations to ban of at least two years on all visitation privileges did not create inhumane prison conditions, or deprive the inmate of basic necessities, under Eighth Amendment); *Block v. Rutherford,* 468 U.S. 576, 577, 586-89, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (jail's blanket ban on contact visiting privileges with spouses, relatives, children and friends, was not unconstitutional).

**Second Circuit:** *See Tafari v. Bennett,* 00-CV-0405, 2001 U.S. Dist. LEXIS 25321, at *13-14 (W.D.N.Y. Sept. 28, 2001) ("The

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

denial of the plaintiff's contact visitations for the period in question [18 months] in this case [where plaintiff was convicted of disciplinary charge of illegal possession of a weapon] did not constitute a violation of the plaintiff's Eighth Amendment rights.") [citation omitted]; *Smith v. Coughlin,* 577 F.Supp. 1055, 1060-61 & n. 8 (S.D.N.Y.1983) (finding that the conditions of plaintiff's confinement, which included restriction on contact visits, did not violate Eighth Amendment) [citation omitted].

**Third Circuit:** *See Thrower v. N.J. Dept. of Corr.,* 07-CV-3434, 2007 U.S. Dist. LEXIS 66252, at *13-14, 2007 WL 2683007 (D.N.J. Sept. 7, 2007) ("[T]he Court finds that Plaintiff's [indefinite] loss of visitation privileges [following his disciplinary charge of refusing to submit to drug testing] did not violate his Eighth Amendment rights, and will dismiss Plaintiff's claims based on loss of visitation for failure to state a claim upon which relief may be granted.").

**Sixth Circuit:** *See Conway v. Wilkinson,* 05-CV-0820, 2007 U.S. Dist. LEXIS 21177, at *10-11, 2007 WL 901531 (S.D.Ohio March 26, 2007) ("As far as the Court is aware, no case has held that restricting a prisoner either to non-contact or limited contact visits violates that amendment's ban on cruel and unusual punishment.") [citations omitted]

**Seventh Circuit:** *See Saleem v. Helman,* No. 96-2502, 1997 U.S.App. LEXIS 22572, at *6, 1997 WL 527769 (7th Cir. Aug. 21, 1997) ("We have previously held that a denial of contact visitation altogether does not violate the Eighth Amendment.") [citation omitted]; *Nkrumah v. Clark,* No. 91-2466, 1992 U.S.App. LEXIS 25067, at *12, 1992 WL 238336 (7th Cir. Sept. 24, 1992) (" "[D]enial of contact visitation simply does not amount to the infliction of pain [under the Eighth Amendment].... Even if this limitation did impose on Nkrumah some degree of pain, the Eighth Amendment would not forbid restricting inmates in disciplinary units to non-contact units unless the pain were wantonly inflicted or unrelated to rational penological objectives [and this restriction was not either of those things].") [internal citations omitted]; *Caldwell v. Miller,* 790 F.2d 589, 601, n. 16 (7th Cir.1986) (holding that a denial of contact visitation altogether does not violate the Eighth Amendment) [citation omitted]; *Stojanovic v. Humphreys,* 06-CV-0318, 2006 U.S. Dist. LEXIS 73213, at *10-11 (E.D.Wisc. Oct. 6, 2006) ("Denial of contact visitation, however, does not violate the Eighth Amendment.") [citation omitted].

**Ninth Circuit:** *See Toussaint v. McCarthy,* 801 F.2d 1080, 1113-14 (9th Cir.1986) (restrictions on non-contact visits not an Eighth Amendment violation because, "Denial of contact visitation simply does not amount to the infliction of pain.... Even if denial of contact visitation amounted to an infliction of pain, the [E]ighth [A]mendment would not prohibit the denial unless the pain were inflicted wantonly and without penological justification.... To the extent that denial of contact visitation is restrictive and even harsh, it is part of the penalty that criminals pay for their offenses against society.") [citations omitted].

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 31

Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)
(Cite as: 2008 WL 850677 (N.D.N.Y.))

**Tenth Circuit:** *See* *Ricco v. Conner,* 146 F. App'x 249, 255 (10th Cir.2005) ("[W]e conclude that the five-year restriction [on all visitation privileges] imposed in this case does not violate the Eighth Amendment]."); *Brown v. PharmChem Lab., Inc.,* 92-CV-3010, 1992 U.S. Dist. LEXIS 15758, at *7, 1992 WL 266550 (D.Kan. Sept. 30, 1992) ("The court ... finds the imposition of loss of visitation [for one year] was a permissible sanction [for a disciplinary conviction of drug possession] and rejects plaintiff's contention the penalty imposed violates the Eighth Amendment."), *aff'd,* 2 F.3d 1160 (10th Cir.1993).

For each of these alternative reasons, I recommend that the Court dismiss Plaintiff's claim that Defendants violated his Eighth Amendment right to be free of cruel and unusual punishment by improperly restricting his visitation privileges to "non-contact" visits.

**D. Plaintiff's Motion for Partial Summary Judgment**

Because I have concluded above that the three claims at issue in Plaintiff's motion for summary judgment should be dismissed for failure to state a claim (and that, in the alternative, two of those claims should be dismissed under Rule 56), I find that Plaintiff's motion for partial summary judgment should be denied.

Moreover, I reach the same conclusion (i.e., that Plaintiff's motion for partial summary judgment should be denied) on the alternative basis that none of the eight paragraphs of factual assertions contained in Plaintiff's Rule 7.1 Statement contains a record citation.[FN64] Local Rule 7.1 clearly provides, "Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." N.D.N.Y. L.R. 7.1(a)(3). It also clearly provides, "*Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.* " *Id.* [emphasis in original].[FN65] Because Plaintiff has failed to meet his modest threshold burden on his motion for partial summary judgment, Defendants' failure to respond to the factual assertions contained in Paragraph Numbers 2, 4, 5, 6, and 7 of Plaintiff's Rule 7.1 Statement with admissions or denials that are *supported by record citations,* and their failure to respond at all to the factual assertion contained in Paragraph Number 8 of Plaintiff's Rule 7.1 Statement, is of no consequence.

FN64. (*See generally* Dkt. No. 25, at 10-12 [Plf.'s Rule 7.1 Statement].) I note that Plaintiff's attachment of a (self-serving) affirmation at the end of his Rule 7.1 Statement, pursuant to 28 U.S.C. § 1746, is not sufficient to transform the factual assertions therein into factual assertions *supported by record citations,* as required by Local Rule 7.1. *See* N.D.N.Y. L.R. 7.1(a)(3) ("The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established."). As an initial matter, Local Rule 7.1 implicitly makes a distinction between a "Statement of Material Facts" and "the record." *Id.* Moreover, such a verification cannot "serve as admissible evidence in the event of trial because it fail[s] to demonstrate how [the affiant] ... [is] competent to testify to the facts [he or] she allege [s]." *Corder v. Lucent Tech., Inc.,* 162 F.3d 924, 927 (7th Cir.1998) (affirming district

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

court's grant of summary judgment, including trial judge's strict enforcement of local rule requiring that non-movant support his or her denial of movant's factual assertions with citations to record evidence and not simply attach a "verification" to his or her response to movant's statement of uncontroverted material facts). Finally, such a verification cannot transform several of Plaintiff's factual assertions into evidence since they are devoid of necessary specifics. *See Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings"); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

FN65. I note that the Clerk of Court for the Northern District of New York has provided to all correctional facilities in New York State copies of the Northern District's *Pro Se* Manual and Local Rules of Practice.

**E. Plaintiff's Motion for a Preliminary and Permanent Injunction**

Plaintiff also requests a preliminary and permanent injunction enjoining Defendants from denying Plaintiff's request to participate in the Auburn C.F.'s Intermediate Care Program. *(See generally* Dkt. No. 4.) I recommend that the Court deny this request largely for reasons stated by Defendants in their memorandum of law. (Dkt. No. 28, Part 5, at 4-5 [Defs.' Opp. Memo. of Law].). In addition to the reasons advanced by Defendants, I rely on the fact that (1) Plaintiff appears to indicate, in his motion papers, that he is currently receiving medication for high blood pressure and possibly depression (which weighs against a finding of irreparable harm),[FN66] and (2) in his motion for partial summary judgment, Plaintiff expressly acknowledges that "clear factual disputes" exist with respect to this claim (which weighs *at least somewhat* against a finding of a likelihood of success on the merits).[FN67]

FN66. (*See* Dkt. No. 4, at 12-13 [Ex. A to Plf.'s Motion for Injunction].)

FN67. (Dkt. No. 25, at 1, ¶ 1 [Plf.'s Decl., stating, "I have not moved for summary judgment on the remaining portions of my complaint [including his referenced Eighth Amendment claim] because it [sic] contains clear factual disputes."].)

***15** Finally, I note that it *appears* that Plaintiff has stated a viable claim with respect to this alleged Eighth Amendment violation,[FN68] although I express no opinion as to whether that claim would survive a motion for summary judgment, should Defendants decide to file such a motion.

FN68. *Cf. Carter v. Devito,* 02-CV-0087, 2006 U.S. Dist. LEXIS 12868, at *25, 2006 WL 581186 (W.D.N.Y. Mar. 7, 2006) (addressing similar Eighth Amendment claim on defendants' motion for summary judgment, not a motion to dismiss); *Spiers v. Greene,* 94-CV-0219, 1995 U.S. Dist. LEXIS 20431, at *11-13, 1995 WL 818674 (W.D.N.Y. June 16, 1995) (addressing

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

analogous Eighth Amendment claim on defendants' motion for summary judgment, not a motion to dismiss).

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' cross-motion for partial dismissal of Plaintiff's Complaint (Dkt. No. 28) be ***GRANTED*** for the reasons stated above in Parts III.A. and III.B. of this Report-Recommendation, and that Plaintiff's Fifth Amendment double jeopardy claim and Fourteenth Amendment due process claim based on the restriction of his visitation privileges be therefore ***DISMISSED;*** and it is further

**RECOMMENDED** that Plaintiff's Eighth Amendment claim based on the restriction of his visitation privileges be ***SUA SPONTE*** **DISMISSED** for failure to state a claim upon which relief may be granted, for the reasons stated above in Part III.C. of this Report-Recommendation; and it is further

**RECOMMENDED** that Plaintiff's motion for partial summary judgment (Dkt. No. 25) be ***DENIED*** for the reasons stated above in Part III.D. of this Report-Recommendation; and it is further

**RECOMMENDED** that Plaintiff's motion for a preliminary and permanent injunction (Dkt. No. 4) be ***DENIED*** for the reasons stated above in Part III.E. of this Report-Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.
Zimmerman v. Burge
Not Reported in F.Supp.2d, 2008 WL 850677 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jose ORRACA, Plaintiff,
v.
T. McCREERY; M. Bertone; Mr. Andrews; T. Nasaveria; Mr. Wright; Mr. Maly; and Mr. Mayberry, Defendants.
**No. 9:04-CV-1183 (DNH/DEP).**

Sept. 15, 2008.

Jose Orraca, Pine City, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Stephen M. Kerwin, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

***ORDER***

DAVID N. HURD, District Judge.

***1** Plaintiff, Jose Orraca, brought this civil rights action pursuant to 42 U.S.C. § 1983. In Report Recommendation dated July 21, 2008, the Honorable David E. Peebles, United States Magistrate Judge, recommended that defendants' motion for summary judgment be granted and all remaining claims contained within plaintiff's complaint be dismissed. Objections to the Report Recommendation have been filed by the plaintiff.

Based upon a de novo review of the portions of the Report-Recommendation to which the plaintiff has objected, the Report-Recommendation is accepted and adopted. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendants' motion for summary judgment is GRANTED;

2. All remaining claims contained within plaintiff's complaint are DISMISSED;

3. The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Jose Orraca, a New York State prison inmate who during the time of his incarceration has generated considerable litigation in this and other districts, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against several New York State Department of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Correctional Services ("DOCS") employees, complaining of constitutional violations alleged to have occurred during the time of his confinement.[FN1] In his complaint, Orraca asserts claims stemming from various occurrences during the period of his incarceration, alleging, *inter alia,* 1) the loss of clothing items and other property; 2) acts of unlawful retaliation, including the filing of false disciplinary citations; 3) denial of his access to the courts; and 4) deprivation of due process in connection with various disciplinary proceedings which have resulted in keeplock or special housing unit ("SHU") confinement and the inability to participate in a prison family reunion program. As relief, plaintiff seeks recovery of compensatory and punitive damages.

FN1. A search of this court's records reflects the filing by plaintiff of six other lawsuits in this district, in addition to the instant action, arising from the terms of his confinement. *See Orraca v. Pilatich,* Civil Action No. 9:05-CV-1305 (DNH/GHL) (N.D.N .Y., filed Oct. 14, 2005); *Orraca v. Lee,* Civil Action No. 9:04-CV-1249 (DNH/DRH) (N.D.N.Y., filed Oct. 27, 2004); *Orraca v. Clark,* Civil Action No. 9:00-CV-766 (TJM/GJD) (N.D.N.Y., closed May 11, 2004); *Orraca v. Estabrook,* Civil Action No. 9:99-CV-1216 (NAM/GLS) (N.D.N.Y., closed Mar. 25, 2002); *Orraca v. Maloy,* Civil Action No. 9:96-CV-2000 (NAM/DEP) (N.D.N.Y., closed Mar. 22, 2001); *Orraca v. Walker,* Civil Action No. 6:98-CV-448 (LEK) (N.D.N.Y., closed March 29, 2000). In addition, it appears that plaintiff has filed at least two suits in the Western District of New York, including *Orraca v. Cetti,* Civil Action No. 96-CV-6385 (DGL/JWF) (W.D.N.Y., filed 1996) and *Orraca v. Kelly,* Civil Action No. 1:95-CV-729 (WMS) (W.D.N.Y., filed 1995). Plaintiff's responsive motion papers also disclose the existence of at least one action commenced by the plaintiff in the Southern District of New York, *Orraca v. Walker,* Civil Action No. 00-CV-5503 (LMM) (S.D.N.Y., filed 2000). *See* Orraca Decl. (Dkt. No. 32) at 3. All of the foregoing matters appear to have involved claims associated with his DOCS confinement. Notwithstanding the commencement of these actions, when asked in the form complaint which he filed with the court in this action whether he had commenced other lawsuits in state or federal court relating to his imprisonment, plaintiff responded that he had not. *See* Complaint (Dkt. No. 1) § I(a).

Certain of the plaintiff's claims were previously dismissed by the court based upon the filing of a pre-answer motion by the defendants, including those damage claims asserted against the defendants in their official capacities as well as his claim against defendant Maly, whose personal involvement in the constitutional deprivations at issue was insufficiently alleged. The remaining defendants in the action have moved for summary judgment, requesting dismissal of the remaining claims both procedurally, based upon plaintiff's alleged failure to exhaust available administrative remedies, and substantively on the merits. For reasons set forth below, I recommend that the defendants' motion for summary judgment be granted.

## I. *BACKGROUND*[FN2]

FN2. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See Jeffrey v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005); *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998); *Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL 1011545, at *2

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(E.D.N.Y. Mar. 30, 2007) (citations omitted).

Plaintiff is a New York State prison inmate entrusted to the custody of the DOCS; while in the past fifteen years he has been housed in at least eight other prisons, *see* Orraca Aff. (Dkt. No. 55) ¶ 5, at the times relevant to his claims in the action Orraca was designated to the Shawangunk Correctional Facility ("Shawangunk"), located in Walkill, New York, where he was transferred in or about 2000. *See generally* Complaint (Dkt. No. 1); *see also* Transcript of Orraca Deposition, held on April 2, 2007 (Dkt. No. 53-8) (hereinafter "Orraca Dep.") at 9.

A. *Loss of Personal Property*

***2** In or about May of 2002, plaintiff attended a jury trial in an action brought by him in the United States District Court for the Western District of New York. Kerwin Decl. (Dkt. No. 53-4) Exh. E. During the course of that trial, plaintiff was apparently permitted by the assigned trial judge to wear civilian clothing supplied by his family, in lieu of his prison garb. Orraca Dep. at 9-10. Upon culmination of the trial plaintiff changed back into his prison dress, and his civilian clothes were sent back with him to Shawangunk. *Id.* at 10.

Once at Shawangunk plaintiff left his civilian clothes at the facility property office, to be picked up by family members on their next visit. Orraca Dep. at 14. While at the property office plaintiff interfaced with as many as four officers, including defendant T. Nasaveria and Corrections Officer Smith, the DOCS employee in charge of the property room.[FN3] *Id.* at 14-15. When plaintiff's family arrived for its next visit at the facility and sought to retrieve plaintiff's civilian clothing from the trial, it could not be located. *Id.* at 18. According to plaintiff's deposition testimony, a formal monetary claim filed by the plaintiff, on advice of the property officer, seeking compensation for the lost clothing was denied.[FN4] *Id.* at 19.

FN3. Corrections Officer Smith is not named as a defendant in this action.

FN4. While at his deposition plaintiff testified that the property loss claim was denied, both initially and on appeal to the superintendent, materials submitted by him earlier, in connection with defendants' dismissal motion, contradict his sworn deposition testimony, revealing that the claim was at least partially allowed. *See* pp. 31-33, *post.*

B. *Missing Documents*

A portion of plaintiff's complaint relates to missing legal documents, including principally a transcript of his criminal trial. The legal documents in issue were delivered by plaintiff's wife during September of 2003 to the prison mail room at Shawangunk, where they were later retrieved and signed for by the plaintiff. Orraca Dep. at 20-22; *see also* Complaint (Dkt. No. 1), Letter dated January 16, 2004 from Janet S. Orraca to Shawangunk Superintendent J.T. Smith. According to Orraca, he was in possession of the papers at the time he entered the prison SHU on October 16, 2003, but upon his release back into general population in December of 2003 they were discovered to be missing, and have not since been located.[FN5] Orraca Dep. at 24-25. Although plaintiff attributes the fact that his legal papers are missing to defendants McCreery and M. Bertone, he acknowledges that he has no evidence to link them to the loss. Orraca Dep. at 30, 70-71. A grievance filed by Orraca concerning the missing documents was denied. *See* Orraca Decl. (Dkt. No. 32), Attachment at p. 18.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN5. Plaintiff's deposition testimony concerning the lost transcript is particularly vague. While he apparently acknowledges having received the lost transcript, and the fact that it was discovered to have been misplaced during one of his various periods of SHU confinement stemming from some fifty misbehavior reports received while at Shawangunk, plaintiff was unable to recall precisely when during those SHU periods of confinement the document was lost. Orraca Dep. (Dkt. No. 53-8) at 24.

C. *Disciplinary Actions Taken Against The Plaintiff*

At the heart of plaintiff's complaint in this action are allegedly false misbehavior reports issued against him, leading to disciplinary proceedings and resulting, at least in some instances, in SHU confinement. Plaintiff alleges that the defendants, including in particular T. McCreery and M. Bertone, issued him false misbehavior reports in retaliation for his having lodged grievances and voiced complaints to their supervisors at Shawangunk.

The record before the court reflects that while at Shawangunk, plaintiff was issued a significant number of misbehavior reports-quantified at various times at between twenty and fifty.[FN6] Orraca Dep. (Dkt. No. 58-3) at 24, 30-31. Prison records also establish that plaintiff was found guilty of violating prison rules, following Tier I I or Tier I I I hearings, on twenty-two separate occasions while at the facility.[FN7] DuBray Decl. (Dkt. No. 53-3) ¶ 8.

FN6. Plaintiff's disciplinary record since having entered DOCS custody has been less than exemplary. Plaintiff's disciplinary history reveals that as a DOCS inmate he has been issued misbehavior reports resulting in Tier II or Tier III disciplinary hearings on approximately eighty-one separate occasions through the end of February, 2007. DuBray Decl. (Dkt. No. 53-3) Exh. A.

FN7. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

***3** In his complaint, plaintiff places major emphasis on certain misbehavior reports related to his alleged drug use or failure to cooperate with required drug testing. Complaint (Dkt. No. 1) at 2. Of the various misbehavior reports issued to the plaintiff and sustained following hearings, seven alleged either drug use or urinalysis testing refusals; those seven all resulted in adverse determinations, although only one such finding was administratively appealed. DuBray Decl. (Dkt. No. 53-3) Exh. A. Only one misbehavior report charging a drug testing refusal and two accusing Orraca of actual drug usage were issued by defendant McCreery. *Id.* Plaintiff maintains that he has no history of drug abuse and is not a user of illicit drugs, arguing that any disciplinary findings of his drug use were based upon submission of adulterated urine samples, and that the inevitability that prison officials will tamper with drug testing specimens given by him has led to his flat refusal to cooperate in drug

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

testing by the DOCS.[FN8],[FN9] Complaint (Dkt. No. 1) at 9-10.

FN8. During his deposition Orraca testified that since his transfer out of Shawangunk he has received two misbehavior reports for urinalysis testing refusal, and that it is his intention to refuse all such testing for the remainder of his prison term. Orraca Dep. (Dkt. No. 53-8) at pp. 43-44.

FN9. Plaintiff's claim not to have been involved in drug use is potentially undermined by a prior finding of drug use on February 5, 1996, while at Great Meadow Correctional Facility, as well as another from Shawangunk dated July 20, 2001, well prior to the events at issue in this instance. *See* DuBray Decl. (Dkt. No. 53-3) Exh. A.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on October 14, 2004. Dkt. No. 1. Named as defendants in Orraca's complaint are various DOCS employees, all of whom are or were at the relevant times assigned to Shawangunk, including T. McCreery, a corrections officer; M. Bertone, a corrections sergeant; Mr. Andrews, identified as a hearing officer; T. Nasaveria, a property officer at the facility; Mr. Wright, a corrections lieutenant; Mr. Maly, the deputy superintendent of security at the prison; and C. Mayberry, a recreational officer. *Id.* Although somewhat difficult to discern, when liberally construed it appears that plaintiff's complaint alleges three causes of action, including 1) unlawful retaliation based upon alleged reprisals for having filed grievances and complaints against prison officials; 2) denial of court access, based upon the loss of his transcript and other legal papers; and 3) potentially, the denial of procedural due process.[FN10]

FN10. Plaintiff's opposition to the pending summary judgment motion makes oblique reference to a potential additional claim nowhere found in his complaint. In his declaration in opposition to the defendants' motion for summary judgment, the plaintiff provides a brief discussion of "fluid delirium." Because that discussion appears to be little more than a synopsis of the disorder, it does not rise to the level of an allegation that the plaintiff has any actual physical or mental disorder or that defendants were deliberately indifferent to that condition. Dkt. No. 55 at 3; Dkt. No. 32 at 3; *see also* *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y 200) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)) (discussing medical indifference in general). Additionally, in the plaintiff's complaint there is also a statement that the defendants "denied [the plaintiff's] religious rights." *See* Complaint (Dkt. No. 1) at 2. Because there is no further evidence regarding this issue anywhere else in the record, however, I have not addressed the issue of a First Amendment religion claim in this report and recommendation.

On April 22, 2005 defendants moved seeking dismissal of portions of plaintiff's claims on a variety of grounds. Dkt. No. 21. That motion led to the issuance on February 14, 2006 of a report, later adopted by order issued by District Judge David N. Hurd on April 25, 2006, recommending dismissal of 1) all claims against the defendants in their official capacities; 2) all claims against defendant Maly, with leave to replead, on the basis of lack of personal involvement; and 3) plaintiff's claim for compensatory damages. Dkt. Nos. 33, 36.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2008 WL 4279509 (N.D.N.Y.)
(Cite as: 2008 WL 4279509 (N.D.N.Y.))

Now that pre-trial discovery in the case has concluded, the remaining defendants have moved for summary judgment, arguing that 1) plaintiff's claims are procedurally barred, based upon his failure to exhaust administrative remedies; 2) plaintiff's claims against various defendants are subject to dismissal based upon lack of their personal involvement in the violations alleged; and 3) plaintiff's causes of action for unlawful retaliation, denial of court access, and deprivation of due process are deficient as a matter of law. Dkt. No. 53. Plaintiff has since responded in opposition to the motion, asking that it be denied. Dkt. No. 55. Defendants' motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Summary Judgment Standard*

***4** Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. *Plaintiff's Failure to Respond to Defendants' Local*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Rule 7.1(a)(3) Statement*

***5** In support of their motion, defendants have submitted a comprehensive statement of material facts alleged by them not to be in dispute, as required under Rule 7.1(a)(3) of this court's local rules.[FN11] Dkt. No. 53-7. While plaintiff has filed papers in opposition to defendants' motion, he did not include among them a response to defendants' Local Rule 7.1(a)(3) Statement.

> FN11. That rule provides, in pertinent part, that "[a]ny motion for summary judgment shall contain a Statement of Material Facts [which] shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established...." N.D.N.Y.L.R. 7.1(a)(3).

This court's local rules require that any party opposing a motion for summary judgment must file a response to the moving party's statement of material facts, mirroring the statement and specifically admitting or denying each of the numbered paragraphs. N.D.N.Y.L.R. 7.1(a)(3). The rule goes on to provide that "any facts set forth in the Statement Material Facts shall be deemed admitted unless specifically controverted by the opposing party." *Id.* (emphasis omitted).

It is readily apparent that plaintiff's papers in opposition to the defendants' summary judgment motion fail to comply with this meaningful requirement. Courts in this district have uniformly enforced Rule 7.1(a)(3) and its predecessor, Rule 7.1(f), by deeming facts set forth in a moving party's statement to have been admitted in similar circumstances, where the party opposing the motion has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, S.J.) (listing case); *see also Monahan v. New York City Dep't. Of Corr.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). In light of plaintiff's demurrer in connection with defendants' Local Rule 7.1(a)(3) Statement, I recommend that the court consider each of the facts asserted in it to have been deemed admitted by the plaintiff, for purposes of the instant motion.

C. *Exhaustion of Remedies*

In their motion defendants assert that plaintiff's claims are procedurally barred based upon his failure to exhaust available administrative remedies. This portion of defendants' motion essentially reiterates an argument raised earlier by the defendants in connection with their pre-answer dismissal motion, but rejected at that point based principally upon the procedural posture of the case and the equivocal nature of the limited record then before the court concerning the issue.

With an eye toward "reduc[ing] the quantity and improv[ing] the quality of prisoner suits[,]" *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002), Congress altered the inmate litigation landscape considerably through the enactment of the Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), imposing several restrictions on the ability of prisoners to maintain federal civil rights actions. An integral feature of the PLRA is a revitalized exhaustion of remedies provision which requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

42 U.S.C. § 1997e(a); *see* *Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007). This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 914-15 (2007) (citations omitted); *see* *Woodford,* 548 U.S. at 91-92, 126 S.Ct. at 2386; *see also* *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter,* 534 U.S. at 532, 122 S.Ct. at 992 (citation omitted).

***6** The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones,* 127 S.Ct. at 918. In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See* *Pettus v. McCoy,* No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also* *Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also* *Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ). While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F .3d at 43 (quoting *Johnson,* 380 F.3d at 697-98) (emphasis omitted).

The primary mechanism made available to New York state prison inmates for presenting grievances concerning prison conditions is the Inmate Grievance Program ("IGP") established by the DOCS and recognized by the courts as an "available" remedy for purposes of the PLRA. *See* *Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)).

The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN12] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia,* *Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

FN12. The IGP supervisor may waive the grievance timeliness requirement due to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2008 WL 4279509 (N.D.N.Y.)
(Cite as: 2008 WL 4279509 (N.D.N.Y.))

"mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

***7** The evidence now before the court regarding exhaustion is sparse. Defendants' moving papers do not include an affidavit, of the type normally submitted when failure to exhaust is relied upon as a ground for dismissal of an inmate's claims, from a representative of the CORC or some other DOCS employee familiar with prison records attesting that no record exists of the plaintiff's filing and pursuit of a relevant grievance to the final step under the IGP.

Plaintiff's statements concerning exhaustion are equivocal, and thus similarly unrevealing. Responding to questions set forth in his form complaint, Orraca answered both "yes" and "no" to inquiries regarding both the existence of a grievance procedure at Shawangunk and his filing of grievances related to the matters set forth in his complaint. Complaint (Dkt. No. 1) at 4. When asked to describe the steps taken to present grievances relating to the matters in suit, plaintiff answered that "[g]rievance does not provide relief that I am seeking." *Id.* Responding to an inquiry regarding the result of his grievance filings, plaintiff stated that

[a]llegations of employee harassment/ discrimination are of particular concern to the administrators of department facilities. Prison Directive 4040(VII) after exercising initial obligations (reported the incidents to supervisors first) after being again threaten [sic] plaintiff was discouraged to process with this complaint any further with the facility out of fear for his safety.

*Id.*

As was previously noted, failure to exhaust represents an affirmative defense which must be raised and proven by the defendants in an action brought by a prison inmate. *Jones,* 127 S.Ct. at 918; *Mendez v. Barlow,* No. 04-CV-1030S, 2008 WL 2039499, at *3 (W.D.N.Y. May 12, 2008) (citing *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004) and *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999)). In this instance, defendants have failed to satisfy their burden of establishing the lack of any genuine issue of material fact concerning plaintiff's failure to exhaust available administrative remedies by grieving one or more of the matters now at issue. I therefore recommend against dismissal of plaintiff's claims based on this alleged procedural shortcoming. [FN13]

FN13. Citing cases which predate the Supreme Court's decision in *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992 (2002), plaintiff argues that the PLRA does not require exhaustion of remedies in connection with claims brought by prison inmates alleging retaliation against them by prison officials. Orraca Aff. (Dkt. No. 55) at p. 4. Plaintiff is clearly mistaken in this assertion. 42 U.S.C. § 1997e(a); *Woodford,* 548 U.S. at 84, 126 S.Ct. At 2382; *Hargrove,* 2007 WL 389003, at *5-6.

D. *Personal Involvement*

Defendants next argue that plaintiff cannot establish the requisite degree of their personal involvement in the constitutional deprivations alleged in his complaint. While generally stating the correct controlling legal principles, defendants' personal involvement point is lacking in specifics regarding the defendants to whom the argument applies.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See* *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

***8** Nothing in the record before the court implicates the involvement of any of the named defendants in this action in connection with the loss of plaintiff's civilian clothing and legal papers. During his deposition Orraca acknowledged that none of the named defendants were involved in his escort to and from the civil trial at which the lost clothing was worn. Orraca Dep. (Dkt. No. 53-8) at 11. At no point during his deposition or in the other submissions to the court has Orraca alleged the direct involvement of any of the named defendants in the loss or destruction of his property.

Similarly, plaintiff has acknowledged that he can cite to no evidence to establish that defendants McCreery or Bertone were involved in the loss or destruction of his legal papers, including his criminal trial transcript, nor does the record disclose any evidence which a reasonable factfinder could conclude that any of the named defendants in this action were involved in that loss. While the plaintiff may suspect that one or more of the defendants orchestrated or was involved in the misplacement, as he has readily acknowledged he lacks evidence to support his hunch. I therefore recommend dismissal of plaintiff's claims surrounding the loss of his civilian clothes and legal documents on the basis of lack of personal involvement on the part of any of the named defendants.[FN14]

FN14. Leaving aside the issue of potential interference with his access to the courts, it is extremely unlikely, in any event, that plaintiff could establish a constitutional deprivation based upon the fact of his missing legal papers and clothing, particularly given the availability of recourse to seek compensation for the losses. *See* *Fisher v. Dep't of Corr.,* No. 92 Civ. 6037, 1995 WL 608379, at *8 (S.D.N.Y. Oct. 16, 1995) (indicating that when a prison inmate merely alleges a deprivation of personal property, no civil rights action lies where the state provides a compensatory remedy); *Smith v. City of New York,* No. 03 Civ. 7576, 2005 WL 1026551, at *8 (S.D.N.Y. May 3, 2005) (noting that New York provides inmates with the opportunity for a hearing to pursue state law causes of action for negligence, replevin, and conversion).

E. *Unlawful Retaliation Claim*

Noting that claims of unlawful retaliation, particularly those growing out of the issuance of misbehavior reports, are easily incanted by prison inmates, and that accordingly “courts must approach prison claims of retaliation with skepticism and particular care[,]” *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds,* *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992 (2002), defendants seek dismissal of plaintiff's retaliation claims as a matter of law. In support of their motion defendants argue that the record lacks any evidence from which a reasonable factfinder could conclude that the issuance of the various misbehavior reports to the plaintiff, most if not all of which resulted in findings of guilt following disciplinary hearings, was motivated by retaliatory animus.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected; (2) the defendants took adverse action against the plaintiff; and (3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Dawes,* 239 F.3d at 492 (2d Cir.2001). If the plaintiff carries this burden, the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct ." *Mount Healthy,* 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, then, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

***9** Standing alone, the mere allegation that a false misbehavior report has been filed against an inmate does not implicate constitutional considerations. *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1273 (1988)). The further assertion that issuance of the false misbehavior report was prompted by retaliatory animus and relates to an inmate having engaged in protected activity, however, can suffice to state a claim for retaliation. *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

In their motion defendants do not dispute either plaintiff's filing of grievances and lodging of complaints or the fact that those actions constitute protected conduct under the First Amendment. Similarly, defendants do not challenge plaintiff's assertion that the resulting disciplinary confinements represented adverse action sufficient to satisfy that prong of the retaliation analysis. Defendants argue, however, that the record is lacking in evidence to establish the requisite nexus between the two.

The determination of whether a sufficient causal connection between protected conduct and adverse action has been established is informed by a number of factors, including 1) the proximity between the two; 2) the inmate's prior disciplinary record; 3) whether there was ultimate vindication of the plaintiff following the disciplinary hearing; and 4) whether statements were made by the particular defendant disclosing an improper motive for disciplining the inmate. *Rivera v. Goord,* 199 F.Supp.2d 327, 339 (S.D.N.Y.2000); *see also Barclay v. New York,* 447 F.Supp.2d 546, 558 (N.D.N.Y.2007). Analysis of the chronology of events for purposes of making this analysis in this case is made difficult by virtue of plaintiff's failure to pinpoint the timing of the grievances and other complaints which, he maintains, triggered the ensuing disciplinary actions. In his complaint plaintiff appears to attribute the retaliatory animus to his having filed complaints regarding his lost clothing, and later the missing transcript. Plaintiff's lost clothing claim dates back to May of 2002. While it is unclear when plaintiff detected and subsequently complained of the loss of his legal papers and transcripts, it appears fairly certain that he did not become aware of the loss until his release from the SHU back into general population at Shawangunk on or about December 31, 2003.

When considered against this backdrop, an analysis of the timing of the issuance of the controlling disciplinary actions does not support an inference of retaliatory motivation. The first misbehavior report issued by defendant McCreery related to alleged drug use or urinalysis testing refusal is dated October 8, 2003, some sixteen months after the loss of clothing occurred and prior to plaintiff's discovery of the missing transcript.[FN15]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

DuBray Decl. (Dkt. No. 53-3) Exh. A.

FN15. That misbehavior report was not the first issued to plaintiff while at Shawangunk, alleging drug use. On July 20, 2001, Corrections Officer Bunce issued a Tier III disciplinary report to the plaintiff alleging drug use, leading to a period of disciplinary keeplock confinement, with corresponding loss of privileges, for one hundred eighty days. DuBray Decl. (Dkt. No. 53-3) Exh. A.

It is true that plaintiff did receive misbehavior reports on January 7, 2004, and again February 25, 2004, both issued by defendant McCreery, alleging urinalysis refusal and drug use, respectively, and those misbehavior reports were issued shortly following plaintiff's release from SHU confinement, and thus presumably after his discovery of the allegedly missing transcript. Those disciplinary citations, however, are consistent with a prior established pattern of this conduct on plaintiff's part. Given his poor disciplinary record and the findings of guilt with regard to both of those misbehavior reports, and without any other evidence tending to establish retaliating animus as a motivation for their issuance, no reasonable fact finder could conclude that they were issued out of retaliatory animus, as opposed to being based upon plaintiff's refusal to comply with prison rules and legitimate demands of corrections officers.

***10** Evaluation of claims of retaliation is a particularly fact-laden exercise, since such claims revolve around both the engaging in protected conduct, as well as establishment of a nexus between that conduct and the adverse action ultimately taken. Because plaintiff's retaliation claims against defendants McCreery and Bertone have been alleged in only conclusory fashion, and are not supported by evidence now in the record tending to establish a nexus between any protected activity and the adverse actions complained of, I recommend that defendants' motion for summary judgment dismissing plaintiff's retaliation claims be granted.[FN16] *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

FN16. The record contains no evidence of any involvement on the part of the remaining defendants named, including defendants Nasaveria, Andrews, Wright, and Mayberry, in the issuance of allegedly false, retaliatory misbehavior reports. Those defendants are therefore entitled to dismissal of plaintiff's retaliation claims against them on the additional, independent ground of lack of personal involvement. *See* *Wright,* 21 F.3d at 501; *Bass,* 790 F.2d at 263.

F. *Plaintiff's Court Access Denial Claim*

Liberally construed, plaintiff's allegations regarding the missing legal documents and transcript could be considered to assert a First Amendment claim for denial of court access. Assuming that plaintiff could establish the involvement of one or more of the named defendants in the action in that loss, defendants nonetheless assert that plaintiff's court access claim is subject to dismissal on the merits.

Without question, an inmate's constitutional right to "meaningful" access to the courts is firmly established. *Bounds v. Smith,* 430 U.S. 817, 823, 97 S.Ct. 1491, 1495 (1977) (citations and internal quotation marks omitted). To establish a violation of the right of access to the courts, a plaintiff must demonstrate that defendants' interference caused him or her actual injury-that is, that a "nonfrivolous legal claim had been frustrated or was being

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

impeded" as a result of defendants' conduct. *Lewis v. Casey,* 518 U.S. 343, 353, 116 S.Ct. 2174, 2181 (1996).

In the face of defendants' motion, plaintiff argues only that it is "impossible to continue to be able to properly represent himself in the court of law ..." without his records. *See* Orraca Aff. (Dkt. No. 55) ¶ 10. Such an assertion, without more, is insufficient to establish prejudice resulting from the loss or unavailability of court documents.[FN17] Because plaintiff has failed to establish the requisite prejudice resulting from defendants' actions, I recommend dismissal of his First Amendment court access denial claims as a matter of law.

> FN17. Since the process of securing direct review of plaintiff's criminal conviction has ended, there is therefore no need for a transcript in connection with that appeal. *See* Kerwin Aff. (Dkt. No. 53-4) Exh. F. Similarly, it appears that the transcript of plaintiff's criminal trial was already entered into the record in connection with his habeas corpus petition, which has been fully briefed and is awaiting decision from a state court. *Id.* at Exh. D. In his deposition, plaintiff seemingly took the position that the loss of his transcript has interfered with or impeded his ability to file a motion under Article 440 of the N.Y. Criminal Procedure Law to vacate his judgment and set aside the corresponding sentence. See Orraca Dep. (Dkt. No. 53-8) at p. 23. Such a conclusory allegation, however, is insufficient to show prejudice resulting from the loss of the transcript. *See* *Arce v. Walker,* 58 F.Supp.2d 39, 44 (W.D.N.Y.1999) ("A prisoner's conclusory assertion that he suffered prejudice does not suffice to support an access to court claim.").

G. *Denial of Due Process*

Although this is far from clear, plaintiff also appears to contend that during the course of the various disciplinary proceedings against him defendants deprived him of procedural due process. Defendants also seek dismissal of this potential claim as a matter of law, assuming that the requisite level of personal involvement on the part of the defendants in the conduct forming the basis for that claim could otherwise be demonstrated.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See* *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

***11** Plaintiff's due process claims, although not artfully stated, appear to have three distinct components, involving the deprivation of his rights to conjugal visits or participation in the Family Reunion Program ("FRP"), the destruction or theft of his property, and the various disciplinary proceedings against him.

1. *Conjugal Visits / FRP Denial*

It is well-established that inmates in New York have no cognizable liberty interest in denial of conjugal visits or participation in the FRP. *See* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *Hernandez v. Coughlin,* 18 F.3d 133, 136-38 (2d Cir.1994); *see also* *McEachin v. Bek,* No.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

06-CV-6453CJS, 2007 WL 529626, at *2 (W.D.N.Y. Feb. 12, 2007) (noting that "contact visits are a privilege for inmates, not a right"). Accordingly, plaintiff cannot claim deprivation of procedural due process stemming from a denial of his ability to participate in the FRP.[FN18]

FN18. As was previously noted, there has been no sufficient allegation of personal involvement of any of the defendants regarding the plaintiff's inability to participate in the FRP. *See* pp. 21-22, *ante.*

2. *Due Process and Theft and/or Destruction of Plaintiff's Personal Property and Transcripts*

Generally speaking, neither negligent nor intentional deprivations of inmate property are sufficient to trigger the protections of the due process clause of the Fourteenth Amendment, provided that there exists an "adequate post-deprivation remed[y] for addressing such circumstances...." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 3203-04 (1984). Because a state cannot anticipate when such negligent or intentional destruction of property will occur, " 'predeprivation procedures' are simply 'impracticable.' " *Id.; see also DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003) (noting that in such claims, where it is "impossible for the government to provide a pre-deprivation hearing, due process requires only a post-deprivation proceeding."). Accordingly, plaintiff's due process claim turns upon whether or not an adequate post-deprivation remedy has been made available to him in connection with the property losses alleged.

a. *Plaintiff's Personal Property*

Addressing first the loss of his personal clothing, I note that Orraca has made no allegation that the post-deprivation remedy available to him has proven inadequate. Indeed, plaintiff's claim for his lost property (# 35-02) appears to have been approved in the amount of $199.00, following an internal investigation at Shawangunk. *See* Dkt. No. 32 at 7-10. The record lacks any evidence as to whether or not the plaintiff has accepted this amount and, more importantly, any allegations that this amount is in any way inadequate. [FN19] Plaintiff therefore cannot maintain a cognizable due process claim resulting from the loss of his personal property. *See Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995).

FN19. In his claim plaintiff estimated the value of his lost clothing items at $2,245.00. *See* Dkt. No. 32 at 7. Plaintiff has not explicitly taken issue with the $199.00 figure, however, nor has he given any indication as to whether or not the claim was ultimately settled.

b. *Plaintiff's Transcripts*

Plaintiff's claim of due process violation growing out of his lost legal records is also unavailing under New York law, inmates are afforded an adequate post-deprivation remedy for such losses-the opportunity to bring an action in the Court of Claims. *See Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir.2001). Plaintiff has provided no evidence that any claim has been brought in the Court of Claims, despite apparently having been notified of his ability to do so. *See* Dkt. No 32 at 10 (document pertaining to plaintiff's claim for lost property with the line "[i]f you are unwilling to accept this offer in full settlement of the claim, your remaining option is to pursue the claim in the Court of Claims"). The failure of Orraca to avail himself of that opportunity precludes his right to recover in this action

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

under section 1983. *Id.* (citing *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir1983)). This loss therefore also fails to support a due process violation claim.

c. *Disciplinary Confinement*

***12** While the evidence is far from unequivocal, it appears that as a result of the various disciplinary proceeding plaintiff did experience periods of SHU disciplinary confinement which, under controlling law, could be considered as deprivations of a cognizable liberty interest, sufficient to trigger the provided due process protections of the Fifth Amendment. *See* *Colon v. Howard,* 215 F.3d 227, 230-32 (2d Cir.2000). Those claims appear to pertain particularly to defendant Wright, who presided over several of plaintiff's various disciplinary hearings.[FN20] *See* Orraca Dep. (Dkt. No. 53-8) at pp. 50-52, 60.

FN20. Plaintiff appears to have also asserted a due process claim against defendant Andrews, based upon his role as a hearing officer. Andrews, however, did not serve as the hearing officer in connection with any of the allegedly retaliatory misbehavior reports. DuBray Decl. (Dkt. No. 53-3) Exh. A. While defendant Andrews did serve as a hearing officer assigned to address charges arising from and incident occurring on July 10, 2002, that was long before the alleged campaign of retaliation commenced, and plaintiff himself has admitted having no due process deprivation against either defendant Andrews or Mayberry. Orraca Dep. (Dkt. No. 53-8) at 49, 62-63.

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. At 2978-80; *see also* *Eng v. Coughlin,* 858 F .2d 889, 897-98 (2d Cir.1988).

The record in this case fails to reveal any evidence that plaintiff did not receive the constitutionally minimum due process mandated under *Wolff. See generally* Kerwin Aff. (Dkt. No. 53-4) Exh. A at pp. 34-53; *see also* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 53-7) ¶ 106. Accordingly, plaintiff's procedural due process claims against defendant Wright are deficient as a matter of law.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint asserts a variety of constitutional claims arising from his receipt of disciplinary citations and the loss of his clothing and court transcripts. Despite those allegations, however, the record fails to disclose any involvement on the part of the majority of the defendants and any of the actions forming the basis for plaintiff's claims. In any event, plaintiff's claims for unlawful retaliation, denial of court access, and deprivation of procedural due process, are all deficient as a matter of law, and no reasonable factfinder could conclude otherwise. Accordingly, it is hereby

RECOMMENDED, that defendant's motion for summary

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2008 WL 4279509 (N.D.N.Y.)
(Cite as: 2008 WL 4279509 (N.D.N.Y.))

judgment (Dkt. No. 53) be GRANTED, and all remaining claims contained within plaintiff's complaint be DISMISSED.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

***13** It is further ORDERED that the Clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.
Orraca v. McCreery
Not Reported in F.Supp.2d, 2008 WL 4279509 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Antonio RUGGIA, Plaintiff,
v.
Kelly S. KOZAK, Sex Offender Counselor at Auburn Correctional Facility; Richard Cox, Sergeant at Auburn Correctional Facility; Brian O'Donnell, Sex Offender Program Supervisor at Auburn Correctional Facility; J. McAnany, Deputy Superintendent of Administration at Auburn Correctional Facility, R. Nelson, Deputy Superintendent of Programs at Auburn Correctional Facility; J. Burge, Superintendent of Auburn Correctional Facility; John H. Nuttall, Deputy Commission of Programs, New York State Department of Correctional Services; Edward J. McSweeney, Assistant Commissioner of New York State Department of Correctional Services; John Doe, Director of Office of Guidance and Counseling, New York State Department of Correctional Services; Glenn S. Goord, Commissioner of New York State Department of Correctional Services, Defendants.
**No. 9:05-CV-0217 (LEK/GHL).**

Feb. 25, 2008.

Antonio Ruggia, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Maria Moran, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

***1** This matter comes before the Court following a Report-Recommendation filed on December 3, 2007, by the Honorable George H. Lowe, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3 of the Northern District of New York. Report-Rec. (Dkt. No. 93). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Plaintiff Antonio Ruggia ("Plaintiff"), which were filed on December 13, 2007. Objections (Dkt. No. 94).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

The Report-Recommendation determined that the government's strong and legitimate interest in protecting a Department of Correctional Services (DOCS) employee outweighed the minimal intrusion into Plaintiff's limited Fourth Amendment interests. Report-Rec. (Dkt. No. 93) at 30, 33. Plaintiff objects to this conclusion, asserting that the court improperly determined that he relinquished his expectation of privacy by signing a "Waiver of Partial Confidentiality." Objections (Dkt. No. 94) at 5-7.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

To trigger Fourth Amendment protections, a plaintiff alleging an unlawful government invasion must possess a subjective expectation of privacy that society is prepared to recognize as "reasonable." *Oliver v. U.S.,* 466 U.S. 170, 177, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984); *see also* *Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Because Plaintiff consented to the release of materials resulting from his participation in the Sex Offender Counseling Program *only* to entities supervising his release or providing treatment thereafter, he retained a limited subjective expectation of privacy. Defs.' Rule 7.1 Statement (Dkt. No. 82, Attach.6, Ex. F) at 9; *see also* Defs.' Rule 7.1 Statement (Dkt. No. 82, Attach.6, Ex. I) at 11 (DOCS Deputy Commissioner acknowledging that waiver was "limited"). Further, the United States Supreme Court, as well as several states' legislatures and judiciaries, has recognized that protecting patient-counselor confidentiality increases the effectiveness of counseling programs. *Jaffee v. Redmond,* 518 U.S. 1, 10, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) ("The psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem."); *see also* *Lile v. McKune,* 224 F.3d 1175, 1191 (10th Cir.2000) (listing state statutes and decisions protecting the communications of participants to sexual offender treatment programs) (overturned on other grounds). However, as Judge Lowe found, the state's interests in protecting a DOCS employee clearly justifies its minimal intrusion into Plaintiff's privacy interests-particularly in light of the place, circumstances, and scope of the search. *See* Report-Rec. (Dkt. No. 93) at 27-33.

***2** Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 93) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 82) be **GRANTED** and that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Antonio Ruggia ("Plaintiff"), currently an inmate at Auburn Correctional Facility, commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Generally, Plaintiff alleges that ten employees of the New York State Department of Correctional Services ("DOCS") violated his rights under the Fourth, Eighth, and Fourteenth Amendments (as well as New York State law) when, between September 16, 2004, and February 8, 2005, they improperly disclosed, or permitted the disclosure of, information about Plaintiff's "private childhood trauma," which was described in two documents contained in his Sex Offender Counseling Program files at Auburn Correctional Facility. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Procedure. (Dkt. No. 82.) For the reasons that follow, I recommend that Defendants' motion be granted.

**I. APPLICABLE LEGAL STANDARDS**

**A. Motion for Summary Judgment Under Rule 56**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN2]

FN1. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN2. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." [FN3] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN4] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN5]

FN3. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN4. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ...."); *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN5. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

What this somewhat complex burden-shifting standard means is that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he fact that there has been no response to a summary judgment motion

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

does not ... [by itself] mean that the motion is to be granted automatically." FN6 Rather, practically speaking, the Court must (1) determine what material facts, if any, are undisputed in the record, and (2) assure itself that, based on those undisputed material facts, the law indeed warrants judgment for the defendants.FN7 However, where a plaintiff has failed to respond to a defendant's statements of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Statement will be accepted as true FN8 to the extent that (1) those facts are supported by the evidence in the record,FN9 and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the potential consequences of failing to respond to the movant's motion for summary judgment.FN10 (Here, I note that Plaintiff was so advised by Defendants.) FN11

FN6. *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

FN7. *See* *Champion,* 76 F.3d at 486 ("Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.") [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, "[t]he Court must review the merits of Plaintiff's claims"). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that "the nonmoving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown," *only where the motion has been "properly filed" and "the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein."* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

FN8. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

FN9. *See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) ("[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.")

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

[emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, at *2-3, 2002 WL 449757 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) ("Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.") [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) ("A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ...."); Fed.R.Civ.P. 56(e) (requiring that, "if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant," and requiring that, as a threshold matter, the motion for summary judgment must be "made *and supported* as provided in this rule") [emphasis added].

FN10. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

FN11. (Dkt. No. 82, Part 1.)

***3** Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.*[FN12] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN13] (Here, I note that Plaintiff's Complaint contains a verification pursuant to 28 U.S.C. § 1746.)[FN14] In any event, to be sufficient to create a factual issue for purposes of a summary judgment motion, an affidavit must, among other things, not be conclusory.[FN15] An affidavit is conclusory if, for example, its assertions lack any supporting evidence or are too general.[FN16] Finally, even where an affidavit (or verified complaint) is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint."[FN17]

FN12. *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN13. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

FN14. (Dkt. No. 1.)

FN15. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN16. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN17. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-55 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit Local Rule § 0.23).

**B. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)**

To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based entirely on the plaintiff's complaint,[FN18] such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

FN18. (*See, e.g.,* Dkt. No. 82, Part 4, at 15 [Defs.' Mem. of Law, arguing, *inter alia,* that Plaintiff's supervisory claim against Defendant O'Donnell "does not state a cause of action"].)

Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[FN19]

FN19. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ....“

For these reasons, it is appropriate to briefly summarize the recently revised legal standard governing Rule 12(b)(6) motions to dismiss. Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2);

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN20 or (2) a challenge to the legal cognizability of the claim.FN21

FN20. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN21. *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-02 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." FN22 The purpose of this rule is to "facilitate a proper decision on the merits." FN23 A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." FN24

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN22. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ); *see also* *Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

FN23. *See* *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

FN24. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g.,* *Photopaint Tech., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

***4** The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN25] However, it is well established that even this liberal notice pleading standard "has its limits." [FN26] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN27]

FN25. *See, e.g.,* *Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN26. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN27. *See, e.g.,* *Bell Atl. Corp. v. Twombly,* ---U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-74, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord,* *Dura Pharm.,* 125 S.Ct. at 1634-35, *Christopher v. Harbury,* 536 U.S. 403, 416-22, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-35 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-09 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g.,* *Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See* *Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001],

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atl. Corp. v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [FN28] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

FN28. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN29] Moreover, it should be noted that "[t]his standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" [FN30] In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are generally to be construed with an *extra* degree of liberality. Indeed, generally "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN31] In addition, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN32]

FN29. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN30. *Hernandez,* 18 F.3d at 136 [citation omitted]; *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN31. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN32. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." FN33 For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN34

FN33. *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M. J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

FN34. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

**II. UNDISPUTED FACTS**

***5** The following facts were asserted by Defendants in their Rule 7.1 Statement, supported by accurate record citations, and either admitted or not specifically controverted by Plaintiff in his Rule 7 .1 Response. For the sake of brevity, I have omitted the record citations supporting the assertions except in those cases where I find they are necessary. In those cases, I have included record citations merely at the end of the relevant paragraph, in the interest of brevity.

1. Plaintiff is a New York State inmate with Department Identification Number 89-A-1115.

2. The crimes for which Plaintiff is currently incarcerated include sodomy in the first degree, burglary in the first degree, and escape in the second degree. He is currently serving an indeterminate sentence of fourteen-and-one-half (14 1/2 ) to twenty-nine (29) years. Plaintiff was previously convicted of the offenses of rape in the first degree, burglary in the first degree, and robbery in the first degree, and was incarcerated in state prison from March of 1982 through July of 1987 for those crimes.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

3. On or about April 5, 2004, Plaintiff was enrolled in the Sex Offender Counseling Program ("S.O.P.") at Auburn Correctional Facility ("Auburn C.F."). The six-month program was administered by Defendant Kelly Kozak, a Corrections Counselor.

4. On April 5, 2004, Plaintiff and Defendant Kozak reviewed and signed some forms required by the S.O.P., including a "Sex Offender Counseling Program Referral/Consent" Form, a "Waiver of Partial Confidentiality," a "Waiver of Access to Pornography, Photographs, and Other Materials," and a copy of the "Sex Offender Program Group Rules."

5. On April 26, 2004, Plaintiff began participating in the S.O.P.

6. On or about May 24, 2004, Defendant Kozak received an anonymous letter in the mail that threatened her life.[FN35] (I note that Plaintiff disputes whether the threat letter offered by Defendants was the threat letter received by Defendant Kozak on or about May 24, 2004, arguing that Defendant Cox altered that threat letter. However, Plaintiff does not offer any admissible record evidence establishing that Defendant Kozak did not receive any threat letter at all on or about May 24, 2004.) [FN36]

FN35. (*Compare* Dkt. No. 82, Part 3, ¶ 6 [Defs.' Rule 7.1 Statement, containing referenced factual assertion, and accurate record citations in support of that assertion, including Paragraph 6 of Def. Kozak's affidavit] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 6 [denying other factual assertions contained in this paragraph of Defs.' Rule 7.1 Statement, but not specifically denying this particular factual assertion, and indeed appearing to expressly admit this factual assertion by acknowledging the existence of "the ... threat letter [Defendant Kozak] received on May 24, 2004"].) I note that, in numerous of his written discovery demands, Plaintiff repeatedly acknowledges that Defendant Kozak "received [a] threat letter on May 24, 2004." (*See, e.g.,* Dkt. No. 89, Ex. FF, ¶¶ 7, 8 [Plf.'s Request for Admissions submitted to Def. Burge].)

FN36. *See, supra,* note 35 of this Report-Recommendation; *see also, infra,* note 49 of this Report-Recommendation.

7. In May of 2004, Sergeant Kirkpatrick was in charge of the school building at Auburn C.F. In the summer of 2004, that job was taken over by Defendant Richard Cox, a Sergeant at Auburn C.F.[FN37]

FN37. (*Compare* Dkt. No. 82, Part 3, ¶ 7 [Defs.' Rule 7.1 Statement, containing referenced factual assertion, and accurate record citation in support of that assertion] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 7 [denying other factual assertions contained in this paragraph of Defs.' Rule 7.1 Statement, but not specifically controverting this factual assertion].)

8. In July of 2004, Defendant Kozak verbally warned Plaintiff about making angry outbursts in class.[FN38]

FN38. (*Compare* Dkt. No. 82, Part 3, ¶ 8 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 8 [denying other factual assertion contained in this paragraph of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defs.' Rule 7.1 Statement, but expressly admitting the rest of the paragraph].) I note that, in support of his partial denial of various factual assertions in this paragraph, Plaintiff cites page 4 of Exhibit D to his opposition papers. However, that document partially supports Defendants' factual assertion. (Dkt. No. 89, Ex. D at 4 [containing S.O.P. Monthly Evaluation Form dated 8/6/04 and authored by Def. Kozak, stating "[A] s you are aware, I encourage you to address anger issues in ART Group. Read a book on anger."].) I note also that Defendants' factual assertion is partly supported by another document offered by Plaintiff, namely, Exhibit L to his opposition papers, which contains a letter from Plaintiff to Defendant Kozak dated September 10, 2004, in which he thanks her for lending him a book on anger in order to "help me with my hidden anger issues." (Dkt. No. 89, Ex. L.)

9. On July 29, 2004, Plaintiff had a verbal conflict with another inmate in the S.O.P. class about the S.O.P. curriculum. When Defendant Kozak confronted Plaintiff about his behavior, Plaintiff raised his voice to her and then withdrew completely from the group. Therefore, on August 2, 2004, Defendant Kozak issued Plaintiff an Inmate Counseling Notification for his behavior. [FN39]

FN39. (*Compare* Dkt. No. 82, Part 3, ¶ 9 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 9 [admitting the vast majority of the factual assertions in this paragraph of Defs.' Rule 7.1 Statement, disputing only certain factual assertions (which are not included above), and adding certain factual assertions (which are included above) ].)

10. On August 16, 2004, Defendant Kozak received a letter from Plaintiff. The letter was "about what occurred on ... August 12, 2004" in S.O.P. class. In the letter, Plaintiff told Defendant Kozak, *inter alia,* that she "should've read the letter" that he (unsuccessfully) attempted to give her after class on August 12, 2004. He also said that he had come to the school building to speak with her on August 13, 2004, outside of S.O.P. class. [FN40]

FN40. (*Compare* Dkt. No. 82, Part 3, ¶ 10 [Defs.' Rule 7.1 Statement, containing various of the referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 10 [either admitting, or at least not specifically controverting, the factual assertions stated above]; *see also* Dkt. No. 82, Part 8, at 17 [Ex. 4 to Kozak Affid., containing letter in question].)

***6** 11. On September 16, 2004, Plaintiff approached Defendant Kozak in class and showed her a note that was taped in his class packet. The note stated that he wanted to give her a letter in which he would confess his feelings for her. When Defendant Kozak told Plaintiff that was inappropriate, he ripped up the note and threw it out the classroom window. Defendant Kozak asked Plaintiff to return to his cell. [FN41]

FN41. (*Compare* Dkt. No. 82, Part 3, ¶ 11 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citation in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 11 [admitting all of the factual assertions in this paragraph of Defs.' Rule 7.1 Statement, except the assertion that Defendant Kozak "ordered" rather than "asked" Plaintiff to return to his cell, which assertion was changed above].)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

12. For his actions on September 16, 2004, Defendant Kozak wrote Plaintiff an Inmate Misbehavior Report, charging him with violating Facility Rules 107.11 (regarding harassment) and 180.11 (regarding facility correspondence).

13. For his actions on September 16, 2004, Defendant Kozak also issued Plaintiff an Inmate Counseling Notification.[FN42]

FN42. (*Compare* Dkt. No. 82, Part 3, ¶ 13 [Defs.' Rule 7.1 Statement, containing referenced factual assertion, and accurate record citations in support of that assertion] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 13 [denying that the Counseling Notification issued by Defendant Kozak was the one contained in Defendants' motion papers, but not specifically denying that a Counseling Notification was issued, and indeed appearing to expressly admit this factual assertion by acknowledging the existence of a “Counseling Notification” in his “guidance unit file”].)

14. Immediately after the incident with Defendant Kozak on September 16, 2004, Defendant Cox directed Correction Officer (“C.O .”) R. Henry to escort Plaintiff away, and Plaintiff was eventually placed in SHU.[FN43]

FN43. (*Compare* Dkt. No. 82, Part 3, ¶ 14 [Defs.' Rule 7.1 Statement, containing referenced factual assertion, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 14 [admitting the referenced factual assertion].)

15. On September 16, 2004, C.O. Henry wrote Plaintiff an Inmate Misbehavior Report, charging him with violating Facility Rules 106.10 (regarding refusals to obey direct orders), 107.10 (regarding interference with employees) and 109.12 (regarding movement inside the facility) for his actions on September 16, 2004.

16. On September 16, 2004, Defendant Kozak reviewed Plaintiff's S .O.P. class work, and compared the handwriting on one of Plaintiff's S.O.P. class homework assignments (specifically, his “Childhood History” assignment of June 10, 2004) to the handwriting on the threatening letter that she had received on May 24, 2004.[FN44]

FN44. (*Compare* Dkt. No. 82, Part 3, ¶ 16 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citation in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 16 [attempting to controvert-in an insufficiently argumentative fashion-several factual assertions contained in this paragraph of Defs.' Rule 7.1 Statement, but not specifically controverting this precise factual assertion, regarding which he would have no personal knowledge in any event].)

17. On September 16, 2004, Defendant Cox took two writing samples from Plaintiff's S.O.P. file, specifically, the homework assignment of June 10, 2004, and a letter Plaintiff had written to Defendant Kozak, dated August 26, 2004.[FN45]

FN45. (*Compare* Dkt. No. 82, Part 3, ¶ 17 [Defs.' Rule 7.1 Statement, containing referenced

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

factual assertion, and accurate record citations in support of that assertion] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 17 [attempting to controvert merely that Defendant Cox took the two referenced writing samples "in furtherance of the May 24, 2004-threat letter investigation," but not specifically controverting this precise factual assertion, and indeed appearing to expressly admit this factual assertion when he states that Defendant Cox took the two writing samples *"not* due to the furtherance of an investigation but only an alleged assumption that he had made"] [emphasis in original].)

18. On September 16, 2004, Defendant Cox wrote an Inmate Misbehavior Report alleged that Plaintiff was the author of the threatening letter of May 24, 2004. Specifically, the Inmate Misbehavior Report charged Plaintiff with violating Facility Rules 102.10 (regarding threats), 107.11 (regarding harassment) and 180.11 (regarding facility correspondence).[FN46]

FN46. (*Compare* Dkt. No. 82, Part 3, ¶ 19 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 19 [not specifically controverting the referenced factual assertions].)

19. On September 16, 2004, Defendant Cox took custody of copies of the three documents, placed them in plastic baggies, and then secured them in an evidence locker at Auburn C.F.[FN47]

FN47. (*Compare* Dkt. No. 82, Part 3, ¶ 20 [Defs.' Rule 7.1 Statement, containing referenced factual assertion, and accurate record citations in support of that assertion] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 20 [not specifically controverting the referenced factual assertions].)

20. On September 22, 2004, Plaintiff's Tier III Superintendent's Hearing for the three misbehavior reports commenced, presided over by Defendant J. McAnany, a Deputy Superintendent of Administration at Auburn C.F. Plaintiff pleaded guilty to the offense of harassment charged by Defendant Kozak, and not guilty to the remaining charges.

21. On October 4, 2004, Defendant McAnany rendered his determination regarding Plaintiff's three misbehavior reports of September 16, 2004. In addition to accepting Plaintiff's guilty plea with regard to the harassment charge by Defendant Kozak, Defendant McAnany found Plaintiff guilty of the offense of refusing a direct order charged by Officer Henry, as well as the offenses of making threats and violating a facility correspondence rule charged by Defendant Cox. Defendant McAnany found Plaintiff not guilty of the remaining charges. Defendant McAnany sentenced Plaintiff to 24 months in the Special Housing Unit, which was suspended for 12 months. In addition, Defendant McAnany sentenced Plaintiff to a loss of phone privileges for 12 months and a loss of commissary, packages, permits, recreation and recommended loss of good time for 24 months.

***7** 22. Subsequently, Plaintiff appealed the hearing determination of October 4, 2004. On November 30, 2004, Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, issued a decision modifying the hearing determination. Specifically, Director Selsky reduced the penalties for the remaining offenses to four months. In addition, he dismissed the two charges made against Plaintiff by Defendant Cox regarding the threatening letter of May 24, 2004, namely,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

violating Facility Rules 102.10 (regarding threats) and 180.11 (regarding facility correspondence). The stated reason for the modification was that "[the] letter that was allegedly written by [the] inmate was not given to [the] employee." FN48 (I note that Plaintiff construes this last statement as meaning that Defendant Kozak never received a threatening letter on or about May 24, 2004. However, I find that such an interpretation flatly contradicts the record in this action, which is clear that she did receive some sort of threatening letter on that date. *See, supra,* Fact No. 6. Rather, the referenced statement appears to mean merely that the May 24, 2004, threat letter offered by Defendants was not given to Defendant Kozak *for authentication during Plaintiff's disciplinary hearing*.) FN49

FN48. (*Compare* Dkt. No. 82, Part 3, ¶ 23 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citation in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 23 [admitting the referenced factual assertions].)

FN49. (Dkt. No. 89, Plf.'s Affid., ¶ 7; Dkt. No. 89, Ex. B to Plf.'s Affid, at 80 [Hearing Transcript, in which Hearing Officer refused to let Plaintiff, at that particular time, ask Defendant Kozak whether "she [had] ever seen [the] letter" in question]; *see also* Dkt. No. 89, Ex. C, ¶ 8 [Responses to Plf.'s Requests for Admissions, in which Defendant Kozak admitted that "[d]uring [her] hearing testimony on September 29, 2004 [she] never verified that the specific threat letter that was being used as evidence against [Plaintiff] was, in fact, the identical threat letter [she] received on May 24, 2004"].)

23. After September 16, 2004, Plaintiff did not return to S.O.P. class. On or about October 6, 2004, he was given an unsatisfactory discharge from the Sex Offender Counseling Program.FN50

FN50. (*Compare* Dkt. No. 82, Part 3, ¶ 25 [Defs.' Rule 7.1 Statement, containing referenced factual assertion, and accurate record citation in support of that assertion] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 25 [admitting assertion]; *see also* Dkt. No. 82, Part 8, ¶ 14 [Kozak Affid.].)

24. On September 29, 2004, Plaintiff wrote a grievance, which was filed on October 7, 2004 with the Auburn C.F. Inmate Grievance Program and docketed as Inmate Grievance No. AUB-43319-04. In that grievance, he claimed that Defendants Kozak and Cox had violated his right to privacy. On October 12, 2004, Defendant J. Burge, Superintendent of Auburn C.F., issued a written decision with regard to Plaintiff's grievance. In that written decision, Defendant Burge stated, "Grievance of inmate A. Ruggia ... is not upheld as [the] investigation finds no violation of [the] inmate's confidentiality in this incident." On October 21, 2004, Defendant R. Nelson, the Acting Superintendent of Auburn C.F., also issued a written decision with regard to Plaintiff's grievance. In that written decision, Defendant Nelson stated, in pertinent part, "There is no evidence to support this grievance." On October 22, 2004, Plaintiff appealed the Superintendent's determination to the Central Office Review Committee ("C.O.R.C."). On December 1, 2004, C.O.R.C. issued a written decision with regard to Plaintiff's appeal. In that written decision, C.O.R.C. upheld the Superintendent's determination with regard to Plaintiff's grievance with clarification. Among other things, C.O.R.C. stated:

Contrary to the grievant's assertions, CORC has not been presented with sufficient evidence to substantiate any

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

malfeasance by the employees referenced in this instant complaint.... Contrary to the grievant's assertions, the grievant's confidentiality rights were not violated. CORC notes that it was necessary for the documents in question to be reviewed based upon security concerns.[FN51]

FN51. (*Compare* Dkt. No. 82, Part 3, ¶ 26 [Defs.' Rule 7.1 Statement, containing most of referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 26 [admitting, or at least not specifically controverting, the referenced factual assertions]; *see also* Dkt. No. 89, Ex. R [Plf.'s Opp. Papers, attaching Def. Burge's written decision of 10/12/04].)

***8** 25. Also on September 30, 2004, Plaintiff sent what he characterizes as a "letter of complaint" to Defendant Glenn S. Goord, the then-DOCS Commissioner. On October 20, 2004, Defendant Edward J. McSweeney, the DOCS Assistant Commissioner/ Executive Assistant, responded to Plaintiff's letter on behalf of Defendant Goord. Among other things, the letter advised Plaintiff, "[Y]ou must submit your grievance or appeal directly to the Grievance Clerk at the facility," because DOCS Directive 4040 (regarding the Inmate Grievance Program) "makes no provision for an inmate to refer grievances directly to [the] Central Office." [FN52]

FN52. (*Compare* Dkt. No. 82, Part 3, ¶ 27 [Defs.' Rule 7.1 Statement, containing most of referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 27 [admitting, or at least not specifically controverting, the referenced factual assertions]; *see also* Dkt. No. 1, ¶ 50 [Plf.'s Verified Compl.]; Dkt. No. 82, Part 6, at 31 [Ex. G to Moran Affirm., attaching Def. McSweeney's response of 10/13/04].)

26. On October 13, 2004, Plaintiff wrote a second grievance, which was filed with the Auburn C.F. Inmate Grievance Program on October 18, 2004, and docketed as Grievance No. AUB-43394-04. In that grievance, Plaintiff claimed that Defendant O'Donnell should not have investigated his prior grievance, namely, Grievance No. AUB-43319-04. On or about October 25, 2004, the Auburn C.F. Inmate Grievance Resolution Committee referred Plaintiff's grievance to the Superintendent for investigation "[d]ue to the nature of the complaint." On November 5, 2004, Defendant Burge issued a written decision with regard to Plaintiff's grievance. In that written decision, Defendant Burge stated, "Grievance of inmate A. Ruggia ... is denied as [the] inmate does not determine who investigates grievances. Grievance # 4331904 addressed [the] inmate's grievance against SOP Counselor Kozak." On or about November 15, 2004, Plaintiff appealed Defendant Burge's determination to C.O.R.C. On December 8, 2004, C.O.R.C. unanimously denied Plaintiff's appeal.[FN53]

FN53. (*Compare* Dkt. No. 82, Part 3, ¶ 28 [Defs.' Rule 7.1 Statement, containing most of referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 28 [admitting first, second and fourth sentence of Paragraph 28 of Defs.' Rule 7.1 Statement, and denying third sentence only to the extent it was the particular copy of the decision that Plaintiff received and signed, not that the substance of that decision was not the exact same as the substance of the written decision attached at Exhibit U to his opposition papers]; *see also* Dkt. No. 82, Part 6, at 39 [Ex. H to Moran Affirm., attaching referral of Plaintiff's grievance by Auburn C.F. IGRC to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Superintendent, dated 10/25/04]; Dkt. No. 89, Ex. U [Plf.'s Opp. Papers, attaching Def. Burge's written decision of 11/5/04].)

27. On or about October 14, 2004, Plaintiff sent a letter to Defendant Goord, alleging that his privacy rights were violated by Defendants Kozak and Cox. On October 15, 2004, Plaintiff sent an addendum to that letter. On November 9, 2004, Defendant Nuttall, the DOCS Deputy Commissioner for Program Services, responded to Plaintiff's letters on behalf of Defendant Goord.[FN54]

FN54. (*Compare* Dkt. No. 82, Part 3, ¶ 29 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citation in support of that assertion] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 29 [admitting assertions].)

28. On or about December 28, 2004, Plaintiff filed an Article 78 petition in Albany County Court regarding his disciplinary determination of October 4, 2004. On April 15, 2005, the matter was transferred to the Appellate Division, Third Department. On December 1, 2005, the Third Department issued a Memorandum and Judgment affirming the disciplinary determination.[FN55]

FN55. (*Compare* Dkt. No. 82, Part 3, ¶ 24 [Defs.' Rule 7.1 Statement, containing referenced factual assertions, and accurate record citations in support of those assertions] *with* Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 24 [admitting, or at least not specifically controverting, the referenced factual assertions].)

## III. ANALYSIS

### A. Fourth Amendment Claim

Plaintiff alleges that Defendant Cox violated his Fourth Amendment rights by searching and seizing two documents from Plaintiff's confidential S.O.P. file, copying them, and distributing them to others without Plaintiff's permission. (Dkt. No. 1, ¶¶ 95-96 [Plf.'s Compl.].) Similarly, Plaintiff alleges that Defendant Kozak violated his Fourth Amendment rights by disclosing private information contained in those two documents to "unauthorized" staff members and "state agencies," in breach of a "confidentiality contract" that existed between her and Plaintiff. (*Id.* at ¶ 97.)

***9** The Fourth Amendment provides that "[t]he right of the people to be secure in their persons ... against unreasonable searches ... shall not be violated." U.S. Const. amend IV. "What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) [internal quotation marks and citation omitted]. "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests ." *Skinner,* 489 U.S. at 619 [internal quotation marks and citations omitted]. In so doing, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) [citations omitted], *accord, Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992).

Here, with respect to the first interest to be balanced (i.e., the intrusion of the individual's Fourth Amendment interest of privacy), it should be remembered that,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

generally, "given the realities of institutional confinement, any reasonable expectation of privacy that a detainee retain[s] necessarily [is] of a diminished scope." *Bell v. Wolfish,* 441 U.S. 520, 556-57, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) (permitting body cavity searches of prison inmates).[FN56] With respect to the second interest to be balanced (i.e., the Government's interest promoted by the practice in question), it should be remembered that, generally, "[t]he Government's interest in regulating ... its operation of a ... prison ... presents special needs beyond [the] normal [need for] law enforcement...." *Skinner,* 489 U.S. at 619 [internal quotation marks and citation omitted]; *see also* *Roe v. Marcotte,* 193 F.3d 72, 80-82 (2d Cir.1999) ("While convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement, the rights they retain are subject to restrictions dictated by concerns for institutional security, order, and discipline."). This is because, as the Supreme Court has recognized, "[a] detention facility is a unique place fraught with serious security dangers." *Bell,* 441 U.S. at 559.

FN56. For example, the Fourth Amendment's proscription against unreasonable searches does not apply *at all* within the confines of a prison cell. *Hudson v. Palmer* 468 U.S. 517, 526, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); *see also* *Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) (Pooler, J., adopting Report-Recommendation of Homer, M.J.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) (Kaplan, J., sitting by designation) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

In arguing that the intrusion into his Fourth Amendment privacy interest was significant, Plaintiff relies almost exclusively on the "Waiver of Partial Confidentiality" he signed. (Dkt. No. 89, Plf.'s Opp. Mem. of Law, at 3-4.). As an initial matter, I believe that Plaintiff misconstrues the "Waiver of Partial Confidentiality." Specifically, he appears to read that document as (1) establishing that, absent a waiver, *all* information generated during his participation in the Auburn C.F. S.O.P. is confidential, and (2) creating a partial waiver of that confidentiality for *some* of that information. (Dkt. No. 89, Plf .'s Opp. Mem. of Law, at 3-4.) To the contrary, I find that the document (1) recognizes that only *some* of the information generated during Plaintiff's participation in the Auburn C.F. S.O.P. is confidential, and (2) waives that partial confidentiality. (Dkt. No. 82, Part 8, at 8 [Ex. 1 to Kozak Affid.].) That is why the document is called a "Waiver of Partial Confidentiality" and not a "Partial Waiver of Confidentiality." (*Id.*) [FN57] That is also why Paragraph 1 of the S.O.P. Group Rules, entitled ***"Confidentiality,"*** provides that "[w]hatever is said in the room[ ] stays in the room. Nothing said in a counseling session is to be repeated. If the specifics of an unreported crime or future offense are reported during group, the Counselor is morally and ethically mandated to report it." (Dkt. No. 82, Part 8, at 10 [Ex. 1 to Kozak Affid.] [emphasis in original].) Notably, Paragraph 1 of the Group Rules does not provide that whatever is *written* is confidential, or that what is written *out of the room* (i.e., homework assignments or letters) is confidential, or that the specifics of an unreported crime or future offense are confidential. (*Id* [emphasis added].)

FN57. I will spare the reader a detailed explanation of why the adjective "partial" modifies a different word in the first title (i.e., the word "confidentiality") than it does in the second title (i.e., the word "waiver")-primarily because I believe that the difference is so obvious. I will simply note that, *generally,* in the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

English language, an adjective immediately precedes the noun it modifies (unless it follows a linking verb). *See* Diana Hacker, *The Bedford Handbook for Writers* 320 (St. Martin's Press 3d ed. 1991) ("[I]n English adjectives usually precede the nouns they modify and ... they may also appear following linking verbs."). I will also note that the meaning of the term "partial confidentiality" is quite different than the meaning of the term "partial waiver." Simply stated, the term "partial confidentiality" means that only *some* confidentiality has been bestowed upon a thing. *See, e.g., SEC v. TheStreet.com,* 273 F.3d 222, 226 (2d Cir.2001) (describing a deposition, only "portions" of which contained sensitive information, as a "partially confidential deposition"); *Lisa C. v. William R.,* 166 Misc.2d 817, 635 N.Y.S.2d 449, 451 (Sup.Ct., New York County, 1995) (describing N.Y. Dom. Rel. Law § 235, which provides for confidentiality of certain information under certain circumstances for a certain period of time, as containing a "grant [ ][of] partial confidentiality" during divorce proceedings). The term "partial waiver," on the other hand, means that only some of a thing has been waived. *See, e.g., In re T.W.,* 732 A.2d 254, 257 (D.C.1999) (discussing order "partially waiving" the blanket of confidentiality that covers child neglect proceeding); *cf. In re White,* 330 S.C. 505, 499 S.E.2d 813, 815 (S.C.1998) (describing an order granting the "partial lifting" of the blanket of confidentiality that covers grand jury proceedings).

***10** However, even if Plaintiff's reading of the "Waiver of Partial Confidentiality" were correct, his argument would fail because the claim in question is not for breach of contract. It is for a violation of the Fourth Amendment. As explained earlier, in assessing the significance of the intrusion on an individual's Fourth Amendment privacy interests, it is necessary to consider things like the *place, circumstances,* and *scope* of the search.

Here, Plaintiff completely ignores the *place* in which the search was conducted, namely, prison. As explained earlier, the fact that the search occurred in prison generally diminishes the reasonableness of any expectation of privacy possessed by Plaintiff. Plaintiff also ignores the *circumstances* of the disclosure. The documents in question were not created by Plaintiff as part of a voluntary psychotherapy treatment with a psychiatrist. They were created by Plaintiff as part of a counseling program in which he was required to participate because he had been convicted of two sex offenses. And they were not disclosed to the public at large but to only those correctional officers necessary to investigate (and prevent) a crime.[FN58] Finally, Plaintiff downplays the limited *scope* of the search. The focus of the search was on the nature of Plaintiff's handwriting, not the events described in the documents containing the handwriting.[FN59] Clearly, there is a difference between these two things.[FN60]

FN58. Specifically, it appears from the record that, as a result of Defendants' actions, the information in question was disclosed to only *three* individuals at Auburn C.F. other than to Defendant Kozak (who presumably saw the information, as part of her review of Plaintiff's course work): (1) Defendant Cox; (2) the hearing officer, Defendant McAnany; and (3) Defendant Kozak's supervisor, Brian O'Donnell. (*See, e.g.,* Dkt. No. 82, Part 2, ¶ 9 [Affid. of Cox, swearing, "At no time have I shown or discussed the contents of plaintiff's S.O.P. materials with another inmate or any staff member who was not directly involved in the threat letter investigation."]; Dkt. No. 82, Part 2, ¶ 6 & Ex. 3 [Affid. of Cox, attaching chain-of-evidence record, showing that the copies of the documents were placed in the evidence locker on 9/16/04,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

removed from the locker on 9/29/04, for Plaintiff's hearing, and "destroyed" thereafter]; Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 20 [not denying Defendants' factual assertion that, on September 16, 2004, Defendant Cox took custody of the two documents in question and "secured them in [an] evidence locker"]; Dkt. No. 89, Ex. B. at 18-20, 31, 82-83 [Hearing Transcript, not indicating that, when Defendant McAnany, read portions of the documents in question into the hearing record, anyone else was present in the room; indicating that, when Lieutenant Head transported the documents from the evidence locker to Defendant McAnany, the documents were sealed in a bag; and indicating that Brian O'Donnell helped Defendant Kozak review handwriting samples in the S.O.P. files].)

FN59. (*See, e.g.,* Dkt. No. 89, Ex. B to Plf.'s Affid, at 101 [Hearing Transcript, in which Defendant Cox testified, "I didn't really care about whatever he was writing about[.] I was simply matching up words and letters and the way they were written, and the context that they were written [in] ... the slant of his handwriting[.] I at no time cared what he supposedly had written. I just wanted to know where they were similar.").

FN60. I note that cases exist differentiating between the confidential communications contained in a document and the type or handwriting in which those communications are written. *See, e.g., United States v. Weger,* 709 F.2d 1151, 1153-56 (7th Cir.1983) (admitting into evidence letter from defendant to her attorney for purpose of comparing style of type on letter with another letter typed on defendant's typewriter, over defendant's objection that letter was protected from disclosure by attorney-client privilege); *United States v. Pipkins,* 528 F.2d 559, 563-64 (5th Cir.1976) ("One's style of handwriting is not an intrinsically confidential attribute.... Moreover, even assuming, *arguendo,* that the samples of handwriting that [the defendant] gave [to his expert witness] were privileged communications, there was no error in admitting the expert's testimony [regarding those communications].... [T]he questions [asked of the defendant's expert witness] did not call for the revelation of the substance of a confidential communication; his testimony was confined to nonconfidential matters.").

In sum, it is difficult for me to imagine how any convicted sex offender in such a program at a maximum-security correctional facility could reasonably believe that an exemplar of his handwriting contained in a letter to the program's coordinator could be cloaked in an impenetrable blanket of confidentiality-especially when that coordinator is female, all the convicted sex offenders in the program are male, and the coordinator is believed to have received an anonymous and threatening letter from one of the sex offenders. FN61

FN61. In arguing that the intrusion into his Fourth Amendment privacy interest was significant, Plaintiff also relies on (1) the Professional Code of Ethics of the Association for the Treatment of Sex Abusers and (2) the New York State therapist-patient privilege. (*See, e.g.,* Dkt. No. 1, ¶¶ 99-100 [Plf.'s Compl.]; Dkt. No. 89, Plf.'s Affid., ¶ 3; Dkt. No. 89, Plf.'s Affid., Ex. A; Dkt. No. 82, Part 6, Ex. F at 2-3.) As an initial matter, I find that neither the aforementioned Code of Ethics nor therapist-patient privilege protects the information in question from disclosure under

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the circumstances. (*See, e.g.,* Dkt. No. 89, Plf.'s Affid, Ex. A, ¶ 9(a),(j) [acknowledging that there are "limits of confidentiality" and "exception[s]" to confidentiality, and instances where disclosures are "mandatory," and that client information may be communicated to others without the consent of the client where the client "presents a clear and immediate danger to another individual"].) Furthermore, and more importantly, I find that, even if there were such a violation, that violation would not be the determinative factor in deciding whether a Fourth Amendment violation has occurred. Rather, as discussed earlier, a balancing test is used to decide whether such a Fourth Amendment violation has occurred. For this reason, the Tenth Circuit has expressly ruled that, even if such a therapist-privilege exists between a prisoner and a correctional counselor, a violation of that privilege would not give rise to a federal civil rights actions pursuant to 42 U.S.C. § 1983. *See Madrid v. Mangindin,* No. 95-1418, 1996 U.S.App. LEXIS 12366, at *5-6 & n. 1, 1996 WL 282265 (10th Cir. May 29, 1996) ("If Mr. Madrid [an inmate] has a claim [for a violation of the therapist-patient privilege], it is under Colorado law.").

Moreover, Plaintiff's underlying privacy interest in the two documents in question was minimal at best. This is because personal information about Plaintiff is contained in only a *few lines* of Plaintiff's four-page homework assignment of June 10, 2007, and *not at all* in Plaintiff's two-page letter of August 26, 2004.[FN62] Furthermore, the "childhood trauma" to which Plaintiff repeatedly refers in his papers, concerns only *two* incidents-one incident involving excessive punishment, and one incident involving an *attempted* sexual assault.[FN63] This last fact is particularly vexing, since this entire lawsuit essentially concerns the disclosure of this information to a handful of individuals for a limited purpose. (Having apparently become emboldened by the administrative reversal of certain of his disciplinary convictions, Plaintiff has aggressively, and indeed litigiously, pursued any remedies he might conceivably have as a result of the disclosure of this information.)

FN62. (*See* Dkt. No. 82, Part 7 [Ex. 2 to Affid. of Cox, provided for *in camera* review only].)

FN63. (*Id.*)

***11** In addition, more than a decade before the disclosure at issue (specifically, on January 26, 1989), information about the attempted sexual assault had been voluntarily disclosed in open court by Plaintiff's then-counsel in an attempt to obtain a more lenient sentence for Plaintiff after his second rape conviction.[FN64] While this fact is by no means determinative of the issue at hand, it somewhat undermines the allegedly "private" nature of the information at issue.

FN64. (Dkt. No. 89, Plf.'s Opp. Papers, Ex. CC, at 12-13.)

For all of these reasons, I find that, based on the current record, no reasonable fact-finder could conclude that the limited intrusion into Plaintiff's limited privacy interest in the information in question was anything more than minimal. The next step, in the Court's analysis of Plaintiff's Fourth Amendment claim, is to determine the significance of any legitimate governmental interest promoted by the search in question, and to balance it against the minimal intrusion into Plaintiff's privacy interest.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Here, the impetus for the disclosure in question was the threat letter that Defendant Kozak received on or about May 24, 2004. However, the nature of that threat letter appears to be in dispute. In particular, Defendants offer, in their motion papers, two copies of the same letter, and swear that the letter is the one received by Defendant Kozak on or about May 24, 2004.[FN65] Plaintiff acknowledges that Defendant Kozak received *some* letter on or about May 24, 2004.[FN66] But he denies that the letter offered by Defendants is *that* letter.[FN67] In support of that denial, Plaintiff cites five portions of the record.[FN68] While I doubt that a rational fact-finder could conclude from these five portions of the record that the letter offered by Defendants is not the letter received by Defendant Kozak on or about May 24, 2004, I am unable to find that such a conclusion is impossible.

FN65. (Dkt. No. 82, Part 8, ¶ 6 & Ex. 2 [Kozak Affid.]; Dkt. No. 82, Part 7, ¶ 2 & Ex. 1 [Cox Affid.].)

FN66. (Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 6 [disputing only that the letter offered by Defendants "was, in fact, the exact threat letter she received on May 24, 2004"].)

FN67. (Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 6.)

FN68. Specifically, these five portions of the record are as follows: (1) Dkt. No. 89, Plf.'s Affid., ¶ 7; (2) Dkt. No. 89, Ex. B to Plf.'s Affid, at 80 [Hearing Transcript, in which Hearing Officer refused to let Plaintiff, at that particular time, ask Defendant Kozak whether "she [had] ever seen [the] letter" in question]; (3) Dkt. No. 89, Ex. C, ¶ 8 [Responses to Plf.'s Requests for Admissions, in which Defendant Kozak admitted that "[d]uring [her] hearing testimony on September 29, 2004[she] never verified that the specific threat letter that was being used as evidence against [Plaintiff] was, in fact, the identical threat letter [she] received on May 24, 2004"]; (4) Dkt. No. 82, Part 7, Ex. 4 [Cox Affid., attaching Misbehavior Report showing blank signature line following subpart entitled "ENDORSEMENTS OF OTHER EMPLOYEE WITNESSES (*if any* ):"] [emphasis added]; and (5) Dkt. No. 82, Part 6, at Ex. C, at 2 [DOCS Memorandum of 11/30/04, from Selsky, stating that Plaintiff's hearing determination had been modified because "letter that was allegedly written by inmate was not given to employee," referring to the letter of 5/24/04, which was not given to Defendant Kozak for authentication during the disciplinary hearing].)

However, the dispute regarding whether the letter offered by Defendants is the particular threat letter received by Defendant Kozak on or about May 24, 2004, is immaterial to Plaintiff's Fourth Amendment claim. This is because Defendants have asserted, and adduced evidence establishing, that, on or about May 24, 2004, Defendant Kozak received *a* threat letter from a prisoner. Moreover, Plaintiff either explicitly acknowledges the truth of this factual assertion, or, at the very least, he fails to adduce evidence controverting that fact. As a result, the fact in question is deemed admitted for purposes of Defendants' summary judgment motion. (*See, supra,* Fact 6 in Part II of this Report-Recommendation.)

In addition, Defendants have asserted, and adduced evidence establishing, that, on September 16, 2004, Defendant Cox took only two writing samples from Plaintiff's S.O.P. file, namely, Plaintiff's homework assignment of June 10, 2004, and Plaintiff's letter to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant Kozak of August 26, 2004.[FN69] Moreover, while denying various other factual assertions with regard to these two writing samples (e.g., that they were taken "in furtherance of the May 24, 2004-threat letter investigation"), Plaintiff does not deny the fact that Defendant Kozak took only these two documents from Plaintiff's S.O.P. file. [FN70] As a result, this fact also is deemed admitted for purposes of Defendants' summary judgment motion.

FN69. (Dkt. No. 82, Part 8, ¶ 13 [Kozak Affid.]; Dkt. No. 82, Part 7, ¶ 4 & Ex. 2 [Cox Affid.].)

FN70. (Dkt. No. 89, Plf.'s Rule 7.1 Response, ¶ 17.)

***12** I note that Plaintiff attempts to make much ado about the fact that Defendant Cox chose to take the aforementioned writing samples from Plaintiff's S.O.P. file, as opposed to taking those samples from some other source or sources. However, record evidence exists suggesting that the reason Defendant Cox chose to take writing samples from Plaintiff's S.O.P. file is because of two rather legitimate reasons: (1) Defendant Cox "went to where [he] believed [Plaintiff] was most comfortable in writing [so he would get a good look at Plaintiff's handwriting], and [he thought Plaintiff] was most comfortable in writing ... [in] that class"; [FN71] and (2) Defendant Kozak suggested that Defendant Cox look at documents from Plaintiff's Program file after she had reviewed those documents herself due to Plaintiff's inappropriate behavior toward her.[FN72] In any event, even if I were to find that the availability of other handwriting examplars *somewhat* undermines the government's legitimate interest promoted by the search in question, I would find that it does so only minimally.

FN71. (Dkt. No. 89, Ex. B to Plf.'s Affid, at 104 [Hearing Transcript].)

FN72. (Dkt. No. 82, Part 8, ¶¶ 12-13 [Kozak Affid.]; Dkt. No. 82, Part 7, ¶¶ 3-4 [Cox Affid.].)

Based on this record evidence, I find that DOCS, and Defendant Cox in particular, had a strong and legitimate interest in reviewing the handwriting on the documents in question, namely, to protect the safety of one of DOCS' employees at a maximum-security correctional facility-a female counselor who had received a threatening letter apparently sent by one of the male sex offenders to whom she was exposed through her work.

I further find that the government's strong legitimate interest in reviewing the handwriting on the documents in question far outweighed the minimal intrusion into any Fourth Amendment interests Plaintiff possessed. *See Roe,* 193 F.3d at 77-80 (permitting collection of DNA sample from convicted sex offender). As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

**B. Eighth Amendment Claims**

Plaintiff's asserts his Eighth Amendment claims in three paragraphs of his Complaint. (Dkt. No. 1, ¶¶ 107-108, 114 [Plf.'s Compl.].) Specifically, Plaintiff's claims are bifurcated into two separate theories of liability. First, Plaintiff claims that all ten Defendants have been deliberately indifferent to (1) his serious mental health condition and/or (2) his humiliating and emotionally painful condition of confinement. (*Id.* at ¶¶ 107-108.) Second, Plaintiff claims that Defendant Goord and Defendant "Doe" (whom Defendants have identified as James Granger) [FN73] were deliberately indifferent to

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 25

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

Plaintiff's "mental health and well-being" by "establishing a therapeutic treatment program which was run by an unlicensed, unregistered and uncertified counselor" (namely, Defendant Kozak). (*Id.* at ¶ 114.)

FN73. (Dkt. No. 82, Part 4, at 1, n. 1 [Defs.' Mem. of Law].)

Defendants recite the correct legal standard that governs Plaintiff's Eighth Amendment claims. (Dkt. No. 82, Part 4, at 20-22 [Defs.' Mem. of Law].) Generally, to prevail on an Eighth Amendment claim, Plaintiff must show two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that Defendant acted with *deliberate indifference* to Plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

***13** With respect to Plaintiff's first Eighth Amendment claim, Defendants essentially argue that Plaintiff has not adduced any evidence that, during the time in question, he experienced either a mental health condition or condition of confinement that was sufficiently serious for purposes of the Eighth Amendment. (Dkt. No. 82, Part 4, at 21 [Defs.' Mem. of Law].) In his response papers, Plaintiff takes issue with this argument, asserting a late-blossoming physical injury claim. (*Compare* Dkt. No. 89, Plf.'s Mem. of Law, at 17-18 *with* Dkt. No. 1, ¶ 107 [Plf.'s Verified Compl., acknowledging that the actions of Defendants were "not physically barbarous"].) Specifically, Plaintiff argues that he has adduced evidence that (1) he has been diagnosed with Post-Traumatic Stress Disorder due to "an extremely traumatic event that he experienced as a child," (2) Defendants' violation of his privacy (or refusals to stop those violations) have "exacerbated" his Post-Traumatic Stress Disorder, and (3) Defendants' actions have caused Plaintiff to sustain "physical as well as mental and emotional injuries." (*Id.* at 17-18.)

For the sake of argument, I will assume that, during the time in question, Plaintiff was suffering from Post-Traumatic Stress Disorder due to the attempted sexual assault that he experienced as a child.[FN74] I will also assume that the disorder was, under the circumstances, a sufficiently serious condition for purposes of the Eighth Amendment.

FN74. (*See* Dkt. No. 89, Ex. E [Plf.'s Opp. Papers, attaching document entitled "Office of Mental Health Mental Status Report for Division of Parole," dated 5/28/02, and authored by a social worker or counselor named "JK Wood" who worked at either the New York State Office of Mental Health or Elmira C.F.].)

The problem with Plaintiff's argument is that there is no evidence in the record that Defendants possessed the sort of mental state (i.e., deliberate indifference) required to subject them to liability under the Eighth Amendment. Deliberate indifference is a mental state that is akin to *criminal recklessness.*[FN75] Here, I can find no evidence that any Defendant knew that Plaintiff was even suffering from Post-Traumatic Stress Disorder during the time in question (if he was indeed suffering from that disorder during the time in question).[FN76] Moreover, there is no evidence that any Defendant knew that the limited disclosure of the modicum of personal information in question carried an excessive risk that Plaintiff would experience physical injury, not to mention the sort of extreme physical injury or pain necessary to invoke the Eighth Amendment. At most, the record evidence indicates that there *might* have been a hint of negligence on the part one or two of the Defendants. However, even if true, such evidence would not be enough to make those two Defendants, or any of the other Defendants, liable to Plaintiff under the Eighth

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 26

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

Amendment.[FN77]

FN75. *See* *Evering v. Rielly,* 98-CV-6718, 2001 U.S. Dist. LEXIS 15549, at *30, 2001 WL 1150318 (S.D.N.Y. Sept. 28, 2001) (" 'The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.' ") (quoting *Hemmings v. Gorczyk,* 134 F.3d 104, 108 [2d Cir.1998] ).

FN76. I note that the document upon which Plaintiff relies to support his claim that he was suffering from Post-Traumatic Stress Disorder was created more than two years before the time in question by someone not working at Auburn C.F., who did not address it to anyone at Auburn C.F. (*See* Dkt. No. 89, Ex. E [Plf.'s Opp. Papers, attaching document entitled "Office of Mental Health Mental Status Report for Division of Parole," dated 5/28/02, and authored by a social worker or counselor named "JK Wood" who worked at either the New York State Office of Mental Health or Elmira C.F.].)

FN77. *See* *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference describes a state of mind more blameworthy than negligence.").

With respect to his second Eighth Amendment claim, Defendants argue that Plaintiff has adduced no record evidence establishing that Defendant Kozak was somehow required by the Eighth Amendment to possess any of the licenses, registrations, or certifications that he alleges she was lacking. (Dkt. No. 82, Part 4, at 21 [Defs.' Mem. of Law].) Indeed, they argue, Defendant Kozak possessed rather significant credentials to be a sex abuse counselor. (*Id.; see, e.g.,* Dkt. No. 82, Part 8, ¶ 15 & Ex. 7 [Kozak Affid., summarizing her background and training as a sex offender counselor] .) In his response papers, Plaintiff takes issue with this argument, asserting that Defendant Kozak was subject to the requirements of four different entities: (1) she was required to be licensed with the New York State Department of Education pursuant to N.Y. Education Law § 7701(2); (2) she was required to be certified and approved by a New York State Civil Service Commission pursuant to N.Y. Civil Service Law § 22; (3) she was required to be more educated and experienced than she was by the Code and Ethics and Standards of Practice of the Association for the Treatment of Sexual Abusers, which, according to Plaintiff, requires "a professionally qualified SOP counselor [to have] an advanced degree in a recognized mental health profession in addition to more than 2000 hours of experience in evaluating and treating sex offenders"; and (4) she was required to be certified by the Uniform Law Commissioner's Model Sentencing and Correction Act § 4-601(b)(1). (Dkt. No. 89, Plf.'s Mem. of Law, at 18-20.)

***14** I begin my analysis by noting the dearth of case law on this issue, at least within the Second Circuit.[FN78] What little case law there is, however, appears to suggest that this claim fails as a matter of law. For example, in *Selah v. Goord,* the plaintiff alleged, *inter alia,* that the DOCS Sex Offender Treatment Program "is not an appropriate alternative to treating him as a sex offender with [a] mental illness," and the prison counselors running the program were "not appropriately qualified" to care for and treat him. *Selah v. Goord,* 04-CV-3273, 2006 U.S. Dist. LEXIS 51051, at *1 (S.D.N.Y. July 24, 2006). Initially,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the district judge assigned to the case (Judge Mukasey) dismissed this claim as facially deficient in a screening order. *Selah,* 2006 U .S. Dist. LEXIS 51051, at *1. When the plaintiff reasserted the claim in an amended complaint, the district judge assigned to the case (Judge Chin) dismissed the claim for failing to "allege facts constituting a deprivation of [the plaintiff's] rights under the Eighth Amendment...." *Id.* at *4. This ruling is certainly consistent with the observation of the Supreme Court that "States enjoy wide latitude in developing treatment regimens [for sex offenders]." *Kansas v. Hendricks,* 521 U.S. 346, 368, n. 4, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997); *see also* *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) ("[A] State necessarily has considerable discretion in determining the nature and scope of its responsibilities [to provide certain services to institutionalized individuals].").

FN78. For example, in *Donhauser v. Goord,* which is a rather seminal case in this Circuit regarding the (Fifth Amendment) constitutionality of the DOCS' Sex Offender Treatment Program, the plaintiff initially requested, among his many forms of relief, an Order directing that "Corrections Counselors assigned to the Sex Offender Program [must] have specialized training in counseling sex offenders," and that "a certified psychologist [must] supervise the Sex Offender Program." *Donhauser v. Goord,* 01-CV-1535, Complaint, "Prayer for Relief" (N.D.N.Y. filed Oct. 10, 2001) (Hurd, J.). However, the plaintiff subsequently filed an amended complaint that omitted this request. *Donhauser v. Goord,* 01-CV-1535, Amended Complaint, "Relief Requested" (N.D.N.Y. filed Apr. 23, 2002) (Hurd, J.). The omission was the result of two Conditional Orders of Dismissal issued by Judge Hurd holding that Plaintiff's claims, inter alia, failed to state a claim upon which relief could be granted. *Donhauser v. Goord,* 01-CV-1535, Orders of Conditional Dismissal (N.D.N.Y. filed Nov. 1.2001, and March 22, 2002) (Hurd, J.) However, neither of those Orders appears to specifically address the merits of the plaintiff's training-and-certification request. *Id.*

Even setting aside these authorities and analyzing Plaintiff's claim anew, I find that the claim has no merit. As an initial matter, none of the four standards cited by Plaintiff prohibit Defendant Kozak from working as a Correction Counselor at Auburn C.F ., or conducting its S.O.P., under the circumstances.

Section 7701(2) of the N.Y. Education Law defines the term "[p]ractice of clinical social work." N.Y. Education Law § 7701(2). I see nothing in that provision requiring Defendant Kozak to be licensed by the New York State Department of Education in order to work as a Correction Counselor at Auburn C.F., or conduct its S.O.P. Perhaps Plaintiff is referring to Section 7704(a) of the N.Y. Education Law, which sets forth the requirements to qualify for a license as a "licensed clinical social worker." N.Y. Education Law § 7701(2). However, again, I see nothing in that provision requiring Defendant Kozak to be a "licensed clinical social worker" in order to work as a Correction Counselor at Auburn C.F., or to conduct its S.O.P.

Section 22 of the N.Y. Civil Service Law provides that, before any new position "in the service of a civil division" shall be created or any existing position in such service shall be reclassified, that creation or reclassification must be approved by "the municipal commission having jurisdiction" over that civil division. N.Y. Civil Service Law § 22. Nothing in that provision requires Defendant Kozak to be licensed by the New York State Department of Education in order to work as a Correction Counselor

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

at Auburn C.F., or conduct its S.O.P. As an initial matter, I have found no evidence in the record that Defendant Kozak's position at Auburn C.F. with regard to the S.O.P. was a "new position" or "reclassification" of an existing position. Moreover, the term "in the service of a civil division" in Section 22 does not mean "in the service of the New York State Department of Correctional Services," but "in the ... service of any subdivision of the state," such as counties, towns and villages. N.Y. Civil Service Law § 2(8). Similarly, the term "municipal commission" does not mean the commission of the State of New York, but the commission of a city, county, or suburban town having a population of at least fifty thousand. N.Y. Civil Service Law § 2(8).

***15** The Code and Ethics and Standards of Practice of the Association for the Treatment of Sexual Abusers sets forth requirements for *membership* in the Association, not requirements for treating sex offenders in prison (or elsewhere). Moreover, it is entirely possible that Defendant Kozak, who possesses a Masters Degree, and possessed work experience prior to counseling Plaintiff,[FN79] would have qualified for membership in ATSA during the time in question. *See* ATSA Membership Requirements, http:// www.atsa.com/memReq.html (last visited Nov. 28, 2007).

FN79. (Dkt. No. 82, Part 8, ¶ 15 & Ex. 7 [Kozak Affid., summarizing her work experience].)

Finally, Section 4-601(b)(1) of the Uniform Law Commissioner's Model Sentencing and Correction Act provides, "Consistent with other provisions of law, the director [of a department of corrections] shall adopt rules to evaluate and approve programs placing confined persons at risk. A program placing a confined person at risk may not be approved unless ... a board of at least 2 persons appointed by the [director] and professionally competent to evaluate the program certifies in writing as to its professional validity .... " Michael Mushlin, *Rights of Prisoners* Appendix B (2d ed.1993). Nothing in that provision prohibits Defendant Kozak from working as a Correction Counselor at Auburn C.F., or conducting its S.O.P. For example, I can find no indication that either the New York State legislature or New York State DOCS has adopted this section of the model act (or any section of that act). Nor is there any evidence that DOCS somehow improperly established or implemented the Sex Offender Treatment Program. Moreover, the provision in question must be narrowly construed so as to be "[c]onsistent with other provisions of law," such as the statutes and regulations establishing the New York State Department of Correctional Services, and empowering it to create and operate the programs it deems, in its discretion, necessary and fit to rehabilitate the offenders incarcerated therein.

Finally, even if Defendant Kozak had somehow failed to meet one or more of these standards, such a failure would not constitute a per se violation of the Eighth Amendment.

Rather, as explained earlier, generally, to prevail on an Eighth Amendment claim, a plaintiff must show two things: (1) that the conditions of his confinement resulted in a deprivation that was sufficiently serious; and (2) that the defendants acted with deliberate indifference to the plaintiff's health or safety. At most, Plaintiff's licensing/registration/certification claim against Defendants Goord and Granger alleges negligence on their part, which is not sufficient to state a claim under the Eighth Amendment.

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claims.

**C. Fourteenth Amendment Due Process Claims**

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In addition to casting his invasion-of-privacy claim as a Fourth Amendment violation, Plaintiff casts that claim as a Fourteenth Amendment violation, specifically, as a violation of his rights to both substantive and procedural due process. (*Compare* Dkt. No. 1, ¶¶ 95-96 [Plf.'s Compl., asserting, as "Count One," a Fourth Amendment claim based on the disclosure of his private information] *with* Dkt. No. 1, ¶¶ 97-104 [Plf.'s Compl., asserting, as "Count Two," a Fourteenth Amendment claim based on the same disclosure of private information].)

***16** The problem with Plaintiff's so-called "substantive due process claim" is that, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth ... Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392-94 [1989] ).[FN80] Because I have already analyzed (and rejected) Plaintiff's invasion-of-privacy claim under the appropriate legal standard (i.e., the legal standard governing Fourth Amendment claims), I need not do so here under the standard for Fourteenth Amendment substantive due process claims.

FN80. *See also* *Conn v. Gabbert,* 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (offering similar recitation of law before refusing to analyze claim of improper search under Fourteenth Amendment); *accord,* *Kia P. v. McIntyre,* 235 F.3d 749, 757-58 (2d Cir.2000).

Even if I were to analyze Plaintiff's invasion-of-privacy claim under the rubric of substantive due process, I would recommend dismissal of that "substantive due process claim" for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 82, Part 4, at 11-12 [Defs.' Mem. of Law].) I would add only that, in addition to failing to fulfill the first requirement in a substantive due process analysis (i.e., identifying the precise constitutional right at stake), Plaintiff fails to fulfill the second requirement in such an analysis (i.e., showing that the state action was arbitrary in the constitutional sense). Specifically, I find that, far from being arbitrary, the actions taken by Defendants Kozak and Cox with regard to the two documents at issue were entirely legitimate, for the reasons stated above in Part III.A. of this Report-Recommendation.

Similarly, I reject Plaintiff's procedural due process claim, largely for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 82, Part 4, at 12-13 [Defs.' Mem. of Law].) Even if Plaintiff has demonstrated that he possessed some limited liberty interest in avoiding the disclosure of the personal matters contained in the two documents at issue, he has not demonstrated that he was deprived of that (limited) interest without being afforded all the process that he was due.[FN81]

FN81. "[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient ....“ *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989).

What procedural protections an individual is entitled to in a particular case "is not a technical concept[ ] with a fixed content unrelated to time, place and circumstances."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 30

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

*Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) [internal quotation marks and citations omitted]. Rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews,* 424 U.S. at 334 [internal quotation marks and citation omitted]. "Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected." *Id.* [citations omitted]. "More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 334-35 [citation omitted].

***17** With regard to the first factor (i.e., the private interest that was affected by the official action), I have carefully reviewed the personal information contained in the two documents in question, and I find that Plaintiff had only a minimal interest in not having that personal information disclosed in the limited manner in which it was done so. As explained above in Part III.A. of this Report-Recommendation, the personal information is contained in only a *few lines* of Plaintiff's four-page homework assignment of June 10, 2007, and *not at all* in Plaintiff's two-page letter of August 26, 2004.[FN82] Moreover, the focus of Defendants' disclosure of that information was not on the personal nature of the information but on the handwriting in which all of the information in the documents was conveyed. [FN83] Furthermore, Plaintiff was given notice of the disclosure at, or before, his disciplinary hearing, and was permitted to raise his arguments that the disclosure of the information had been improper because the information was private or confidential.[FN84] In addition, after the hearing, the copies made of the documents in question were destroyed.[FN85] Finally, although the Court has no duty to independently scour the record for evidence creating a factual dispute on this issue, I have reviewed most (if not all) of the voluminous record and I have found no clear evidence establishing that, as a result of Defendants' actions, the information in question was disclosed to more than three individuals at Auburn C.F. (other than to Defendant Kozak, who presumably saw the information, as part of her review of Plaintiff's course work): (1) Defendant Cox; (2) the hearing officer, Defendant McAnany; and (3) Defendant Kozak's supervisor, Brian O'Donnell.[FN86]

FN82. (*See* Dkt. No. 82, Part 7 [Ex. 2 to Affid. of Cox, provided for *in camera* review only].)

FN83. (*See, e.g.,* Dkt. No. 89, Ex. B to Plf.'s Affid, at 101 [Hearing Transcript, in which Defendant Cox testified, "I didn't really care about whatever he was writing about[.] I was simply matching up words and letters and the way they were written, and the context that they were written [in] ... the slant of his handwriting[.] I at no time cared what he supposedly had written. I just wanted to know where they were similar."]; *see also, supra,* note 60 of this Report-Recommendation [citing cases differentiating between the confidential communications contained in a document and the type or handwriting in which those communications are written].)

FN84. (*See, e.g.,* Dkt. No. 82, Part 7, Ex. 4 [Cox Affid., attaching Inmate Misbehavior Report of 9/16/04, describing grounds for charges]; Dkt.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 89, Ex. B to Plf.'s Affid, at 29, 44, 45, 75 [Hearing Transcript, evidencing that Plaintiff was given a copy of the documents in question at the start of the hearing, and that he raised his arguments that the information contained in the documents was private and confidential].)

FN85. (Dkt. No. 82, Part 2, ¶ 6 & Ex. 3 [Affid. of Cox, attaching chain-of-evidence record, showing that the copies of the documents were placed in the evidence locker on 9/16/04, removed from the locker on 9/29/04, for Plaintiff's hearing, and "destroyed" thereafter].)

FN86. *See, supra,* note 12 of this Report-Recommendation.

With regard to the second factor (i.e., the probable value, if any, of additional procedural safeguards), the value of giving Plaintiff the ability to challenge the disclosure of the documents in question, prior to the disclosure, would have been modest: the confidential nature of the information contained in the documents was minimal, at best, and Defendants possessed a legitimate reason to view that information, for the reasons stated above in Part III.A. of this Report-Recommendation. In short, they would have obtained the information anyway.

With regard to the third factor (i.e., the burden to the Government that would be imposed by any additional procedural requirement), the record is clear that (1) Defendant Kozak had received a threatening letter, (2) Plaintiff was suspected of sending that letter, and (3) Defendant Kozak was, at least occasionally, exposed to Plaintiff, on a physical level, during group counseling sessions in the S.O.P. To require Defendant Cox to confront Plaintiff with his suspicion of wrongdoing before Defendant Cox was permitted to view the documents in question would have, if Plaintiff had in fact been the author of the threatening letter, probably placed Defendant Kozak in further peril. The burden placed on the Government, then, would have been significant. Based on the current record, I find that no rational fact-finder could find that Plaintiff was not afforded all of the procedural protections to which he was due.

***18** For all these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due process claims.

**D. Fourteenth Amendment Equal Protection Claim**

Plaintiff's Fourteenth Amendment Equal Protection claim is so without merit that it borders on the frivolous. Plaintiff asserts this claim in one paragraph of his Complaint. (Dkt. No. 1, ¶ 117 [Plf.'s Compl.].) Specifically, in that paragraph, Plaintiff alleges as follows:

> The actions of [the ten defendants in this action] demonstrated discrimination towards plaintiff because of his sex offender status. The alleged threat incident never occurred as ... can be ... demonstrated by the plaintiff's disciplinary appeal decision. The plaintiff was treated like an animal with no rights, and still is [being so treated], ... because he is in the class of sex offenders. His privacy rights were maliciously violated and continue to be [violated] without penological justification and was used as a scapegoat because of his sex offender status. These actions denied the plaintiff the equal protection of the laws within the meaning of the Equal Protection Clause and violated the 14th Amendment.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(*Id.*)

Based on these allegations, and the record evidence, I recommend dismissal of this claim largely for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 82, Part 4, at 23-25 [Defs.' Mem. of Law].) To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he was intentionally treated differently from others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *Travis v. N.Y. State Div. of Parole,* 96-CV-0759, 1998 U.S. Dist. LEXIS 23417, at *11, 1998 WL 34002605 (N.D.N.Y. Aug. 26, 1998) (Sharpe, M.J.), *adopted,* 96-CV-0759, Decision and Order (N .D.N.Y. filed Nov. 2, 1998) (McAvoy, C.J.). Where the alleged classification involves a "suspect class" or "quasi-suspect class," the alleged classification is subject to "strict scrutiny" by a court. *Travis,* 1998 U.S. Dist. LEXIS 23417, 1998 WL 34002605 at *11. However, "[s]ex offenders do not comprise a suspect or quasi-suspect class for Equal Protection purposes." *Id.* at *12-13 [citations omitted]. FN87 As a result, the alleged classification is subject to only "rational basis scrutiny." *Id* . at *11-12. To survive such scrutiny, the alleged classification need only be "rationally related" to a "legitimate state interest ." *Id.*

FN87. *See also Selah v. Goord,* 04-CV-3273, 2006 U.S. Dist. LEXIS 51051, at *21 (S.D.N.Y. July 24, 2006) ("Neither sex offenders nor the mentally ill are a suspect class warranting heightened [or strict] equal protection scrutiny.") [citations omitted].

Here, Plaintiff has not even alleged facts plausibly suggesting there has been any *classification* at all in this case, i.e., that he was treated differently from prisoners who were not convicted sex offenders. Even if he had alleged such facts, he has adduced no evidence that the alleged discrimination he experienced was not rationally related to a legitimate state interest. The "disciplinary appeal decision," which is referred to in Plaintiff's Complaint, states that Plaintiff's hearing determination had been modified because the "letter that was allegedly written by inmate was not given to employee." FN88 Plaintiff *appears* to interpret this statement as meaning that Defendant Kozak never received any threatening letter on or about May 24, 2004. I do not interpret that statement in such a manner. Clearly, that statement is referring to either (1) the fact that the letter of May 24, 2004, was not given to Defendant Kozak for authentication during the disciplinary hearing, or (2) the fact that Plaintiff ripped up his letter of September 16, 2004, after Defendant Kozak refused to accept it.

FN88. (Dkt. No. 82, Part 6, at Ex. C, at 2 [DOCS Memorandum of 11/30/04, from Selsky, stating that Plaintiff's hearing determination had been modified because "letter that was allegedly written by inmate was not given to employee," referring to either (1) the letter of 5/24/04, which was not given to Defendant Kozak for authentication during the disciplinary hearing, or (2) Plaintiff's letter of 9/16/04, which Plaintiff ripped up after Defendant Kozak refused to accept it].)

***19** Even if Plaintiff's interpretation of the statement were correct, the statement would not constitute evidence from which a rational fact-finder could conclude that there was no rational relation between Defendants' conduct and a legitimate state interest. For the reasons stated above in Part III.A. of this Report-Recommendation, Defendant Cox clearly possessed a legitimate reason to view that information, namely, to conduct a handwriting comparison in order to protect the safety of a female employee of a maximum security correctional facility who apparently had been threatened by a male prisoner. As also explained

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

above, record evidence exists suggesting that the reason Defendant Cox chose to take writing samples from Plaintiff's S.O.P. file is because (1) Defendant Cox believed those samples would give him a "good look" at Plaintiff's handwriting since Plaintiff had been "comfortable" when he wrote on those samples, and (2) Defendant Kozak had suggested that Defendant Cox look at those samples after she had reviewed those samples due to Plaintiff's inappropriate behavior toward her. *See, supra,* Part III.A. of this Report-Recommendation.

I reach the same conclusion (i.e., that Plaintiff's claim lacks merit) for the alternative reason that Plaintiff has failed to oppose Defendants' legal argument regarding Plaintiff's equal protection claim. Under Local Rule 7.1(b)(3), "[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3). Among the "papers" required to be filed and served by Plaintiff in response to the Defendants' motion is a memorandum of law.[FN89] Because Plaintiff has failed to file a memorandum of law opposing Defendants' argument, Plaintiff has "consented" to that argument under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [FN90] Because Plaintiff has "consented" to the Defendants' argument, the only remaining issue is whether Defendants have met their burden "to demonstrate entitlement to the relief requested" through that argument. This burden has appropriately been characterized as "modest." [FN91] This is because, as a practical matter, the burden requires only that the Defendants present an argument that is "facially meritorious." [FN92] Here, I find that Defendants' equal protection argument is, at the very least, facially meritorious, for the reasons set forth above.

FN89. N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added].

FN90. *See, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

FN91. *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord,*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN92. *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious")* [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, at *28 & n. 43, 2007 WL 911891 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2,2007 WL 894375 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, at *28-29 & n. 40, 2007 WL 951447 (N . D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, at *5 & n. 2, 2006 WL 3940592 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

For all these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment equal protection claim.

**E. Conspiracy Claims**

Plaintiff asserts his conspiracy claims in two paragraphs of his Complaint. (Dkt. No. 1, ¶¶ 115-16 [Plf.'s Compl.].) For the same reasons that I find there is no record evidence of any underlying constitutional violation in this case (*see, supra,* Parts III.A. to III.D. of this Report-Recommendation), I find there is no record evidence of any conspiracy to engage in such a violation. Moreover, I reach the same conclusion (i.e., that Plaintiff's conspiracy claims lack merit) for the alternative reason that (1) Defendants' legal argument in favor of dismissal of Plaintiff's conspiracy claims is, at the very least, "facially meritorious," FN93 and (2) by failing to oppose that legal argument in his opposition memorandum of law, Plaintiff is deemed to have "consented" to that argument under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. *See, supra,* Part III.D. of this Report-Recommendation (reciting legal standard governing unopposed motions).

FN93. (Dkt. No. 82, Part 4, at 22-23 [Defs.' Mem. of Law].)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

***20** For these reasons, I recommend that the Court dismiss Plaintiff's conspiracy claims.

**F. Pendent State Law Claims**

Plaintiff asserts his conspiracy claims in a dozen paragraphs of his Complaint, which allege that Defendants committed the following violations of New York State law: (1) the state law tort of "invasion of common law right to privacy"; (2) a violation of N.Y. Civil Rights Law § 50-(b)(1); (3) a breach of fiduciary duty; (4) a violation of N.Y. C.P.L.R. § 4510(b); (5) the state law tort of intentional infliction of emotional distress; (6) the state law tort of medical malpractice; and (7) a violation of Penal Law § 240.25. (Dkt. No. 1, ¶¶ 96, 98-101, 109-113 [Plf.'s Compl.].) I find that Defendants' legal argument in favor of dismissal of these claims is, at the very least, "facially meritorious." (Dkt. No. 82, Part 4, at 27-30 [Defs.' Mem. of Law].) I also find that, by failing to oppose that legal argument in his opposition memorandum of law, Plaintiff is deemed to have "consented" to that argument under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. *See, supra,* Part III.D. of this Report-Recommendation (reciting legal standard governing unopposed motions).

For these reasons, I recommend that the Court dismiss Plaintiff's pendent state law claims.

**G. Alternative Grounds for Dismissal**

In the alternative, Defendants assert three additional arguments in favor of dismissal of Plaintiff's claims: (1) that Plaintiff's claims against Defendants in their official capacities should be dismissed under the Eleventh Amendment; (2) that Plaintiff's claims against the eight Defendants who are supervisors (i.e., Defendants O'Donnell, McAnany, Goord, Granger, McSweeney, Nuttall, Burge, and Nelson) should be dismissed because there is no record evidence that they were personally involved in the constitutional violations alleged; and (3) that all of Plaintiff's claims should be dismissed based on qualified immunity. (Dkt. No. 82, Part 4, at 7, 13-19, 25-27 [Defs.' Mem. of Law].)

I find that Defendants' first argument (i.e., regarding Plaintiff's official-capacity claims) has, at the very least, facial merit. Moreover, in his opposition memorandum of law, Plaintiff fails to oppose this argument. As a result, I find that he has "consented" to the dismissal of his official-capacity claims.

With regard to Defendants' second and third arguments, I have carefully reviewed Defendants' memorandum of law, Plaintiff's opposition memorandum of law, and the record evidence. For the sake of brevity, I will not engage in a detailed discussion of these arguments and the record evidence in this case. I will simply report my finding that Defendants' arguments have merit, and Plaintiff's arguments lack merit, based on the record evidence.

For these reasons, should the Court decide not to adopt the recommendations set forth in Parts III.A. to III.F. of this Report-Recommendation, I recommend that the Court dismiss Plaintiff's claims for the three alternative reasons advanced by Defendants (i.e., Eleventh Amendment immunity, lack of personal involvement, and qualified immunity).

***21 ACCORDINGLY,** it is

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 36

Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)
(Cite as: 2008 WL 541290 (N.D.N.Y.))

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 82) be *GRANTED* and that Plaintiff's Complaint be *DISMISSED*.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.
Ruggia v. Kozak
Not Reported in F.Supp.2d, 2008 WL 541290 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



C Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
James BARNA and Jason B. Nicholas, Plaintiffs,
v.
Brion D. TRAVIS, Chairperson, New York State Div. of Parole et al., Defendants.
**No. CIV97CV1146(FJS/RWS).**

April 22, 1999.

James Barna, Wallkill Correctional Facility, Walkill, Plaintiff Pro Se.

Jason B. Nicholas, Walkill Correctional Facility, Walkill, Plaintiff Pro Se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Attorney for Defendants, Department of Law, Albany, Steven H. Schwartz, Esq., Asst. Attorney General, of Counsel.

ORDER AND REPORT-RECOMMENDATION

SMITH, Magistrate J.

***1** Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983. This case has been referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, then United States District Judge,[FN1] pursuant to 28 U.S.C. Section 636(b) and N.D.N.Y.L.R. 72.4. Pending before the court is a motion by the defendants to dismiss plaintiffs' complaint. Plaintiffs allege violations of both due process and the Ex Post Facto Clause. Each plaintiff has filed a memorandum of law in opposition to the motion. For the reasons which follow, it is recommended that defendants' motion be granted, dismissing plaintiffs' complaint in its entirety.

FN1. Judge Pooler now serves as a member of the Second Circuit Court of Appeals. This action has been reassigned to the Honorable Frederick J. Scullin, United States District Judge.

*The Underlying Convictions and Sentences*

Plaintiff Barna was sentenced in 1977 following a conviction for second degree murder and first degree burglary, for which he received concurrent prison sentences of fifteen years to life and zero to fifteen years, respectively. The New York State Division of Parole considered and denied him parole in 1991, 1993, 1995, and 1997. Barna's next appearance before the Board is scheduled for July 1999.

Plaintiff Nicholas was sentenced in 1991 following a conviction of first degree manslaughter and a youthful offender crime, for which he received consecutive prison sentences of five to fifteen years and one and one-third to four years, respectively. The New York State Division of Parole considered and denied him parole in 1997. Nicholas was scheduled to appear before the Board for the second time in January 1999.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

DISCUSSION

*Due Process Claim*

Plaintiffs first allege that defendants systematically deny parole applicants due process safeguards in parole release determinations. It is a fundamental principle of constitutional law that the first inquiry in the analysis of an alleged due process violation is whether there exists a protected liberty interest. *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). As a predicate to their due process claim, then, plaintiffs must establish that they enjoy a protected liberty interest under New York's statutory scheme for determining whether to grant or deny an inmate's application for parole (i.e., a legitimate expectation of release).

In 1979, the Supreme Court announced that an inmate is entitled to due process safeguards in parole determinations only when the state's parole provisions create a legitimate expectation of release. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11-13, 99 S.Ct. 2100, 2106-07, 60 L.Ed.2d 668 (1979). The *Greenholtz* Court held that the presence of mandatory language in state parole schemes, directing that an inmate "shall" be released upon a finding that the relevant criteria have been met, creates a presumption that parole release will be granted and thus gives rise to an expectation of release. *Id.* at 12, 99 S.Ct. at 2106. In accordance with the principles set forth in *Greenholtz,* the Second Circuit thereafter held that New York's statutory scheme creates no such expectation because the state's parole provisions "do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist." *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979). On the contrary, under New York's scheme, the decision to release is a matter committed to the discretion of the Parole Board. [FN2] N.Y. Exec. Law § 259-i(2)(c) (McKinney Supp.1999). "Decisions that are purely discretionary or ultimately discretionary with the parole authorities do not create a protectible liberty interest ...." *Berard v. State of Vermont Parole Bd.,* 730 F.2d 71, 75 (2d. Cir.1984) (citations omitted). As a result, pursuant to *Boothe,* prisoners in New York state are not entitled to the safeguards afforded by federal due process with respect to parole release determinations.

FN2. New York's statute provides the following:

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of the crime as to undermine respect for law.

> N.Y. Exec. Law § 259-i(2)(c) (McKinney 1993 & Supp.1999).

***2** Until recently, discussion of plaintiffs' due process claim would have concluded with reference to *Greenholtz* and *Boothe.* In 1995, however, the Supreme Court reformulated the liberty interest analysis under which federal courts determine whether state law confers a liberty interest on inmates. *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Under *Sandin,* the presence or absence of mandatory language, while still relevant, is no longer dispositive in determining whether a particular statute gives rise to a protectible liberty interest. *Id.* Rather, the focus of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

inquiry should be on the nature of the interest allegedly created by the state. *Id.* State created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to ordinary prison life." *Id.*

In light of *Sandin,* the validity of the conclusion that New York's parole provisions do not create a protectible liberty interest must be reexamined. Such a reexamination reveals, however, that although *Sandin* changes the analysis, it does not change the result. Even assuming, arguendo, that the "absence of procedural safeguards attending a decision denying an inmate's application for parole is one that 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," ' the discretionary language of New York's parole provisions nonetheless militates against a finding of a protectible liberty interest. *Quartararo v. Catterson,* 917 F.Supp. 919, 963 (E.D.N.Y.1996) (*quoting* *Sandin,* 515 U.S. at 483, 115 S.Ct. at 2300). Although *Sandin* expressly rejects the approach of drawing negative implications from mandatory language, it does not render language considerations irrelevant to the liberty interest analysis. *See id.* at 964; *see also, Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995). Given the broad discretion afforded the Parole Board under New York's statutory scheme, *Sandin* does not alter the conclusion that inmates in this state have no legitimate expectation of release. Accordingly, plaintiffs are not entitled to federal due process protection with respect to parole release determinations.

Finally, even if New York's parole provisions conferred upon inmates a protectible liberty interest, plaintiffs fail to state a claim against the Parole Board under § 1983. The Second Circuit recently held that Parole Board officials are entitled to absolute immunity from liability for damages under § 1983 for their decisions to grant, deny, or revoke parole. *Montero v. Travis,* No. 98-2063, 1999 WL 163554, at *4 (2d Cir. Mar. 26, 1999).

*Ex Post Facto Claim*

Plaintiffs further allege that the Parole Board's enforcement of the "Pataki policy" to eliminate parole of violent offenders, particularly those convicted of homicide and sex-related offenses, violates their right to be free of ex post facto punishment under Article I, § 10 of the federal Constitution. Plaintiffs do not cite to any specific legislative enactment or measure as having violated the Ex Post Facto Clause. Rather, they allege only that they have been aggrieved by the enforcement of a "policy", one that is both unwritten and unofficial. In other words, the basis of plaintiffs' claim is the purported "get-tough" approach recently adopted by the New York State Parole Board. Assuming, without deciding, that such a "policy" does in fact exist, plaintiffs' claim lacks an arguable basis in law and thus fails.

***3** It has long been held that the Ex Post Facto Clause prohibits laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins v. Youngblood,* 497 U .S. 37, 43, 110 S.Ct 2715, 2719-20, 111 L.Ed.2d 30 (1990) (*citing* *Calder v. Bull,* 3 Dall. 386, 391-392 (1798)). In large part, ex post facto jurisprudence centers on whether a particular enactment, measure, or regulation runs afoul of the Clause under that definition. *See e.g., California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Lee v. Governor of the State of New York,* 87 F.3d 55 (2d Cir.1996).

Although such an inquiry is determinative in many cases,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the analysis of plaintiffs' claim begins, and ultimately ends, on a much more fundamental level. Simply stated, the "policy" upon which plaintiffs rely as the basis of their claim is not a law subject to ex post facto analysis. This is not to say, of course, that a policy can never constitute a law for purposes of the Ex Post Facto Clause. A number of circuit courts have addressed, or at least made reference to, the issue of whether an administrative policy or regulation can be an ex post facto law.[FN3] The focus of the inquiry in those courts has been whether the policy or regulation is binding on the Parole Board, or merely serves as a guideline for the exercise of discretionary decisionmaking. *See e.g., Shabazz v. Gabry,* 123 F.3d 909, 914-915 (6th Cir.1997), *cert denied,* 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998) (finding memoranda and directives not laws for ex post facto purposes); *Hamm v. Latessa,* 72 F.3d 947, 956 n. 14 (1st Cir.1995) (identifying the nature of the inquiry); *Bailey v. Gardebring,* 940 F.2d 1150, 1156-57 (8th Cir.1991) (finding parole regulations merely aid Parole Board in exercise of discretionary authority); *Devine v. New Mexico Dep't of Corrections,* 866 F.2d 339, 343 n. 7 (10th Cir.1989) (finding guidelines that merely channel discretion of Parole Board do not constitute ex post facto laws); *Prater v. United States Parole Comm'n,* 802 F.2d 948, 952-53 (7th Cir.1986) (finding written policies do not qualify as laws for purposes of ex post facto analysis). Under such an analysis, binding regulations fall within the purview of the Clause whereas those that merely function as discretionary guides are not subject to ex post facto review.

> FN3. The Second Circuit is not among the courts that have considered this issue.

When viewed in accordance with this distinction, it is clear that the policy relied upon by the plaintiffs in the instant case is not one that is binding on the Parole Board. No official promulgation of the policy, either through legislative mandate or internal directive, requires the Board to follow or adopt it. The Board remains free to ignore the policy if it is so inclined. The most such a policy can be said to do is guide or channel the discretion of the Parole Board, thereby effectively removing it from the reach of the Ex Post Facto Clause. Simply put, this policy does not have the force and character of law necessary to invoke ex post facto analysis.

***4** Finally, plaintiff Barna contends that the application of parole guidelines enacted after his 1976 conviction, instead of those in force at the time of his offense, similarly violates the Ex Post Facto Clause. Specifically, Barna asserts that the guidelines now permit consideration of both the seriousness of the offense and the defendant's prior criminal record, two criteria that allegedly worked to his detriment. It is well-established in the Second Circuit, however, that federal parole guidelines are not laws within the meaning of the Ex Post Facto Clause. *Beltempo v. Hadden,* 815 F.2d 873, 875 (2d Cir.1987); *DiNapoli v. Northeast Regional Parole Comm'n,* 764 F.2d 143, 145 (2d Cir.1985). To the extent that *Beltempo* and *DiNapoli* involved the application of federal, rather than state, parole guidelines, such a distinction is one without a difference. Accordingly, Barna cannot establish an ex post facto violation with respect to the application of amended parole guidelines.

CONCLUSION

For the reasons stated above, it is hereby

RECOMMENDED, that defendants' motion to dismiss be granted and that the complaint be dismissed in its entirety.

IT IS HEREBY ORDERED that the Clerk of the Court serve a copy of this Order and Report-Recommendation,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)
(Cite as: 1999 WL 305515 (N.D.N.Y.))

by regular mail, upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health & Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1999.
Barna v. Travis
Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



C Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
William HYMAN, Plaintiff,
v.
C. HOLDER, et al., Defendants.
**No. 96 Civ. 7748(RCC).**

March 15, 2001.

Opinion and Order

CASEY, J.

***1** Plaintiff William Hyman ("Hyman"), an inmate at the Sing-Sing Correctional Facility, brings this action against Correction Officer Christopher Holder, Correction Officer J. McCarthy, Lieutenant Robert Patterson, Lieutenant Thomas Lucas, First Deputy Superintendent Charles Greiner and Superintendent John P. Keane (collectively, "defendants"), alleging that defendants conspired to violate his civil rights by filing a false inmate misbehavior report against him and by failing to conduct an adequate hearing before imposing certain disciplinary sanctions. Defendants now seek summary judgment on the grounds that no genuine issue of material fact is in dispute and that defendants are entitled to judgment in their favor as a matter of law. For the reasons set forth below, defendants' motion is granted.

I. BACKGROUND

On December 9, 1995, Hyman heard the sounds of a disturbance coming from the Southgate section of the Sing-Sing Correctional Facility. Hyman proceeded to that area where certain officers were engaged in a confrontation with a prisoner, inmate Delacruz. Roughly 40 other prisoners were in the vicinity and had begun shouting at the officers.

Hyman observed Officer Holder force inmate Delacruz to the ground. According to Hyman, Delacruz began thrashing on the floor in what Hyman assumed was an epileptic seizure. A principal dispute between the parties concerns Hyman's response to Officer Holder's actions. Hyman claims that he then raised his voice in order to alert the officers of his concern for Delacruz's presumed medical condition. In contrast, defendants contend that Hyman shouted obscenities and other loud and boisterous remarks, inciting other inmates to do the same.

The officers transported Delacruz to the Emergency Room. After Delacruz was removed, the prisoners moved on to their assigned activities. Hyman continued to follow his daily routine until the next morning, when Hyman was advised that he was in keeplock status and would be fed in his cell. That afternoon, Hyman received an inmate misbehavior report prepared by Officers Holder and McCarthy, which charged him with violations of Institutional Rules 104.10 (Rioting), 104.13 (Creating a Disturbance) and 102.10 (Threats). The reviewing officer, Lieutenant Patterson, designated the subsequent hearing as "Tier III," the most serious in the New York prison system.

Hyman met with his assigned assistant, Ms. Ibrahim, on

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

December 11, 1995, in order to prepare his defense. Hyman again met with Ms. Ibrahim on the day of the hearing, December 15, 1995. During the proceeding before Lieutenant Lucas, Hyman pled guilty to the charge of creating a disturbance. Hyman withdrew his request to call witnesses and did not proffer any witness testimony. Hyman was found guilty of rioting and threats and was sentenced to 270 days in keeplock, loss of 9 months good-time credits and loss of phone, commissary and package privileges.

Hyman wrote to Superintendent Keane by letter dated December 22, 1995, to request a discretionary review of the disciplinary hearing. The letter was forwarded to First Deputy Superintendent Greiner, who affirmed the underlying determination on January 8, 1996. Hyman appealed defendant Greiner's decision to the Director of Special Housing Donald Selsky. Selsky reduced Hyman's loss of good-time credits to 6 months and the keeplock sentence to 150 days, and dismissed the charge of rioting.

***2** Hyman brings the instant suit pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986 and 1988 on the basis that defendants conspired to violate his civil rights by filing a false inmate misbehavior report and conducting a procedurally improper hearing.[FN1] In addition, Hyman alleges that his equal protection rights were violated because he alone was singled out for discipline and that his confinement to segregated housing was contrary to the Eight Amendment. Finally, Hyman contends that defendants violated a number of prison regulations and directives.

FN1. The Complaint also refers to 18 U.S.C. §§ 241-42. However, those criminal statutes do not provide a private right of action. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 511 (2d Cir.1994).

Defendants make the following arguments in support of summary judgment: (1) Hyman's due process claims are barred under *Edwards v. Balisok,* 520 U.S. 641 (1997); (2) the allegations as to the inmate misbehavior report fail to state a constitutional claim because the Tier III hearing comported with due process; (3) Hyman has not established a viable equal protection violation on the basis of selective enforcement; (4) there is no evidence of conspiracy; (5) the Eighth Amendment claim is not cognizable; (6) the Court lacks jurisdiction over any allegations of state law violations; (7) defendant Keane was not personally involved with any alleged constitutional deprivations; and (8) defendants are entitled to qualified immunity. These arguments are addressed below.

## II. DISCUSSION

Summary judgment is appropriate only where no genuine issues of material fact remain for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). The moving party bears the initial burden of proof on such a motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Facts, and all inferences therefrom, must be viewed in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986); *American Cas. Co. v. Nordic Leasing, Inc.,* 42 F.3d 725, 728 (2d Cir.1994). If the moving party meets its burden, then the non-movant must set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 250. Mere "metaphysical doubt" is inadequate; sufficient evidence must exist upon which a reasonable jury could return a verdict for the non-movant. *Matsushita,* 475 U.S. at 587. A grant of summary judgment is appropriate when no rational jury could find in favor of the non-moving party because there is no genuine issue of material fact based on the evidence in the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

record or the substantive law. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

A. *Edwards v. Balisok*

Defendants first argue that Hyman's due process claims are not cognizable under § 1983 because the sanctions imposed on Hyman include the loss of good-time credits. *See Edwards v. Balisok,* 520 U.S. 641 (1997). In *Edwards,* which involved similar penalties to those here, the petitioner alleged that his prison disciplinary hearing, which led to the revocation of his good-time credits as well as a term of segregated confinement, violated his Fourteenth Amendment rights. Although the petitioner did not request restoration of the credits and framed his case solely as a challenge to the prison's procedures, the Supreme Court nevertheless determined that the § 1983 suit was barred. The Court held that the petitioner's case implicitly presented a challenge to the length of his sentence, and as such was not cognizable until the prison's determination was overturned administratively or judicially by the state courts, or through federal habeas review. *See also Heck v. Humphrey,* 512 U.S. 477 (1994); *Preiser v. Rodriguez,* 411 U.S. 475 (1973).

***3** Hyman argues that *Edwards* is inapplicable and that his suit should be allowed to proceed because his loss of good-time credits does not in and of itself affect his term of imprisonment. Although Hyman does not cite any case law, Hyman appears to rely on *Jenkins v. Haubert,* 179 F.3d 19, 27 (2d Cir.1999), in which the Second Circuit held that *Edwards* does not bar suits that do not affect the overall length of confinement. Hyman argues that the length of his confinement is not affected by the prison sanctions because under New York regulations the hearing disposition is merely tentative until a final decision is made by the Time Allowance Committee. *See* 7 N.Y.C.C.R. § 260.4. Hyman notes that the Committee may restore all or part of the lost allowance. *See* 7 N .Y.C.C.R. § 261.3. However, the possibility that the credits may be restored does not alter the Superintendent's decision. As another court in this District noted in rejecting the same argument:

> None of the cases evaluating § 1983 claims attacking a disciplinary decision involving a loss of good-time credits suggests that the fact or length of confinement is not implicated unless the inmate has already been considered for parole or conditional release. If Plaintiff were correct, if the deprivation of good-time does not implicate the fact or length of a prisoner's confinement unless and until the time allowance committee actually implements the superintendent's decision, a prisoner could not attack the deprivation in a state court CPLR article 78 proceeding or via habeas, which the law clearly allows him to do.... Although the prisoner has available to him ways by which he may recoup time lost, potentially cancelling out the effect of part or all of the deprivation, whether he will earn all of the lost time back is what is speculative. Unless and until he does, the deprivation of good-time most certainly does affect the length of the prisoner's sentence.

*Gomez v. Kaplan,* No. 94 Civ. 3292, 2000 WL 1458804, at *7 n. 7 (S.D.N.Y. Sept. 29, 2000). Therefore, because any ruling by this Court in Hyman's favor on his procedural claims would invalidate his sentence under *Edwards,* Hyman's due process claims are not cognizable until the prison's determination is overturned through administrative channels or through habeas corpus review. [FN2]

FN2. Hyman also appears to suggest that the length of his confinement was unaffected because he was held past his earliest release date of May 19, 1999. However, Hyman does not

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

indicate whether the Parole Board thereby affirmed the loss of the good-time credits or whether the issue of good-time credits may be reviewed again in the future with respect to another release date. In either event, Hyman's loss of good time credits affects the overall length of his confinement.

B. *Due Process*

Even if *Edwards* was not dispositive, Hyman's due process claims nonetheless must be dismissed as a matter of law. First, as a preliminary matter, Hyman's allegation that defendants conspired to file a false inmate misbehavior report does not in and of itself state a constitutional claim. The Constitution requires only that prison officials conduct a proper hearing before sanctioning an inmate based upon such a report. *See Greaves v. State of New York,* 958 F.Supp. 142, 144 (S.D.N.Y.1997) ("In other words, the failure to conduct an adequate disciplinary hearing may give rise to a Section 1983 action, but the mere filing of a false misbehavior report does not."); *see also Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U.S. 982 (1988) ("a prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest").

***4** Similarly, Hyman's assertion that a prison disciplinary determination must be supported by substantial evidence also does not comport with the case law. In *Superintendent v. Hill,* 472 U.S. 445, 453 (1985), the Supreme Court made clear that due process is satisfied if "some" evidence supports the prison's determination. In spite of "meager" evidence, including the lack of any direct evidence identifying the violator, the Supreme Court nonetheless found that the record in *Hill* was not "so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." *Id.* at 457. Here, it is undisputed that Hyman raised his voice either during or directly following a violent situation. Moreover, Hyman pled guilty to the charge of creating a disturbance. Therefore, there is sufficient evidence to support the determination at Hyman's disciplinary hearing.

Furthermore, Hyman has presented no other facts which would suggest that his Tier III hearing was in any way contrary to due process. Hyman suggests that his rights were violated because (1) the hearing was held less than 24 hours after he met with his assistant; (2) he was not provided with a to-from memorandum or an unusual incident report, as allegedly required by New York regulations; and (3) he was not permitted to call witnesses at the hearing.

In *Wolff v. Macdonnell,* 418 U.S. 539, 563 (1974), the Supreme Court elucidated the requirements of due process with respect to prison hearings, holding that an inmate is entitled to no less than 24 hours "advance written notice of the claimed violation and a written statement of the fact finders as to the evidence relied upon and the reasons for the disciplinary actions taken." However, *Wolff* does not require that the inmate meet with his assistant 24 hours in advance of the proceeding as well; indeed, *Wolff* necessarily presumes that assistance will be provided during the 24 hour period. Furthermore, the undisputed evidence indicates that Hyman met with Ms. Ibrahim on December 11, 1995, approximately 4 days prior to the hearing. The fact that Hyman met with her again on the day of the hearing does not vitiate the prior meeting, and indeed suggests that Hyman was provided with ample assistance.

Hyman next points out that defendants did not provide him with a to-from memorandum or an unusual incident report, which Hyman contends is required under New York

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

regulations. First, even if New York law does indeed require that an unusual incident report be filed in Hyman's situation,[FN3] the failure to do so does not give rise to a constitutional violation. In a similar case from this district also involving the failure to provide an unusual incident report, the court granted summary judgment to defendants, holding that:

FN3. Defendants contend that the incident at issue here did not rise to the level of an unusual incident because no force was used by or against Hyman, and no disruption of normal facility operations resulted. *See* Holder Reply Aff. ¶ 5.

> Although DOCS Directives 4933 and 4004 do require that special SHU logs and unusual incident reports should have been filed following the January 7, 1990 incidents, the failure of defendants to make such reports is a violation of a state directive, not a violation of a federal constitutional right.

***5** *Woods v. Robertson,* No. 90 Civ. 1672(JFK), 1990 WL 115717, at *4 (S.D.N.Y. Aug. 6, 1990); *see also infra* Section F.

Second, Hyman was not provided with a copy of the to-from memorandum because defendant Lucas believed that no such document had been issued, as to-from memoranda generally accompany only unusual incident reports, not inmate misbehavior reports. *See* Lucas Aff. ¶ 7. Hyman proffers no evidence that Lucas knowingly withheld the memorandum. The negligent failure to turn over materials cannot support a § 1983 claim. *See Daniels v. Williams,* 474 U.S. 327 (1986). Moreover, as the to-from memorandum was identical to the inmate misbehavior report, Hyman was not deprived of any relevant information prior to his hearing.

Finally, Hyman's claim that he was denied the right to call witnesses is wholly unsupported by the record. It is undisputed that Hyman withdrew his request to proffer witness testimony at the hearing. Indeed, defendant Lucas specifically asked Hyman if he would like to call witnesses, and Hyman declined. Lucas Aff. ¶ 7.

C. *Equal Protection*

Hyman also fails to state a viable claim for selective enforcement in violation of the Equal Protection Clause of the Fourteenth Amendment. In order to prevail, Hyman must show that (1) he was selectively treated as compared with others similarly situated, and (2) his selective treatment was prompted by an impermissible consideration, such as membership in a suspect class, intent to inhibit or punish the exercise of a constitutional right or malicious or bad faith intent to injure. *Birmingham v. Ogden,* 70 F.Supp.2d 353, 371 (S.D.N.Y.1999).

Hyman claims that he was singled out for discipline because he exercised his First Amendment right to report a medical emergency. However, it is undisputed that Hyman expressed his opinion by yelling during or immediately after a violent situation. Hyman acknowledges that he created a disturbance to get the officer's attention. Hyman Aff. ¶ 4. Such behavior is not constitutionally protected activity. *See Butler v. Westchester Cty.,* 94 Civ. 8216, 2000 WL 335539, at *7 (S.D.N.Y. Mar. 30, 2000) ("[t]here is no constitutional right to behave problematically"). Although no other prisoners were subject to disciplinary proceedings, Officer Holder has sworn that he charged Hyman because Hyman was the loudest, most threatening and most repetitive. Holder Reply Aff. ¶ 3. Moreover, Holder denies the allegation that he issued the report in order to retaliate against Hyman for calling attention to another inmate's

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

illness. *Id.* Hyman points to no evidence beyond mere speculation which would cast doubt upon defendant Holder's stated motive.

D. *Conspiracy*

Similarly, Hyman's conspiracy allegations also are unsupported. Hyman claims that defendants conspired to assist Officers Holder and McCarthy in the filing of the inmate misbehavior report, for the purpose of covering up the assault on Delacruz. It is well settled that plaintiff must proffer more than mere conclusory allegations in order to support a civil rights conspiracy complaint. *See* *Salahaddin v. Cuomo,* 861 F.2d 40, 43 (2d Cir.1988). Plaintiff must put forth facts demonstrating an agreement among two or more persons. *See* *Whitfield v. Forest Elec. Corp.,* 772 F.Supp. 1350, 1353 (S.D.N.Y.1991). Hyman claims that each defendant took actions that resulted in Hyman's keeplock sentence. However, Hyman points only to tasks that defendants are required to perform under state law, such as defendant Patterson's review of the report, defendant Lucas' hearing determination and defendant Greiner's appellate review after receiving the file from defendant Keane. These actions cannot constitute a "meeting of the minds;" otherwise, prison officials would be liable for conspiracy each time they performed their assigned duties.

E. *Eighth Amendment*

***6** Hyman claims that his confinement to a special housing unit constitutes cruel and unusual punishment. To prevail on an Eight Amendment claim, Holder must show that the conditions of his confinement involved "unquestioned and serious deprivations of human needs" and that prison officials imposed those conditions with deliberate indifference. *Jackson v. New York Dep't of Correctional Servs.,* 994 F.Supp. 219, 223 (S.D.N.Y.1998). Hyman does not point to any specific way in which his human needs went unmet. The Second Circuit has held that the conditions of special housing units do not per se violate the Eight Amendment. *See* *Anderson v. Coughlin,* 757 F.2d 33 (2d Cir.1985). Thus summary judgment is warranted on this claim as well.

F. *State Law Violations*

To the extent that Hyman claims defendants failed to follow prison regulations, such as directives concerning the implementation of disturbance control plans or the failure to include the specific roles of other prisoners in the inmate misbehavior report, these state law violations are not cognizable under § 1983. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, not for violations arising solely out of state or common-law principles. *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994); *see also* *Doe v. Connecticut Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ( "[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim.") (citations omitted). Because Hyman fails to allege the violation of any underlying federal law, his state law claims must be dismissed.

G. *Defendant Keane*

Hyman seeks to impose liability on defendant Keane on the grounds that Keane was notified of Hyman's appeal by letter and failed to remedy the alleged wrong. Courts consistently have held that mere receipt of a letter does not render the supervisor personally liable. *See* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Richardson v.*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

Not Reported in F.Supp.2d, 2001 WL 262665 (S.D.N.Y.)
(Cite as: 2001 WL 262665 (S.D.N.Y.))

*Coughlin,* No. 93-CV-6254, 2000 WL 815117, at *4-5 (W.D.N.Y. June 19, 2000). Nor can Hyman assert a viable claim based upon mere conclusory allegations that defendant Keane failed to supervise defendant Greiner. Hyman has provided no evidence which shows that Keane's supervision was grossly negligent as required in this Circuit. *See* *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

H. *Qualified Immunity*

Because Hyman fails to establish any constitutional violations on the merits, this Court need not address defendants' qualified immunity claims.

III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

S.D.N.Y.,2001.
Hyman v. Holder
Not Reported in F.Supp.2d, 2001 WL 262665 (S.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Wayne BARNES, Plaintiff,
v.
Lt. CRAFT; Sgt. J. O'Keefe; C.O. C. Hodges; and G. Goord, Commissioner of the New York State Department of Correctional Services, Defendants.
**No. 9:04-CV-1269.**

Aug. 18, 2008.

Wayne Barnes, Hackensack, NJ, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Michael G. McCartin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Chief Judge.

***1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 24th day of July, 2008. Following ten days from the service thereof, the Clerk has sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED, that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. The Defendants' motion for summary judgment (Dkt. No. 43) is granted.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This action has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Wayne Barnes ("Plaintiff"), while an inmate, commenced this *pro se* civil rights action on November 1, 2004, against four employees of the New York State Department of Correctional Services ("Defendants"), pursuant to 42 U.S.C. § 1983. (Dkt. No. 9 [Plf.'s Am. Compl.].) Generally, Plaintiff's Amended

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Complaint alleges that Defendants violated his rights under the First, Eighth and Fourteenth Amendments by confining him to the Special Housing Unit ("S.H.U.") at Ulster Correctional Facility ("Ulster C.F.") between March 12, 2004, and March 17, 2004, without providing him a hearing, in response to his refusal to shave his full beard, for which he claims he possessed, at the time, a valid exemption issued by the New York State Department of Correctional Services ("DOCS") due to his need to maintain the beard in order to engage in Rastafarian spiritual practices. (*Id.*) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. No. 43.) For the reasons that follow, I recommend that Defendants' motion be granted.

## I. BACKGROUND

### A. Plaintiff's Amended Complaint

Liberally construed, Plaintiff's Amended Complaint asserts the following factual allegations, in pertinent part.

In late 2003, while Plaintiff was incarcerated in the New York State Department of Correctional Services ("DOCS"), he was "passing through" Ulster Correctional Facility ("Ulster C.F."), wearing a full beard.[FN1] C.O. Hodes [FN2] stopped Plaintiff and ordered him to shave his beard.[FN3] Plaintiff informed C.O. Hodes that he had received a written permit from DOCS exempting him from DOCS' rule that beards may be no more than one inch in length (hereinafter "DOCS' one-inch beard rule").[FN4] C.O. Hodes called Wyoming C.F. (the correctional facility at which Plaintiff was regularly housed, and which was responsible for maintaining Plaintiff's records at the time), and was informed that Plaintiff indeed had such a written exemption on file.[FN5] As a result, C.O. Hodes permitted Plaintiff to pass through Ulster C.F. without having to shave his beard.[FN6]

FN1. (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

FN2. I note that, although Plaintiff's Amended Complaint refers to this individual as "C.O. C. Hodges" (Dkt. No. 9), Defendants have previously identified this individual as "C.O. Hodes" (Dkt. No. 19, Part 2 at 1 [Defs.' Mem. of Law in Support of Motion to Dismiss] ), and Plaintiff has previously requested that the Court amend his Amended Complaint accordingly (Dkt. No. 22, at 10 [Plf.'s Mem. of Law in Opp. to Motion to Dismiss] ).

FN3. (Dkt. No. 9, ¶ 7(a) [Plf.'s Am. Compl.].)

FN4. (*Id.* at ¶ 7(a).)

FN5. (*Id.*)

FN6. (*Id.*)

***2** Then, during the afternoon of March 12, 2004, while again passing through Ulster C.F., Plaintiff was again stopped by C.O. Hodes and ordered to shave his beard.[FN7] Plaintiff asked C.O. Hodes whether he did not remember Plaintiff from the previous time he had passed through Ulster C.F. [FN8] Plaintiff explained that he was the inmate who had received a written exemption from DOCS' one-inch beard rule.[FN9] C.O. Hodes responded that, at Ulster C.F., a permit does not matter and that if Plaintiff did not cut his beard he would have to go to the "box"

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

until he cut it.[FN10] Despite having been given a copy of the written exemption (by an unidentified person at an unidentified point in time), and knowing that Plaintiff was exempt from DOCS' one-inch beard rule regarding beards, C.O. Hodes sought to incarcerate Plaintiff in the "box" at Ulster C.F.[FN11]

FN7. (*Id.* at ¶ 7(a) & Exs. 1, 2 [attaching "Administrative Segregation Recommendation" dated 3/12/04, and complaint letter from Plaintiff dated 4/13/04].)

FN8. (*Id.* at ¶ 7(a).)

FN9. (*Id.*)

FN10. (*Id.*)

FN11. (*Id.*)

Toward this end, C.O. Hodes called Sgt. O'Keefe and informed him that Plaintiff was refusing to cut his beard and claiming that he had an exemption on file due to the fact that he was a "practicing and registered Rastafarian." [FN12] Plaintiff informed Sgt. O'Keefe that previously, when Plaintiff had been passing through Ulster. C.F., C.O. Hodes had learned that Plaintiff did indeed have an exemption on file.[FN13] Plaintiff also informed Sgt. O'Keefe that the Ulster C.F. "Intake Draft" has a copy of the permit from DOCS in Albany, New York.[FN14] Sgt. O'Keefe responded that, at Ulster C.F., a permit from Albany holds no weight and that if Plaintiff continued to refuse to cut his beard he would be sent to Ulster C.F.'s Special Housing Unit ("S.H.U.") until he cut his beard, regardless of any such permit.[FN15]

FN12. (*Id.* at ¶ 7(b) & Ex. 2 [attaching complaint letter from Plaintiff dated 4/13/04].)

FN13. (*Id.* at ¶ 7(b).)

FN14. (*Id.* at ¶ 7(a), (b).)

FN15. (*Id.* at ¶ 7(b).)

As a result, at approximately 3:40 p.m. on March 12, 2004, Sgt. O'Keefe signed an "Administrative Segregation Recommendation," stating that the reason for his recommendation was that "[Plaintiff] refused to shave his beard to one inch during the incoming draft process. [Plaintiff] claims he has an exemption on file." [FN16] At some point thereafter, Lt. Craft signed the "Administrative Segregation Recommendation," authorizing Plaintiff's confinement in S.H.U. pending a hearing on the recommendation.[FN17] The bottom of the "Administrative Segregation Recommendation" form stated as follows:

FN16. (*Id.* at Ex. 1 [attaching "Administrative Segregation Recommendation" dated 3/12/04].)

FN17. (*Id.*)

**Notice to Inmate:** A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V. You will be entitled to call witnesses on your own behalf, provided that doing so does not jeopardize institutional safety or correctional goals.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)
(Cite as: 2008 WL 3884369 (N.D.N.Y.))

If restricted pending a hearing on this recommendation, you may write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement.[FN18]

FN18. (*Id.*)

Between March 12, 2004, and March 17, 2004, Plaintiff remained in the Ulster C.F. S.H.U., during which time he was subjected to the following restrictive conditions, among others: the continuous confinement in his cell, the continuous isolation from the general prison population, the continuous denial of use of prison facilities (such as the libraries, gym, etc.), and sleep deprivation due to the 24-hour lighting in his cell and the loud noise of the air-conditioning system above his cell.[FN19]

FN19. (*Id.* at ¶¶ 5, 7 & Exs. 2, 4 [attaching complaint letter from Plaintiff dated 4/13/04, and a letter from Plaintiff dated 5/23/04].)

***3** On March 17, 2004, Plaintiff sent a letter of complaint to an unidentified person at Ulster C.F., complaining about the harsh conditions to which he was being subjected in S.H.U.[FN20] Plaintiff alleges that he sent this letter to "the hearing officer" (and/or perhaps to an unspecified lieutenant),[FN21] although he acknowledges that no hearing had yet been held.[FN22] Plaintiff never received a response to his letter.[FN23] However, on or about March 17, 2004, Plaintiff was released from S.H.U. and returned to Wyoming C.F.[FN24] No hearing was ever held.[FN25]

FN20. (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04].) I note that Plaintiff does not attach to his Amended Complaint a copy of this March 17, 2004, letter.

FN21. (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter to "the hearing officer (Lt./etc.)" and letter from Plaintiff dated 6/16/04 alleging that he sent the 4/17/04 letter to "the 'hearing officer' "].)

FN22. (*Id.* at Ex. 4 [attaching letter from Plaintiff dated 5/23/04 alleging that he sent the 4/17/04 letter "prior to a hearing"].)

FN23. (*Id.* at Exs. 4, 6 [attaching letter from Plaintiff dated 5/23/04 stating *inter alia* "I have yet to have ... a response from the hearing officer regarding this issue," and letter from Plaintiff dated 6/16/04 stating *inter alia* "I have never gotten a response from the hearing officer"].)

FN24. (*Id.* at Exs. 2, 4, 6 [attaching complaint letter from Plaintiff dated 4/13/04, letter from Plaintiff dated 5/23/04, and letter from Plaintiff dated 6/16/04].)

FN25. (*Id.* at ¶¶ 5, 7(c) & Ex. 4 [attaching letter from Plaintiff dated 5/23/04].)

Although Plaintiff's Amended Complaint references only the First Amendment (in asserting a retaliation claim), I liberally construe that pleading as attempting to raise an inadequate prison-conditions claim under the Eighth Amendment, and a procedural due process claim under the Fourteenth Amendment, given his special status as a *pro*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*se* civil rights litigant, and given various of the statements made in his Amended Complaint and documents attached to that pleading.FN26

FN26. (*See, e.g., id.* at ¶ 5 & Ex. 4 [attaching his letter dated 5/23/04, complaining that there was "no hearing" with regard to his confinement in the Ulster C.F. S.H.U.]; *id.* at Exs. 2 & 4 [attaching his letters dated 4/13/04 and 5/23/04, complaining about the allegedly "harsh," "degrading" and "inhumane" conditions in the Ulster C.F. S.H.U.].)

**B. Defendants' Motion for Summary Judgment**

Defendants argue that the Court should grant their motion for summary judgment for six reasons: (1) Plaintiff's Fourteenth Amendment procedural due process claim should be dismissed because he has failed to establish that his six-day stay in administrative segregation created a sufficient liberty interest to give rise to such a claim; (2) Plaintiff's Eighth Amendment claim of inadequate prison conditions should be dismissed because he has failed to establish either that he experienced a sufficiently serious deprivation or that Defendants acted with a sufficiently culpable state of mind; (3) Plaintiff's First Amendment retaliation claim should be dismissed because he failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature; (4) in the alternative, Plaintiff's claims against Defendants Goord and Craft should be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged; (5) in the alternative, Plaintiff's claims against all Defendants should be dismissed because, based on the current record, they are protected from liability by the doctrine of qualified immunity, as a matter of law; and (6) in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) of the Local Rules of Practice for this Court because of Plaintiff's failure to keep the Court apprised of his current address. (Dkt. No. 43, Part 12 [Defs.' Mem. of Law].)

Plaintiff has opposed Defendants' motion. (Dkt. No. 48.)

**II. RELEVANT LEGAL STANDARD**

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material FN27 fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.FN28

FN27. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN28. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

***4** However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FN29 The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

pleading" or "simply show that there is some metaphysical doubt as to the material facts." FN30 Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." FN31

FN29. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate, shall be entered against the [plaintiff]."); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN30. Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading...."); *Matsushita,* 475 U.S. at 585-86; *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN31. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

It should be noted that, where a non-movant fails to adequately oppose a properly supported factual assertion made in motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.FN32 Moreover, to be sufficient to create a factual issue for purposes of a summary judgment motion, statements made in an affidavit or deposition testimony must (among other things) not be conclusory.FN33 Such statements are conclusory if, for example, their assertions lack any supporting evidence or are too general.FN34

FN32. *See* *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord,* *Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13, 2004 WL 5477530 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4, 2006 WL 395269 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN33. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate v. Top Assoc.,* 425 F.2d 92, 97 (2d Cir.1970) (stating that the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN34. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

## III. ANALYSIS

### A. Whether Plaintiff's Fourteenth Amendment Procedural Due Process Claim Should Be Dismissed Because He Has Failed to Establish that His Six-Day Stay in Administrative Segregation Created a Sufficient Liberty Interest to Give Rise to Such a Claim

In 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Defendants argue that the short duration of Plaintiff's stay in Administrative Segregation at Ulster C.F., coupled with the rather ordinary conditions of that segregated confinement, do not create a sufficient liberty interest to give rise to a Fourteenth Amendment procedural due process claim. (Dkt. No. 43, Part 12, at 2-6 [Defs.' Mem. of Law].)

Plaintiff responds with a three-part argument: (1) he possessed a protected liberty interest because he possessed a valid DOCS-issued beard exemption when he was placed in administrative segregation; (2) he need not show *Sandin v. Connor'* s "atypical and significant hardship" requirement because the injury that he experienced consisted of the retaliatory conduct itself; and (3) in any event, his stay in Administrative Segregation imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" because (a) the conditions of his stay in Administrative Segregation were sufficiently harsh, and (b) those conditions were not "ordinary" to him since he was otherwise incarcerated in the general population of a medium-security correctional facility. (Dkt. No. 48, at 15-16 [Pages 14 and 15 of Plf.'s Response Mem. of Law].)

***5** With respect to Plaintiff's first argument, the fact that he possessed a DOCS-issued beard exemption does not create a protected liberty interest for purposes of a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

procedural due process claim. *Lee v. Quillar,* 04-CV-1203, 2007 U.S. Dist. LEXIS 50894, at *5-7, 2007 WL 2069942 (E.D.Cal. July 13, 2007) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge that he failed to cut his beard, even though charge contravened medical authorization permitting prisoner to wear beard), *adopted by,* 2007 U.S. Dist. LEXIS 61480, 2007 WL 2340235 (E.D.Cal. Aug. 16, 2007).[FN35] This is because, in 1995, the United States Supreme Court shifted a court's focus, when conducting a procedural due process analysis, from the language of the particular authority allegedly giving rise to the protected liberty interest alleged (e.g., a state law or regulation) to the nature of the deprivation alleged. *Sandin v. Connor,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).[FN36] Specifically, as stated earlier, in 1995, the Supreme Court held that a liberty interest protected by the Fourteenth Amendment's Due Process Clause will generally be limited to freedom from a restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84.

FN35. *See also* *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 52797, at *2, 14-21, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.) (recommending dismissal of prisoner's procedural due process claim arising from disciplinary charge and conviction-even assuming disciplinary charge had been issued in contravention of medical permit-since deprivation following conviction did not result in an atypical and significant hardship).

FN36. *See also* *Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord,* *Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord,* *Watson v. City of N. Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord,* *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Before continuing to Plaintiff's second argument, a few words are appropriate about any *substantive* due process claim he may be trying to assert in his Amended Complaint.[FN37] As an initial matter, I do not liberally construe Plaintiff's Amended Complaint (which essentially challenges the way DOCS' beard policy was implemented) as alleging a violation of his right to *substantive* due process.[FN38] Even if I were to so construe Plaintiff's Amended Complaint, I would have difficulty finding that the issuance of a DOCS' beard exemption (without the issuance of a court order) created such a right of substantive due process. *See* *Johnson v. Coughlin,* 90-CV-1731, 1997 WL 431065, at *6, 1997 U.S. Dist. LEXIS 11025, at *19-20 (S.D.N.Y. July 30, 1997) ("A prison official's knowing refusal to obey a state court order affecting a prisoner's rights would make that official liable for infringing upon the inmate's personal liberty protected by the substantive due process clause of the Fourteenth Amendment.").[FN39]

FN37. The Due Process Clause of the Fourteenth Amendment contains both a substantive component and a procedural component. *Zinernon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinernon,* 494 U.S. at 125 [internal quotations marks and citation omitted]. The procedural component bars "the deprivation by state action of a constitutionally protected interest in life, liberty, or property ... *without due process of law." Id.* at 125-26 [internal quotations marks

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

and citations omitted; emphasis in original]. One of the differences between the two claims is that a substantive due process violation "is complete when the wrongful action is taken," while a procedural due process violation "is not complete unless and until the State fails to provide due process" (which may occur *after* the wrongful action in question). *Id.*

FN38. Setting aside the lack of factual allegations in Plaintiff's Amended Complaint plausibly suggesting a substantive due process claim, I note that, as the Supreme Court has repeatedly held, "if a constitutional claim is covered by a specific constitutional provision, such as the ... Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the [more generalized notion] of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 392-94 [1989] ). Here, Plaintiff's failure-to-honor-his-beard-exemption claim is more appropriately analyzed as a First Amendment retaliation claim, an Eighth Amendment inadequate-prison-conditions claim, and/or a Fourteenth Amendment procedural due process claim. Thus, there is no need to analyze that claim as a Fourteenth Amendment substantive due process claim.

FN39. *Cf. Young v. Goord,* 192 F. App'x 31, 33 (2d Cir.2006) ("[I]t is at least reasonable to read Rule 110.32 [the DOCS regulation governing inmates' beard length, which permits DOCS-issued exemptions] *not* to create a substantive right to a religious exemption from the beard-length policy ....") [emphasis in original].

Furthermore, even if I were able to find that the issuance of a DOCS' beard exemption alone created such a right of substantive due process, I would have difficulty finding evidence in the record that Defendants' actions were not simply "incorrect or ill-advised" but were "arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense." *Lowrence v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) [internal quotations marks and citations omitted], *aff'g,* 91-CV-1196, *Memorandum-Decision and Order* (N.D.N.Y. Jan. 26, 1993) (DiBianco, M.J.) (granting summary judgment to defendants in inmate's civil rights action). I note that prison beard-length policies generally appear to have a legitimate penological objective-whether it be to facilitate inmate identification, prevent hygiene problems, or minimize the need for contact between guards and the inmate during searches.[FN40] Here, the record indicates that accurate identification was one of the penological objectives of the beard-length policy in question.[FN41]

FN40. *Cf. Singh v. Goord,* 520 F.Supp.2d 487, 507 (S.D.N.Y.2007) ( "[N]umerous courts have held that Directive 4914's initial shave requirement serves a legitimate penological interest in maintaining prison security and a record of prisoners' appearances in case of escape.") [collecting cases].

FN41. (Dkt. No. 43, Part 5, at 2 [Ex. C to McCartin Decl., attaching Directive 4914, stating, "It is the purpose of this directive to ensure that inmate appearance will be regulated sufficiently to maintain accurate identification of each individual"].)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

***6** With respect to Plaintiff's second argument, I have found no cases suggesting that *Sandin'* s atypicality requirement is automatically satisfied when a prisoner has been subjected to retaliation. Rather, in every on-point case I have found (in my non-exhaustive search), courts have considered allegations (and evidence) of retaliation *separately* from allegations (and evidence) of due process violations.[FN42]

> FN42. *See, e.g., Wells v. Wade,* 36 F.Supp.2d 154, 158-59 (S.D.N.Y.1996) (finding that evidence did *not* exist that plaintiff experienced atypical and significant hardship, due to placement in pre-hearing keeplock confinement, for purposes of due process claim, but that evidence *did* exist that defendant took adverse action against plaintiff, by causing him to be placed in pre-hearing keeplock confinement, because he engaged in protected activity for purposes of retaliation claim); *Watson v. Norris,* 07-CV-0102, 2007 WL 4287840, at *3-5 (E.D.Ark. Dec.7, 2007) (finding that prisoner's allegations, arising from placement in segregated housing, did *not* plausibly suggest atypical and significant hardship for purposes of due process claim, but that his allegations-arising from same placement in segregated housing-*did* plausibly suggest that defendants took adverse action against him because he engaged in protected activity for purposes of retaliation claim); *Harris v. Hulkoff,* 05-CV-0198, 2007 WL 2479467, at *4-5 (W.D.Mich. Aug.28, 2007) (first considering whether evidence existed that plaintiff experienced atypical and significant hardship, due to placement on suicide watch, for purposes of due process claim, and *then* considering whether evidence existed that defendants took adverse action against plaintiff, by placing him on suicide watch, because he engaged in protected activity for purposes of retaliation claim).

With regard to Plaintiff's third argument, the fact that the conditions of his Administrative Segregation were restrictive, and the fact that he "ordinarily" was incarcerated in the general population of a medium-security correctional facility, do not, in and of themselves, create a question of fact regarding whether his stay in Administrative Segregation, coupled with the conditions of that segregated confinement, gave rise to a Fourteenth Amendment claim. Rather, in determining whether Plaintiff's six-day stay in Administrative Segregation imposed an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life," the Court must determine what the conditions of that six-day Administrative Segregation were, as established by the record evidence, and then compare the imposition of those conditions for six days to "the ordinary incidents of prison life."

Here, Plaintiff has adduced at least *some* record evidence that, during the time in question, he experienced the following conditions of confinement. First, prior to entering his cell in S.H.U. on March 12, 2004, Plaintiff was strip searched and "handled very rigorously...." (Dkt. No. 43, Part 3, at 33-34 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) Plaintiff was told that, if he took his hands off the wall, he would "be beaten up[,] but not [in] those words." (*Id.* at 34.)

Second, during his confinement in Administrative Segregation, from March 12, 2004, to March 17, 2004, Plaintiff was alone in his cell, and he never left his cell. (Dkt. No. 43, Part 3, at 33, 36 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) He was locked in his cell twenty-four (24) hours a day for all six days he spent in Administrative Segregation. (*Id.* at 39.) In addition, Plaintiff did not participate in recreation period, nor was

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

he afforded the opportunity to shower. (*Id.* at 38-39; *see also* Plf.'s Decl. in Opp., ¶ 25.)

Third, Plaintiff's cell in Administrative Segregation was approximately five feet by ten feet in size. (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) It contained one bed, one toilet, and no shower. (*Id.*) The lights were on in the cell twenty-four (24) hours a day. (*Id.* at 37.) What Plaintiff thinks was an "air-conditioning system" made a loud noise almost constantly that vibrated the cell. (*Id.*) While in the cell, Plaintiff was "deprived of sleep" and he felt "claustrophobic." (Plf.'s Decl. in Opp., ¶ 25.)

Fourth, although it was wintertime, the cell was "very hot" and "too hot." (Dkt. No. 43, Part 3, at 37 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) If the window was open, the cell would feel too cold to Plaintiff. (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 25.) Plaintiff felt comfortable only when wearing just a t-shirt, although "it still would be too humid." (Dkt. No. 43, Part 3, at 38 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

***7** Fifth, during his six-day stay in Administrative Segregation, Plaintiff "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.)

Sixth, and finally, during his confinement in Administrative Segregation, Plaintiff possessed his "State[-issued] green[ ] clothing]," received three meals a day, and was permitted to mail at least one letter. (Dkt. No. 43, Part 3, at 36, 38 [Exhibit A to McCarin Decl., attaching Plf.'s depo. trans.]; Plf.'s Decl. in Opp., ¶ 21.)

No record evidence exists that, during the six-day period at issue, Plaintiff was subjected to any substandard cell conditions (e .g., regarding bedding, cleanliness, etc.), or poor treatment (e.g., unwarranted searches, beatings, denial of meals, etc.), other than the previously described conditions and poor treatment. (*See* Plf.'s Decl. in Opp., ¶ 25; Dkt. No. 43, Part 3, at 39-40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].)

Under these circumstances, I find that no record evidence exists that the duration and conditions of Plaintiff's stay in Administrative Segregation at Ulster C.F. created a protected liberty interest to give rise to a Fourteenth Amendment due process claim. Generally, the conditions experienced by Plaintiff in Administrative Segregation were the same as, or perhaps slightly more harsh than, the conditions ordinarily experienced in disciplinary confinement in a correctional facility within the New York State DOCS.[FN43] *See Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing 7 N.Y. Comp.Codes R. & Regs. §§ 304.1-304.14).

FN43. I note that, in his deposition, Plaintiff testified that he had "spoken to several prisoners of the treatment you get [in S.H.U. confinement]" and that he "was subject to ... that type of treatment." (Dkt. No. 43, Part 3, at 34 [Ex. A to McCarin Decl., attaching Plf.'s depo.

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

trans.].)

Finally, numerous courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in a Special Housing Unit ("S.H.U.") of *far* more than six (6) days, even where the conditions of confinement in the Special Housing Unit were, to varying degrees, more restrictive than those in the prison's general population. *See, e.g., Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and *somewhat more severe than those of general population"* did not rise to the level of atypicality) [emphasis added]. FN44 Several of those cases have also recognized (1) the fact that restrictions (such as the amount of time allowed out of one's cell to exercise and the number of showers allowed per week) are placed even on inmates in the general population FN45 and (2) the fact that a sentence in S.H.U. is a relatively common and reasonably expected experience for an inmate in the general population of a New York State correctional facility.FN46

FN44. *See also Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN45. *See, e.g., Husbands,* 990 F.Supp. 218-19 ("The conditions of confinement in SHU also are not dramatically different from those experienced in the general population. For example, as stated previously, all inmates in SHU are allowed one hour of outdoor exercise daily. [7 NYCRR] § 304.3. This is the same amount of time allotted for exercise to general population inmates, *id.* § 320.3(d)(2), and is in full compliance with constitutional requirements.... SHU inmates are allowed a minimum of two showers per week, 7 NYCRR § 304.5(a), while general population inmates are allowed three showers per week, *id.* § 320.3(d)(1). SHU inmates are confined to their cells approximately twenty-three hours a day. General population inmates are confined to their cells approximately twelve hours a day during the week and even more on the weekends.... Thus, conditions at New York correctional facilities involve a significant amount of

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

lockdown time even for inmates in the general population."); *accord, Warren,* 985 F.Supp. at 354-55; *see also Ruiz,* 1997 WL 137448, at *5 ("Indeed, the conditions at Halawa [prison] involve significant amounts of 'lockdown time' even for inmates in the general population. Based on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing him there for 30 days did not work a major disruption in his environment.").

FN46. *See, e.g., Husbands,* 990 F.Supp. 217 ("[The plaintiff] was convicted of a drug-related crime and was serving an indeterminate sentence of six years to life at the time of the events in question. With respect to the duration of his confinement in SHU, [the plaintiff] spent six months there. Lengthy disciplinary confinement is prevalent in New York State prisons. In fact, New York law imposes no limit on the amount of SHU time that may be imposed for Tier III infractions. 7 NYCRR § 254.7(a)(1)(iii). As of March 17, 1997, there were 1,626 inmates in SHU for disciplinary reasons.... Of those inmates, 28 had SHU sentences of 59 days or less; 129 had SHU sentences of 60-119 days; 127 had SHU sentences of 120-179 days; 545 had SHU sentences of 180-365 days; and 797 had SHU sentences exceeding 365 days. These statistics suggest that lengthy confinement in SHU-for periods as long as or longer than [the plaintiff's 180-day] stay-is a normal element of the New York prison regime."); *accord, Warren,* 985 F.Supp. at 354.

***8** For all of these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment due process claim.

**B. Whether Plaintiff's Eighth Amendment Claim of Inadequate Prison Conditions Should Be Dismissed Because He Has Failed to Establish Either that He Experienced a Sufficiently Serious Deprivation or that Defendants Acted with a Sufficiently Culpable State of Mind**

Generally, to prevail on a claim of inadequate prison conditions, a plaintiff must demonstrate two things: (1) that the conditions of his confinement resulted in deprivation that was *sufficiently serious;* and (2) that the defendant acted with *deliberate indifference* to the plaintiff's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W.D.N.Y.2005).

To satisfy the seriousness requirement, a plaintiff must demonstrate that the conditions of his confinement deprived him of "the minimal civilized measure of life's necessities" or an "unquestioned and serious deprivation of basic human needs." *Farmer,* 511 U.S. at 834; *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). As the Supreme Court has rather famously observed, "[T]he Constitution does not mandate comfortable prisons," and "conditions [that] are restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes,* 452 U.S. at 347, 349.

To satisfy the deliberate-indifference requirement, a plaintiff must demonstrate that the defendants acted with a state of mind of "deliberate indifference to inmate health or safety...." [FN47] This means a state of mind "more blameworthy than negligence." [FN48] Rather, it means that the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

substantial risk of serious harm exists, and he must also draw the inference." [FN49] In other words, "this standard requires that only the deliberate infliction of punishment, and not an ordinary lack of due care for prisoner interests or safety, leads to liability." [FN50]

FN47. *Farmer,* 511 U.S. at 834.

FN48. *Id.* at 835.

FN49. *Id.* at 837.

FN50. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999) (citing *Farmer,* 511 U.S. at 841).

**1. Sufficient Seriousness**

Here, I find no record evidence that the conditions of Plaintiff's six-day stay in Administrative Segregation were *sufficiently serious* for purposes of the Eighth Amendment in that they deprived him of *the minimal civilized measure of life's necessities,* such as food, water, or a toilet. To the contrary, Plaintiff testified in his deposition that his cell contained "the bare necessities." (Dkt. No. 43, Part 3, at 35 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.].) For example, he testified that his cell was equipped with a toilet, a bed, lights, heat, an "air-conditioning system," and a window. (*Id.* at 35, 37-38.) In addition, he testified that he possessed a t-shirt and his "State[-issued] greens"; he received three meals a day; and he was able to mail a letter. (*Id.* at 36, 38; *see also* Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 21.)

***9** Granted, Plaintiff has adduced some evidence that, during the six-day time period, he was denied the opportunity to exercise outside, the ability to shower, and (when his window was open) a certain degree of warmth. (Dkt. No. 43, Part 3, at 35, 38-39 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 48, Plf.'s Decl. in Opp., ¶ 25.) However, these deprivations for six days were simply not sufficiently severe and prolonged to rise to the level of an Eighth Amendment violation. *See Trammel v. Keane,* 338 F.3d 155, 158-159, 164 (2d Cir.2003) (affirming grant of defendants' motion for summary judgment dismissing Eighth Amendment claim based on [1] deprivation of all property except one pair of undershorts and [2] exposure to "bitter cold," because the temperatures to which inmate was exposed were not cold enough, and the period of time in which he was deprived of clothing-seventeen days-was not long enough); *Scot v. Merola,* 555 F.Supp. 230, 231-234 (S.D.N.Y.1983) (granting defendants' Rule 12[b][6] motion to dismiss inmate's Eighth Amendment claim based on his incarceration for three-and-a-half months on Rikers Island in housing area without heat where windows were broken, and temperature dropped below fifty degrees).[FN51]

FN51. *See also Lock v. Clark,* 90-CV-0327, 1992 U.S. Dist. LEXIS 21991, at *1, 11-12, 1992 WL 559660 (N.D.Ind. March 17, 1992) ("The deprivations alleged by Mr. Lock in this case [which consisted of being confined for seven days in a "strip cell" in a segregation unit] fail to satisfy the objective component of his Eighth Amendment conditions claim, and they do not rise to the level of a constitutional violation."). (*See also* Dkt. No. 43, Part 12, at 8 [Defs.' Mem. of Law, citing cases].)

Furthermore, Plaintiff has adduced evidence that he "never received any medical attention." (Dkt. No. 48, Plf.'s Decl. in Opp ., ¶ 25.) However, he has not adduced evidence that (1) he needed such attention or (2) he requested such

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

attention. (*Id.*) As a result, he has adduced no evidence that, during the time in question, either (1) medical attention was, to him, one of "life's necessities," or (2) he was *denied* such attention after requesting it. *Trammell,* 338 F.3d at 164 ("Although Trammell's requests to be taken from his cell for medical evaluation were not granted, the record shows that the defendants were mindful of, not indifferent to, his health and ensured that his basic 'health or safety' was not at risk.").

For these reasons, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish a deprivation that was sufficiently serious.

**2. Deliberate Indifference**

Because I have already found that an adequate ground exists upon which to recommend the dismissal of Plaintiff's Eighth Amendment claim of inadequate prison conditions, the Court need not analyze Defendants' alternative Eighth Amendment argument that Plaintiff has failed to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation at Ulster C.F. However, in the interest of thoroughness, I will briefly analyze that claim.

Defendants focus their argument on the fact that none of them had any control over, or even knew about, the allegedly inadequate conditions of Plaintiff's confinement during his six-day stay in Administrative Segregation. (Dkt. No. 43, Part 12, at 7-9 [Defs.' Mem. of Law].)

***10** Plaintiff responds with a three-part argument: (1) Defendant Hodes acted with the requisite mental state because he knew on March 12, 2004, that Plaintiff had a DOCS-issued beard exemption (due to his previous encounter with Plaintiff in late 2003); (2) Defendants Craft and O'Keefe acted with the requisite mental state because they recklessly failed to take the easy step of checking if he had a beard exemption; and (3) each Defendant, after causing Plaintiff to be confined to Administrative Segregation, failed to "[ ]check [ ]" up on him there. (Dkt. No. 48, at 16-17 [Pages 15 and 16 of Plf.'s Response Mem. of Law].)

I can find no record evidence that any Defendant knew of the allegedly inadequate prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C.F. before they caused Plaintiff to be confined there. Furthermore, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

Plaintiff may have adduced some evidence that Defendants Hodes and O'Keefe turned a blind eye to the written exemption inside the top of his "draft bag" upon his arrival at Ulster C.F. on March 12, 2004. (Dkt. No. 43, Part 3, at 17-28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) However, that evidence does not constitute evidence that Defendants Hodes and O'Keefe possessed a reckless mental state with regard to the prison conditions that Plaintiff would experience in Administrative Segregation at Ulster C .F.

For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's Eighth Amendment claim of inadequate prison conditions for failure to establish that Defendants acted with a sufficiently culpable state of mind with regard to the conditions of Plaintiff's confinement

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

during his six-day stay in Administrative Segregation at Ulster C.F.

**C. Whether Plaintiff's First Amendment Retaliation Claim Should Be Dismissed Because He Failed to Establish that the Adverse Action Allegedly Taken Against Him Was Anything More than *De Minimis* in Nature**

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

***11** *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

Defendants focus their First Amendment argument on the assertedly *de minimis* nature of the adverse action, the fact that it was not accompanied by any threat of future such adverse action, and the fact that Plaintiff subjectively expected that the adverse action would be brief (at the time it was taken). (Dkt. No. 43, Part 12, at 12-15 [Defs.' Mem. of Law].) In response, Plaintiff focuses on, among other things, the nature of the deprivations he unjustifiably experienced during his confinement in Administrative Segregation. (Dkt. No. 48, at 18-19 [Pages 17 and 18 of Plf.'s Response Mem. of Law].)

In making their argument, Defendants attempt to distinguish the facts of the current case from the facts of a Second Circuit case finding that a question of fact existed as to the *de minimis* nature of a nine-day keeplock

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

confinement, *which was accompanied by threat of future misbehavior reports*. *See* Gill v. Tuttle, 93 F. App'x 301, 303 (2d Cir.2004). I agree that this sort of additional adverse action by a defendant is an adequate ground upon which to distinguish *Gill v. Tuttle* and similar cases.[FN52] Granted, I have found some district court cases (from within the Second Circuit) ruling that a question of fact existed as to the *de minimis* nature of keeplock confinements that do not appear to have been accompanied by such additional adverse action. [FN53] However, the keeplock confinements in those cases were somewhat longer than was the keeplock confinement in this action.

FN52. *See, e.g.,* Keesh v. Goord, 04-CV-0271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct.1, 2007) (question of fact existed as to *de minimis* nature of Correction Officer Ekpe's keeplock confinement of plaintiff for one day, during which, according to the record evidence [specifically, Plf.'s Ex. 9], Correction Officer Ekpe "may have ... deprived [plaintiff] of meals") [citations omitted]; *see also Keesh v. Goord,* 04-CV-0271, Verified Complaint, ¶ "IV.W." (W.D.N.Y. filed Apr. 7, 2004) (swearing that Def. Ekpe and officials "refused to provide me with my meal").

FN53. *See, e.g.,* Auleta v. LaFrance, 233 F.Supp.2d 396, 402 (N.D.N.Y.2002) (Kahn, J.) ("At this stage of the action [i.e., the pleading stage], Plaintiff's claim that he was placed in keeplock for 7 1/2 days is properly construed as alleging adverse action") [citations omitted]; *Bartley v. Collins,* 95-CV-10161, 2006 U.S. Dist. LEXIS 28285, at *22, 2006 WL 1289256 (S.D.N.Y. May 12, 2006) ("Collins's second misbehavior report against plaintiff did constitute adverse action because it caused plaintiff to be placed in keeplock confinement for ten days.") [citations omitted]; *Wells v. Wade,* 96-CV-1627, 2000 WL 1239085, at *4 (S.D.N.Y. Aug.31, 2000) ("[A] rational trier of fact could find that the filing of a frivolous misbehavior report that resulted in thirteen days of pre-hearing 'keeplock' confinement would be likely to chill a person of ordinary firmness from continuing to engage in activity protected by the First Amendment: namely, pursuing a prison grievance.") [internal quotations omitted].

I have also found some cases in which a plaintiff was taken to a Special Housing Unit ("S.H.U."), as was Plaintiff in the current action.[FN54] These cases suggest that, generally, a *transfer* to a housing unit may be a type of adverse action that is more than *de minimis*.[FN55] However, these cases too appear to be somewhat distinguishable because they invariably involve a formal *transfer* (i.e., change in residence) to a Special Housing Unit for a long period of time.[FN56]

FN54. (*See* Dkt. No. 43, Part 11, ¶ 12 [Defs.' Rule 7.1 Statement, asserting that Plaintiff was "place[d] in administrative segregation status in the Special Housing Unit ... at Ulster Correctional Facility...."]; Dkt. No. 43, Part 9, ¶¶ 8, 10 [O'Keefe Decl., stating that "I was directed to have the plaintiff taken to SHU on administrative segregation status ..." and "plaintiff was placed in the SHU on March 12, 2004 ..."].)

FN55. *See* Allah v. Poole, 506 F.Supp.2d 174, 187 (W.D.N.Y.2007) ( "C]ourts have held that transfers to other facilities or housing units can satisfy the adverse-action requirement ....") [collecting cases]; *Chavis v. Struebel,* 317 F.Supp.2d 232, 238-39 (W.D.N.Y.2004)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

("[T]ransferring an inmate to another housing unit or to a psychiatric facility ... satisfies the adverse action requirement.") [citations omitted].

FN56. *See, e.g., Walker v. Pataro,* 99-CV-4607, 2002 WL 664040, at *8-9 (S.D.N.Y. Apr.23, 2002) (question of fact exists as to *de minimis* nature of permanent transfer to different housing unit in general population, which resulted in loss of higher-paying prison job).

***12** Here, there was no long-term transfer to the Ulster C.F. S.H.U. Rather, Plaintiff was taken to the Ulster C.F. S.H.U. (during his transportation through Ulster C.F.) for what was intended to be, and what Plaintiff *understood* would be, a brief period of time.[FN57] There is no admissible record evidence that Defendants *knew* the duration of, or (allegedly) substandard conditions of, the confinement that Plaintiff would ultimately experience in the Ulster C.F. S.H.U.[FN58] Moreover, there is no admissible record evidence that Plaintiff ended up staying in S.H.U. for six days *because of* the acts of Defendants O'Keefe or Craft (or any Defendant).[FN59] Rather, the admissible record evidence suggests that the delay in Plaintiff's release from S.H.U. was caused by (1) the delay of the Inmate Records Coordinator in reviewing Plaintiff's file (presumably in DOCS' Central Files) to determine whether he was correctly stating that he had an exemption for his beard, and/or perhaps (2) Plaintiff's own delay in sending a letter to his Administrative Segregation hearing officer regarding his release.[FN60]

FN57. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing that "After I contacted the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard. The Inmate Records Coordinator was going to be the individual to check the records."]; Dkt. No. 43, Part 3, at 18, 22-23 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that, during the time in question, he was being "transported through Ulster [C.F.]" on his way back from "court appearances in New York City"]; Dkt. No. 43, Part 3, at 45 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before March 17, 2004, "because I figure I would have been out of the box before this because they would have verified that I had a permit but apparently that didn't happen."].)

FN58. (Dkt. No. 43, Part 8, ¶¶ 7-11 [Craft Decl.]; Dkt. No. 43, Part 9, ¶¶ 8, 10-11 [O'Keefe Decl.]; Dkt. No. 43, Part 10, ¶¶ 10, 12-13 [Hodes Decl.]; Dkt. No. 43, Part 3, at 40 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans.]; *see also* Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 15 [stating, "Plaintiff posses[es] no information or knowledge" in response to Defendants' Rule 7.1 factual assertion that "[f]rom March 12, 2004 until March 17, 2004, none of [D]efendants w[as] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU"].) I note that the only role that Defendants O'Keefe and Craft played in Plaintiff's confinement to S.H.U. was in the initial decision to take Plaintiff to S.H.U.-Defendant O'Keefe recommending that Plaintiff be subject to Administrative Segregation, and Defendant Craft authorizing Plaintiff's pre-hearing confinement to Administrative Segregation. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

the facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status...."]; Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., alleging that Def. Craft "failed to ... see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 10, ¶ 10 [Hodes Decl., swearing, "I played no role in a decision to place plaintiff into administrative segregation in the Ulster SHU. That decision was made by others...."].)

FN59. (*See* Dkt. No. 43, Part 10, ¶ 12 [Hodes Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 9, ¶ 10 [O'Keefe Decl., swearing, "Once plaintiff was placed in the SHU on March 12, 2004, I had no further contact with him."]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl., swearing that, during Plaintiff's confinement to S.H.U., he had no involvement in the conditions of that confinement].)

FN60. (Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "I was directed to have the plaintiff taken to SHU on administrative segregation status until plaintiff's file could be reviewed and it could be determined whether plaintiff was correctly stating that he had an exemption for his beard. The Inmate Records Coordinator was going to be the individual to check the records. ... ]; Dkt. No. 9, at 18 [Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft, indicating that Plaintiff would be "confined pending a determination on [the] recommendation," a hearing would "be conducted within 14 days of [the] recommendation," and that Plaintiff could "write to the Deputy Superintendent for Security or his/her designee prior to the hearing to make a statement on the need for continued confinement"]; Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCarin Decl., attaching Plf.'s depo. trans., stating that he did not write a letter before March 17, 2004, "because I figure I would have been out of the box before this because they would have verified that I had a permit but apparently that didn't happen. And, so, ... I wrote that letter to [the Lieutenant or Hearing Officer who would be conducting his Administrative Segregation Hearing] and I gave it to the Officer for mailing."].)

As a result, I find some guidance in a case from the U.S. District Court for the Western District of New York that recently recognized the rather common-sense point of law that, when considering whether or not adverse action is *de minimis* for purposes of a First Amendment retaliation claim, it is appropriate for a court to focus on the adverse action *caused by the defendant or defendants in question* (rather than whatever bad things happened to the plaintiff following the taking of adverse action by the defendant or defendants). In *Coleman v. Sutton,* a prison doctor transferred a prisoner to the prison's infirmary, where-because of the prisoner's own refusal to stay in the infirmary-he was then transferred to the prison's Special Housing Unit. *Coleman v. Sutton,* 530 F.Supp.2d 451, 452-53 (W.D.N.Y.2008). The Western District held that the prisoner's transfer to S.H.U. was not sufficiently adverse to constitute adverse action (for purposes of the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

prisoner's First Amendment retaliation claim against the correctional officer) since that transfer was caused not by the correctional officer but by the plaintiff's own refusal to stay in the prison's infirmary. *Coleman,* 530 F.Supp.2d at 453.

Here, as in *Coleman,* while Plaintiff's *initial placement* in S.H.U. was caused by Defendants O'Keefe and Craft, Plaintiff's stay there *for six days* was caused not by those Defendants but by other events. Under the circumstances, I can find no record evidence that Plaintiff's being taken to S.H.U. pending the Ulster C .F. Inmate Records Coordinator's review of Plaintiff's file (to determine whether he was correctly stating that he had an exemption for his beard) was an action that was sufficiently adverse to deter a similarly situated individual of ordinary firmness from exercising his constitutional rights (i.e., by continuing to wear a beard of more than an inch in length as a tenet of his Rastafarian religion).

***13** For these reasons, I recommend that, in the alternative, the Court dismiss Plaintiff's First Amendment retaliation claim because he has failed to establish that the adverse action allegedly taken against him was anything more than *de minimis* in nature.

**D. Whether, in the Alternative, Plaintiff's Claims Against Defendants Goord and Craft Should Be Dismissed Because Plaintiff Has Failed to Establish that They Were Personally Involved in the Constitutional Violations Alleged**

Because I have already concluded that no constitutional violations occurred in which any Defendant (including Defendants Goord and Craft) could have been personally involved, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against Defendants Goord and Craft be dismissed because Plaintiff has failed to establish that they were personally involved in the constitutional violations alleged. However, in the interest of thoroughness, I will analyze that argument (and assume, for the sake of argument, that constitutional violations did occur in which they could have been personally involved).

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 [2d Cir.1991] ).[FN61] In order to prevail on a cause of action under 42 U.S.C. § 1983 against an individual, a plaintiff must show some tangible connection between the alleged unlawful conduct and the defendant.[FN62] If the defendant is a supervisory official, such as a DOCS Commissioner or Deputy Commissioner, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct.[FN63] In other words, supervisory officials may not be held liable merely because they held a position of authority.[FN64] Rather, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing or supervising subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring.[FN65]

FN61. *Accord, McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978);

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

FN62. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

FN63. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985).

FN64. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

FN65. *Iqbal v. Hasty,* 490 F.3d 143, 152 (2d Cir.2007) (setting forth five prongs); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986) (setting forth four prongs).

**1. Defendant Goord**

In their Rule 7.1 Statement, Defendants have asserted that "Defendant Goord was not personally involved in any of the actions that lead to the plaintiff's confinement in the Ulster Correctional Facility SHU from March 12, 2004 until March 17, 2004," supporting that assertion with a record citation. (Dkt. No. 43, Part 11, ¶ 23 [Defs.' Rule 7.1 Statement, citing pages 28-29 of Plaintiff's depo. trans.].) Setting aside the fact that Defendants' assertion is too much like a conclusion of law, I find that the deposition transcript to which they cite does not go so far as to say that Defendant Goord "was not personally involved" in the constitutional violations alleged. (Dkt. No. 43, Part 3, at 28-31 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

***14** Rather, fairly and reasonably read, Plaintiff's deposition transcript says that Defendant Goord's involvement was limited to the fact that (1) he had (presumably) created two conflicting rules and/or policies (i.e., a rule or policy requiring a prisoner to physically possess on his person his written beard-exemption during a prison transfer and a rule or policy prohibiting the prisoner from physically possessing property on their person during a prison transfer), and (2) he had (presumably) failed to property instruct or train his subordinates as to how to resolve that conflict without violating the prisoner's rights. (*Id.*) Clearly, this is meant to assert that Defendant Goord was personally involved through the third and fourth means of personal involvement described above-(1) the creation, or allowed continuance, of a policy or custom under which the violation occurred, and/or (2) gross negligence in the managing or supervising of subordinates who caused the violation.

However, Defendants are correct that Plaintiff's deposition testimony contains no evidence of any other of the five sorts of personal involvement described above-(1) direct participation in the alleged constitutional violation, (2) a failure to remedy the violation after being informed of it through a report or appeal, or (3) the exhibition of deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. Therefore, having established this specific fact for purposes of their summary judgment motion, Defendants were entitled to have the fact either admitted by Plaintiff or denied by him with an accurate record citation. N.D.N.Y. L.R. 7.1(a)(3). Plaintiff denies the assertion. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)
(Cite as: 2008 WL 3884369 (N.D.N.Y.))

23.) However, the only "evidence" he cites in support of that denial are those portions of his Amended Complaint, Opposition to Defendants' Motion to Dismiss for Failure to State a Claim, and Objections to my previous Report-Recommendation, wherein he "charge[d]" Defendant Goord with "actions" and "inactions" causing Plaintiff's injuries. (*Id.*)

Such a general citation is not the "specific citation to the record where the factual issue arises" that is required by Local Rule 7.1(a)(3). As a result, the Court need not, and I recommend that it decline to, *sua sponte* sift through the 52 pages of Plaintiff's verified Objections to my previous Report-Recommendation in a quest for a specific factual assertion by Plaintiff that Defendant Goord was personally involved in one of the three ways described in the previous paragraph of this Report-Recommendation. (Among other things, the chance of Plaintiff having personal knowledge of such facts is extremely unlikely, in light of his other allegations.) Furthermore, Plaintiff's Opposition to Defendants' Motion to Dismiss does not constitute evidence because it was not verified. (Dkt.Nos.22.) Finally, his Amended Complaint generally may constitute evidence since it is verified. (Dkt. No. 9.) However, the portion of his Amended Complaint in which he refers to Defendant Goord (in a footnote in Paragraph "7.D.") is not sufficiently specific as to Defendant Goord's "actions and inactions" to constitute admissible evidence based on personal knowledge to successfully oppose a motion for summary judgment. *See* Fed.R.Civ.P. 56(e)(1) ("A supporting or opposing affidavit must be made on personal knowledge ...."); *see also, supra,* notes 33-34 of this Report-Recommendation.

***15** As a result, Plaintiff has effectively admitted the narrowed fact described above-that there contains no record evidence that Defendant Goord (1) directly participated in the alleged constitutional violation, (2) failed to remedy the violation after being informed of it through a report or appeal, or (3) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that constitutional violations were occurring. I will turn, then, to Plaintiff's theory that Defendant Goord was personally involved because he (1) created, or allowed to continue, a policy or custom under which the violation occurred, and/or (2) was grossly negligent in the managing or supervising of subordinates who caused the violation.

Plaintiff points to no admissible record evidence of a *DOCS-wide* rule or policy, created or promulgated by Defendant Goord, prohibiting the prisoner from physically possessing property on their person during a prison transfer. (Dkt. No. 48, at 17-18 [Pages 16 and 17 of Plf.'s Response Mem. of Law].) Nor does Plaintiff point to any admissible record evidence of a DOCS-wide rule or policy, created or promulgated by Defendant Goord, requiring a prisoner to physically possess *on his person* his written beard-exemption during a prison transfer. (*Id.*) [FN66] Nor does Plaintiff point to any record evidence that Defendant Goord failed to properly instruct or train his subordinates as to how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. (*Id.*) [FN67] The only "evidence" that Plaintiff has is (1) the fact of Defendant Goord's position as the "boss of Corrections," [FN68] and the (2) occurrence of the (presumed) violation in question. (*Id.*) This sort of liability (premised on the theory that a supervisor must have been liable because his subordinate did something wrong) is precisely the sort of *respondeat superior* liability that is not allowed under 42 U.S.C. § 1983.

FN66. I note that the written beard-exemption in question, issued by Deputy Commissioner Lucien J. Leclaire, Jr., on December 8, 2003, merely states, "This letter should be retained by you and will serve as your statewide beard and

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

mustache exemption permit.” (Dkt. No. 43, Part 6.)

FN67. For example, Plaintiff points to no admissible record evidence that incidents such as the one at issue in this action had previously occurred and been brought to Defendant Goord's attention, or that he had otherwise known of a need to instruct correctional officers on how to ascertain or confirm a prisoner's possession of a written beard-exemption during a prison transfer without violating the prisoner's rights. In addition, I note that defense counsel asked Plaintiff in his deposition, “Do you have any evidence or reason to believe that Commissioner Goord instructs Officers not to walk ten feet away to check a draft bag to determine if the permit is available in that draft bag [as Plaintiff asserts it was in this circumstance]” (Dkt. No. 43, Part 3, at 30 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].) In pertinent part, Plaintiff responded, “I don't know exactly what he instructs them....” (*Id.*)

FN68. (Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.].)

**2. Defendant Craft**

In their Rule 7.1 Statement, Defendants have asserted the following facts, in pertinent part: (1) “[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft was not] responsible for the conditions of the Ulster Correctional Facility SHU while [P]laintiff was in that SHU”; (2) “[f]rom March 12, 2004 until March 17, 2004, [Defendant Craft had no] interaction with [Plaintiff] while he was in the Ulster Correctional Facility SHU”; (3) “Plaintiff never spoke to [D]efendant Craft from March 12, 2004 until March 17, 2004”; (4) “Plaintiff did not write to [D]efendant Craft requesting to be released from the Ulster Correctional Facility SHU until March 17, 2004”; (5) “Defendant Craft never received [P]laintiff's March 17, 2004 letter”; and (6) “[o]n the same morning that [P]laintiff wrote to [D]efendant Craft, [P]laintiff was in fact released from the Ulster Correctional Facility SHU and was transported back to Wyoming Correctional Facility.” (Dkt. No. 43, Part 11, ¶¶ 14-15, 19-22 [Defs.' Rule 7.1 Statement].) Moreover, Defendants have supported each factual assertion with one or more accurate record citations. (*Id.*) FN69

FN69. In an apparent typographical error, I note that Defendants mistakenly cited Paragraphs 8 through 10, rather than Paragraph 11, of Defendant Craft's declaration in support of the first factual assertion listed above. (*See* Dkt. No. 43, Part 11, ¶ 15 [Defs.' Rule 7.1 Statement]; Dkt. No. 43, Part 8, ¶ 11 [Craft Decl .].)

***16** In his Rule 7.1 Response, Plaintiff states “[d]eny” with regard to each of the six factual assertions listed above. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶¶ 14-15, 19-22.) However, Plaintiff's assertions following each of these “denials” render the denials ineffective for purposes of Local Rule 7.1(a)(3), which requires that, in order to successfully controvert a fact asserted in a Statement of Material Facts, the non-movant must, among other things, (1) “specifically controvert[ ]” the facts in question, and/or (2) “set forth a specific citation to the record where the factual issue arises.” N.D.N.Y. L.R. 7.1(a)(3).

In particular, with regard to the first factual assertion, Plaintiff acknowledges that he “possesses no information or knowledge to respond [to that assertion].” (*Id.* at ¶ 15.) With regard to the second factual assertion, Plaintiff states

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

only that Defendant *O'Keefe* spoke to an unidentified correction officer in the Ulster C.F. S.H.U. on March 12, 2004, and in any event Plaintiff provides no record citation in support of this assertion. (*Id.* at ¶ 14.) With regard to the third factual assertion, he effectively *admits* that assertion, stating, "Plaintiff never spoke to Defendant Craft." (*Id.* at ¶ 19.) FN70 He also effectively admits the fourth factual assertion, stating that he did not write the letter in question until March 17, 2004. (*Id.* at ¶ 20.) FN71 With regard to the fifth factual assertion, he again acknowledges that he "possesses no information or knowledge to respond [to that assertion]." (*Id.* at ¶ 21.)

FN70. Apparently, Plaintiff takes issue with only the word "until" in the factual assertion contained in Paragraph 19 of Defendants' Rule 7.1 Statement, which he interprets as implying that Plaintiff did in fact speak to Defendant Craft on March 17, 2004. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 19.) If so, I find that this controversy can be eliminated by simply construing Defendants' factual assertion as reading "Plaintiff never spoke to [D]efendant Craft from March 12, 2004 *through* March 17, 2004," which is clearly the fact that Defendants are intending to assert. (*See* Dkt. No. 43, Part 3, at 28 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans.]; Dkt. No. 43, Part 8, ¶¶ 8-10 [Craft Decl.] .)

FN71. Again, apparently, Plaintiff takes issue with only part of the factual assertion in question, asserting that he addressed the letter to the "Lt./Hearing Officer," and not to Defendant Craft. (Dkt. No. 48, Plf.'s Rule 7.1 Response, ¶ 20.) If so, I find that he cites no record evidence controverting his deposition testimony that he *intended* the letter to go to Defendant Craft. (Dkt. No. 43, Part 3, at 45-47 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating, "I ... did write the Lieutenant Craft. I don't ... think at the time I remembered his name. But Sergeant O'Keefe did mention ... Lieutenant Craft.... I don't think I wrote Lieutenant Craft specifically. But, I did write [the letter to the] Lieutenant because I knew it was a Lieutenant."].) In any event, I find that any factual dispute about this narrow issue is immaterial, since the crux of Defendants' factual assertion is clearly that Plaintiff did not write a letter to Defendant Craft requesting to be released from the S.H.U. until March 17, 2004, *if ever.*

Finally, with respect to the sixth factual assertion, Plaintiff appears to take issue with only part of the factual assertion in question, asserting that he was not transported back to *Wyoming Correctional Facility* but was "placed on a DOCS bus toward *Auburn Correctional Facility."* (*Id.* at ¶ 22 [emphasis added].) For the sake of brevity, I will set aside the evidentiary insufficiency of the documents on the docket to which Plaintiff cites in support of partial denial. (*Id.*) Rather, I find that the limited fact that Plaintiff is denying is immaterial to Defendants' motion and thus can be disregarded by the Court.

As a result, pursuant to Local Rule 7.1(a)(3), the following five facts are undisputed for purposes of Defendants' motion: (1) from March 12, 2004, until March 17, 2004, Defendant Craft was not responsible for the conditions of the Ulster C.F. S.H.U. while Plaintiff was in that S.H.U.; (2) from March 12, 2004, until March 17, 2004, Defendant Craft had no interaction with Plaintiff while he was in the Ulster C.F. S.H.U.; (3) Plaintiff never spoke to Defendant Craft from March 12, 2004, through March 17, 2004; (4) Plaintiff did not write to Defendant Craft requesting to be released from the Ulster C.F. S.H.U. until March 17, 2004, if ever; (5) Defendant Craft never received Plaintiff's March 17, 2004, letter; and (6) on the same morning that Plaintiff wrote his March 17, 2004,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

letter, Plaintiff was in fact released from the Ulster C.F. S.H.U.

***17** Based on these undisputed facts, and based on the lack of record evidence establishing any involvement of Defendant Craft in the conditions of confinement that Plaintiff experienced in the Ulster C .F. S.H.U., I find that no rational fact-finder could conclude that Defendant Craft was personally involved in the Eighth Amendment violation alleged by Plaintiff.[FN72] I make the same finding with regard to Plaintiff's Fourteenth Amendment due process claim because (even assuming Plaintiff possessed a right of procedural due process arising from his six-day confinement in S.H.U.) he was afforded all the process that was due from Defendant Craft under the circumstances in that (1) no record evidence exists that Plaintiff did not properly receive notice of the Administrative Segregation Recommendation,[FN73] and (2) Plaintiff was entitled to a hearing only within *14 days* of Defendant O'Keefe's signing of the Administrative Segregation Recommendation on March 12, 2004.[FN74] However, I have trouble making the same finding with regard to Plaintiff's First Amendment retaliation claim, because record evidence exists that Defendant Craft was the individual who signed the Administrative Segregation Recommendation (submitted by Defendant O'Keefe on March 12, 2004) authorizing Plaintiff's confinement in S.H.U. pending a hearing to be conducted within 14 days of the recommendation.[FN75]

FN72. I note that, as I stated in Part III.B.2. of this Report-Recommendation, I know of no case law that imposes on a correctional official who charges an inmate with a disciplinary offense a duty to "check up" on that inmate once he is confined to administrative segregation, or that deems that official to be *reckless* if he fails to check up on that inmate.

FN73. (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, containing paragraph at bottom labeled, **"Notice to Inmate"**] [emphasis in original]; *cf.* Dkt. No. 43, Part 3, at 27-28, 45 [Ex. A to McCartin Decl., attaching Plf.'s depo. trans., stating that, before Plf. was brought to the Ulster C.F. S.H.U., Def. Craft orally informed Plf. to write to Def. Craft if he "wanted to get out of the box or not go in the box"].)

FN74. (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, stating, in pertinent part, "A hearing will be conducted within 14 days of this recommendation in accordance with the provisions of Part 254 of Chapter V."]; Dkt. No. 43, Part 8, ¶ 3 [Craft Decl.].) *See also* 7 N.Y. Comp.Codes R. & Regs. § 301.4(a) ("This hearing [conducted pursuant to Part 254] shall be conducted with 14 days of an inmate's admission to administrative segregation, after issuance of an administrative segregation recommendation made by the employee who ascertained the facts or circumstances.").

FN75. (Dkt. No. 9, at 18 [Ex. 1 to Plf.'s Verified Am. Compl., attaching copy of Administrative Segregation Recommendation of March 12, 2004, authored by Defendant O'Keefe, and authorized by Defendant Craft]; *cf.* Dkt. No. 9, ¶ 7[c] [Plf.'s Verified Am. Compl., asserting that Def. Craft "failed to ... see why I should not be sent to the Special Housing Unit [and] he never verified that I had or had not an exemption from cutting my beard...."]; Dkt. No. 43, Part 9, ¶ 8 [O'Keefe Decl., swearing, "After I contacted the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 26

Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)
(Cite as: 2008 WL 3884369 (N.D.N.Y.))

facility Watch Commander on March 12, 2004 and informed him of the circumstances, I was directed to have the plaintiff taken to SHU on administrative segregation status....”].)

For these reasons, I recommend, in the alternative, as follows: (1) that all of Plaintiff's claims against Defendant Goord be dismissed because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged; and (2) that only Plaintiff's Eighth and Fourteenth Amendment claims be dismissed against Defendant Craft because Plaintiff has failed to establish that he was personally involved in the constitutional violations alleged.

**E. Whether, in the Alternative, Plaintiff's Claims Against all Defendants Should Be Dismissed Because, Based on the Current Record, They Are Protected from Liability by the Doctrine of Qualified Immunity, as a Matter of Law**

Because I have already found that adequate grounds exist upon which to recommend the dismissal of Plaintiff's claims, the Court need not analyze Defendants' alternative argument that Plaintiff's claims against all Defendants should be dismissed because, based on the current record, Defendants are protected from liability by the doctrine of qualified immunity, as a matter of law. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) As a result, I do not analyze Defendants' argument other than to make one point.

In my Report-Recommendation of January 30, 2007, addressing Defendants' motion to dismiss for failure to state a claim, I stated, “I believe that a credible argument might be made by Defendants that the law [as to whether a DOCS-issued exemption from the one-inch beard rule was effective, or whether a court order was required] was not clearly established [on March 12, 2004], giving rise to a qualified immunity defense.” (Dkt. No. 24, at 31-32 & nn. 84-84.) As explained in that Report-Recommendation, I made that statement based on the case of *Young v. Goord,* in which the U.S. District Court for the Eastern District of New York traced the “alternat[ing]” law between November 16, 1993, and February 5, 2001, with regard to whether a DOCS “exemption” or a “court order” was necessary to excuse an inmate from the effects of DOCS' one-inch beard rule. *Young v. Goord,* 01-CV-0626, 2005 WL 562756, at *2-6 (E.D.N.Y. March 10, 2005), *aff'd,* 192 F. App'x 31 (2d Cir. Aug 2, 2006) (unpublished decision cited only to show case's subsequent history). In their argument regarding qualified immunity, Defendants have cited no case after *Young,* suggesting that the law continued to alternate after February 5, 2001. (Dkt. No. 43, Part 12, at 15-17 [Defs.' Mem. of Law].) [FN76] As a result, I have no reason to believe that that point of law was not clearly established by March 12, 2004.

FN76. Indeed, *Young* stated that the DOCS Directive issued on February 5, 2001, “remain[s] in force” as of the date of the decision, which was March 10, 2005. *Young,* 2005 WL 562756, at *6.

**F. Whether, in the Alternative, Plaintiff's Action Should Be Dismissed Under Local Rule 41.2(b) Because of His Failure to Keep the Court Apprised of His Current Address**

***18** Defendants argue that, in the alternative, Plaintiff's action should be dismissed under Local Rule 41.2(b) because (1) he was released from DOCS' custody on November 13, 2007, (2) since November 13, 2007, and the date of Defendants' motion, January 23, 2008, Plaintiff

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

had failed to notify the Court of his current address, and (3) this failure has caused the Court's mail to Plaintiff (specifically, the Court's receipt of Plaintiff's partial payment of the Court filing fee) to be returned as undeliverable on November 20, 2007. (Dkt. No. 43, Part 12, at 17-18 [Defs.' Mem. of Law]; Dkt. No. 43, Part 11, ¶ 26 [Defs.' Rule 7.1 Statement].) Defendants are correct in the above recitation of events. Indeed, an additional mailing from the Court to Plaintiff was returned as undeliverable on January 7, 2008, due to Plaintiff's failure to promptly notify the Court of his change in address upon release from DOCS. (Dkt.Nos.42.)

However, on January 17, 2008, Plaintiff resurfaced in the Bergan County Jail in Hackensack, New Jersey, and by letter notified the Court of his change in address. (Dkt. No. 45.) In his letter, Plaintiff explained that, immediately upon his release from DOCS, he was taken into custody by the Department of Homeland Security and "placed in [i]mmigration proceedings," wherein he was (allegedly) denied access to his legal work and materials necessary to write to the Court. (*Id.*) Plaintiff repeats these assertions in his sworn declaration in opposition to Defendants' motion. (Dkt. No. 48, Plf.'s Decl. in Opp., ¶¶ 2-4.) Defendants have submitted no reply to Plaintiff's response. In addition, I can find only minimal prejudice to the Court and Defendants due to Plaintiff's two-month delay, under the circumstances.

For these reasons, I find that Plaintiff's two-month failure to keep the Court notified of his current address is not an appropriate ground upon which to dismiss his Amended Complaint. Rather, Plaintiff's Amended Complaint should be dismissed for the reasons (and alternative reasons) discussed above in Parts III.A. through III.D. of this Report-Recommendation.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 43) be *GRANTED*.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance.** FN77

FN77. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec 'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by* *U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2008.
Barnes v. Craft
Not Reported in F.Supp.2d, 2008 WL 3884369 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Anthony SHULER, Plaintiff,
v.
BROWN, et al., Defendant.
**No. 07-CV-0937.**

March 23, 2009.

West KeySummary
**Civil Rights 78 1395(7)**

78 Civil Rights
78III Federal Remedies in General
78k1392 Pleading
78k1395 Particular Causes of Action
78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases

An inmate failed to state a § 1983 claim for a violation of his right to privacy. The inmate did not allege precisely what medical information he believed that his counselor had revealed to a corrections officer. Thus, the court could not determine from the face of the complaint whether the inmate suffered from an "unusual" condition that would be protected by his right to privacy. Moreover, the inmate did not allege that his condition, whatever it might be, was revealed to other inmates. 42 U.S.C.A. § 1983.

Anthony Shuler, Alden, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Charles J. Quackenbush, Esq., of Counsel, New York, NY, for Defendants.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

***1** This matter brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. George H. Lowe, United States Magistrate Judge, for a Report-Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). No objections to the February 2, 2009 Report-Recommendation have been raised. After examining the record, this Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, this Court adopts the Report-Recommendation for the reasons stated therein. Defendant's motion for judgment on the pleadings is GRANTED and Plaintiff's Complaint is DISMISSED.

IT IS SO ORDERED.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, filed pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Plaintiff Anthony Shuler alleges

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

that two employees of the New York State Department of Correctional Services ("DOCS") [FN1] violated his constitutional rights when one revealed statements he made during a counseling session and the other, based on that revelation, issued a misbehavior report that resulted in a 60-day disciplinary sentence. (Dkt. No. 1.)

FN1. Plaintiff's complaint also named DOCS as a defendant. (Dkt. No. 1 at ¶ I(B).) The Court dismissed DOCS as a defendant upon initial review of the complaint. (Dkt. No. 6.)

Currently pending is Defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) [FN2]. (Dkt. No. 16.) After Defendants filed the pending motion, Plaintiff requested a voluntary dismissal without prejudice. (Dkt. No. 19.) The Court denied that request. (Dkt. No. 21.) Plaintiff has not opposed the pending motion despite having been granted an extension of time to do so and being advised of the consequences of failing to do so. (Dkt. No. 21.) Because I find that Plaintiff's complaint fails to state a cause of action, I recommend that Defendants' motion for judgment on the pleadings be granted.

FN2. Defendants' memorandum of law suggests that the Court find the complaint "wholly insubstantial and frivolous" and dismiss it for lack of jurisdiction pursuant to Federal Rule of Civil Procedure 12(h)(3). (Dkt. No. 16-2 at 4-5.) That suggestion did not appear in the notice of motion, the title page of the memorandum of law, or the introduction to the memorandum of law. Accordingly, I decline Defendants' suggestion and will address Plaintiff's complaint solely under Federal Rule of Civil Procedure 12(c).

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

Liberally construed, the complaint alleges as follows:

On August 25, 2006, Plaintiff went to see his Mental Health Unit counselor, Defendant V. Brown. (Dkt. No. 1 at ¶ II(D).) Thereafter, Defendant Brown informed Defendant Sergeant R.J. Ballard that Plaintiff had behaved inappropriately toward her. (Dkt. No. 1 at 16.) On September 25, 2006, Defendant Ballard issued a misbehavior report. The report stated that when Defendant Ballard interviewed Plaintiff about Defendant Brown's allegations, Plaintiff "began yelling 'I'll do or say what I want to these females. I'm 41 years old and I'll do what I want.' " (Dkt. No. 1 at 10.) After a Tier III hearing on the misbehavior report, Plaintiff was sentenced to 60 days of keeplock along with loss of commissary, package and phone privileges. (Dkt. No. 1 at 17.)

On October 19, 2006, Plaintiff filed an inmate grievance. (Dkt. No. 1 at 8.) He complained that Defendant Brown had revealed the contents of their September 25, 2006, counseling session to Defendant Ballard. *Id.* He requested that Defendant Brown "take or retake a course in patient confidentiality." *Id.* He also asked "to have no future female as my counselor, since it makes me feel very uncomfortable to deal with the other sex on that level." *Id.* The grievance was denied. (Dkt. No. 1 at 16.)

***2** Plaintiff appealed his disciplinary sentence. (Dkt. No. 1 at 11-13.) On November 27, 2006, after Plaintiff had completed his keeplock sentence, DOCS reversed the disciplinary sentence. (Dkt. No. 1 at 15.)

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

In his complaint, Plaintiff alleges that Defendants violated his civil rights by violating his right to privacy and unlawfully detaining him in keeplock. (Dkt. No. 1 at ¶ II(D).) Liberally construed, Plaintiff's complaint raises a right-to-privacy claim against Defendant Brown and procedural and substantive due process claims against Defendant Ballard. Plaintiff requests $1 million in damages. (Dkt. No. 1 at ¶ V.)

**B. Summary of Grounds in Support of Defendants' Motion For Judgment on The Pleadings**

Defendants argue that (1) Plaintiff has not stated a right-to-privacy claim because he has not alleged that he suffers from a medical condition "unusual" enough to warrant privacy protection; (2) even if Plaintiff had alleged a cognizable privacy interest, the face of the complaint reveals that Defendant Brown's disclosure was reasonably related to legitimate penological interests; (3) the complaint fails to state a due process claim because the face of the complaint reveals that Plaintiff was granted a hearing and given the opportunity to rebut the charges against him [FN3]; and (4) they are entitled to qualified immunity. (Dkt. No. 16-2.) Because I find that the complaint fails to state a cause of action, I will not address Defendants' argument regarding qualified immunity.

FN3. Defendants devoted only a four-sentence footnote to their argument regarding Plaintiff's due process claims.

**II. ANALYSIS**

**A. First Basis for Dismissal: Facial Merit of Defendants' Unopposed Motion**

"Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the nonmoving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown." N.D.N.Y. L.R. 7.1(b)(3).

Here, Defendants' motion for judgment on the pleadings was properly filed, Plaintiff has failed to oppose it (despite being warned of the possible consequences of that failure), and Plaintiff has failed to show good cause why his failure to oppose Defendants' motion should not be deemed as consent to the granting of the motion. Therefore, I must determine whether Defendants have met their burden to "demonstrate entitlement to dismissal" under Rule 12(c). [FN4]

FN4. *See also* Fed.R.Civ.P. 7(b)(1) (requiring motions to, *inter alia,* "state with particularity the grounds therefor").

An inquiry into whether a movant has met its "burden to demonstrate entitlement" to dismissal under Local Rule 7.1[b][3] is a more limited endeavor than a review of a contested motion for judgment on the pleadings. Specifically, under such an analysis, the movant's burden has appropriately been characterized as "modest." [FN5] This is because, as a practical matter, the burden requires only that the movant present an argument that is "facially meritorious." [FN6]

FN5. *See, e.g., Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord, Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *see also Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing merely whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

FN6. *See, e.g., Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b] [3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted]; *accord, Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M .J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, 2007 WL 894375, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28-29 & n. 40 (N.D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458, 2007 WL 969576 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336, 2007 WL 189021 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

Here, I find that Defendants have met their lightened burden on their unopposed motion given Defendants' cogent, and legally supported, legal arguments set forth in their memorandum of law. (Dkt. No. 16.) I note that this Court has, on numerous occasions, granted motions to dismiss based on a similar facial analysis of a defendant's legal arguments (and a plaintiff's claims).[FN7]

FN7. *See, e.g., Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Local Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 96-CV-1269, 1997 U.S. Dist. LEXIS 16340, 1997 WL 640982, at *2 (N.D.N .Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-0989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.); *Munoz v. Coombe,* 95-CV-1191, 1996 U.S. Dist. LEXIS 15107, at *3 (N.D.N.Y. Aug. 21, 1996) (Hurd, M.J.), *adopted by* 95-CV-1191, 1996 U.S. Dist. LEXIS 15108, 1996 WL 589369, at *2

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

(N.D.N.Y. Oct. 11, 1996) (Pooler, J.) (rejecting plaintiff's objections, explaining that "Local Rule 7.1(b) permits the court to grant an unopposed motion"); *Owens v. Long,* 95-CV-0604, 1996 U.S. Dist. LEXIS 6520, at *2 (N.D.N.Y. March 11, 1996) (Hurd, M.J.), *adopted by* 95-CV-0604, 1996 U.S. Dist. LEXIS 4807 (N.D.N.Y. Apr. 10, 1996) (Pooler, J.).

***3** For these reasons, I recommend that the Court grant Defendants' motion for judgment on the pleadings.

**B. Alternative Basis for Dismissal: Substantive Merit of Defendants' Motion**

In the alternative, I recommend dismissal based on the sort of detailed scrutiny of Defendants' legal arguments that would be appropriate on a *conteste* d motion for judgment on the pleadings.

"The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enter. .,* 448 F.3d 518, 521 (2d Cir.2006). Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[FN8] or (2) a challenge to the legal cognizability of the claim.[FN9]

FN8. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN9. *See* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ( "There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8 [a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether*

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, 2004 WL 2613993, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, 2002 WL 313156, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN10] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN11] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN12]

FN10. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also* *Swierkiewicz,* 534 U.S. at 512 [citation omitted]; *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN11. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also* *Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN12. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord,* *Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g.,* *Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN13] However, it is well established that even this liberal notice pleading standard "has its limits." [FN14] As a result, several Supreme Court and Second Circuit decisions exist, holding that a pleading has failed to meet this liberal notice pleading standard.[FN15]

FN13. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN14. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN15. *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord, Dura Pharm.,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN16] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Rule 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

FN16. The Court in *Bell Atlantic* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Bell Atlantic,* 127 S.Ct. at 1969.

***4** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Rule 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id* .

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Bell Atlantic* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Bell Atlantic* ).[FN17] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN18]

FN17. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, 2008 WL 269100, at *14 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

FN18. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

It should be emphasized that Rule 8's plausibly standard, explained in *Bell Atlantic,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Rule 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Bell Atlantic*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Bell Atlantic,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN19] There must still be enough facts alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

FN19. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Bell Atlantic,* all that is required is "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN20] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*[FN21] In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN20. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN21. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

***5** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN22] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN23] Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN24] Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.[FN25] In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN26]

FN22. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN23. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN24. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN25. *Yang v. New York City Trans. Auth.,* 01-CV-3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN26. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]; *see, e.g., See Rhodes v. Hoy,* 05-CV-0836, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* 07-CV-0166, 2008 WL 3582743, at *2 (D.Vt. Aug.13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) [citations omitted]; *Hylton v. All Island Cob Co.,* 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* 00-CV-1309, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed), FN27 it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12. FN28 Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. FN29 Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." FN30

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN27. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN28. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN29. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN30. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

1. *Privacy*

a. *Cognizable privacy interest*

Plaintiff alleges that Defendants violated his right to privacy. (Dkt. No. 1 at ¶ II(D).) Defendants argue that Plaintiff has not stated a cause of action. (Dkt. No. 16-2 at 5-7.) Defendants are correct.

There is a constitutional right of privacy [FN31] that protects the individual interest against disclosure of personal matters such as one's medical condition. *Whalen v. Roe,* 429 U.S. 589, 598-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). In *Doe v. City of New York,* 15 F.3d 264 (2d Cir.1994), the Second Circuit applied *Whalen* to hold that individuals who are HIV positive "clearly possess a constitutional right to privacy regarding their condition."

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Second Circuit has extended this protection to prisoners. *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir.1999). These decisions do not create an absolute right of privacy regarding a prisoner's medical condition. Rather, the prisoner's privacy interest will vary with the prisoner's medical condition. *Id.* at 111; *Doe v. City of New York,* 15 F.3d at 267. This privacy interest is at its zenith when the prisoner suffers from an "unusual" condition, such as HIV or transsexualism, that is "likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others." *Powell,* 175 F.3d at 111. Courts have refused to recognize a protected privacy interest where a prisoner's medical condition is not "unusual." *Rodriguez v. Ames,* 287 F.Supp.2d 213, 220 (W.D.N.Y.2003). Courts have also refused to recognize a protected privacy interest where there is no evidence that a prisoner's condition was revealed to other inmates. *Leon v. Johnson,* 96 F.Supp.2d 244, 252 (W.D.N.Y.2000) [FN32].

FN31. The Supreme Court has ruled that "a right to privacy ... [is] derived from the Fourteenth Amendment or the 'penumbra' of other constitutional rights." *Webb v. Goldstein,* 117 F.Supp.2d 289, 296 (E.D.N.Y.2000) (citing *Whalen v. Roe,* 429 U.S. 589, 598 n. 23, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)).

FN32. Defendants have not cited, and the Court has not found, authority specifically addressing the standard to be applied where a prison mental health official allegedly reveals statements made by a prisoner during a counseling session. However, the logic underlying the disclosure-of-medical-condition cases-that prisoners have a reduced right to privacy that arises only in unusual situations, such as those that implicate a prisoner's safety-is applicable here.

***6** Here, Plaintiff has not alleged precisely what medical information he believes Defendant Brown revealed. He states that "the contents" of his August 25, 2006, session with Brown were disclosed and that "the information released was not a threat to the facility, staff or the inmate population." (Dkt. No. 1 at 8.) Thus, this Court cannot determine from the face of the complaint whether Plaintiff suffers from an "unusual" condition that would be protected by his right to privacy. Moreover, Plaintiff does not allege that his condition, whatever it may be, was revealed to other inmates. Therefore, Plaintiff has not alleged a cognizable privacy interest.

b. *Legitimate penological interest*

Even if Plaintiff had alleged a cognizable privacy interest, his right to privacy claim would be subject to dismissal for failure to state a claim because the face of the complaint reveals that Defendant Brown had a legitimate penological interest in revealing information from her counseling session with Plaintiff.

Prison officials may reveal a prisoner's medical condition, even an "unusual" medical condition that is protected by the zenith of the prisoner's right to privacy, if the disclosure is "reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112. A court can determine whether a prison official's actions were "reasonably related to legitimate penological interests" on a motion to dismiss. See e.g. *Webb v. Goldstein,* 117 F.Supp.2d 289 (E.D.N.Y.2000).

Here, the face of the complaint reveals that Defendant Brown had legitimate penological reasons for revealing information from her session with Plaintiff. During the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

session with Defendant Brown, Plaintiff allegedly engaged in "inappropriate sexual behavior/conduct." (Dkt. No. 1 at 10.) Reporting this incident to a correctional officer was reasonably related to the legitimate penological interest of protecting prison personnel from potential threats. See e.g. *Choice v. Coughlin,* No. 94 Civ. 8307, 1996 WL 325627 (S.D.N.Y. June 11, 1996) (prisoner's letter regarding his romantic feelings for a civilian medical employee at prison was "fundamentally inconsistent with the legitimate penological interests of the facility" because it presented "a potential threat to the safety and security of [the employee] and other prison staff.").

Therefore, it is recommended that Plaintiff's cause of action for invasion of his right to privacy be dismissed.

2. *Due Process*

Plaintiff does not explicitly allege that Defendants violated his due process rights. However, the complaint states that Defendant Ballard "wrote up a fabricated misbehavior report that led to me being sentenced to 60 days of keeplock." (Dkt. No. 1 at ¶ II(D).) Liberally construing the complaint, I have deemed this to be a claim that Defendants violated Plaintiff's procedural and substantive due process rights.

a. *Procedural due process*

In order to state a claim for violation of his procedural due process rights, Plaintiff must allege facts plausibly suggesting that (1) he was deprived of a liberty interest; (2) without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

***7** As Defendants note, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)); *accord, Pittman v. Forte,* 01-CV-0100, 2002 WL 31309183, *5 (N.D.N.Y. July 11, 2002) (Sharpe, M.J.). The only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is where the false accusation is based on something such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 WL 965345, at *8 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted]. Here, Plaintiff does not claim that the misbehavior report was issued in retaliation for Plaintiff's exercise of a constitutional right. Accordingly, the complaint does not state a claim for a procedural due process violation based on the filing of an allegedly false misbehavior report.

The complaint could also be construed as stating a procedural due process claim based on the length of Plaintiff's keeplock detention. Although Defendants did not address this claim, I will do so *sua sponte* under 28 U.S.C. § 1915(e)(2). An inmate has a liberty interest in remaining free from a confinement or restraint where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular confinement or restraint; and (2) the confinement or restraint imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). Regarding the first prong of this test, "[i]t is undisputed ... that New York state law creates a liberty interest in not being confined to the SHU [FN33]." *Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004). The issue, then, is whether Plaintiff's keeplock confinement imposed "an atypical and significant hardship on [him] in relation to the ordinary

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

incidents of prison life."

FN33. Although keeplock confinement and SHU confinement are not identical detention statuses, the Second Circuit has applied the same procedural due process analytical framework to both. See e.g. *Palmer v. Richards,* 364 F.3d 60, 66-67 (2d Cir.2004).

In the Second Circuit, determining whether a disciplinary confinement constituted an "atypical and significant hardship" requires examining "the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions and the duration of the disciplinary segregation compared to discretionary confinement." *Palmer,* 364 F.3d at 64. Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions [FN34]." *Palmer,* 364 F.3d at 65. For confinements of an "intermediate duration-between 101 and 305 days-development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer,* 364 F.3d at 64-65. Disciplinary segregation lasting more than 305 days implicates a protected liberty interest even if served under "normal" SHU conditions because a term of that length is a "sufficient departure from the ordinary incidents of prison life." *Palmer,* 364 F.3d at 65 (quoting *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir.2000)).

FN34. "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir.2004).

***8** Here, Plaintiff alleges that he served 60 days in keeplock. Accordingly, a protected liberty interest is implicated only if Plaintiff was confined under conditions "more severe" than "normal" SHU conditions. Plaintiff has alleged no such conditions. Compare *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1999) (plaintiff alleged that while in the SHU he received "inadequate amounts of toilet paper, soap and cleaning materials, a filthy mattress, and infrequent changes of clothes); *Palmer,* 364 F.3d at 66 (plaintiff alleged that he suffered unusual SHU conditions such as being deprived of his property, being mechanically restrained whenever he was escorted from his cell, and being out of communication with his family); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (plaintiff alleged that he was confined to his cell for 24 hours a day, not permitted to shower for weeks at a time, denied hygiene products, and denied utensils); *Wheeler v. Butler,* 209 F.App'x 14 (2d Cir.2006) (plaintiff alleged that he was denied the use of his hearing aids during his SHU confinement). Therefore, Plaintiff has not sufficiently alleged that his confinement in keeplock deprived him of a protected liberty interest.

District courts in the Second Circuit are split on whether a prisoner can state a procedural due process cause of action when he alleges that he served less than 101 days in the SHU but does not allege conditions more severe than normal SHU conditions. Compare *Gonzalez-Cifuentes v. Torres,* No. 9:04-cv-1470 GLS/DRH, 2007 WL 499620, at * 3 (N.D.N.Y. Feb.13, 2007) ("The Second Circuit has held that at least where the period of confinement exceeded thirty days, refined fact-finding is required to resolve defendants' claims under *Sandin.* No such fact-finding can occur ... on a motion to dismiss") and *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ("Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions ... However, such detailed factual allegations are not necessary to withstand a motion to dismiss ... Since Smart has alleged that she was confined for seventy days,

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

she has met her burden in alleging the deprivation of a protected liberty interest") with *Alvarado v. Kerrigan,* 152 F.Supp.2d 350 (S.D.N.Y.2001) (granting motion for judgment on the pleadings where prisoner's allegations about the conditions of his 93-day SHU confinement failed to "elevate his confinement to the level of deprivation required under *Sandin* ); *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at *7 (S.D.N.Y. Dec.2, 2004) (granting motion to dismiss with leave to amend because plaintiff's "due process claim arising out of two months' confinement in the SHU ... cannot survive the *Sandin* test absent further allegations") *Tookes v. Artuz,* No. 00 Civ. 4969 RCC HBP, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("No such additional egregious circumstances are pled here. Indeed, the complaint is devoid of any allegations regarding the circumstances of plaintiff's confinement. Nor has [plaintiff] responded to the defendants' motion in order to provide further detail. Therefore, dismissal of plaintiff's due process claims is appropriate"); and *Prince v. Edwards,* No. 99 Civ. 8650, 2000 WL 633382, at *5 (S.D.N.Y. May 17, 2000) (dismissing case with prejudice where the complaint contained "no allegations whatever regarding the conditions of [prisoner's 66-day] confinement."). The Second Circuit has never addressed this issue directly [FN35].

FN35. While the Second Circuit has stated that "development of a detailed record will assist appellate review" of SHU cases and that "development of a detailed record of the conditions of the confinement relative to ordinary conditions is required," it has done so only in cases involving "intermediate" SHU confinements of 101 to 305 days. *Colon,* 215 F.3d at 232; *Palmer,* 364 F.3d at 64-65. Even in this "intermediate" context, where a detailed record is "required," the Second Circuit has not remanded a case for further development of the record absent an allegation of severe SHU conditions. For example, in *Iqbal v. Hasty,* 490 F.3d 143 (2d Cir.2007), the plaintiff was confined to a super-restrictive housing unit for six months. He sued, arguing in part that his procedural due process rights were violated. The defendants moved to dismiss. The district court denied the motion, finding that the plaintiff had alleged the deprivation of a liberty interest. The defendants brought an interlocutory appeal. The Second Circuit affirmed, finding that "the Plaintiff's confinement of more than six months fell in the intermediate range, thereby requiring inquiry into the conditions of his confinement, which he *sufficiently alleges* to have been severe." *Iqbal,* 490 F.3d at 163 (emphasis added).

***9** The undersigned agrees with the *Alvarado, Sales, Tookes,* and *Prince* courts that a motion to dismiss can be granted where a prisoner who served less than 101 days in the SHU alleges that his procedural due process rights were violated but does not allege conditions more severe than normal SHU conditions. The undersigned adopts this view for two reasons. First, as discussed at length above, Rule 8 requires that a complaint include factual allegations that raise a right to relief above the speculative level to the plausible level. Where a prisoner contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory is purely speculative. Second, the Second Circuit's manner of reviewing motions to dismiss in SHU confinement cases suggests that dismissal is the better course. In its cases, the Second Circuit has focused on the *content* of the prisoner's allegations regarding SHU conditions rather than establishing a bright-line rule that a determination of whether conditions were "atypical and significant" cannot be resolved on a Rule 12(b)(6) motion. For example, in *Ortiz,* the district court granted the

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendants' motion to dismiss a case in which a prisoner complained of a 90-day SHU confinement. The Second Circuit reversed, not because the *Sandin* issue can never be decided at the motion to dismiss stage, but because *the prisoner had alleged the existence of "conditions in SHU far inferior to those prevailing in the prison in general."* *Ortiz,* 380 F.3d at 655 (emphasis added). Plaintiff's bare allegation that his procedural due process rights were violated by his 60-day keeplock confinement is insufficient to state a claim. Therefore, I recommend that Plaintiff's procedural due process claim be dismiss with leave to amend.

b. *Substantive due process*

Given the special solicitude due to *pro se* civil rights plaintiffs, I have deemed the complaint to include a substantive due process claim and will address it *sua sponte* under 28 U.S.C. § 1915(e)(2). Defendants have not addressed any possible substantive due process claim.

"Substantive due process protects individuals against government action that is arbitrary, ... conscience-shocking, ... or oppressive in a constitutional sense, ... but not against constitutional action that is incorrect or ill-advised." *Lowrance v. Achtyl,* 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citations omitted). Very few conditions of prison life are "shocking" enough to violate a prisoner's right to substantive due process. In *Sandin,* the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs. *Sandin,* 515 U .S. at 479 n. 4, 484. Courts have also noted that a prison official's refusal to obey a state court order to release a prisoner from disciplinary confinement may violate the prisoner's right to substantive due process. *Johnson v. Coughlin,* No. 90 Civ. 1731, 1997 WL 431065, at *6 (S.D.N.Y. July 30, 1997); *Arce v. Miles,* No. 85 Civ. 5810, 1991 WL 123952, at *9 (S.D.N.Y. June 28, 1991).

***10** Plaintiff's complaint does not allege facts plausibly suggesting that Defendants' actions were arbitrary, conscience-shocking or oppressive in the constitutional sense. As discussed above, the complaint does not indicate that Plaintiff was held in unusual keeplock conditions. Moreover, Plaintiff does not allege that Defendants refused to obey a state court order to release him from disciplinary confinement. Therefore, the complaint fails to state a claim for violation of Plaintiff's right to substantive due process and I recommend that the claim be dismissed with leave to amend.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for judgment on the pleadings (Dkt. No. 16) be ***GRANTED*** with leave to amend.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [FN36]

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN36. *See, e.g.,* *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at *18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; *see also* *Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by* *U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

N.D.N.Y.,2009.
Shuler v. Brown
Slip Copy, 2009 WL 790973 (N.D.N.Y.)

END OF DOCUMENT

© 2009 Thomson Reuters. No Claim to Orig. US Gov. Works.